# EXHIBIT A

Case 1:04-cv-00582-GMS   Document 60-2   Filed 08/15/2005   Page 1 of 13

Westlaw.

Not Reported in B.R.                                                                                                    Page 1

Not Reported in B.R., 2001 WL 1820323
**(Cite as: Not Reported in B.R.)**

▷
Not Reported in B.R., 2001 WL 1820323
Only the Westlaw citation is currently available.
United States Bankruptcy Court, D. Delaware.
In re: CHERRYDALE FARMS, INC., et al.,
Debtors.
THE OFFICIAL COMMITTEE OF UNSECURED
CREDITORS FOR THE USE AND BENEFIT OF
THE BANKRUPTCY ESTATE OF
CHERRYDALE FARMS, INC., Plaintiff,
v.
Jerry BROWN, Defendant.
**No. 99-597(PJW).**

Feb. 20, 2001.

Michael F. Bonkowski , Mark Minuti , J. Kate Stickles , Saul Ewing LLP , Wilmington, DE, J. Scott Victor , Jeremy W. Ryan , Saul Ewing LLP , Philadelphia, PA, for Jerry Brown.
Edwin J. Harron , Young Conaway Stargatt & Taylor, LLP , Wilmington, DE, Mark C. Kopec , Whiteford, Taylor & Preston LLP, Baltimore, Maryland, for the Official Committee of Unsecured Creditors.

MEMORANDUM OPINION

WALSH , Bankruptcy J.
*1 Before the Court is the motion (Doc. # 11) for summary judgment by defendant Jerry Brown ("Brown") and the cross motion (Doc. # 14) for summary judgment by plaintiff the Official Committee of Unsecured Creditors for the Use and Benefit of the Bankruptcy Estate of Cherrydale Farms, Inc. ("Committee"). At issue is whether the " ordinary course of business" defense applies to an otherwise preferential $50,000.00 sales commission Brown received from the debtor, Cherrydale Farms, Inc. ("Cherrydale" or "Debtor"). For the reasons discussed below, I will grant summary judgment in favor of Brown.

BACKGROUND

Cherrydale is a supplier of candy and gift items to the fundraising market. It filed a voluntary chapter 11 petition on March 15, 1999. Brown was one of Cherrydale's salespersons. On February 24, 1999, Cherrydale paid Brown $50,000 as a sales commission. On September 2, 1999, the Committee filed this adversary proceeding to recover the payment as a preferential transfer pursuant to §§ 547 and 550. FN1

> FN1. Unless otherwise indicated, all references to " § ___" are to a section of the Bankruptcy Code, 11 U.S.C. § 101 *et. seq.*

Brown submitted two affidavits, one from himself and the other from Howard Lightstone, the Chief Financial Officer ("CFO") of R & R Operating Partnership, d/b/a Cherrydale Farms, Inc. (" Lightstone Aff."). Howard Lightstone has held this post since 1999. He previously served as Cherrydale's CFO from 1986 to 1994. Cumulatively, he has worked in the industry for 10 years. The affidavits establish the following.

Brown has been a salesperson for Cherrydale since 1990. He has worked in the fund raising and candy industry for approximately 25 years. Cherrydale pays its salespeople on a commission basis. It considers commissions earned as each sale is made but does not pay on commissions until it receives money from the customer. Sales occur throughout the year, but most of its sales are in September through December.

Cherrydale pays salespeople twice a year on earned commissions, once in July which is the end of its fiscal year ("Year End Payment") and once at the beginning of the calendar year between January and March ("First Half Payment"). It also pays a salaried draw. Cherrydale determines the Year End

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R.                                                                                              Page 2
Not Reported in B.R., 2001 WL 1820323
**(Cite as: Not Reported in B.R.)**

Payment by calculating total sales and gross commissions earned for each salesperson. From this total, it subtracts various expenses, the total of salaried draws and any commission payment already received.

Cherrydale calculates the First Half Payment as follows. First, it determines the total commissions earned by the salesperson. It then subtracts the total salaried draws for the fiscal year (year to date and projected), expenses, and earned commissions for which customers have not yet paid Cherrydale. The balance serves as the maximum amount of the First Half Payment. Within this formula limit, each salesperson determines the actual amount of the First Half Payment received.

Brown requested and received First Half Payments since he began working for Cherrydale. He also received First Half Payments from his previous employer, who was Cherrydale's predecessor. In 1999 and 1998, Brown requested and received a First Half Payment of $50,000. In 1997, his First Half Payment was $30,000. In 1996 it was $25,000. Brown attributes the increase to an increase in his sales volumes and commissions. He bases the amount of his request in part on tax considerations.

*2 Brown states Cherrydale ordinarily pays First Half Payments to its salespeople. Based on his years of experience, Brown also states such payment terms are ordinary within the industry. Cherrydale's CFO, Howard Lightstone, agrees.

According to Lightstone, the First Half Payment is a payment that Cherrydale salespeople receive in the ordinary course of business. "Indeed," he states, "it would be difficult for Cherrydale to retain is [sic] sales force if Cherrydale refused to make such First Half Payments and instead refused to pay salespeople money they have rightfully earned. Also, based upon my years of experience with Cherrydale, my familiarity with Cherrydale's industry, my conversations with other salespeople and executives within Cherrydale's industry, such First Half Payments are part of the ordinary business terms in Cherrydale's industry." Lightstone Aff. at 3-4, ¶¶ 21-22.

