# TAB 9

# PLAINTIFF'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

## IN THE UNITED STATE DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 11 |
| INACOM CORP., et al., | ) | |
| | ) | Case No. 00-2426 (PJW) |
| Debtors. | ) | |
| ———————————————— | ) | |
| | ) | |
| INACOM CORP., on behalf of affiliated | ) | |
| Debtors, | ) | Civil Action No. 04-582-GMS |
| | ) | Adv. No. 02-3499 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| DELL COMPUTER CORPORATION, et al,) | | |
| | ) | |
| Defendants. | ) | |
| ———————————————— | ) | |

### PLAINTIFF'S PROPOSED FINDINGS OF
### FACT AND CONCLUSIONS OF LAW

Bonnie Glantz Fatell (DE No. 3809)
Elio Battista, Jr. (DE No. 3814)
Alisa E. Moen (DE No. 4088)
**BLANK ROME LLP**
1201 Market Street, Suite 800
Wilmington, DE 19801
Tel:  (302) 425-6400
Fax:  (302) 425-6464

        -and-

Earl M. Forte
Regina Stango Kelbon
**BLANK ROME LLP**
One Logan Square
Philadelphia, PA 19103
Tel:  (215) 569-5500
Fax:  (215) 569-5555

Attorneys for Plaintiff Executive Sounding Board
Associates, Inc., as Plan Administrator for Debtors

119096.01600/40155907v1

TABLE OF CONTENTS

I.  Introduction

II. Findings of Fact

    A.  The Debtors' Business and Chapter 11 Filings

        1.  The State of the Debtors' Industry in 1999 and 2000.

        2.  The Impact of Industry Changes on the Debtors' Business.

        3.  The Debtors Sell Their Distribution Business to Compaq in February 2000.

        4.  The Debtors' Prospects Continue to Worsen, the Failed Compucom Sale.

        5.  The Debtors File Chapter 11 Petitions on June 16, 2000 and Cease Operations.

    B.  The Preference Claim Against Dell.

        1.  Dell Received $7,619,790.47 In Payments from the Debtors During the Preference Period.

        2.  Contentions and Defenses Raised By Dell:

            (a)  Insolvency

            (b)  The Chapter 7 Element

            (c)  The Ordinary Course of Business Defense

III.  Conclusions of Law

    A.  The Elements of a Preference

        1.  The Elements Challenged By Dell

    B.  Statutory Defenses Raised By Dell

    D.  Issues Presented

        1.  Insolvency

        2.  The Chapter 7 Element

        3.       Section 547(c)(2)(B)

        4.       Section 547(c)(2)(C)

E.      Analysis and Discussion

        1.       The Debtors Were Insolvent During the Preference Period.

        2.       The Chapter 7 Element Has Been Satisfied.

        3.       Dell Has Failed to Meet Its Burden Under Section 547(c)(2)(B).

        4.       Dell Has Failed to Meet Its Burden Under Section 547(c)(2)(C).

F.      The Debtors May Recover $7,619,790.47 In Preferential Transfers from Dell.

DONE and ORDERED

## I.    Introduction

1.    InaCom Corp. ("InaCom") and its affiliates (collectively, the "Debtors") filed a Complaint for Avoidance and Recovery of Preferential Transfers (the "Complaint") on May 16, 2002 against Dell Receivables, L.P., Dell, Inc. (f/k/a Dell Computer Corporation) and Dell Marketing, L.P. (collectively, "Dell"). Dell filed its Original Answer on June 11, 2002 and a First Amended Answer on December 29, 2004 (collectively, the "Answer"). Executive Sounding Board Associates, Inc., Plan Administrator on behalf of the Debtors (the "Plaintiff"), is authorized to pursue this adversary proceeding on behalf of the Debtors, the Reorganized Debtors and the Estates, pursuant to the Debtors' confirmed Joint Plan of Liquidation pursuant to Chapter 11 of the United States Bankruptcy Code (the "Plan"). No cross-claims or counter-claims have been asserted by Dell.

2.    The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334 and §§ 547 and 550 of the United States Bankruptcy Code (the "Bankruptcy Code"). Venue is proper before this Court under 28 U.S.C. §§ 1408 and 1409. This is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (B), (F) and (O).

## II.    Findings of Fact

A.    The Debtors' Business and Chapter 11 Filing

1.    The State of the Debtors' Industry in 1999 and 2000

3.    The Debtors were originally in two basic lines of business: computer hardware and peripherals distribution (the "Distribution Business") and a related technology service and configuration business (the "Service Business"). Through these businesses, the Debtors delivered personal computer and related information technology products to businesses together with related support services. Following the merger with Vanstar Corporation on February 17,

1

1999, the Debtors had more than 12,500 employees and nearly $7 billion in annual revenues. The Distribution Business generated the vast majority of these revenues.

4.      Historically, the major PC manufacturers concentrated on PC designs, development, assembly and marketing.    The manufacturers left the functions of sales, distribution and end-user customer service to third-party distributors such as the Debtors.  During the early to mid-1990s, the rise of Dell led the major PC manufacturers to shift their distributor-channel strategy from selling to third-party distributors to selling to the end-users directly.  The major manufacturers also recognized the end-users' preferences for "turn-key" operations—the ability to provide the hardware, install the hardware, finance the hardware, service the hardware and, in some cases, operate the hardware.

5.      By the late 1990s, the major manufacturers had broadened their businesses to meet customers' demands for a single-solution provider who could provide bundled services such as hardware delivery, installation, financing, and related services.  Thus, the third-party distributors, such as the Debtors, were placed at a competitive disadvantage to the PC manufacturers who now offered complete services to major end-users.

6.      The change in the computer industry had an adverse effect on the computer reseller industry as reflected in the various in and out-of-court restructurings and liquidations of computer resellers which occurred during this period.  This shift in the industry and its negative effect is exemplified in the bankruptcy filing of MicroAge, Inc. one of the industry's largest resellers.

