# TAB 10

# DELL, INC.'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

IN THE UNITED STATE DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| INACOM CORP., et al., | ) | Case No. 00-2426 (PJW) |
| | ) | |
| Debtors. | ) | |
| | ) | |
| INACOM CORP., on behalf of affiliated Debtors, | ) | Civil Action no. 04-582-GMS |
| | ) | Adv. No. 02-3499 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| DELL COMPUTER CORPORATION, et al, | ) | |
| | ) | |
| Defendants. | ) | |

## DELL, INC.'S PROPOSED FINDINGS OF FACT
## AND CONCLUSIONS OF LAW

### I.      FINDINGS OF FACT

#### A.      Parties and Procedural History

1.      Dell, Inc. (f/k/a Dell Computer Corp.) ("Dell") is a corporation formed under the laws of the State of Delaware. Its principal place of business is located at One Dell Way, Round Rock, Texas. Dell manufactures and sells computer products and peripherals, as well as a variety of other electronic and technological products.

2.      Inacom Corp. and its affiliated Debtors (collectively "Debtors") filed a Voluntary Petition for Relief Under Chapter 11 of Title 11, United States Code (the "Bankruptcy Code") on June 16, 2000 (the "Petition Date).

3.      On June 16, 2000, the United States Bankruptcy Court for the District of Delaware entered an order procedurally consolidating the Debtors' Chapter 11 cases for administrative

purposes only. Following the Petition Date, the Debtors operated their businesses and managed their properties as Debtors-in-Possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

4.     On May 16, 2002, Inacom filed its Complaint against Dell.

5.     On June 11, 2002, Dell filed its Original Answer. Thereafter, on December 29, 2004, Dell filed its Amended Answer.

6.     The Bankruptcy Court confirmed the Debtor's Plan on May 23, 2003.

7.     On June 25, 2004, this Court entered an Order withdrawing the reference of this adversary proceeding to the bankruptcy court.

**B.     Debtors' Financial Condition At the Time of the Alleged Preferential Transfers**

8.     The Debtors were originally in two basic lines of business: computer hardware and peripherals distribution (the "Distribution Business") and a technology service business (the "Service Business"). Through these businesses the Debtors delivered personal computer and related information technology products to businesses and provided various technology-related services, managing the entire technology lifecycle, including technology planning, technology procurement, technology integration, technology support, and technology management.

9.     On April 9, 1999, Inacom entered into a Credit Agreement with various lending institutions, with Deutsche Bank AG New York Branch ("Deutsche Bank") as the administrative agent ("Credit Agreement"). The Credit Agreement provided a $450,000,000 loan to Inacom, with such loan being comprised of both a Term Loan Facility and a Revolving Loan Facility.

10.     In late 1999, the Debtors entered into negotiations with Compaq Computer Corporation ("Compaq"), one of their largest distribution vendors, for the sale of the Distribution Business to Compaq. At that time, Compaq was the largest seller of computer products in the United States. Upon the sale of the Distribution Business to Compaq, Inacom fully intended to continue operating the Service Business, which historically enjoyed higher margins than the Distribution

2

Business, and Compaq had promised to be a major Inacom customer. Specifically, for the first nine months of 1999, the Service Business had a Gross Margin of approximately 37%; whereas, for that same time period, the Distribution Business had a Gross Margin of approximately only 7%. Therefore, the sale to Compaq permitted Inacom to focus its business on the high-margin Service Business as opposed to the low-margin Distribution Business.

11.    As a result of these negotiations, on January 4, 2000, Inacom signed an Asset Purchase Agreement (the "APA") and certain related operational agreements with Compaq and its acquisition subsidiary ITY Corp., subsequently known as Custom Edge, Inc. (referred to collectively as "Compaq").

12.    Under the APA, Compaq agreed to purchase substantially all of the assets of Inacom's Distribution Business (the "Compaq Sale").

13.    In connection with the Compaq Sale, Compaq, in addition to the APA, also entered into substantial long-term operational agreements with Inacom worth hundreds of millions of dollars. Among these related agreements were: (i) a $55.5M credit facility in which Compaq agreed to extend to Inacom a $55.5M loan; (ii) a three year, $420M Services, Supply and Sales Agreement (and a related Service Level Agreement) in which Compaq agreed to utilize Inacom's services and "assist Inacom in a generation of incremental revenues for Inacom service business" in the aggregate amount of $85M for year 2000, $140M for year 2001, and $195M for year 2002; (iii) a three-year outsourcing/agency agreement in which Compaq agreed to pay Inacom a 3.5% distribution fee for the sale of Compaq computer products; and (iv) a Separation and Sharing Agreement, in which Inacom and Compaq would share certain assets and personnel for up to twelve (12) months following the close of the Compaq Sale.

14.    In connection with the APA, Inacom also executed a Fourth Amendment and Waiver to the April 9, 2000 Credit Agreement, amending the Credit Agreement to modify it to a $225M

3

revolving credit facility ("Deutsche Bank Credit Facility"). The proceeds of the sale of the Distribution Business to Compaq significantly reduced Inacom's total indebtedness.

15.    The Deutsche Bank Credit Facility contained certain financial covenants, including minimum net worth covenants, covenants requiring certain minimum levels of working capital, and minimum EBITDA covenants, among others. Under the Deutsche Bank Credit Facility, as stated under the February 15, 2000 Fourth Amendment and Waiver, the minimum EBITDA covenant required Inacom to have EBITDA of $7,000,000 by December 31, 2000 and $15,000,000 by March 31, 2001. In addition, the Deutsche Bank Credit Facility set a net worth covenant, which required Inacom to maintain a minimum net worth of $185,000,000, plus 75% of net income, plus 100% of capital stock net issuance proceeds, plus 100% of any indebtedness converted into equity. Deutsche Bank's own analysis showed that Inacom would be able to comply with the minimum EBITDA and net worth covenants set forth in the Deutsche Bank Credit Facility.

16.    The Third Amendment and Waiver to the Credit Agreement, dated January 4, 2000 established a borrowing base requirement to govern advances under the Deutsche Bank Credit Facility. The borrowing base was comprised of 60% of eligible inventory plus 85% of eligible receivables plus 50% of the amount of the Nesbitt Burns Residual Note (a pre-existing debt). This borrowing base requirement continued under the Fourth Amendment and Waiver.