Brown moves for summary judgment under § 547(c)(2). Section § 547(c)(2) prevents avoidance of an otherwise preferential transfer to the extent the transfer was made

   (A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee;
   (B) made in the ordinary course of business or financial affairs of the debtor and the transferee; and
   (C) made according to ordinary business terms.
   11 U.S.C. § 547(c)(2)(A)-(C).

He argues that, even if the First Half Payment is otherwise a preference under § 547(b), it is not avoidable because Cherrydale made the transfer on account of a debt incurred and paid in its ordinary course of business with Brown. He also claims Cherrydale paid according to the ordinary business terms in its industry.

The Committee disputes that § 547(c)(2) applies. It argues that the discretionary nature of the First Half Payments and Cherrydale's practice of not finalizing commission obligations until the end of its fiscal year suggests it did not make the transfer in the ordinary course of business. The Committee also argues that Brown failed to offer evidence of an industry standard exclusive of his dealings with Cherrydale, a defect the Committee claims is fatal to Brown's § 547(c)(2) defense.

The Committee moves for summary judgment in its favor. It claims Cherrydale undisputedly made the First Half Payment during the ninety-day prepetition period and that the transfer is clearly preferential. It offers the amount of the First Half Payment as further proof of Brown's favored treatment, an amount the Committee argues equals the highest early commission payment Brown ever sought and over twice what he sought just a few years before.

DISCUSSION

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R.    Page 3
Not Reported in B.R., 2001 WL 1820323
**(Cite as: Not Reported in B.R.)**

material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); FN2 *Anderson v.. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2509-10 (1986) ; *Showalter v. Univ. of Pittsburgh Med. Ctr.,* 190 F.3d 231, 234 (3d Cir.1999). In making this determination, I view the facts "in the light most favorable to the nonmoving party and draw all inferences in that party's favor." *Showalter,* 190 F.3d at 234 *quoting Armbruster v. Unisys Corp.,* 32 F.3d 768, 777 (3d Cir.1994).

> FN2. Fed.R.Bank.P. 7056 makes Fed.R.Civ.P. 56 applicable to adversary proceedings in bankruptcy.

*3 A party opposing a motion for summary judgment "may not rest upon the mere allegations or denials of his pleading, but ... must set forth specific facts showing that there is a genuine issue for trial." *Liberty Lobby,* 477 U.S. at 248, 106 S.Ct. at 2510 *quoting* Fed.R.Civ.P. 56(e). Thus, although the movant has the burden of showing that there is no genuine issue of fact, the nonmovant is "not thereby relieved of his own burden of producing in turn evidence that would support a jury verdict." *Id.* at 256, 106 S.Ct. at 2514.

To fall within the § 547(c)(2) exception, Brown must prove by a preponderance of the evidence that Cherrydale incurred the debt in the ordinary course of its business with Brown; that it was ordinary as between the parties; and ordinary in the industry examined as a whole. 11 U.S.C. § 547(g) ; *In re Midway Airlines, Inc.,* 69 F.3d 792, 797 (7th Cir.1995).

The Committee does not genuinely dispute the initial element and it seems clear to me that Cherrydale incurred the First Half Payment in the ordinary course of its dealings with Brown. The gist of the Committee's argument focuses on the second and third elements of § 547(c)(2). Section 547(c)(2)(B) sets forth a "subjective" test relating solely to the dealings between the parties. *SEC v. First Jersey Sec. (In re First Jersey Sec.),* 180 F.3d 504, 512 (3d Cir.1999). Section 547(c)(2)(C) sets forth an "objective" test relating to the billing practices generally within the relevant industry. *Fiber Lite Corp. v. Molded Acoustical Prod. (In re Molded Acoustical Prod.),* 18 F.3d 217, 224 (3d Cir.1994).

The inquiry under the subjective test is whether the transfer was ordinary as between Brown and Cherrydale. To qualify, the First Half Payment must be consistent with Brown and Cherrydale's prior business dealings. *J.P. Fyfe, Inc. of Florida v. Bradco Supply Corp.,* 96 B.R. 474, 476-77 (D.N.J.1998) *aff'd* 891 F.2d 66 (3d Cir.1989). It need not, however, possess a rigid similarity to each past transaction. *Id.* Furthermore, "[t]he transaction need not have been common; it need only be ordinary. A transaction can be ordinary and still occur only occasionally." *Id.* at 477 *quoting In re Economy Milling Co.,* 37 B.R. 914, 922 (D.S.C.1983). The disputed transfer must nevertheless be comparable to prior transactions so as not to indicate a significantly adverse change in the Debtor's liquidity. *Id.*

The inquiry under the objective test of § 547(c)(2)(C) is whether Cherrydale made the First Half Payment according to ordinary business terms. " '[O]rdinary business terms' refers to the range of terms that encompasses the practices in which firms similar in some general way to the creditor in question engage, and that only dealings so idiosyncratic as to fall outside that broad range should be deemed extraordinary and therefore outside the scope of subsection C." FN3 *Molded Acoustical,* 18 F.3d at 224 *quoting In re Tolona Pizza Prod.,* 3 F.3d 1029, 1033 (7th Cir.1993). The Third Circuit permits a greater departure from the range of normal industry terms based on the duration of the pre-insolvency relationship between the debtor and creditor. *Id.* at 224-25. Thus, "the more cemented (as measured by its duration) the pre-insolvency relationship between the debtor and creditor, the more the creditor will be allowed to vary its credit terms from the industry norm yet remain within the safe harbor of § 547(c)(2)." *Id.* at 225.