7.      Additionally, during the late 1990's there was a dramatic reduction in manufacturers' incentives.  The computer industry is characterized by a continual decline in the price of technological products, a trend that is matched with constant advances in design.  To

2

support profitability, third-party distributors relied heavily on rebates, such as volume discounts, special bid rebates and price protection, from their key suppliers. In 1999 and 2000, however, the major PC manufacturers reduced the level of rebates offered and increased the complexity in granting such rebates. The change was driven primarily by the major PC manufacturers' strategic shift to sell directly to end-users, compared to their historic practice of selling to resellers, such as the Debtors. During this same time period, PC unit sale growth began to decline, especially in North America.

2.     The Impact of Industry Changes on the Debtors' Business.

8.     These changes in the Debtors' industry directly impacted the Debtors and began to take their toll on the Debtors' business.

9.     Beginning in late 1999, the Debtors began to experience cash flow problems resulting in, among other things, Richard C. Oshlo ("Oshlo"), the Debtors' Treasurer, arranging to have checks written to vendors by the Debtors' accounts payable department, physically carried to his office in the Debtors' Treasury Department and stored there in bins under lock and key until released by him. During this period, the Debtors, among other things, went into default on their accounts receivable lending facility with Nesbitt Burns and came within hours of missing a payroll.

3.     The Debtors Sell Their Distribution Business to Compaq in February 2000

10.     As a result of these changes in the information and technology services industry and its negative impact on the Debtors Distribution business, the Debtors began to explore the possible sale of their Distribution Business, which had become less profitable, to allow them to focus on their remaining Service Business. Accordingly, the Debtors entered into negotiations with Compaq Computer Corporation ("Compaq"), one of their largest distribution vendors, for

3

the sale of the Distribution Business to Compaq. As a result of these negotiations, on January 4, 2000, the Debtors signed an Asset Purchase Agreement (the "APA"), and certain related operational agreements, with Compaq and its acquisition subsidiary ITY Corp., subsequently known as Custom Edge, Inc. (also referred to collectively, as "Compaq"). Under the APA, Compaq agreed to purchase substantially all of the assets of the Debtors' Distribution Business (the "Compaq Sale").

11.    On February 16, 2000, the Compaq Sale closed. Compaq paid approximately $369.5 million in cash for the Debtors' Distribution Business and also assumed some of the Debtors' debt. Literally all of the funds received from the Compaq Sale were used to pay down the Debtors' secured debt.

4.    The Debtors' Prospects Continue to Worsen, the Failed Sale to Compucom

12.    Following the Compaq Sale, the Debtors' business fortunes did not improve and in fact worsened. Among other things, the Debtors learned that their outside auditors KPMG were unable to certify the Debtors' financial statements for 1999 causing a delay in the filing of the Debtors' form 10K with the Securities & Exchange Commission for 1999. The delay in filing their form 10K also adversely effected the Debtors' ability to negotiate and enter into new contracts and to maintain existing customer relationships, thus impacting the Debtors' business prospects. The Debtors' operations also continued to decline. Beginning in approximately the second half of April 2000, the Debtors entered into discussions with Compucom Systems, Inc. ("Compucom") for the sale of its remaining Service Business to Compucom. Testimony by the Debtors then Chief Executive Officer, Gerald A. Gagliardi ("CEO"), stated that the proposed transaction with Compucom was aimed solely at salvaging jobs for the Debtors' employees and

4

assuming liabilities and offered no additional monies to the Debtors. The Compucom transaction was proposed to occur in a § 363 sale in a bankruptcy proceeding of the Debtors.

5.      The Debtors File Chapter 11 Petitions on June 16, 2000 and Cease Operations.

13.     When the proposed sale of the Debtors' remaining Service Business to Compucom failed, the Debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code on June 16, 2000, (the "Filing Date") initiating these Chapter 11 cases.

14.     Shortly after the Filing Date, the Debtors ceased all business operations.

15.     On June 30, 2000, the Office of the United States Trustee appointed an Official Committee of Unsecured Creditors (the "Creditors' Committee") of the Debtors. On September 15, 2000 and October 10, 2000, the Bankruptcy Court approved the Creditors' Committee's retention, respectively, of Blank Rome LLP, as its general bankruptcy counsel and Executive Sounding Board Associates, Inc. ("ESB") as its financial consultants.

16.     On May 23, 2003, the Bankruptcy Court entered the Order Confirming Debtors' Joint Plan of Liquidation (the "Plan") as Amended Pursuant to Chapter 11 of the Bankruptcy Code (the "Confirmation Order"). Pursuant to the Confirmation Order and the Plan, ESB was appointed as Plan Administrator. Implementation of the Plan accomplished the liquidation of all the Debtors' remaining assets and granted full authority to ESB to pursue this litigation on behalf of the Debtors.

B.      The Preference Claim Against Dell

1.      Dell Received $7,619,790.47 in Payments from the Debtors During the Preference Period

17.     Before the Compaq Sale, the Debtors purchased computer equipment and peripherals (the "Product") from Dell Computer Corp. or Dell Marketing, L.P. and paid either

Dell Receivables, L.P., Dell Computer Corp. or Dell Financial Services.[1]  After the close of the Compaq Sale, Dell did not engage in any new ongoing business with the Debtors.  After the close of the Compaq Sale, Dell's dealings with the Debtors consisted solely of fulfilling pre-Compaq Sale Product purchase orders and the collection and pay down of the Debtors' pre-Compaq Sale invoices from Dell.