17.    In connection with the APA, Houlihan Lokey Howard & Zukin ("Houlihan Lokey") prepared a solvency opinion, dated February 16, 2000 ("Houlihan Lokey Solvency Opinion"). After an extensive review and analysis of Inacom's financial records and the Service Business and after interviews with Inacom's top management, including but not limited to Thomas Fitzpatrick (Inacom's CFO) and Richard Oshlo (Inacom's Treasurer), Houlihan Lokey stated in the Houlihan Lokey Solvency Opinion that: (i) the fair value and present saleable value of Inacom's assets exceeded the company's stated and identified contingent liabilities; (ii) Inacom would be able to pay its debts as they matured; and (iii) the capital remaining in Inacom after the sale of the Distribution

4

Business to Compaq would not be unreasonably small for the continued operation of the Service Business. The Houlihan Lokey Solvency Opinion was a condition precedent to finalization and consummation of the APA. The Houlihan Lokey Solvency Opinion was based on an extensive financial and business analysis, and Houlihan Lokey was paid $400,000 for the Houlihan Lokey Solvency Opinion.

18.     Accordingly, Compaq, Inacom, and Deutsche Bank relied upon the Houlihan Lokey Solvency Opinion and believed that it was an accurate of assessment of Inacom's financial condition.

19.     Prior to the APA, Goldman Sachs & Co. ("Goldman Sachs") utilized market data and other information in preparing a January 4, 2000 presentation to Inacom's Board of Directors. Goldman Sachs provided investment and financial advice and services to Inacom for approximately two years prior to the APA. During the over two-year relationship between Goldman Sachs and Inacom, Goldman Sachs performed business analysis for Inacom on a variety of topics, including valuation analysis and capital structure analysis.

20.     In preparing the January 4, 2000 presentation to Inacom's Board of Directors, Goldman Sachs undertook an extensive analysis concerning Inacom, including utilizing the information previously known and made available to it over the course of the various projects performed by Goldman Sachs over the two-year prior relationship. In addition, Goldman Sachs analyzed information from various sources including IBIS estimates[1] (for earnings projections) and information from Wall Street analysts in preparing the January 4, 2000 presentation to Inacom's Board of Directors.

---

[1] IBIS is a public market source for forecast information.

5

006005.00189:175417.07

21.    Based on Goldman Sachs knowledge of Inacom and its extensive analysis, Goldman Sachs prepared projections showing that Inacom would have increasing EBITDA throughout 2000 with a positive EBITDA by the second quarter of 2001. In preparing this analysis, Goldman Sachs was projecting future increases in EBITDA and revenues for Inacom, and Goldman Sachs specifically believed that the Service Business of Inacom was viable and would survive as a going concern.

22.    In addition, Deutsche Bank performed a specific analysis concerning Inacom in connection with the Deutsche Bank Credit Facility. Deutsche Bank, like Goldman Sachs & Co., concluded that Inacom would achieve positive EBITDA in 2001 and that its revenue and EBITDA levels would continue to strengthen throughout 2000.

23.    Deutsche Bank believed that Inacom's management had a sound plan and direction for the company and believed that Inacom would continue as a going concern after the Compaq Sale in the future.

24.    Following the Compaq Sale, Deutsche Bank, Goldman Sachs, Compaq, and Inacom all believed based on their independent analysis and experience, that Inacom would continue as a going concern into the future.

25.    Based on the APA, the related operational agreements discussed above, the Fourth Amendment and Waiver to the April 9, 2000 Credit Agreement, and the Houlihan Lokey Solvency Opinion, the Compaq Sale closed on February 16, 2000. Compaq paid approximately $369,500,000 for Inacom's Distribution Business and also assumed some of Inacom's accounts receivable and debt obligations, including but not limited to all of Inacom's previous obligations owed to Deutsche Financial Services in connection with Inacom's floor planning facility for Compaq product.

26.    Inacom's management received bonuses, approved by Inacom's Board of Directors, following the Compaq Sale, including a $625,000 which in part was a bonus and other

6

006005.00189:175417.07

additional compensation to the CEO, Gerald Gagliardi, and a $100,000 bonus to the CFO, Thomas Fitzpatrick.

27.     After the Compaq Sale, Inacom through its treasurer, Richard Oshlo, submitted monthly Borrowing Base Certificates to Deutsche Bank in accordance with the Deutsche Bank Credit Facility, providing information concerning the eligible inventory, receivables, and outstanding principal of the Nesbitt Burns Residual Note (an existing note), in order to calculate the funds available to Inacom.

28.     In the February 26, 2000 Borrowing Base Certificate, Inacom had availability under the Deutsche Bank Credit Facility of $79,322,298.40.  In the March 25, 2000 Borrowing Base Certificate, Inacom had availability under the Deutsche Bank Credit Facility of $54,656,000.  In the April 22, 2000 Borrowing Base Certificate, Inacom had availability under the Deutsche Bank Credit Facility of $89,681,203.

29.     In the February 26, 2000 Borrowing Base Certificate and the March 25, 2000 Borrowing Base Certificate, Richard Oshlo, Inacom's Treasurer, specifically represented, among other things, that "no default or event of default or potential default exists." Accordingly, Inacom, itself, was representing that as of the dates of the Borrowing Base Certificates, it was in compliance with the Deutsche Bank Credit Facility, including but not limited to compliance with its minimum net worth covenants.

30.     At all times, from March 17, 2000 through April 17, 2000 Inacom continued to sell services and products, retain employees and pay wages, advertise, pay its obligations, and generally continue to operate its business and perform its business functions.

31.     In addition, from February 16, 2000 through the Petition Date, Inacom continued to pay its indebtedness and reduce the loan balance it owed to Deutsche Bank.  The outstanding balance owed by Inacom to Deutsche Bank under the Credit Agreement was $164,672,000 on

7

February 16, 2000. By April 22, 2000 that amount had been reduced to $112,672,000, and by the Petition Date, the amount had been further reduced to $66,872,000. Indeed, as of April 24, 2000, the amounts owed to Deutsche Bank by Inacom were "lower than projected" by Deutsche Bank, thus showing that Inacom was operating in such a manner so as to be able to reduce its indebtedness even more than was expected. Inacom was even able to pay off its current debts earlier than expected, including paying an extra $15,000,000 to IBM in late March 2000 to pay off a $78,000,000 loan over a month and a half early.