> FN3. The Court of Appeals for the Third Circuit substitutes "unusual" for "

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R.                                                                                                 Page 4
Not Reported in B.R., 2001 WL 1820323
**(Cite as: Not Reported in B.R.)**

idiosyncratic" but otherwise fully endorses this definition. *Molded Acoustical,* 18 F.3d at 224.

*4 Applying these standards, I conclude that Cherrydale made the First Half Payment in the ordinary course of its business with Brown. I also conclude Cherrydale made the payment according to the ordinary business terms in its industry.

Brown enjoyed an enduring and stable pre-insolvency relationship with Cherrydale. During this time, like other salespeople, Brown routinely received salaried draws, First Half Payments and Year End Payments. His 1999 and 1998 First Half Payments were for the same amount. The increase of the draws from $25,000 to $50,000 over four years is consistent with increased earnings. It is not so extraordinary as to suggest Brown manipulated his draw in anticipation of Cherrydale's financial decline.

I do not find the fact Brown based the amount of his First Half Payment on tax considerations relevant. Brown's draw against his earned commissions at the beginning of the calendar year strikes me as a normal practice given that Cherrydale's sales occur mostly in September through December and that its fiscal year ends in July. There is no evidence to suggest Brown used economic pressure to exert an unusually large payment, or somehow procured an unfair advantage from Cherrydale over other creditors. A comparison of the timing of the First Half Payment to the past payment history between the parties shows Cherrydale made the 1999 payment according to a long standing practice, i.e., it was business as usual between the parties.

I do not believe Brown's discretion in determining the amount of the First Half Payment is probative of whether the payment is in the ordinary course of his dealings with Cherrydale. The relevant inquiry is whether Cherrydale has an established practice of making such payments, discretionary or otherwise. *Accord Waldschmidt v. Ranier (In re Fulghum Constr. Corp.),* 872 F.2d 739, 743 (6th Cir.1989) (" Even if the debtor's business transactions were irregular, they may be considered 'ordinary' for purposes of § 547(c)(2) if those transactions were consistent with the course of dealings between the particular parties").

The Committee seems to infer that the First Half Payment is an unearned advance akin to a loan because Cherrydale does not finalize actual commissions due until the end of its fiscal year. Even if this distinction is relevant for purposes of § 547(c)(2), I disagree with the characterization. It seems to me that the formula used to calculate the maximum available draw at the beginning of the calendar year actually ensures that the First Half Payment does not exceed earned commissions on sales for which Cherrydale was paid by its customers, adjusted downward for expenses and salary advances. Thus, the First Half Payment is a draw on earned commissions, not an advance on projected earnings. If Brown had terminated employment immediately after receiving his First Half Payment, he would have been entitled to keep the payment in full. Accordingly I find no merit in the Committee's argument that Cherrydale's practice of finalizing commission calculations in July renders the First Half Payment outside the ordinary course of business.

*5 Turning to the objective standard of § 547(c)(2)(C), I find the undisputed evidence establishes that the First Half Payment was made according to ordinary business terms. The Committee argues that Brown produced no evidence of the relevant industry standard. I disagree. Brown submitted an affidavit from Cherrydale's CFO with many years of experience with Cherrydale and within the industry. I cannot think of a better witness. At trial, the CFO would be qualified to testify on the subject matter, regarding both the industry standard in terms of competitor practices and the practice between the parties. Here, the CFO stated that based on his direct knowledge, draws on earned commissions such as the First Half Payment are standard in the industry.

The Committee has offered no contrary evidence. It does not even allege that the industry standard is something other than that described in the affidavits. The Committee cannot survive Brown's properly supported summary judgment motion by resting on mere allegations or denials; it must set

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R. Page 5
Not Reported in B.R., 2001 WL 1820323
**(Cite as: Not Reported in B.R.)**

forth specific facts showing that there is a genuine issue for trial. Fed.R.Civ.P. 56(e). Because Brown's affidavits are unrebutted, I find them sufficient to establish the relevant industry standard. *See Unsecured Creditors' Comm. v. CBA Indus. (In re Color Tile, Inc.),* 239 B.R. 872, 874 (Bankr.D.Del.1999) (finding creditor's undisputed affidavits sufficient to establish industry standard); *accord McCord v. Venus Foods, Inc. (In re Lan Yik Foods Corp.),* 185 B.R. 103, 114-15 (Bankr.E.D.N.Y.1995) (finding that creditor established elements of § 547(c)(2) and noting that " self-serving testimony may suffice to prove what ' ordinary business terms' are for a particular industry when there is no evidence to the contrary").