18.    The Debtors continued to pay down old trade debt after cessation of their Distribution Business.  During the period from March 18, 2000 through June 16, 2000 (the "Preference Period"), Dell received the following twenty-eight (28) payments from the Debtors (the "Transfers"):

| Payment Application Date | Payment Cleared Date | Payment Amount | Payment Number | Vendor | Payment Type |
|---|---|---|---|---|---|
| 3/20/2000 | 3/21/2000 | $1,515,938.54 | 715707 | Dell | check |
| 3/20/2000 | 3/21/2000 | $86,554.50 | 714247 | Dell | check |
| 3/22/2000 | 3/23/2000 | $4,561,559.51 | 712805 | Dell | check |
| 3/22/2000 | 3/21/2000 | $412.28 | 683524 | Dell | check |
| 3/23/2000 | 3/24/2000 | $236.55 | 714246 | Dell | check |
| 3/23/2000 | 3/22/2000 | $27.90 | 683523 | Dell | check |
| 3/24/2000 | 3/23/2000 | $433.59 | 684341 | Dell | check |
| 3/28/2000 | 3/28/2000 | $456.05 | 684814 | Dell | check |
| 3/30/2000 | 3/30/2000 | $37,349.32 | 716651 | Dell | check |
| 3/31/2000 | 3/31/2000 | $68,843.53 | 717249 | Dell | check |
| 3/31/2000 | 3/30/2000 | $1,136.80 | 684343 | Dell | check |
| 4/3/2000 | 4/3/2000 | $806,278.00 | 3 | Dell | Wire Transfer |
| 4/4/2000 | 4/4/2000 | $8,373.43 | 717793 | Dell | Check |
| 4/4/2000 | 4/4/2000 | $474.00 | 716650 | Dell | Check |
| 4/6/2000 | 4/6/2000 | $433.54 | 685622 | Dell | Check |
| 4/12/2000 | 4/12/2000 | $114,440.81 | 719530 | Dell | Check |
| 4/12/2000 | 4/11/2000 | $99.95 | 687662 | Dell | Check |
| 4/13/2000 | 4/13/2000 | $160.55 | 718891 | Dell | Check |
| 4/17/2000 | 4/17/2000 | $25,929.50 | 687886 | Dell | Check |
| 4/18/2000 | 4/19/2000 | $215,051.45 | 719850 | Dell | Check |
| 4/18/2000 | 4/12/2000 | $134,037.50 | 718892 | Dell | Check |
| 4/18/2000 | 4/17/2000 | $938.00 | 688738 | Dell | Check |
| 4/27/2000 | 4/27/2000 | $514.36 | 684342 | Dell | Check |

[1]    For purposes of this action, Dell, Inc. has agreed that it has received all of the Transfers (defined below).

6

| 4/28/2000 | 5/1/2000 | $298.92 | 720717 | Dell | Check |
| 5/3/2000 | 5/3/2000 | $4,182.39 | 722044 | Dell | Check |
| 5/12/2000 | 5/11/2000 | $215.97 | 693213 | Dell | Check |
| 5/17/2000 | 5/17/2000 | $34,924.44 | 723236 | Dell | Check |
| 5/22/2000 | 5/22/2000 | $489.09 | 723818 | Dell | Check |
| | **Total Payments:** | **$7,619,790.47** | | | |

19.     On May 16, 2002, the Debtors filed the Complaint against Dell initiating this adversary proceeding, which seeks to recover $7,619,790.47 in Transfers from Dell.[2]

2.      Contentions and Defenses Raised by Dell

20.     The following contentions and defenses to the Complaint were raised by Dell at trial:

(a) Insolvency: the Debtors were not insolvent at all relevant times during the Preference Period and therefore can not satisfy the requirement of 11 U.S.C. § 547(b)(3);

(b) The Chapter 7 Element: the Plaintiff cannot satisfy the requirement of 11 U.S.C. § 547(b)(5), that the Transfers enabled Dell to receive more than it would have received if the case were a liquidating chapter 7 case, if the Transfers had not been made, and if Dell received payment of the debts in question to the extent provided by the Bankruptcy Code; and

(c) The Ordinary Course of Business Defense: under 11 U.S.C. §§ 547(c)(2)(B) and (C), the Transfers were made in the ordinary course of business or financial affairs of the Debtors and Dell and according to ordinary business terms.

7

III.    Conclusions Of Law

A.    Elements of Preference

21.    Section 547(b) of the Bankruptcy Code states:

The trustee may avoid any transfer of an interest of the debtor in property—

(1) to or for the benefit of a creditor;
(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
(3) made while the debtor was insolvent;
(4) made -
  (A) on or within 90 days before the date of the filing of the petition; or
  (B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and
(5) that enables such creditor to receive more than such creditor would receive if –
  (A) the case were a case under chapter 7 of this title;
  (B) the transfer had not been made; and
  (C) such creditor received payment of such debt to the extent provided by the provisions of this title.

11 U.S.C. § 547(b).

22.    Section 547 "aims to ensure that creditors are treated equitably, both by deterring the failing debtor from treating preferentially its most obstreperous or demanding creditors in an effort to stave off a hard ride into bankruptcy, and by discouraging the creditors from racing to dismember the debtor." *In re Molded Acoustical Products, Inc.*, 18 F.3d 217 (3d Cir. 1994). The preference provisions are designed "not to disturb normal debtor-creditor relationships, but to derail unusual ones which threaten to heighten the likelihood of the debtor filing for bankruptcy at all and, should that contingency materialize, to then disrupt the paramount bankruptcy policy of the equitable treatment of creditors." *Id.* at 224.

---

[2] The Complaint also sought to recover and additional $1,224.36 in transfers made to Dell Financial Services L.P.,

1.    The Elements Challenged by Dell

23.    With the exception of the insolvency requirement of § 547(b)(3) and the Chapter 7 element of § 547(b)(5), the Plaintiff and Dell stipulated before trial that the Plaintiff has satisfied the requirements of a *prima facie* case under § 547(b) with respect to all the Transfers.

B.    Statutory Defenses Raised by Dell

24.    Section 547(c) of the Bankruptcy Code provides the statutory defenses available to Dell . Specifically, § 547(c)(2), the ordinary course of business defense which has three (3) separate components, states:

> The trustee may not avoid a transfer to the extent such transfer was—
> (A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee;
> (B) made in the ordinary course of business or financial affairs of the debtor and the transferee; and
> (C) made according to ordinary business terms.

11 U.S.C. § 547(c)(2).

25.    The Plaintiff and Dell have agreed that the requirement of § 547(c)(2)(A) has been established, and therefore the debts associated with the Transfers were incurred by the Debtors in the ordinary course of business or financial affairs of the Debtors and Dell.  Thus, the only prongs of the ordinary course of business defense asserted by Dell at issue at trial were the §§547(c)(2)(B) and (C) defenses—that the Transfers were made in the ordinary course of business or financial affairs of the Debtors and Dell and made according to ordinary business terms.