32.     On March 31, 2000, Inacom contacted Deutsche Bank concerning the regularly-scheduled meeting between Inacom and Deutsche Bank scheduled for April 27, 2000. In the March 31, 2000 correspondence concerning the meeting, Inacom made no mention of or reference to any problems or issues concerning the operation of its business or any defaults (existing or potential) or difficulties in meeting its covenants or obligations under the Deutsche Bank Credit Facility.

33.     On April 17, 2000, Thomas Fitzpatrick, Inacom's Chief Financial Officer, learned, by telephone, while on vacation in Cancun, Mexico, that certain accounts receivables allegedly belonging to Compaq had been mistakenly received in Inacom's lockboxes and automatically swept as payments upon the Deutsche Bank Credit Facility. Upon learning this information, Mr. Fitzpatrick, nevertheless, chose to continue his vacation in Mexico and did not return to the United States until the following week.

34.     On April 27, 2000, Compaq, for the first time, notified Deutsche Bank that Compaq claimed that certain receivables owned by Compaq were mistakenly paid into Inacom's lockboxes. Deutsche Bank notified Compaq that it would investigate the matter. Subsequently, Deutsche Bank refused to return the swept funds and, refused to advance further funds to Inacom, giving as the reason an alleged material adverse change under the Deutsche Bank Credit Facility.

8

35.     Deutsche Bank funded the draw requests of Inacom under the Deutsche Bank Credit Facility on each occasion as requested up through April 28, 2000.

36.     Indeed, it was not until April 28, 2000 that Deutsche Bank provided any indication to Inacom that Deutsche Bank was considering declaring a material adverse change and advancing no further funds to Inacom under the Deutsche Bank Credit Facility. However, Deutsche Bank did not actually declare a material adverse change at that time; instead it continued to investigate Compaq's allegations concerning the commingling of funds paid into Inacom's lockboxes.

37.     As of April 21, 2000, Inacom still had five thousand six hundred and forty-eight (5,648) employees, and revenues based upon income statements for the four the weeks ending April 22 of $63 million.

38.     In fact, on May 1, 2000 and again on May 26, 2000, Deutsche Bank informed Compaq that it was still investigating the matter of the misapplied funds that Compaq had misdirected to Inacom's bank account.

39.     Throughout February, March, and April, 2000, there was no indication to Inacom, its customers, its lenders, its investment advisors, or the general public that Inacom would cease operations, and during that time, Inacom continued to operate its business and bankruptcy was not clearly imminent. Throughout February, March, and April, 2000, Inacom was a going concern actively engaged in business.

40.     The aggregate equity of Inacom Corp. on April 22, 2000 was between $44,000,000 and $144,000,000.

41.     Therefore, at least through April 22, 2000 Inacom was solvent.

9

C.     **Facts Concerning the Amounts Dell Would Have Received Under Chapter 7**

42.     Inacom has failed to meet its burden of proof under 11 U.S.C. § 547(b)(5). Specifically, Inacom has failed to show that it can meet the Chapter 7 liquidation test, i.e that Payments to Dell allowed Dell to receive more than Dell would have received if (i) the case were a case under Chapter 7; (ii) the Payments had not been made; and (iii) Dell received payment of such debt to the extent provided by the provisions of the Bankruptcy Code.  The reason Inacom cannot meet this burden is that the costs in this case are so excessive and the results from the sale of the business would appear to be far less than what would have been obtained by a Chapter 7 Trustee, who would only be paid a small statutory % of the amounts recovered.

43.     For the period of June 30, 2000 through June 8, 2003, Blank Rome, L.L.P. ("Blank Rome"), counsel for the Creditors' Committee and then the Administrative Agent, received compensation of $1,794,178.00.

44.     For the period of June 26, 2000 through June 9, 2003, Inacom's counsel, Pachulski, Stang, Ziehl, Young, Jones & Weintraub, P.C. ("Pachulski Stang") received compensation for attorneys' fees in the amount of $9,160,035.69, with an additional $2,428,569.20 being paid to Pachulski Stang as expenses.

45.     For the period of June 22, 2000 through June 8, 2003, Bridge Associates, L.L.C., previously known as Restoration Management Company, L.L.C. ("Bridge Associates"), was paid by Inacom's bankruptcy estate the following: (i) fees in the amount of $4,333,720.00, (ii) expenses in the amount of $565,652.14, and (iii) a $4,463,520.00 contingent fee.  Accordingly, from June 22, 2000 through June 8, 2003, Inacom paid Bridge Associates $9,362,892.14.

10

46.    Executive Sounding Board Associates, Inc. ("ESB") financial advisors to the Official Committee of Unsecured Creditors for the period of August 28, 2000 through June 8, 2003, received $1,192,074 in fees and $83,466 in expenses from Inacom's bankruptcy estate.

47.    In addition, Inacom's Plan provided a $6,000,000 fund for post-confirmation, professional compensation and reimbursement claims.

48.    Since Plan Confirmation, Blank Rome, Pachulski Stang, and Bridge Associates have been paid undisclosed amounts by Inacom out of the $6,000,000 fund.

49.    As set forth above, the compensation paid to Blank Rome, Pachulski Stang, Bridge Associates, and ESB through June 9, 2003, in connection with the Chapter 11 bankruptcy proceeding of Inacom was $24,021,215.03.    In addition to this $24,021,215.03, another $6,000,000 was made available from the estate to pay further compensation to Blank Rome, Pachulski Stang, Bridge Associates, and others.    Therefore, total expenses for the compensation of Blank Rome, Pachulski Stang, ESB and Bridge Associates may total more than $30 million dollars.

## D.    Facts Regarding the Parties' Business Relationship

50.    Starting from seven (7) years prior to the Petition Date, the Debtors purchased computer equipment and peripherals ("Product") from Dell.    This was a long standing vendor relationship under which Dell accepted Inacom's purchase orders and extended credit terms to Inacom.    This relationship continuously existed for the seven (7) years, and Inacom purchased Product from Dell generally under standard net-thirty day terms.    From January 1, 1998 through March 17, 2000, a two and a half year period, Inacom paid 95% of its Dell invoices between 27 and 71 days from the invoice date (the "45 day payment range").

51.    After the February 16, 2000 closing of the Compaq Sale, Dell continued to provide Product to the Debtors under the same terms as it had prior to the Compaq Sale.