The Committee also argues that Brown's failure to offer evidence of an industry standard exclusive of the parties' course of dealings is fatal to his " ordinary course of business" defense. FN4 I am not persuaded that the cases on which the Committee relies are relevant here. *See Sacred Heart Hosp. of Norristown v. E.B. O'Reilly Servicing Corp. (In re Sacred Heart Hospital of Norristown),* 200 B.R. 114 (Bankr.E.D.Pa.1996) ; *Official Comm. Of Unsecured Creditors v. Sabrina (In re RML, Inc.),* 195 B.R. 602 (Bankr.M.D.Pa.1996).

> FN4. As indicated above, to the extent the Committee attacks the *sufficiency* of Brown's evidence, I find Howard Lightstone's unrebutted affidavit on ordinary business terms within Cherrydale's industry adequate.

At issue in both *Sacred Heart Hospital* and *RML, Inc.* is the question of which industry standard establishes "ordinary business terms" where two possible industry standards exist-that of the creditor or that of the debtor. This issue arises where the creditor is a supplier or trade creditor of the debtor. The emerging legal view is that § 547(c)(2)(C) requires objective proof that the disputed payments are "ordinary" in relation to the prevailing standards in the *creditor's* industry. *Midway Airlines,* 69 F.3d at 799. As a practical matter, this prevents the creditor from satisfying § 547(c)(2)(C) indirectly by using its own relationship with the debtor to prove the existence of a unified industry standard. *Id.* at 797. Because courts following this view require the creditor to reference some external data, usually relating to the practices of its competitors, the creditor's failure to proffer evidence exclusive of its own course of dealing with the debtor is fatal.

*6 In *Sacred Heart Hospital,* for example, the creditor, a heating, ventilation and air-conditioning contractor at the debtor's hospital, attempted to establish "ordinary business terms" by relying solely on evidence of its business relationship with hospitals. 200 B.R. at 115-16. The court found this inadequate. It held that the proper focus under § 547(c)(2)(C) was on ordinary business terms within the *creditor's* industry, not within that of the debtor. *Id.* at 118-19. Accordingly, it held the contractor failed to meet its burden under § 547(c)(2) because the creditor had confined its objective evidence to only the debtor's industry. *Id.* at 119; *accord In re RML, Inc.,* 195 B.R. at 616 (holding that creditor's failure to proffer evidence exclusive of parties' course of dealing fatal under § 547(c)); *see also Lawson v. Ford Motor Co. (In re Roblin Indus.),* 78 F.3d 30, 43 (2d Cir.1996) ("[T]he behavior of the parties cannot be sufficient in and of itself to sustain the creditor's burden of proof with respect to ordinary business terms in the industry").

The question of which industry standard to apply, however, does not arise where the creditor and debtor are in the same industry. This is, of course, the case where the creditor is the debtor's employee. Both parties are within the same industry, i.e., that of the employer. Thus, where the debtor is the employer, the only relevant industry is that of the debtor. It follows that the employee as creditor may establish "ordinary business terms" under § 547(c)(2)(C) in reference to the debtor's industry.

Because there is only one industry at issue in the present controversy, I do not believe the evidentiary concerns in *Sacred Heart Hospital* or *RML, Inc.* are relevant here. Brown's evidence in the form of the CFO's affidavit references compensation terms other than his own in Cherrydale's industry. This suffices for § 547(c)(2)(C) under the facts of this case. My conclusion comports with the case I find most analogous to Brown's situation, *NIMI Sys .,*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R.                                                                                          Page 6
Not Reported in B.R., 2001 WL 1820323
**(Cite as: Not Reported in B.R.)**

*Inc. v. Pillard (In re NIMI Sys., Inc.),* 179 B.R. 357 (Bankr.D.D.C.1995).

In *NIMI Systems,* the creditor, an executive employee of the debtor, received an annual bonus at the end of the calendar year but had the right to take draws against the bonus beginning in May. 179 B.R. at 363. The employee received four bonus draws totaling $6,666 in the 90 days preceding his employer's bankruptcy. *Id.* at 371. In the resulting preference action, the employee raised the " ordinary course of business" defense.

After concluding that the employee established the first two elements of the defense, the court held that the debtor paid the bonus draws according to ordinary business terms under § 547(c)(2)(C). The court reasoned that "[b]onuses are paid by well established companies in the industry on a monthly, quarterly or yearly basis. It follows that a bonus plan finally calculated at year-end and partially payable by way of a set draw amount on each of the two pay periods in a month is not so at variance with the range of payment terms prevailing in the industry such as to be non-ordinary business terms." *In re NIMI Sys.,* 179 B.R. at 373. The court noted it "heard exceedingly weak evidence of the ordinary payment terms prevailing in the entire industry," but was nevertheless satisfied based on the employee's " work experience at other firms and the offers he received from other firms that the bonus draws were paid according to ordinary business terms." *Id.*

*7 The terms of Brown's compensation from Cherrydale are analogous to that of the employee in *NIMI Systems* and I think its conclusion under § 547(c)(2)(C) *a propos.* There simply is no evidence that Cherrydale's practice of paying its salespeople on earned commissions biannually, once as a draw, is at variance with the range of payment terms available in Cherrydale's industry. All the evidence, albeit sparse, is to the contrary. *See Molded Acoustical,* 18 F.3d at 223 ("[t]he purpose of [§ 547(c)(2) ] is to leave undisturbed normal financing relations, because it does not detract from the general policy of the preference section [which is] to discourage unusual action by either the debtor or his creditors during the debtor's slide into bankruptcy") (citations omitted).