---

an affiliate of Dell, Inc.  Those transfers are no longer being pursued in this action.

9

D.    <u>Issues Presented</u>

26.    The issues tried to the Court were:

(i).    Insolvency: Were the Debtors insolvent when the Transfers were made under 11 U.S.C. § 547(b)(3)?;

(ii).    The Chapter 7 Element: Should the relief requested in the Complaint be denied because the Transfers did not enable Dell to receive more than Dell would have received if the case were a Chapter 7 case, if the Transfers had not been made, and if Dell received payment to the extent provided under 11 U.S.C. § 547(b)(5)?;

(iii).    Section 547(c)(2)(B): Were the Transfers made by the Debtors to Dell during the Preference Period in the ordinary course of business or financial affairs of the Debtors and Dell under 11 U.S.C. § 547(c)(2)(B)?; and

(iv).    Section 547(c)(2)(C): Were the Transfers made by the Debtors to Dell during the Preference Period according to ordinary business terms under 11 U.S.C. § 547(c)(2)(C)?.

E.    <u>Analysis and Discussion</u>

1.    <u>The Debtors Were Insolvent During the Preference Period</u>

27.    The Debtors are presumed to have been insolvent during the Preference Period pursuant to Bankruptcy Code § 547(f). Dell bears the burden to put forward sufficient evidence of the Debtors' solvency to rebut that presumption. *See, e.g., In re Lids Corporation*, 281 B.R. 535, 540 (Bankr. D. Del. 2002), (citing F. R. E. 301). A determination of insolvency is a mixed question of law and fact. *In re Transworld Airlines, Inc.*, 134 F.3d 188, 193 (3rd Cir. 1998); *see also In re Roblin Indus*, 78 F.3d. 30 (2d Cir. 1996). Evidence amounting merely to speculation that a debtor may have been insolvent is insufficient to rebut the solvency presumption. *See In*

*re Allegheny Health, Education and Research Foundation*, 292 B.R. 68 (Bankr. W.D. Pa. 2003);

*In re Molded Acoustical Products, Inc.*, 150 B.R. 608 (Bankr. E.D. Pa. 1993).

28.     The District of Delaware's leading case on the insolvency issue is *In re Transworld Airlines, Inc.*, 180 B.R. 389 (Bankr. D. Del. 1994), *affirmed*, 134 F.3d 188 (3rd Cir. 1998) ("*TWA*"), which explains at length the adjusted balance sheet test appropriate to evaluate a debtor's insolvency for the purposes of § 547(b)(4).  Among other things, *TWA* expressly rejects the idea that the debtor's financial statements prepared in accordance with Generally Accepted Accounting Principles (GAAP) can rebut the presumption of insolvency, because they are based on book value and not a fair valuation of the debtor's assets as required by Bankruptcy Code § 101(32). *TWA,* at 410.  *TWA* explains that an analysis of insolvency must begin by placing the debtor and its industry in the appropriate economic and financial context as of the time of the valuation. *See TWA*, at 412-15.  This is done by examining the general condition of the debtor's industry and the debtor's position in that industry at the time insolvency is measured. *Id.*

29.     For purposes of the adjusted balance sheet test, assets are presented at fair value, <u>not</u> book value as required by GAAP, while liabilities are presented at face (book) value. *See TWA*, at 410.  The April 19, 2005 expert report of Bridge Associates, LLC ("Bridge") performs precisely such an analysis as of March 25, 2000, and concludes that the Debtors' liabilities exceeded the value of its assets by $560 million.

| Bridge Analysis as of March 25, 2000 | |
| --- | --- |
| Assets (at fair value) | $400.2 million |
| Liabilities (at face value) | $960.2 million |
| Net Financial Position | ($560 million) |

11

30.     The Bridge report notes: (1) After transitioning to a computer service business in February, 2000, the Debtors' primary asset was its accounts receivable. Its remaining inventory was quickly becoming obsolete.  Its fixed assets were mainly software, office equipment, furniture and leasehold improvements (for over 100 leased locations), which have little recoverable value; (2) the Debtors' long-term intangible assets (such as goodwill and deferred taxes) had no value because of large losses and lack of income and profit; (3) the Debtors had large current and long term liabilities, and over $50 million in unrecorded liabilities, including real property leases, which substantially impact a balance sheet analysis; and (4) Bridge's conclusions regarding assets and liabilities are consistent with the recoveries projected for creditors through the liquidation of the bankruptcy estates.

31.     Dell's expert report, prepared by Duff & Phelps/Sasco Hill Advisors ("Sasco Hill"), does not follow the adjusted balance sheet approach required by *TWA*, and uses the wrong methodology (e.g., it adjusts liabilities to purported market rates which the *TWA* case says is the wrong approach. *TWA*, at 410.) and unreliable data in performing its alternative analyses (e.g., future financial projections and "comparable" competitor data from companies very different from the Debtors).  A complete explanation of the errors in the Sasco Hill report is set forth in the Bridge's May 27, 2005 Response.

32.     Dell also tries to rely on a "solvency opinion" of the Debtors given by Houlihan Lokey Howard & Zukin ("HLHZ") at the time of the Compaq Sale on February 16, 2000, over one month before the Preference Period.[3]  As described at length in the Plaintiff's expert report of Murray Devine & Co., Inc. ("Murray Devine"), the HLHZ report cannot be relied upon to

---

[3] The function of the HLHZ analysis was not to perform a balance sheet analysis, but to review pro forma projections (*i.e.*, future forecasts) and determine whether the Debtors would have sufficient capital to execute, e.g., pay bills as they became due, and as a result, would not trip lending convenants or run afoul of fraudulent transfer

12

accurately reflect the Debtors' financial condition as of February 16, 2000, since among other problems, (1) HLHZ did not say how it became comfortable with the revenue growth projected by the Debtors' management when in fact the Debtors' revenues for the Services Business was declining; (2) HLHZ relied on inaccurate and incomplete financial information, particularly projections prepared using information from the Debtors' former chief financial officer, which were determined to be grossly inaccurate shortly after the closing of the Compaq Sale, and misleading representations by the Debtors' outside auditors, KPMG, made on the eve of the Compaq Sale, that restatements of the Debtors' prior publicly filed financial statements would be minimal when in fact those restatements were extensive; (3) HLHZ inaccurately calculated the total funded debt for covenant calculation purposes as required under the Debtors' senior credit agreement; (4) HLHZ performed inconsistent and inaccurate cash flow tests; (5) HLHZ did not take into consideration the possibility that cost savings could not be achieved; (6) HLHZ performed limited or no analyses of the assets and liabilities of the computer hardware business retained by the Debtors and the impact to the Debtors if such assets could not be sold as quickly as projected; and (7) HLHZ does not provide evidence that it either received or reviewed any of the Debtors' quarterly or annual reporting documents.