11

52.    In the Preference Period, Dell received twenty-eight (28) payments from the Debtors totaling $7,619,790.47 (the "Payment(s)") for product manufactured by Dell and sold to Inacom in the regular course of Dell's and Inacom's business as follows:

| Payment Applied Date | Payment Amount | Payment Number | Vendor | Payment Type |
|---|---|---|---|---|
| 3/20/2000 | $1,515,938.54 | 715707 | Dell | check |
| 3/20/2000 | $86,554.50 | 714247 | Dell | check |
| 3/22/2000 | $4,561,559.51 | 712805 | Dell | check |
| 3/22/2000 | $412.28 | 683524 | Dell | check |
| 3/23/2000 | $236.55 | 714246 | Dell | check |
| 3/23/2000 | $27.90 | 683523 | Dell | check |
| 3/24/2000 | $433.59 | 684341 | Dell | check |
| 3/28/2000 | $456.05 | 684814 | Dell | check |
| 3/30/2000 | $37,349.32 | 716651 | Dell | check |
| 3/31/2000 | $68,843.53 | 717249 | Dell | check |
| 3/31/2000 | $1,136.80 | 684343 | Dell | check |
| 4/3/2000 | $806,278.00 | WT-3 | Dell | Wire Transfer |
| 4/4/2000 | $8,373.43 | 717793 | Dell | Check |
| 4/4/2000 | $474.00 | 716650 | Dell | Check |
| 4/6/2000 | $433.54 | 685622 | Dell | Check |
| 4/12/2000 | $114,440.81 | 719530 | Dell | Check |
| 4/12/2000 | $99.95 | 687662 | Dell | Check |
| 4/13/2000 | $160.55 | 718891 | Dell | Check |
| 4/17/2000 | $25,929.50 | 687886 | Dell | Check |
| 4/18/2000 | $215,051.45 | 719850 | Dell | Check |
| 4/18/2000 | $134,037.50 | 718892 | Dell | Check |
| 4/18/2000 | $938.00 | 688738 | Dell | Check |
| 4/27/2000 | $514.36 | 684342 | Dell | Check |
| 4/28/2000 | $298.92 | 720717 | Dell | Check |
| 5/3/2000 | $4,182.39 | 722044 | Dell | Check |
| 5/12/2000 | $215.97 | 693213 | Dell | Check |
| 5/17/2000 | $34,924.44 | 723236 | Dell | Check |
| 5/22/2000 | $489.09 | 723818 | Dell | Check |

**Total Payments:**    **$7,619,790.47**

53.    All of the Payments were made in payment for Dell technology products previously sold, delivered, and accepted by Inacom. The Payments are not avoidable under the three part ordinary course test.

006005.00.89:175417.07

54. First, as stipulated by Inacom, under 11 U.S.C. § 547(c)(2)(A), the Payments were in payment of a debt incurred by the Debtors in the ordinary course of business or financial affairs of the Debtors and Dell.

55. Second, under 11 U.S.C. § 547(c)(2)(B), the Payments were in payment of a debt incurred by the Debtors in the ordinary course of business or financial affairs of the Debtors and Dell.

56. When applying the 45 day payment range, which, as discussed above, is the payment range representing 95% of the invoices paid in the two and one half year Pre-Preference Period, to the Preference Period payments, all but $99,300.45 fall within this 27 to 71 day payment range.

57. When adjusting this amount for credit memos and accounting adjustments, only $82,476.81 of the amount of monies ultimately received by Dell were received outside of the 45 day payment range.

58. As set forth in Mr. Thomas' report and the Dell/Inacom invoice and payment chart for 1998, 1999 and 2000, and the comprehensive data presented, during the preference period, the timing of payments by Inacom on Dell invoices were for the very most part the same as timing of the payments during the two and one half year pre-preference period.

59. Indeed, for two and a half years prior to the preference period, Dell custom manufactured and sold to Inacom a total of $183,822,705 worth of computer products under 19,567 separate invoices. Significantly, the preference period payments, based on the invoice date to payment date, remained consistent in terms of the timing of payments on Dell's invoices as those made during the two and a half year pre-preference period.

13

60.    During the preference period, Dell did not put Inacom on credit hold or initiate legal proceedings to recover amounts owed by Inacom.

61.    During the preference period, Dell did not alter its credit terms, and Dell continued to supply product that was ordered by Inacom.

62.    Inacom, prior to the beginning of the Preference Period, engaged in a pattern or practice of "cutting" checks and holding such checks prior to sending them.    Inacom acknowledges that it regularly held checks in the three and a half month period prior to the beginning of the Preference Period.  In fact, by the admission of Inacom's Accounts Payable Manager, on many occasions, every check in a check run would be held.

63.    In addition, Inacom consistently held checks for the entire one year period prior to the beginning of the Preference Period, and, in fact, Inacom regularly held checks between 1993 and 1997.  In short, Inacom's practice of holding checks was usual and ordinary for many years prior to the beginning of the Preference Period.

64.    Before the beginning of the Preference Period, Dell, placed five (5) of 162 of Inacom's accounts on "soft credit hold" and sent a single demand letter.  Neither of these actions resulted in any of the Payments received by Dell during the Preference Period.  In fact, this soft credit hold was released two weeks prior to the beginning of the Preference Period and prior to Inacom making any of the Payments at issue in Inacom's Complaint.  The Payments received by Dell during the Preference Period are consistent, both in terms of the time and manner of payment, as those received by Dell during the two and a half year period from January 1, 1998 through March 17, 2000.

006005.00189:175417.07

65.     Third, under 11 U.S.C. § 547(c)(2)(C), the Payments were made according to ordinary business terms. Payments made in the 45 day payment range are not so idiosyncratic as to fall outside that broad range so as to be deemed extraordinary.

66.     Based on the testimony of Jon LaRocca, and his 22 years in the credit industry specifically working with computer companies and re-sellers, and the data submitted, the payments in this case were in line with the payment practices of the Computer industry and Re-sellers in 2000. Re-sellers paid other computer manufactures, including but not limited to Hewlett Packard, outside the stated terms of invoices, generally after the stated terms (i.e. net 30 days paid past the 30 days). The alleged preferential payments by InaCom on the invoices to Dell compared with the computer industry and the repayment practices of re-sellers were not so "unusual" or "idiosyncratic" as to be considered outside of the of ordinary course of business for industry.