CONCLUSION

For the reasons set forth above, I hold that Brown has met his burden under § 547(c)(2). Cherrydale incurred and paid the First Half Payment in the ordinary course of its business relationship with Brown. Cherrydale also made the First Half Payment according to ordinary business terms. Summary judgment in favor of Brown is appropriate.

ORDER

For the reasons set forth in the Court's Memorandum Opinion of this date, the motion (Doc. # 11) of defendant Jerry Brown for summary judgment is GRANTED. The cross-motion (Doc. # 14) of plaintiff The Official Committee of Unsecured Creditors for the Use and Benefit of the Bankruptcy Estate of Cherrydale Farms, Inc. is DENIED.

Bkrtcy.D.Del.,2001.
In re Cherrydale Farms, Inc.
Not Reported in B.R., 2001 WL 1820323

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**Westlaw.**

Not Reported in B.R.                                                                                                                   Page 1

Not Reported in B.R., 2004 WL 3113718
**(Cite as: Not Reported in B.R.)**

H
Not Reported in B.R., 2004 WL 3113718
Only the Westlaw citation is currently available.
United States Bankruptcy Court,D. Delaware.
In re: HECHINGER INVESTMENT COMPANY
OF DELAWARE, INC., et.al., Debtors.
HECHINGER INVESTMENT COMPANY OF
DELAWARE, INC., et al., Debtors in Possession,
Plaintiffs,
v.
UNIVERSAL FOREST PRODUCTS, INC.,
Defendant.
No. 99-02261(PJW), 01-3170(PBL).

Dec. 14, 2004.

Ian Connor Bifferato , Bifferato, Bifferato & Gentilotti , Mark D. Collins , Shannon Stacy Frazier , Deborah E. Spivack , Rebecca L. Booth , Richards, Layton & Finger , Aaron A. Garber , Pepper Hamilton LLP , Christopher Dean Loizides , Loizides & Associates , Wilmington, DE, Mark S. Marani , Cohen Pollock Merlin Axelroad & Small , Atlanta, GA, Rebecca Lee Scalio , Charles A. Shaffer , Mahler, Shaffer & Pugliese, Kingston, PA, for Debtors.
John T. Carroll , Cozen O'Connor, Philadelphia, PA, for Debtors and Plaintiffs.

*MEMORANDUM* FN1

> FN1. This Memorandum constitutes the findings of fact and conclusions of law of the Court pursuant to Federal Rule of Bankruptcy Procedure 7052, which is made applicable to contested matters by Rule 9014.

LINDSEY , Bankruptcy J.
*1 Before the Court are Cross-Motions for Summary Judgment by Hechinger Investment Company of Delaware, Inc. (hereinafter referred to as "Hechinger" or "Debtor") and Universal Forest Products, Inc. (hereinafter referred to as "UFP" or " Defendant"). For the reasons set forth below, the motions are granted in part and denied in part.

I. *FACTUAL AND PROCEDURAL BACKGROUND*

Hechinger Investment Company had operated a retail chain of "do-it-yourself" stores that sold a wide range of home improvement products including a variety of treated wood products. (Brief in Support of Universal Forest Products' Motion for Summary Judgment, at 3) UFP was one of Hechinger's top vendors and supplied Hechinger with treated wood products for over 15 years. (UFP's Brief, at 4) Unfortunately, Hechinger's business succumbed to the pressures of market competition and its Chapter 11 Bankruptcy Petition was filed on June 11, 1999. FN2 (UFP's Brief, at 3) Hechinger ceased operations of its business in September of 1999 and became a liquidating Chapter 11. Hechinger remained as Debtor in Possession and as such, was authorized to institute the above-captioned adversary proceeding.

> FN2. Hence, the preference period, the 90 day period prior to the petition date, was between March 13, 1999 and June 11, 1999.

This action was filed June 5, 2001 and seeks to avoid and recover thirty-four allegedly preferential transfers amounting to $16,703,604.57, pursuant to §§ 547 and 550 of the Bankruptcy Code. FN3 Hechinger filed its First Amended Complaint on August 15, 2001 and UFP answered on January 8, 2002.

> FN3. 11 U.S.C. §§ 101 et seq. Hereafter, references to statutory provisions by section number only will be to provisions

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R.                                                                                                                    Page 2
Not Reported in B.R., 2004 WL 3113718
**(Cite as: Not Reported in B.R.)**

of the Bankruptcy Code, unless the context requires otherwise.

UFP filed its Motion for Summary Judgment on April 29, 2003 and Hechinger filed its Motion for Summary Judgment on June 13, 2003. Both parties filed extensive exhibits, depositions, and affidavits in support of their respective Motions. Notices of Completion of Briefing were subsequently filed with regard to the Motions in November, 2003.

In addition to the Cross-Motions for Summary Judgment, UFP filed a Motion in Limine (Spoliation of Evidence) on September 10, 2003, which the Court denied on October 12, 2004. FN4

> FN4. This adversary proceeding was transferred to this Court from the Honorable Peter J. Walsh in May of 2004.