33.    Over the next 60 days, the truth regarding the weakness of the Debtors' financial position manifested itself through a series of negative events, leading its new chief financial officer to conclude that he could not "believe any number coming out of Inacom." (Fitzpatrick Depo. pp. 41, 123). The Debtors' liquidation within four months after the Compaq Sale corroborates the unreliability of the HLHZ opinion with respect to the Debtors' insolvency during the Preference Period.

---

laws. HLHZ did nothing to independently verify the data upon which its opinion was based and the opinion was not prepared for the purpose of establishing solvency under § 547(b)(3).

13

34.     In addition to the adjusted balance sheet evaluation of insolvency, *TWA* states that the debtors' financial performance in the months preceding the bankruptcy filing is highly relevant.  Here, uncontroverted testimony from the Debtors' CEO, Chief Financial Officer ("CFO") and Treasurer establishes that the Debtors faced a worsening liquidity crisis beginning in December of 1999.  The financial crisis became severe in mid-January 2000.  At that time, the Debtors went into default of their accounts receivable securitization facility with Nesbitt Burns, which began sweeping the Debtors' accounts of cash in order to pay down that outstanding obligation.  To meet the mid-January bi-weekly payroll, the Debtors were required to obtain a special concession from, and pay a substantial fee to, Nesbitt Burns and the Debtors' senior lender, DeustcheBank.  The Debtors' financial crisis was so acute that management concluded bankruptcy would be necessary if the Compaq Sale did not close.

35.     Nothwithstanding the best hopes of all concerned, the Debtors' liquidity crisis continued even after the Compaq Sale.  Nesbitt Burns continued to control the Debtors' receivables lock boxes until its securitization facility was paid off in early March.  On the date of the Compaq Sale, the Debtors used $313,836,629 of the Compaq Sale proceeds of $369.5 million to pay their secured creditors, DeustcheBank, Nesbitt Burns and IBM Credit.  In addition, the Debtors paid $78,173,988 to IBM Credit Corp. through March 29, 2000, and Nesbitt Burns seized $147,875,991 (from lock box collections) through March 6, 2000.[4]

36.     Gerald A. Gagliardi ("Gagliardi"), the Debtors new CEO and Thomas J. Fitzpatrick, their new CFO, testified at length regarding the various other difficulties facing the Debtors after the Compaq Sale, resulting in their decision in late April, 2000 to sell the remaining Service Business.  These included: (1) the discovery of further inaccuracies in the

---

[4] All told, from February 16 through June 16, 2000, Inacom paid $583,291,056 to DeutscheBank, IBM Credit and Nesbitt Burns, net of any new borrowings during this time period.

14

Debtors' books and records, including the collectibility of over $100 million of booked vendor receivables, (2) the inability of the Debtors' outside auditors KPMG to complete the restatement of the Debtors' financial statements from prior years, which among other things, eroded the confidence of the Debtors and its existing customers in these financial statements, and precluded the Debtors from competing for new business with its traditional customer base, publicly-held Fortune 1000 companies, (3) $20 million in monthly losses from operation of the Service Business, contrary to projections, and (4) a claim by Compaq to approximately $100 million in disputed receivables collections and overpayments arising out of the Compaq Sale.

37.    After all of these problems were identified in mid-April, 2000, the Debtors could not certify to DeutscheBank that they were in compliance with all lending covenants. As a result, DeutscheBank was unwilling to lend further amounts, despite apparent availability on the Debtors' borrowing base certificates, and in late April seized the Debtors' lock boxes and accounts. Thereafter, until the Petition Date, the Debtors operated on budgeted cash releases negotiated with DeustcheBank.

38.    In sum, applying the analysis required by *TWA*, it is clear that the Debtors were insolvent during the Preference Period.

2.    The Chapter 7 Element Has Been Satisfied

39.    Section 547(b)(5) of the Bankruptcy Code states:

> (b) Except as provided in subsection (c) of this section, the trustee may avoid any transfer of an interest of the debtor in property--
>      (5) that enables such creditor to receive more than such creditor would receive if--
>           (A) the case were a case under chapter 7 of this title;
>           (B) the transfer had not been made; and
>           (C) such creditor received payment of such debt to the extent provided by the provisions of this title.

11 U.S.C. § 547(b)(5).

40.     Ms. Elaine Agee, the Debtors' remaining head officer and a veteran officer of the Debtors, testified that the bankruptcy court confirmed the Plan on May 23, 2003, and that there is no scenario under which general unsecured creditors such as Dell will receive 100 cents on the dollar on their proofs of claim or scheduled amounts.  Ms. Agee also testified that general unsecured creditors will receive substantially less than 100 cents on the dollar.     No countervailing evidence was offered by Dell on this point.

41.     In light of Ms. Agee's uncontroverted testimony, and the other evidence showing that Dell was paid 100 cents on the dollar for the invoices paid by the Transfers, the Court concludes that the Plaintiff has satisfied the requirements of 11 U.S.C. § 547(b)(5).