67.     Contrary to the contention of Plaintiff's expert, data from 2003, three years later than the date the payments were made to Dell, is not relevant. In addition, data across a number of industries (e.g. telecom and software companies with no break down across any customer base), which was provided by Inacom's expert is simply not relevant to the industry standard test. Rather, the payment practices of the computer/reseller industry in 2000 is determinative.

68.     In addition, Dell provided $69,814.17 of products and services to Inacom after the first allegedly preferential payment. This $69,814.17 of products and services sold to and received by Inacom during the Preference Period constitutes new value pursuant to 11 U.S.C. § 547(c)(4). Specifically, the $69,814.17 of products and services sold to and received by Inacom during the Preference Period were not secured by an otherwise unavoidable security interest, and

15

006005.00189:175417.07

on account of such product, Inacom did not make an otherwise unavoidable Transfer to or for the benefit of Dell.

## II.    CONCLUSIONS OF LAW:

### A.    Jurisdiction and Venue

69.    This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334 and §§ 547 and 550 of the United States Bankruptcy Code (the "Bankruptcy Code"). Venue is proper before this Court under 28 U.S.C. §§ 1408 and 1409. This is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (B), (F), and (O).

### B.    Inacom's Preference Claim—11 U.S.C. § 547(b)

70.    Inacom brought this adversary proceeding against Dell pursuant to 11 U.S.C. §§ 547 and 550 to avoid transfers of the Debtors property to wit: the payments to Dell for products previously sold to and accepted by Inacom. Inacom has failed to meet its burden of proof under 11 U. S. C. 547(b). Under section 547(b) of the Bankruptcy Code, Inacom has the burden of proof to establish that such transfers:

(1)    were to or for the benefit of Defendant;

(2)    were for or on account of an antecedent debt owed by the Debtor before such transfer was made;

(3)    were made while the Debtor was insolvent;

(4)    were made—

(a)    on or within ninety (90) days before the date of filing of the petition; or

16

(b)     between ninety (90) days and one year before date

of the filing of the petition, if Defendant at the time of the transfer

was an insider; and

(5)     enabled the Defendant to receive more than it would receive if the

case were a case under chapter 7 of the Bankruptcy Code, the transfer had not

been made, Defendant received payment of such debt to the extent provided by

the provisions of 11 U.S.C. § 550.


71.     As a matter of law, Dell has rebutted the presumption of insolvency and Inacom

as set forth in more detail below, failed to establish that it was insolvent from the beginning of

the preference period to April 22, 2000.  In addition, Inacom has failed to prove that it has met its

burden under 11 U.S.C. §547(a)(5).  Section 550 does not apply if the payments cannot be

avoided.

**C.     Inacom Was Not Insolvent at the Time the Payments Were Made**

72.     The factual evidence established that Dell has rebutted the presumption of

insolvency and, therefore, Inacom has the burden of proof to establish insolvency at the time of

the payments made by Inacom to Dell by a preponderance of the evidence.  *See In re Trans*

*World Airlines, Inc.,* 180 B.R. 389, 404 (Bankr. D. Del. 1994), *affirmed in part, reversed in part*

*on other grounds*, 203 B.R. 890 (D. Del. 1996), *reversed*, 134 F.3d 188 (3rd Cir. 1998) (Third

Circuit affirmed the bankruptcy court and reversed the district court's reversal);  *see also In re*

*Lids Corp.*, 281 B.R. 535, 540 (Bankr. D. Del. 2002); 11 U.S.C. § 547(g); FED. R. EVID. 301.

73.     "Insolvency" is defined as a "financial condition such that the sum of . . . [the

debtor's] debts is greater than all of . . . [the debtor's] property, at a fair valuation, exclusive of"

17

exempt and fraudulently transferred property. 11 U.S.C. § 101(32)(A); *see also In re Lids Corp.*, 281 B.R. at 540. This test is commonly referred to as the Balance Sheet Test. *See id.* There is no statutory guidance as to the manner of assessing the "fair valuation" of assets so the determination of "[i]nsolvency requires the court to use some practical business judgment about asset valuation." DANIEL R. COWANS, 2 BANKRUPTCY LAW AND PRACTICE 467 (7th ed. 1998).

74.    The Third Circuit, contemplating the proper manner to determine fair valuation, has stated that where "liquidation in bankruptcy was not clearly imminent on the date of the challenged transfer . . . assets [are] valued on a going concern basis," not a liquidation basis. *In re Trans World Airlines, Inc.*, 134 F.3d at 193; *see also Moody v. Sec. Pac. Bus. Credit, Inc.*, 971 F.2d 1056, 1067 (3d Cir. 1992); *In re Lids Corp.*, 281 B.R. at 541 (going concern where company planned to continue operations as usual on valuation date). Contrarily, "going concern value is not the proper standard if the business is 'on its deathbed'" at the time of the transfer. *Matter of Taxman Clothing Co., Inc.* 905 F.2d 166, 170 (7th Cir. 1990). A company is on its deathbed only when it is "wholly inoperative, defunct, or dead on its feet." *In re Art Shirt Ltd., Inc.*, 93 B.R. 333, 341 (E.D. Pa. 1988). Therefore, a company need not be thriving to receive going concern valuation. *Id.*

75.    Inacom, as of April 22, 2000, employed thousands of people, continued to carry on its business, and was actively engaged in pursuing the Service Business. Inacom was a going concern, through at least April 22, 2000. Therefore, in valuing Inacom for purposes of determining whether Inacom was solvent on the date of the Payments, Inacom as a matter of law should be valued on a going concern basis, not as a company in liquidation.

76.    The Third Circuit has defined the fair valuation of assets, in the going concern context, as "'market value' rather than 'distress value,' but . . . the valuation must be analyzed 'in

18

006005.00189:175417.07

a realistic framework' considering amounts that can be realized 'in a reasonable time' assuming
a 'willing seller' and a 'willing buyer.'" *In re Trans World Airlines, Inc.*, 134 F.3d at 193-94; *see
also In re Lids Corp.*, 281 B.R. at 541.

77.     A "reasonable time" is defined as an estimate of the time that a typical
creditor would find optimal: not so short a period that the value of the goods is
substantially impaired via a forced sale, but not so long a time that a typical creditor
would receive less satisfaction of its claims, as a result of the time value of money and
typical business needs, by waiting for the possibility of a higher price. *In re Trans World
Airlines, Inc.*, 134 F.3d at 195 (in that case a reasonable time was twelve (12) to eighteen
(18) months); *see also In re Lids Corp.*, 281 B.R. at 541.