The Cross-Motions for Summary Judgment are the only motions that remain before this adversary proceeding is readied for Trial.

II. *JURISDICTION*

This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157(b)(1) and it is a core proceeding under 28 U.S.C. § 157(b)(2), (A), (B), (F) and (O). Venue is proper in this jurisdiction pursuant to 28 U.S.C. § 1409.

III. *STANDARD FOR SUMMARY JUDGMENT*

Federal Rule of Civil Procedure 56(c), made applicable to this adversary proceeding pursuant to Federal Rule of Bankruptcy Procedure 7056, provides that summary judgment should be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *See also, Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In deciding a motion for summary judgment, all factual inferences must be viewed in the light most favorable to the non-moving party. *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 547, 587-588 (1986) (quoting *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962)). After sufficient proof has been presented to support the motion, the burden shifts to the non-moving party to show that genuine issues of material fact still exist and that summary judgment is not appropriate. *Matsushita* at 587. A genuine issue of material fact is present when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

IV. *DISCUSSION*

*2 In its Motion for Summary Judgment, UFP asserts that of the $16,500,445 at issue in this proceeding, summary judgment is appropriate as to $13,125,822.00 because that amount of the allegedly preferential transfers were actually advance payments made by Hechinger to UFP. (UFP's Brief, at 23) UFP argues the remaining $3,374,623 is protected by the ordinary course of business defense under § 547(c)(2), the contemporaneous exchange for new value defense under § 547(c)(1), or the new value defense under § 547(c)(4). (UFP's Brief, at 2)

Hechinger opposes Universal Forest Products' Motion for Summary Judgment and in its Cross-Motion states that this is the quintessential preference action, in that, UFP engaged in a nefarious plot to deceive Hechinger and trick them into prepaying for goods during the preference period. (Hechinger's Brief in Opposition to Universal Forest Products' Motion for Summary Judgment, at 6-7) Hechinger asserts that the clements of a preferential transfer pursuant to § 547(b) FN5 have been met as to many of the transfers and therefore, summary judgment can be entered in favor of Hechinger in an amount not less than $1,067,786.86. FN6

> FN5. Under § 547(b), the trustee may seek

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R.                                                                 Page 3
Not Reported in B.R., 2004 WL 3113718
(Cite as: Not Reported in B.R.)

to avoid, as a preference, "... any transfer of an interest of the debtor in properly
(1) to or for the benefit of a creditor;
(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
(3) made while the debtor was insolvent;
(4) made-
(A) on or within 90 days before the date of the filing of the petition; or
(B) between 90 days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and
(5) that enables such creditor to receive more than such creditor would receive if-
(A) the case were a case under chapter 7 of this title;
(B) the transfer had not been made; and
(C) such creditor received payment of such debt to the extent provided by the provisions of this title."

FN6. Hechinger contends that if the Court disallows UFP's new value defense, Hechinger is then entitled to recover $9,923,913.58.

A. Hechinger's Cross-Motion for Summary Judgment

Hechinger states in its Cross-Motion for Summary Judgment that all of the elements of a preference have been satisfied under § 547(b) and that it is therefore entitled to judgment as to some of the transfers.

There is no dispute that Hechinger has proven several of the elements under § 547(b). Hechinger alleges, and UFP admits, that the transfers were within 90 days of the petition and made to UFP and that UFP was a creditor of the Debtor. FN7 Hechinger also contends that the transfers were made while the Debtor was insolvent FN8 and claims the statutory presumption of insolvency under § 547(f). FN9 UFP has not challenged this contention and has not produced evidence to rebut the presumption. Furthermore, UFP stated that it was aware of Hechinger's declining financial position and had known of it for many years prior to Debtor's bankruptcy. (UFP's Brief, at 33) Lastly, Hechinger has submitted the affidavit of Mr. James F. Iampieri, Hechinger's former Vice President of Merchandise Administration, who states that the estimated distribution to unsecured creditors in Hechinger's bankruptcy is between 6.5% and 9.7%. UFP has offered no evidence to place this testimony in doubt and therefore, Hechinger has established that the transfers enabled UFP to receive more than it would have received under a hypothetical Chapter 7 case. FN10 The remaining element under § 547(b) is in dispute as to certain of the transfers.

FN7. Section 547(b)(1).

FN8. Section 547(b)(3).

FN9. Section 547(g) states in material part, "the debtor is presumed to have been insolvent on and during the 90 days immediately preceding the date of the filing of the petition."

FN10. Section 547(b)(5).

Notwithstanding the other provisions of § 547(b), subsection (b)(2) provides that a trustee may avoid a transfer of an interest of the debtor in property " for or on account of an antecedent debt owed by the debtor before such transfer was made." It is well established that advance payments are prima facie not preferences because the transfer from the debtor to the creditor is not for or on account of an antecedent debt. Collier on Bankruptcy instructs: " [a]lthough 'antecedent debt' is not defined by the Code, a debt is 'antecedent' if it is incurred before the transfer: the debt must have preceded the transfer." 5 Collier on Bankruptcy ¶ 547.03[4] (Alan N. Resnick & Henry J. Sommer eds., 15th ed. rev.)