### 3.     Dell Has Failed to Meet its Burden Under Section 547(c)(2)(B)

42.     The ordinary course of business defense is set forth at 11 U.S.C. § 547(c)(2), and states that:

> (c) The trustee may not avoid under this section a transfer-- ...
> (2) To the extent that such transfer was--
> (A) In payment of a debt incurred by the debtor in the ordinary course of business of financial affairs of the debtor and the transferee;
> (B) Made in the ordinary course of business or financial affairs of the debtor and the transferee;  and
> (C) Made according to ordinary business terms;

43.     The ordinary course of business defense is probably the most often used and litigated defense in preference actions.  The "[p]urpose of the section is to leave undisturbed normal financing relations, because it does not detract from the general policy of the preference section to discourage unusual action by either the debtor or his creditors during the debtor's slide into bankruptcy."  *Molded Acoustical*, 18 F.3d at 223, *quoting J.P. Fyfe, Inc. of Florida v. Bradco Supply Corp.*, 891 F.2d 66, 70 (3d Cir. 1989); *see also In re Equipment Co. of Ame*rica,

16

135 B.R. 169 (Bankr. S.D. Fla. 1991) and *In re Craig Oil Co.*, 785 F.2d 1563, 1566 (11th Cir. 1986).

44.     To fall within the safeguard of § 547(c)(2), Dell, pursuant to § 547(g), must prove by a preponderance of the evidence the nonavoidability of the Transfers. The three subparts of § 547(c)(2) must be read in the conjunctive and each must be proven separately. *J.P. Fyfe, Inc.* at 70.

45.     The determination of whether Dell has satisfied its burden under § 547(c)(2)(B) is a subjective examination concerning the consistency of dealings between the Debtors and Dell before and during the preference period. *SEC v. First Jersey Sec.*, 180 F.3d 504 (3d Cir. 1999). Some of the factors to be considered are:

> (1) the length of time the parties have engaged in the type of dealing at issue; (2) whether the subject transfer[s] was in an amount more than usually paid; (3) whether the payments were tendered in a manner different from previous payments; (4) whether there appears *any unusual action by either the debtor or creditor to collect or pay on the debt*; and (5) whether the creditor did anything to gain an advantage (such as gain additional security) in light of the debtor's deteriorating financial condition.

*In re Hechinger Investment Co. of Delaware, Inc.*, 320 B.R. 541, (Bankr. D. Del. 2004) (emphasis added); *see also In re Allegheny Health Education and Research Foundation*, 292 B.R. 68 (Bankr. W.D.Pa. 2003). This determination depends upon the particular facts of each case. *In re APS Holding Corp.*, 282 B.R. 795 (Bankr. D. Del. 2002); *In re Kaypro*, 218 F.3d 1070 (9th Cir. 2000); and *In re Freeny*, 187 B.R. 711 (Bankr. N.D. Okla. 1995).

46.     When addressing the § 547(c)(2)(B) prong, courts are unanimous in holding that the analysis "is based upon the circumstances of the business transactions between the parties [the Debtors and Dell], not the standard in the industry". *Braniff, Inc. v. Sundstrand Data Control, Inc.*, 154 B.R. 773, 780 (Bankr. M.D. Fla. 1993); *see also, J.P. Fyfe, Inc. of Florida v.*

17

*Bradco Supply Corp.*, 891 F.2d 66, 69 (3d. Cir. 1989); *In re Bangor & Aroostook Railroad Co.*, 2005 WL 434426 (Bankr. D. Maine 2005); In re Cyberrebate.Com, Inc., 296 B.R. 639 (Bankr. E.D.N.Y. 2003); and *In re APS Holding Corp.*, 282 B.R. 795 (Bankr. D. Del. 2002).

47.    Whether Dell has meet its burden under § 547(c)(2)(B) requires that the Court examine and take into consideration all the varied and surrounding circumstances regarding the relationship between the Debtors and Dell. *See In re Hechinger Inv. Co. of Delaware, Inc.,* 320 B.R. 541, 548 (Bankr. D. Del. 2004); *In re Cyberrebate.Com, Inc.*, 296 B.R. 639, 642 (Bankr. E.D.N.Y. 2003); *In re APS Holding, Corp.*, 282 B.R. 795, 802 (Bankr. D. Del. 2002); *In re Daedalean, Inc.*, 193 B.R. 204, 213 (Bankr. D. Md. 1996); *In re T.B. Home Sewing Enterprises, Inc.*, 173 B.R. 790, 795 (Bankr. N.D. Ga. 1993); *In re Julien Co.*, 157 B.R. 834, 838 (Bankr. W.D. Tenn. 1993).

48.    Evidence of unusual transactions or non-customary collection efforts "show that a transfer occurred outside of the ordinary course of business." *In re Sibilrud*, 308 B.R. 388, (Bankr. D. Minn. 2004). Courts have identified a variety of factors that will take a transfer outside of the ordinary course of business, for example: (i) phone calls to the debtor by an officer of the creditor, *see In re Schwinn Bicycle Co.*, 205 B.R. 557 (Bankr. N.D. Ill. 1995); (ii) a creditor's refusal to deliver product unless the debtor made payments on outstanding invoices, *see Braniff, Inc. v. Sundstrand Data Control, Inc.*, 154 B.R. 773 (Bankr. M.D. Fla. 1993); (iii) changes in the method of payment by the debtor to the creditor, such as a wire transfer or cashier's check, *see In re Spirit Holding Co., Inc.*, 153 F.3d 902 (8th Cir. 1998); *In re Craig Oil Co.*, 785 F.2d 1563 (11th Cir. 1986); and (iv) if the debtor held a check for a period of time before delivering the check to the defendant, *see Braniff, Inc. v. Sundstrand Data Control, Inc.*, 154 B.R. 773 (Bankr. M.D. Fla. 1993). In addition, courts routinely have observed that

18

payments made after a debtor ceases all or a portion of its business operations are outside of the ordinary course of business. *See Hovis v. Powers Construction Co, Inc. (In re Hoffman Assocs., Inc.)*, 194 B.R. 943, 954 (Bankr. D.S.C. 1995); *Equip. Co. of Am. V. Prod. Supply Co. of Fla. (In re Equip. Co. of Am.)*, 135 B.R. 169, 173 (Bankr. S.D. Fla. 1991); *In re Jerry-Sue Fashions, Inc.*, 91 B.R. 1006, 1008 (Bankr. S.D. Florida 1988).