78.     In this context, the fair valuation/market value is "the amount that may be realized
if the Company's aggregate assets are sold as an entirety with reasonable promptness in an arm's
length transaction under present conditions for the sale of comparable business enterprises, as
such conditions can reasonably evaluated by . . ." an expert. *In re Lids Corp.*, 281 B.R. at 541.

79.     Furthermore, the debtor's "assets must be valued at what they are reasonably
worth at the time of the allegedly preferential transfers and <u>not what they turned out to be worth
at some time after the bankruptcy intervened</u>." *In re Davis*, 120 B.R. 823, 825 (Bankr. W.D. Pa.
1990) (emphasis added); *see also Total Tech. Servs., Inc. v. Whitworth*, 150 B.R. 893, 900
(Bankr. D. Del. 1993).  Consistent with this rule, the Third Circuit has stated that "the use of
hindsight to evaluate a debtor's financial condition for purposes of the [Bankruptcy] Code's
'insolvency' element has been criticized by courts and commentators alike." *In re R.M.L., Inc.*,
92 F.3d 139, 155 (3d Cir. 1996).  Indeed, "[t]here is overwhelming authority to the effect that . . .
subsequent dismemberment [of the debtor] . . . should not enter into the picture." *In re Trans*

19

*World Airlines, Inc.*, 134 F.3d 188, 197-98 (3d Cir. 1998) (quoting Lawrence P. King, 2 Collier on Bankruptcy ¶ 101.32[4], p. 101-16 (15th ed. 1997)), *cert. denied*, 523 U.S. 1138 (1998).

80.     Once the fair value of Debtor is determined, "it is necessary to reduce that value by the liabilities which existed on the Valuation Date to determine if "the debtor was insolvent. *In re Lids Corp.*, 281 B.R. at 545. Unlike assets, debts are measured at their face value and not at market value. *In re Trans World Airlines, Inc.*, 134 F.3d 188, 190, 196 (3rd Cir. 1998); *In re Lids Corp.*, 281 B.R. at 545. Contingent liabilities, however, are "limited to costs arising from foreseeable events that might occur while the debtor remains a going concern." *In re Trans World Airlines, Inc.*, 134 F.3d at 196-98; *see also In re Lids Corp.*, 281 B.R. at 546. Therefore, "[c]ontingent liabilities do not include costs associated with liquidation or dissolution of the debtor" as this would inherently contradict the going concern status of the debtor. *In re Lids Corp.*, 281 B.R. at 546; *see also In re Trans World Airlines, Inc.*, 134 F.3d at 197-98.

81.     Further, hindsight is forbidden when a court is assessing whether an entity was on its financial deathbed at the time of the transfer(s). *In re Payless Cashways, Inc.*, 290 B.R. 689, 705 (Bankr. W.D. Mo. 2003); *In re DAK Indus., Inc.*, 195 B.R. 117, 125 (Bankr. C.D. Cal. 1996). Therefore, evidence after April 22 time period, is irrelevant to the inquiry.

82.     Under the foregoing valuation standards, Dell has provided sufficient evidence to rebut the presumption of insolvency, thus shifting the burden of persuasion to Inacom to establish by a preponderance of the evidence that Inacom was insolvent during the period of the alleged Preferential Payments at issue in this action.

83.     Inacom was solvent at least through April 22, 2000. As of April 22, 2000, Inacom had an aggregate equity value of between $44,000,000 and $144,000,000. The legal conclusion is based upon on the April 2000 income statement prepared by Inacom, the collective

20

opinions of third parties with substantial expertise in valuing business, including but not limited

to Goldman Sachs and Houlihan Lokey, Compaq Computer's determination that it would enter

into a $55 million dollar subordinated loan with Inacom and a three year, $420 million dollar

service agreement, a separate service and support agreement whereby Inacom's employees were

to work with Compaq's in the future, the revolving credit facility with Deutsche Bank with

availability in the range of $89,681,203 in April and Borrowing Base Reports prepared by

Inacom.

84.    Because Inacom was solvent through April 22, 2000, Inacom is not entitled to any

recovery as to any of the Payments made prior to that date, having failed to satisfy the

requirement of 11 U.S.C. § 547 (b)(3). Therefore, the maximum amount Inacom may even be

entitled to recover, subject to Dell's affirmative defenses discussed below, is $40,625.17.

### B.    ORDINARY COURSE OF BUSINESS DEFENSE

85.    Dell has asserted an affirmative defense pursuant to 11 U.S.C. § 547(c)(2)(A)-(C)

(the "Ordinary Course Defense"). The purpose of the Ordinary Course Defense "is to leave

undisturbed normal financial relations between a debtor and its creditors, even as a company

approaches bankruptcy." *In re First Jersey Sec., Inc.*, 180 F.3d 504, 512 (3rd Cir. 1999); *see also*

*In re Molded Acoustical Prods., Inc.*, 18 F.3d 217, 223 (3rd Cir. 1994). "It protects 'recurring,

customary credit transactions that are incurred and paid in the ordinary course of business of the

debtor and the debtor's transferee.'" *In re First Jersey Sec., Inc.*, 180 F.3d at 512 (citation

omitted).

86.    Under the Ordinary Course Defense, Inacom cannot avoid any alleged

preferential payments to the extent such payments are:

21

(A)    in payment of a debt incurred by Debtor in the ordinary course of the

business or financial affairs of Debtor and Dell;

(B)    made in the ordinary course of business or financial affairs of Debtor and

Dell; and

(C)    made according to ordinary business terms.

11 U.S.C. § 547(c)(2)(A)-(C). It is undisputed and the parties have stipulated that the transfers

satisfy 11 U.S.C. § 547(c)(2)(A). Therefore, the first element of the Ordinary Course defense is

satisfied.

87.    The second element is often referred to as the "subjective" test, as it examines the

relationship between the specific debtor and creditor. 11 U.S.C. § 547(c)(2)(B). In addressing

this element, courts consistently review the pre-preference period of business and then compare

that data to the preference period. *See In re Big Wheel Holding Co.*, 223 B.R. 669, 674 (Bankr.