*3 UFP contends that Hechinger is not entitled to recover $13,125,822.00 as preferences because those monies were advance payments. Hechinger concedes in its Motion for Summary Judgment that at the end of the preference period it was prepaying for product that it thought it was purchasing on

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R. Page 4
Not Reported in B.R., 2004 WL 3113718
**(Cite as: Not Reported in B.R.)**

credit. (Hechinger's Brief in Support of its Cross-Motion for Summary Judgment, at 17) In fact, Hechinger admits that it was relegated to relying on UFP to tell it how much it owed at any particular time because of the acquisition and merger between Hechinger and Builders Square which caused administrative problems in its accounts payable department. (Hechinger's Brief in Support of its Cross-Motion, at 9) Regardless, Hechinger argues that based on its analysis, the correct amount of advances is $6,576,603.36. (Hechinger's Brief in Support of its Cross-Motion, at 14)

The Court finds, and the parties are in agreement, that at least $6,576,603.36 was paid in advance and therefore was not preferential. The Court will grant summary judgment as to that amount of advance payments in favor of Universal Forest Products. Hechinger's Cross-Motion for Summary Judgment is denied.

### B. Universal Forest Products' Motion for Summary Judgment

UFP argues that even if the transfers in question were preferential, it is entitled to certain of the defenses enumerated in § 547(c). Specifically, UFP claims that the transfers were made in the ordinary course of business pursuant to § 547(c)(2), were contemporaneous exchanges for new value pursuant to § 547(c)(1), or that new value was given pursuant to § 547(c)(4). Each of the claimed defenses will be discussed in turn.

#### 1. Ordinary Course of Business

UFP argues that the transfers that were not paid in advance are protected by the ordinary course of business defense pursuant to § 547(c)(2). FN11 By UFP's calculations, of the $16,500,446 it asserts is at issue, $15,965,425.00 was paid in advance or within 8 days. UFP states that the $15,965,425.00 was paid within terms and therefore is presumptively made within the ordinary course of business. Additionally, UFP states that it had not engaged in any aggressive collection activity whatever. UFP argues that the transactions between the parties during the preference period were not very different from those that occurred during the pre-preference period. Hechinger chose to "fast pay" on its account both before and during the preference period. The only differences were that UFP shortened the payment terms on new sales and lowered Hechinger's credit limit to assure faster payments for new shipments. (UFP's Brief, at 32) UFP concedes that while the parties' business terms were not identical during the preference period, the transfers were substantially similar to those throughout the parties business relationship that has spanned over 15 years. Therefore, the Court should find that the transfers are protected by the ordinary course of business defense under § 547(c)(2).

> FN11. Section 547(c)(2) provides:
> (c) The trustee may not avoid under this section a transfer-
> ...
> (2) to the extent that such transfer was-
> (A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee;
> (B) made in the ordinary course of business or financial affairs of the debtor and the transferee;
> (C) made according to ordinary business terms.

*4 Hechinger asserts that UFP applied severe collection pressure by limiting Hechinger's available credit, shortening the payment terms between the parties, and requiring Hechinger to use wire transfers to remain at or below their credit limit. Hechinger argues that the parties course of dealing during the preference period was very different than in years prior. Additionally, Hechinger claims that they had never previously paid in large even sum wire transfers, which then required reconciliation of the payment and the invoice to be thereafter completed. In this way, Hechinger disputes that the transfers were made in the ordinary course of business between the parties and opposes summary judgment being entered in favor of UFP on this issue.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R.                                                                                                  Page 5
Not Reported in B.R., 2004 WL 3113718
**(Cite as: Not Reported in B.R.)**

The Court finds that there are genuine issues of material fact whether the transfers were made within the ordinary course of business, and that summary judgment on this issue is therefore not appropriate.

2. Contemporaneous Exchange for New Value

Section 547(c)(1) provides a complete defense to preference liability if the transfer was intended by the debtor and creditor to be a contemporaneous exchange for new value, and in fact was a substantially contemporaneous exchange. FN12 According to *APS, Inc. v. ABX Enterprises, Inc. (In re APS Holding Corporation)*, 282 B.R. 795 (Bankr.Del.2002), defendant must prove that it extended new value to the debtors, that the parties intended the new value and the transfers to be contemporaneous exchanges, and that the exchanges were, in fact, substantially contemporaneous. "The critical inquiry in determining whether there has been a contemporaneous exchange for new value is whether the parties intended such an exchange." *Id.* at 800.

> FN12. Section 547(c)(1) provides that the trustee may not avoid a transfer "to the extent that such transfer was-(A) intended by the debtor and the creditor to or for whose benefit such transfer was made to be a contemporaneous exchange for new value given to the debtor; and (B) in fact a substantially contemporaneous exchange."

UFP asserts that because the parties were entering into the busy spring season where Debtor would be ordering hundreds of thousands of dollars of wood products per day from UFP, the parties agreed that ordinary checks were impractical considering the recent imposition of a credit limit on Hechinger's account. Therefore, UFP required, and Hechinger reluctantly agreed, to instead use wire transfers to ensure that a sufficient volume of goods were shipped to Hechinger. (UFP's Brief, at 41) UFP argues that Debtor's records show that the wire transfers were made to cover goods ready for shipment and that it was Debtor's intent that it make payments in this way. UFP further points to deposition testimony of Mr. Clifford Smith, Hechinger's Marketing Manner during the preference period, and Mr. James F. Iampieri, who both admitted that Hechinger was paying for goods in advance or contemporaneously with delivery. Because $15,965,425.00 of the transfers was paid in advance or within 8 days, UFP contends that the payments were intended to be and were contemporaneous exchanges for new value. Therefore, UFP urges that it is entitled to summary judgment for this amount.