49.     Finally, although timing or lateness of the payments also may be factors to be considered, if any one factors is compellingly inconsistent with prior transactions, the payment is deemed to be outside the ordinary course of business between the parties. *See In re Sibilrud*, 308 B.R. 388, (Bankr. D. Minn. 2004) (citing *In re Laclede Steel Co.*, 271 B.R. 127 (8th Cir. BAP 2002)).

50.     Dell has not met its burden of establishing that the Transfers were made in the ordinary course of business between Dell and the Debtors.  Before the Compaq Sale, the Debtors purchased Product from Dell on purchase orders and were invoiced by Dell or one of its affiliates, Dell Receivables, L.P.  After the Compaq Sale, Dell essentially ceased doing any new business with the Debtors and did not provide them further Product.  Rather, all that occurred after the Compaq Sale was the pay down of invoices from Dell existing before the Compaq Sale and the delivery of a small amount of Product on previously-submitted purchase orders; deliveries that were not released until the old invoices were first paid.  It is clear that as a result of the Compaq Sale, the fundamental business relationship between the Debtors and Dell changed dramatically from a distribution-vendor relationship to one involving to pay down of old invoices and cessation of business.

51.     Evidence presented at trial showed that changes in the information technology industry occurred that resulted in reduced profit margins and acute liquidity difficulties for the

Debtors.  The combination of industry-wide declining sales, declining prices, and the reduced level of financial support from vendor rebates led to extreme pressure on the Debtors.  All of these factors significantly impacted the Debtors, who were unable to adapt effectively to the changing industry conditions and business practices of their suppliers.   Consequently, the significantly reduced revenues had a corresponding adverse impact on the Debtors' cash flow.

52.    The evidence presented by the Debtors shows that on approximately February 16, 2000 Dell learned that the Debtors were showing signs of financial difficulty.  Near that time, Dell became aware of the pending Compaq Sale and that Oshlo was physically holding checks to Dell totaling approximately $6,077,498.00 in the Debtors' Treasury Department.  Dell became concerned about the Debtors' ability to pay Dell on its outstanding invoices (which exceeded $12 million by March 1, 2000, an historic high) and was further concerned about any continuing business with the Debtors due to the Debtors' sale of their entire Distribution Business to Compaq, one of Dell's major competitors.  In Dell's view it was poor business judgment to sell its product through a major competitor such as Compaq.

53.    Therefore, following the Compaq Sale, the prior ordinary course of business between Dell and the Debtors changed from that of supplier and re-seller of computer equipment to one of paying down past due invoices and fulfilling outstanding Product orders.  As a consequence, consideration of the timing and lateness of the Transfers must be viewed from the perspective of a creditor seeking to recover outstanding payments from a dying company and not a creditor/supplier maintaining its business dealings with a debtor/customer.  In essence, the Debtors were already in a liquidation mode prior to the commencement of their chapter 11 cases and were no longer doing any business with Dell.

20

54.    The evidence also shows that during the Preference Period, Dell engaged in various unusual activities attempting to collect its past due invoices from the Debtors. Beginning on February 16, 2000, Mr. Horton, Dell's then-Director of Finance, Enterprise Segment and the highest ranking Dell executive responsible for overseeing the collections from the Debtors, contacted Mr. Oshlo by telephone and was told that, due to cash flow difficulties the Debtors were holding checks to Dell in the Treasury Department and that payments could not be released until after the Compaq Sale closed. Horton and others at Dell spoke directly to Oshlo about the checks to Dell that Oshlo was holding. This was the first time Horton had ever had contact with Oshlo or other representatives of the Debtors. After his conversation with Oshlo, Horton became very concerned about the Debtors' ability to pay Dell and fulfill the Debtors' obligations.

55.    In reaction to his conversation with Oshlo, Horton initiated a collection program against the Debtors whereby Dell resolved to "aggressively pursue payments from them using all legal means necessary". On February 17, 2000, Horton sent a demand letter to Fitzpatrick, the Debtors CFO, demanding payment of all outstanding invoices and expressing concern for the Debtors' transaction with Compaq, a major Dell competitor.

56.    On February 17, 2000, Dell placed the Debtors on credit hold by which Dell did not release any Product on any pending purchase orders from the Debtors until prior delinquent invoices were first paid. The credit hold initiated by Dell extended into the Preference Period. Dell had never before placed the Debtors on any form of credit hold.

57.    The Plaintiff has presented competent evidence that the Transfers of $1,515,938.54 and $4,561,559.50 were specific checks to Dell that Oshlo was holding and were released during the time and as a result of the collection program initiated by Dell. Further, the parties payment history shows that the $4,561,559.50 Transfer was by far the largest payment the

21

Debtors had ever made to Dell.  The evidence shows that Dell was aware that Mr. Oshlo was

holding the $4,561,559.50 check to Dell, as well as other checks to Dell, that Dell had placed the

Debtors on credit hold at the time these checks were being held and were released to Dell, and

that Dell had sent a collection letter to the Debtors' CFO, which Dell had never done before,

after Horton contacted Oshlo by telephone.

58.      Dell's concern regarding its collection efforts against a company it was no longer

supplying Product to, a company struggling to maintain its remaining Service Business and on

the verge of bankruptcy, is further shown through documents produced by Dell, including its

privilege log dated July 6, 2005.  These documents show that Dell's legal department become

involved with the Inacom situation and that outside preference counsel at Hughes & Luce LLP

was consulted by Dell in March of 2000.  Dell was also aware of the economic downturn in the

computer reseller industry and the effect of that downturn on the Debtors and other computer

resellers.  As the testimony of Mr. Keller and Horton of Dell established, Dell is no stranger to

bankruptcy proceedings or preference actions, specifically with preferences arising from the

bankruptcy of computer resellers.   Keller testified that he had been involved in over 1,000

bankruptcy cases and 200 preferences on behalf of Dell in the past five years alone.  Dell's

concern with respect to exposure to the Debtors resulted in the creation of a collection "script"

by Dell legal to be followed by Horton and his collection team in dealing with the Debtors and

their "end-users" during the time Dell had placed the Debtors on credit hold.  None of this

activity was in the ordinary course of business between Dell and the Debtors.