D. Del. 1998) (holding that because the debtor paid invoices late in the pre-insolvency period,

then late payments were the ordinary course of business for the preference period); *see also In

re Color Tile, Inc.*, 239 B.R. 872, 875 (Bankr. D. Del. 1999) (summary judgment in favor of the

defendant; during pre-insolvency period, payments were made in a range of fifteen (15) to

seventy-two (72) days; during preference period, payments were made is a range of twenty-two

(22) to forty-seven (47) days, well with in the pre-insolvency range). In addition, given the long-

standing, seven-year relationship between Inacom and Dell, more latitude must be given in

determining those practices that are considered in the ordinary course of business. *See In re

Molded Acoustical Products, Inc.*, 18 F.3d at 225 ("[W]e adopt the following rule of construction

as an aid to resolving these problems: the more cemented (as measured by duration) the pre-

insolvency relationship between the debtor and the creditor, the more the creditor will be allowed

22

to vary its credit terms from the industry norm and yet remain within the safe harbor of §
547(c)(2)."); *See also,; In re First Jersey Securities, Inc.*, 180 F.3d 504, 513 (3d Cir. 1999); *In re
U.P. Interactive, Inc.*, 321 B.R. 388, 393 (Bankr. D. Del. .2005); *In re Cherrydale Farms, Inc.*,
2001 WL 1820323, at *3(Bankr. D. Del. February 20, 2001).

88.    Between Debtor and Dell there was an established business relationship in which
the form and tender of the alleged preferential transfers parallel the pre-preference period
transfers.  Looking at this two and a half year pre-preference period in this case, 95% of the
payments, were made twenty-seven (27) and seventy-one (71) days after invoice date.  Using a
only a forty-five (45) day range of payments and applying it to the preference period Payments,
all but $99,300.45 of the preference period payments fall within this range.  When adjusting this
amount for credit memos and accounting adjustments, only $88,476.81 was received by Inacom
outside of this 45-day range for payments.

89.    Further, based on the accounting data and other evidence presented, there was no
unusual collection activity during the preference period that resulted in the payment of any
amounts at issue in Inacom's Complaint.  *See In re Craig Oil Co.*, 785 F.2d 1563, 1566 (11th
Cir. 1986).

90.    Indeed, the practice of holding a check prior to payment, in and of itself, does not
automatically disqualify the payment from the ordinary course of business defense.  Indeed,
holding checks may be deemed in the ordinary course of business if such practice is consistent
with the actions of the parties prior to the preference period.  *See generally, In re T.B. Home
Sewing Enterprises, Inc.*, 173 B.R. 790 (Bankr. N.D. Ga. 1993) (holding checks not inconsistent
with prior dealings); *see also In re Narragansett Clothing Co.*, 146 B.R. 609 (Bankr. R.I. 1992)
(same); *In re Powerine Oil Company*, 126 B.R. 790 (9th Cir. BAP 1991) (holding of checks but

23

one factor in determining whether payments were outside the ordinary course of business; no evidence presented to the court with respect to the debtor's practices prior to the preference period); *In re Braniff*, 154 B.R. 773 (Bankr. D. Fl. 1993) (debtor, during the preference period only, was forced to hold checks due to cash flow problems); *In re Kroh Brothers Development Company*, 115 B.R. 1011 (Bankr. W.D. Mo. 1990) (also a check holding case; "necessary to look to the payment history for the time before the preference period. . . to see how the parties dealt with the payments before.").

91.    In this case, by Inacom's own admission, Inacom held checks for at least the three and one half months prior to the beginning of the Preference Period.  Additionally, Inacom started a practice of holding checks as early as 1993.  Finally, the payment range, as discussed above, shows no marked difference between the two and one half year Pre-Preference Period and the Preference Period, which substantiates that any alleged holding of checks either occurred both during the Pre-Preference Period and in the Preference Period or that any such holding of checks had no impact on the Payments received.  Therefore, the fact that a Payment by the Debtor during the Preference Period was made in connection with a held check does not remove such Payment from the protection afforded by the ordinary course of business defense.

92.    Moreover, the held checks issue is of little import in this case since Dell data is not in any way based on check date in comparison to the date an invoice was paid.  The actual applied date is used for the two and a half years of pre-preference period data and the preference period data.  The actual application of payments to invoices, rather than when a check was issued or held, is more indicative for the ordinary course of business defense (i.e. comparing the payment history in the pre-preference period to the preference period)..

006005.00 89:175417.07

93.    The third element of the ordinary course of business defense is referred to as the "objective" test, as it examines whether transfers were made "according to ordinary business terms." *See In re First Jersey Sec., Inc.*, 180 F.3d at 513; 11 U.S.C. § 547(c)(2)(C). This phrase encompasses "'the practices in which firms similar in some general way to the creditor in question engage.'"  *See In re First Jersey Sec., Inc.*, 180 F.3d at 513 (quoting *In re Molded Acoustical Prods., Inc.*, 18 F.3d at 224); *See also In re U.P. Interactive, Inc.*, 321 B.R. 388, 393 (Bankr. D. Del. .2005); *In re Cherrydale Farms, Inc.*, 2001 WL 1820323, at *3(Bankr. D. Del. February 20, 2001).  This element is not a high hurdle for the creditor as "this test may be satisfied as long as the payment was made within the *range* of terms that encompasses the practices in which firms similar in some general way to the creditor in question engage . . . [and] only dealings so <u>idiosyncratic</u> as to fall outside that broad range should be deemed extraordinary."  *In re Cocolat, Inc.*, 176 B.R. 540, 550 (Bankr. N.D. Cal. 1995) (emphasis in original); *see also In re First Jersey Sec., Inc.*, 180 F.3d at 513; *In re Molded Acoustical Prods., Inc.*, 18 F.3d at 220 & 224; *In re Tolona Pizza Prods. Corp.*, 3 F.3d 1029, 1033 (7th Cir. 1993).

94.    Further, based on duration of Dell's and Inacom's pre-insolvency relationship, seven (7) years, the Third Circuit permits a substantially greater departure from the range of normal industry terms.  *See In re Molded Acoustical Products, Inc.*, 18 F.3d at 225 (Holding: "the more cemented (as measured by duration) the pre-insolvency relationship between the debtor and the creditor, the more the creditor will be allowed to vary its credit terms from the industry norm . . . ."); *In re First Jersey Securities, Inc.*, 180 F.3d 504, 513 (3d Cir. 1999); *In re U.S. Interactive, Inc.*, 321 B.R. 388, 393 (Bankr. D. Del. .2005); *In re Cherrydale Farms, Inc.*, 2001 WL 1820323, at *3(Bankr. D. Del. February 20, 2001). Therefore, considering the length

006005.00 .89:175417.07

of the relationship between Dell and Inacom, the transfers meet the third element of the Ordinary Course Defense under 11 U.S.C. § 547(c)(2)(C).