Conversely, Hechinger argues that UFP has put forth no evidence to prove that the transfers were contemporaneous exchanges and therefore has not carried its burden under § 547(c)(1). Hechinger states that Debtor never intended to pay in advance for goods and this is evident in the deposition testimony of Mr. Smith and Mr. Iampieri. (Hechinger's Brief in Support of its Cross-Motion, at 38) Therefore, since there was in fact no mutual intent by the parties that the transfers be contemporaneous exchanges for new vaule, Hechinger contends that the purported defense be stricken and summary judgment be entered in its favor.

*5 The Court finds that there are genuine issues of material fact whether the payments were intended to be contemporaneous exchanges for new value and whether the exchanges were in fact, substantially contemporaneous. Summary judgment on this issue will be denied.

3. New Value

UFP lastly asserts that most of the transfers are protected by the new value defense pursuant to § 547(c)(4). FN13 UFP urges this Court to follow the decision of *Check Reporting Services v. The Water Doctor (In re Check Reporting Services, Inc.)*, 140 B.R. 425 (Bankr.W.D.Mich.1992), which held that the new value amounts must not "remain unpaid." UFP contends that the case at bar is similar to the fact situation in *Check Reporting Services* because there are several payments at issue where new value was subsequently transferred to Hechinger by UFP.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R.   Page 6
Not Reported in B.R., 2004 WL 3113718
**(Cite as: Not Reported in B.R.)**

UFP argues based on the policy reasons of the Bankruptcy Code and the overwhelming trend of courts to reject the "remain unpaid" rule, that this Court should enter summary judgment in its favor.

> FN13. Section 547(c)(4) provides that the trustee may not avoid a transfer that was " to or for the benefit of a creditor, to the extent that, after such transfer, such creditor gave new value to or for the benefit of the debtor-
> (A) not secured by an otherwise unavoidable security interest; and
> (B) on account of which new value the debtor did not make an otherwise unavoidable transfer to or for the benefit of such creditor."

Hechinger contests that UFP should receive the benefit of the new value defense because it has failed to provide credible evidence in support of the defense, and moreover, no amounts "remain unpaid. " Hechinger states that "[t]he Third Circuit has held that § 547(c)(4) requires UFP to *prove* that it received a transfer that is otherwise avoidable as a preference under § 547(b), UFP advanced "new value" to the debtor on an unsecured basis after receiving the preferential transfer, and Hechinger did not fully compensate UFP for the "new value" as of the date it filed its bankruptcy petition." (Hechinger's Brief in Support of its Cross-Motion, at 39)(emphasis in the original) Hechinger cites *In re New York City Shoes, Inc.*, 880 F.2d 679 (3rd Cir.1989) for this proposition. However, Hechinger concedes that this is an issue of law and if this Court follows the holding of *Check Reporting Services*, then UFP has provided $8,856,126.72 in new value to the Debtors. (Hechinger's Brief in Opposition to Universal Forest Products' Motion for Summary Judgment, at 19-20) If the Court follows the Third Circuit holding then Hechinger is entitled $9,923,913.58.

In *Check Reporting Services*, the court undertook a detailed analysis of the relevant case law and more importantly the specific language of § 547(c)(4)(B) to conclude that the clear import of the statute would be defeated if it is held that the new value must remain unpaid. The court, in that case, looked to the complicated but unambiguous language of § 547(c)(4)(B), and found that the statute requires but one result, and that the "net result rule" was not was intended by Congress. *In re Check Reporting Services,* 140 B.R. 425, 437.

In this case, there are thirty-four allegedly preferential transfers at issue during the preference period and this case is more akin to the running account or rolling account analysis of *Check Reporting Services* than to *New York City Shoes,* which dealt with just one transfer at issue in the preference period. Based on language of § 547(c)(4)(B) and the policy reasons of the code section, this Court finds that *New York City Shoes* is distinguishable on its facts and adopts the reasoning of *Check Reporting Services*. Thus, this Court is inclined to grant summary judgment in favor of UFP in the further amount of $8,856,126.72. This Court, however, may not do so, absent a waiver of the other asserted defenses under § 547(c) or a stipulation by the parties as to that amount, because a calculation under § 547(c)(4) must be prefaced by a determination of whether the transfers made on account of new value are " otherwise avoidable." *See, Check Reporting Services,* 140 B.R. 425, 437-438.

### V. CONCLUSION

*6 As to UFP's Motion, summary judgment will be entered in favor of Universal Forest Products and against Hechinger Liquidation Trust as to transfers in the amount of $6,576,603.36, and the Motion will be denied in all other respects. Hechinger Liquidation Trust's Motion for Summary Judgment will be denied in its entirety. An appropriate order follows.

Bkrtcy.D.Del.,2004.
In re Hechinger Investment Co. of Delaware, Inc.
Not Reported in B.R., 2004 WL 3113718

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.