59.      Based on the evidence presented at trial, Dell has not demonstrated a consistency

of payment with respect to the Preference Period Transfers.  The payment terms on Dell's

invoices to the Debtors were "net 30 days".  The evidence illustrates that this meant that payment

22

was due to Dell within thirty calendar days from the date of each invoice and that Dell treated any payment after 30 days as delinquent. There was no evidence presented that these payment terms were ever modified by Dell.

60.     When payments made within the preference period are made by wire and previous payments were always made by check, such wire payments likely will be deemed outside of the ordinary course. *See In re Valley Steel*, 182 B.R. 728 (Bankr. W.D. Va. 1995); *In re National Aerospace, Inc.*, 219 B.R. 625 (Bankr. M.D. Fla. 1998); *In re Dewey Bear Foot*, 952 F.2d 795 (4th Cir. 1991).

61.     Before the Preference Period it was the usual and ordinary course of the Debtors to pay invoices to Dell by check, and the overwhelming majority if not all of payments made by the Debtors to Dell before and during the Preference Period were made by checks issued from the Debtors' accounts payable department, under the management of Ms. Nancy Pearson. Checks were ordinarily cut by the Debtors' accounts payable department every Tuesday and Thursday and mailed out the same day. The Debtors' accounts payable department had no authority to pay Dell by wire; that responsibility rested solely with the Debtors' Treasurer, Mr. Oshlo, the Debtors' CFO Thomas J. Fitzpatrick ("Fitzpatrick"). The record shows that one Transfer to Dell in the amount of $806,278.00 received by Dell on April 3, 2000, was made by wire. Mr. Oshlo testified that in all likelihood he authorized this single wire Transfer to Dell. Payment by wire transfer was not an ordinary and customary means of payment between the Debtors and Dell.

62.     In accordance with the established case law regarding § 547(c)(2)(B), the payments made after the sale of the Debtors' Distribution Business and cessation of business by Dell, the timing and amount of the payments, the withholding of checks, the collection efforts

23

and high level phone inquires from Dell executives, the involvement of in-house legal attorneys and outside preference counsel, the credit hold and withholding of Product by Dell and the wire payment is sufficient for the Court to conclude that the Transfers were not made in the ordinary course of business or financial affairs of the Debtors and Dell and that Dell has failed to meet its burden under § 547(c)(2)(B) of the Bankruptcy Code.

4.      Dell Has Failed to Meet Its Burden Under Section 547(c)(2)(C)

63.     The determination of whether a defendant has satisfied its burden under § 547(c)(2)(C), whether transfers made according to ordinary business terms, is an objective test. The Third Circuit adopted the conclusions of the Seventh Circuit stating that:

> [O]rdinary business terms refers to the *range* of terms that encompasses the practices in which firms similar in some general way to the creditor in question engage, and only dealings so idiosyncratic as to fall outside that broad range should be deemed extraordinary and therefore outside the scope of subsection C. (emphasis added).

*Fiber Lite Corp. v. Molded Acoustical Prod.*, 18 F.3d 217, 224 (3d Cir. 1994) (quoting *In re Tolona Pizza Prod. Corp.*, 3 F.3d 1029, 1033 (7th Cir. 1993)). The *Molded Acoustical* court further elaborated "we substitute the word 'unusual' for 'idiosyncratic' but otherwise adopt *Tolona Pizza's* definition. *Id.* at 224.

64.     The Plaintiff's expert on "ordinary business terms", Stuart A. Gollin of Weiser LLP ("Weiser"), provided the most credible testimony on this issue. Mr. Gollin began by identifying the relevant industry for creditors such as Dell and the other three defendants in the other pending preference actions brought by the Debtors, Tech Data Corp., Lexmark International, Inc. and Ingram Entertainment, Inc. Next, a thorough search was conducted to identify Weiser clients in similar industries to Dell and the other three creditors. An additional search was conducted utilizing the services of Dun & Bradstreet, Moores Rowland International,

24

two nationally recognized credit and business data reporting companies, and Strategic Consulting & Research Group, a data gathering organization. From this extensive search, 89 target companies was identified and surveyed. The surveys were conducted with financial executives or accounts payable/receivable personnel within the target companies. A total of 64 out of the 89 target companies were interviewed and surveyed.

65. Based on the Weiser report and Mr. Gollin's testimony, the Plaintiff has produced evidence sufficient to show that the ordinary business terms for the parties' industry was approximately 69.7% of account payments made within the invoice contract terms, and 90% made within the "net 30 day" window. The ordinary industry practice reveals mostly current payments with some slippage to 30 days. The evidence shows that the Transfers were made much later than this industry standard.

66. Based on the evidence presented at trial, the Court concludes that the Transfers were not made within ordinary business terms and Dell has failed to meet its burden under §547(c)(2)(C) of the Bankruptcy Code.

F.   The Debtors May Recover $7,619,790.47 in Preferential Transfers from Dell

67. The Court finds that Dell has not produced sufficient evidence to refute the presumption of insolvency accorded the Debtors under § 547(f) of the Bankruptcy Code. Thus, the Plaintiff has satisfied the requirement of § 547(b)(3).

68. The Plaintiff has satisfied the requirements of § 547(b)(5). The Transfers enabled Dell to receive more than it would have received if the Debtors' cases were cases under chapter 7, if the Transfers had not been made, and Dell received payment in accordance with the applicable provisions of the Bankruptcy Code.

119096.01600/40155907v1

69.    The Court also finds that Dell has not satisfied its burden § 547(g) with respect to the ordinary course of business defense. Dell has not proven by a preponderance of the evidence under §§ 547(c)(2)(B) and (C) that the Transfers were made in the ordinary course of business or financial affairs of the Debtors and Dell and that the Transfers were made according to ordinary business terms.

70.    The Plaintiff is entitled to judgment in its favor and against Dell in the amount of $7,619,790.47. The Transfers are held to be avoidable under § 547 of the Bankruptcy Code and recoverable in full by the Debtors under § 550 of the Bankruptcy Code.

DONE and ORDERED.


This _____ day of _____ 2005        _____

The Honorable Gregory M. Sleet
United States District Court Judge

119096.01600/40155907v1