95.    Payments made in a 45-day range cannot be considered so "idiosyncratic" or "unusual" as to fall outside that broad range so as to be deemed extraordinary. In this regard, the payments made to Dell by Inacom within the 45-day range of payments are "according to ordinary business terms" pursuant to 11 U.S.C. § 547(c)(2)(C).

96.    To the extent that Inacom asserts that all checks that were "held" by Debtor's before being transferred to Dell were not transferred according to ordinary business terms, Inacom is incorrect.[2]  Again, courts generally find that the practice of holding a check prior to payment, in and of itself, does not automatically disqualify the payment from the ordinary course of business defense. Instead, the courts examine the practices in which firms similar in some general way to the creditor in question engage. See In re T.B. Home Sewing Enterprises, Inc., 173 B.R. 790 (holding checks not inconsistent with industry); see also In re Narragansett Clothing Co., 146 B.R. 609 (same); In re L. Bee Furniture Co., Inc., 206 B.R. 981 (Bankr. M.D. Fla. 1997) (not adopting objective standard; but stating even if it had the holding of checks was within industry standards). Here it is within industry standards/terms for checks to be held. The practice of holding checks is not "so idiosyncratic as to fall outside that broad range that should be deemed extraordinary." Therefore, as to any held checks received by Dell during the Preference Period at issue in Inacom's Complaint, such Payments are "according to ordinary business terms" pursuant to 11 U.S.C. § 547(c)(2)(C).

---

[2] It should be noted that the pre-preference period and preference period data presented by Dell at trial and referenced herein were based on the dates the payments were applied by Dell. Therefore, Dell is not using the check date, thus the payment data is not affected by whether a check was held by Inacom.

26

### D.    NEW VALUE DEFENSE

97.    In response to Inacom's preference claim, Dell has also asserted that, pursuant to

11 U.S.C. § 547(c)(4)(A) & (B) (the "New Value Defense"), Inacom cannot avoid certain

transfers.  Section 547(c)(4) provides that Inacom may not avoid a transfer that was to or for the

benefit Dell, to the extent that, after said transfer, Dell gave new value to of for the benefit of

Debtor that:

> (A)    was not secured by an otherwise unavoidable security interest; and
>
> (B)    on account of which new value Debtor did not make an otherwise
> unavoidable transfer to or for the benefit of Dell.

11 U.S.C. § 547(c)(4)(A) & (B).  New value is defined as: "money or money's worth in goods,

services, or new credit . . . ."  11 U.S.C. § 547(a)(2).  Section 547(a)(2)'s definition is broad

enough to encompass any type of consideration that would support a contract.  *See In re*

*Discovery Zone, Inc.*, 300 B.R. 856, 860 (Bankr. D. Del. 2003); *see also In re Spada*, 903 F.2d

971, 971 (3rd Cir. 1990) (§ 547(a)(2) construed to codify usual rules of consideration).

98.    Although the Third Circuit has held that new value must remain unpaid, [*see In re*

*New York City Shoes, Inc.*, 880 F.2d 679, 680 (3rd Cir. 1989 ) (debtor must not have fully

compensated creditor for new value as of date of bankruptcy petition], this case is

distinguishable under the holding of the Bankruptcy Court in the *In re Hechinger Investment Co.*

*of Del., Inc.*, 2004 WL 3113718, *5 (Bankr. D. Del. Dec. 14, 2004) (Unpublished).  In that case,

just as in this case,  there was a long running credit history and repeated extensions of credit to

the debtor.   The Bankruptcy Court found that because there were "thirty-four allegedly

preferential transfers at issue . . .  [and the case was] more akin to the running account or rolling

account analysis . . . than . . . [the Third Circuit case], which dealt with just one transfer . . . in

006005.00189:175417.07

the preference period." *See In re Hechinger Investment Co. of Del., Inc.*, 2004 WL 3113718, *5

(Bankr. D. Del. Dec. 14, 2004) (Unpublished). Therefore, the court refused to apply the

"remains unpaid" rule. *See id.* Rather, the court required the creditor to provide evidence that

any transfers made by the debtor on account of the new value provided by the creditor (i.e. to pay

the new value) were "otherwise avoidable." *See id.* (in other words, if the creditor's other

defenses to the preference action were waived or defeated then the transfers that paid the new

value were avoidable and, therefore, the creditor could assert a new value defense even though as

of the petition date the new value had been fully paid); *see also generally In re JKJ Chevrolet,

Inc.*, 412 F.3d 545 (4th Cir. 2005) (new value does not have to remain unpaid; inquiry is whether

payment on new value could have been avoided in the bankruptcy proceeding; did not matter

that the trustee failed to actually avoid the payments since creditor showed that such payments

could have been avoided); *In re Toyota of Jefferson*, Inc., 14 F.3d 1088 (5th Cir. 1994) (new

value does not have to remain unpaid); *In re Roberds, Inc.*, 315 B.R. 443 (Bankr. W.D. Wash.

1994) (new value does not have to remain unpaid); *In re Check Reporting Servs. Inc.*, 140 B.R.

425 (Bankr. W.D. Mich. 1992) (in depth analysis of why "remains unpaid" is not an element of

new value defense); *but see In re Braniff, Inc.*, 154 B.R. 773 (Bankr. M.D. Fla. 1993).

99.    In this case, Dell provided $69,814.17 of "new value" to Inacom. This

$69,814.17 of products and services sold to and received by Inacom during the Preference Period

constitutes new value pursuant to 11 U.S.C. § 547(c)(4). Specifically, the $69,814.17 of

products and services sold to and received by Inacom during the Preference Period were not

secured by an otherwise unavoidable security interest, and on account of such product, Inacom

did not make an otherwise unavoidable Transfer to or for the benefit of Dell.

006005.00189:175417.07

**E.     Conclusion**

92.     For the foregoing reasons, the Court finds that Dell is not liable to Inacom for any of the Payments and that Inacom is entitled to no relief or recovery whatsoever against Dell.

29

006005.00189:175417.07