# EXHIBIT B

# ORIGINAL

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

In re:  INACOM CORP., et al.,
------------------------------------x
INACOM CORP., on behalf of all
affiliated Debtors,
                Plaintiff,
      -against-
TECH DATA CORP.,
              Defendant.
------------------------------------x

Civ Act No.
04-148 GMS
Adversary No.
02-03496 PJW

INACOM CORP., on behalf of all
affiliated Debtors,
                Plaintiff,
      -against-
DELL COMPUTER CORPORATION,
              Defendant.
------------------------------------x

Civ Act No.
04-582 GMS
Adversary No.
02-03499 PJW

INACOM CORP., on behalf of all
affiliated Debtors,
                Plaintiff,
      -against-
LEXMARK INTERNATIONAL, INC.,
              Defendant.
------------------------------------x

Civ Act No.
04-583 GMS
Adversary No.
02-03500 PJW

INACOM CORP., on behalf of all
affiliated Debtors,
                Plaintiff,
      -against-
INGRAM ENTERTAINMENT, INC.,
successor in interest to
NASHVILLE COMPUTER LIQUIDATORS,
              Defendant.
------------------------------------x

Civ Act No.
04-593 GMS
Adversary No.
02-03960 PJW

July 28, 2005

9:11 a.m.

Deposition of JASON FENSTERSTOCK

**Computer Reporting Incorporated** CRI

501 Fifth Avenue  New York, NY 10017
(212) 986-1344  Fax (212) 983-9149  www.crinyc.com

July 28, 2005

9:11 a.m.


        Deposition of JASON FENSTERSTOCK,

held at the offices of Pachulski Stang Ziehl

Young Jones & Weintraub, 780 Third Avenue,

New York, New York, pursuant to Agreement,

before John Ianno, Jr., a Notary Public of

the State of New York.

A P P E A R A N C E S:


PACHULSKI STANG ZIEHL YOUNG

JONES & WEINTRAUB

Attorneys for Plaintiff

      10100 Santa Monica Blvd.

      Los Angeles, California 90067-4100

BY:   ANDREW W. CAINE, ESQ.,

         of Counsel


ADORNO & YOSS, LLP

Attorneys for Tech Data Corp.

      350 East Las Olas Boulevard

      Ft. Lauderdale, Florida 33301

BY:   STEPHEN HUNT, ESQ.,    (By Telephone)

         of Counsel

A P P E A R A N C E S:  (Cont'd):


HUGHES LUCE LLP

Attorneys for Dell Computer Corp.

    111 Congress Avenue   Suite 900

    Austin, Texas 78701

BY:   H. ROBERT POWELL, ESQ.,

    SABRINA L. STRUESAND, ESQ.,

       of Counsel


STOLL KEENON & PARK LLP

Attorneys for Lexmark International

    400 West Market Street

    Louisvile, Kentucky 40202-3377

BY:   CULVER V. HALLIDAY, ESQ.,

       of Counsel

A P P E A R A N C E S: (Cont'd):

SHEPPARD MULLIN RICHTER & HAMPTON LLP

Attorneys for Ingram Entertainment

      650 Town Center Drive  4th Floor

      Costa Mesa, California 92626-1993

BY:   JONATHAN P. HERSEY, ESQ.,

          of Counsel

BLANK ROME LLP

Attorneys for Executive Sounding Board

      One Logan Square

      Philadelphia, Pennsylvania 19103-6998

BY:   EARL M. FORTE, ESQ.,

          of Counsel

ALSO PRESENT:

      DEAN VOMERO

      RICHARD A. WHALEN

1                          *J. Fensterstock*

2      items 1, 2, 3 and 4, thereafter, an accurate

3      statement of matters for which you have been

4      engaged?

09:30:18    5          A.    Yes.

6              Q.    Other than the review of the discovery

7      information about which you have also told me, are

8      there any other activities for which you have been

9      engaged?

09:30:37    10         A.    All activities that were required in

11     order for us to fulfill the engagement as set

12     forth on page 3.

13             Q.    Any other matters?

14             A.    No.

09:30:52    15         Q.    Who decided the scope of the

16     engagement?

17             A.    Conversation between me, and counsel.

18             Q.    At any time since you became engaged

19     in this matter, have you read any legal decisions

09:31:15    20     with respect to solvency determination in

21     preference cases?

22             A.    Yes.

23             Q.    Do you recall the names of any of

24     those legal decisions?

09:31:30    25         A.    Among others, TWA, and Lids, L I D S.

1              **J. Fensterstock**

2         Q.     Did you read more than one TWA

3    decision?

4         A.     I believe so.

09:32:08  5    Q.     Any other court decisions regarding

6    insolvency determinations in preference actions

7    that you recall reading during the course of this

8    engagement?

9         A.     Not at this time.

09:32:26  10   Q.     Referring back to page 3 of Exhibit 1,

11   and the first bullet point that we discussed, do

12   you intend to offer opinions on any other topics

13   or issues other than those identified here?

14        A.     Not to my knowledge.

09:32:46  15   Q.     Do you intend to offer any opinions in

16   this matter, other than those stated in the

17   reports marked as Exhibits 1, 2 and 3?

18        A.     Not to my knowledge.

19        Q.     Exhibit 1, your May 2nd report, is

09:33:31  20   issued by Duff & Phelps and Sasco Hill Advisors;

21   correct?

22        A.     Yes.

23        Q.     Why is that?  Why are both firms

24   involved?

09:33:48  25   A.     When I made the determination to move

1                        *J. Fensterstock*

2    beyond Duff & Phelps, I advised the client that

3    that was about to occur, discussed with the

4    clients the obvious options, whether I would do

09:34:03    5    the work on my own, whether I would continue to

6    work with a selected team at Duff & Phelps.

7                        We determined that the work, as a

8    devoted service person, that the work would be

9    best handled, and be the best that it could be,

09:34:24 10    combining the forces of Duff & Phelps and Sasco

11    Hill Advisors.

12        Q.    After you left Duff & Phelps, who was

13    the primary person on this engagement for Duff &

14    Phelps?

09:34:48 15        A.    Richard Whalen.

16        Q.    Were there any other Duff & Phelps

17    personnel working on this engagement with

18    Mr. Whalen?

19        A.    Yes.

09:35:05 20        Q.    Do you recall their names?

21        A.    The ones I currently recall are

22    Matthew Miller and Jonathan Cooper.

23        Q.    Are they still at Duff & Phelps to

24    your knowledge?

09:35:17 25        A.    To my knowledge, yes.

*J. Fensterstock*

2          Q.      What are their positions at Duff &
3    Phelps?

4          A.      Associates and/or analysts.

09:35:35  5          Q.      Exhibit 2, which is a May 27 report,
6    is issued only in the name of Sasco Hill Advisors;
7    correct?

8          A.      Yes.

9          Q.      Did anybody from Duff & Phelps do work
09:36:12 10    on Exhibit 2?

11          A.      The individuals at Duff & Phelps were
12    aware of all of the contents of Exhibit 2.  I did
13    the work, prepared the report, and signed it.

14          Q.      The June 21st report, Exhibit 3, is
09:36:53 15    also issued only in the name of Sasco Hill
16    Advisors; correct?

17          A.      Yes.

18          Q.      Did anyone from Duff & Phelps assist
19    in your preparation of this report?

09:37:02 20          A.      Same answer.

21          Q.      What, if anything, did anyone from
22    Duff & Phelps do to assist you in the preparation
23    of this report?

24          A.      In formulating my opinions, in
09:37:22 25    connection with the creation of this report, I

*J. Fensterstock*

1  discussed my thinking, and the bases therefore,

2  with those parties at Duff & Phelps, prior to

3  issuing the report, and signing it myself.

09:37:51  5  Q.    Did you discuss the contents of your

6  June 21 report, Exhibit 3, with anyone from Duff

7  other than Mr. Whalen?

8  A.    I believe so.

9  Q.    Who did you discuss it with?

09:38:07  10  A.    Included in the discussions were Matt

11  Miller, of Duff & Phelps.

12  Q.    With respect to Exhibit 2, your May 27

13  report, who at Duff did you converse with, prior

14  to the issuance of that report, regarding the

09:38:34  15  subject of that report?

16  A.    Included in the discussions were Rich

17  Whalen and Matt Miller.  Possibly others, but

18  primarily those two, to my current recollection.

19  Q.    Is it fair to say that with respect to

09:39:00  20  Exhibit 1, your initial report, both you and

21  Mr. Whalen were involved in its preparation?

22  A.    Yes.

23  Q.    I'd like to explore a little bit more

24  your respective roles with respect to the

09:39:15  25  preparation of that report, and I'd like to start

22

### J. Fensterstock

1      with you.

2              Can you tell me what your role was in

3      the preparation of this report.

09:39:40  5      A.    Together with Mr. Whalen, we created

6      the structure of the report, which is where you

7      start.  How were we going to provide the analyses

8      which would be responsive to the engagement

9      mission.  What would be included in those

09:40:04 10     analyses, the time frame for those analyses, and

11     how the work that would be done, either the

12     writing of the report itself, or the financial

13     analyses and research, whose responsibility would

14     be primarily for each, and then we would review

09:40:26 15     the overall report together, in an iterative

16     process, until we were both satisfied with its

17     content, and its conclusions and offerings.

18              Q.    After those conversations, what role

19     did you assume with respect to the preparation of

09:40:48 20     this report?

21              A.    Iterative editing, iterative

22     questioning with respect to all analyses, close

23     attention to calculation, and I fess up, I missed

24     one, definitely advocate to analyses done by other

09:41:17 25     parties at Duff & Phelps, weighing approaches and

**J. Fensterstock**

1

2    thinking with Rich Whalen on issues, among others.

3        Q.    Did you personally perform any of the

4    tasks connected with the discounted cash flow

09:41:41  5    analysis?

6        A.    Yes.

7        Q.    What tasks were you involved with?

8        A.    Review of the discounted cash flow

9    analysis, review of the weighted average cost of

09:41:58 10    capital calculation, review of the Excel

11    spreadsheets, checking numbers, the way

12    professionals like I do, with back of the envelope

13    checks, to see that the numbers make sense from an

14    overall point of view, reviewing of the base data

09:42:25 15    to that data which was included in the Excel

16    spreadsheet that comprised the DCF analysis.

17        Q.    Did you, in the course of the tasks

18    you just described, review any of the source

19    documents?

09:42:49 20        A.    All of the source documents relative

21    to the discounted cash flow analysis, I located

22    through the discovery process, and provided to

23    Duff & Phelps personnel, and reviewed those

24    documents and the data in those documents for the

09:43:23 25    normal processes of review that one includes in a

24

*J. Fensterstock*

1

2    DCF analysis.

3    Q.    In the course of that review, did you

4    select any of the numbers used from those source

09:43:43  5    documents in the DCF analysis?

6    A.    I'm not sure I understand your

7    question.

8    Q.    Okay.  Dollar amounts, in various

9    categories, were taken from source documents in

09:44:10  10    order to be used in your discounted cash flow

11    analysis, correct?

12    A.    Yes.

13    Q.    Did you personally select any of the

14    dollar amounts from the source documents, that

09:44:19  15    were to be used in the DCF analysis?

16    A.    No, I reviewed what was selected by

17    others.

18    Q.    Did you have any personal involvement

19    in the comparable company analysis that is set

09:44:37  20    forth in your May 2 report?

21    A.    Yes.

22    Q.    What was your involvement in that

23    regard?

24    A.    Through the discovery process, I

09:44:50  25    identified, through I think thousands and

*J. Fensterstock*

1

2    thousands of pages, that there were a number of

3    entities that had looked at Inacom industry.

4    These entities included -- not in any particular

09:45:10  5    order, Compac, Goldman Sachs, Greenhill, Houlahan,

6    Lokey, Deutsche Bank, and in the context of the

7    Houlahan, Lokey work, there were independent,

8    third party broker firm reports that were referred

9    to in the Houlahan, Lokey work. I reviewed all of

09:45:32  10   those, and I selected the universe of comparable

11   companies that I saw Goldman Sachs looking at,

12   Deutsche Bank looking at, Greenhill looking at,

13   Houlahan, Lokey looking at, and some of the other

14   brokerage firms looking at, and I provided that

09:45:55  15   full universe to Duff & Phelps as the beginning

16   base of their comparable company analysis.

17       Q.    Did you perform any other tasks with

18   respect to the comparable company analysis?

19       A.    Yes.

09:46:20  20       Q.    What other tasks?

21       A.    I helped Duff & Phelps advise and

22   clarify on the procedure that they would follow to

23   reach the list of comparable companies that would

24   be included in our report, dated May 2nd.

09:46:40  25              The younger persons on the Duff &

*J. Fensterstock*

1

2    Phelps team were to take that full universe that I

3    just mentioned, review it, look at all other

4    companies that in their independent judgment, they

09:46:56  5    would, in the normal course, have included in an

6    overall universe of comparable companies for

7    Inacom, as of the valuation date, and then when

8    that large list had been compiled, they would

9    then, pursuant to normal Duff & Phelps comparable

09:47:16  10   company procedures, winnow down the larger list to

11   the best list of comps, comparable companies that

12   they could arrive at.

13          As they did that work, the list became

14   smaller, and when it became smaller, during the

09:47:35  15   process of it becoming smaller, we reviewed why

16   companies were being excluded, why companies were

17   going to be included, and finally came to a list

18   of what I believe is eight companies for our

19   report.  That was an iterative process involving

09:47:50  20   at least four different minds.

21          Q.    Did you personally have any role with

22   respect to the comparable company analysis after

23   those eight companies were selected?

24          A.    Could you be more specific, please?

09:48:12  25          Q.    With respect to the analyses that were

27

*J. Fensterstock*

1

2    conducted, as described in the comparable company

3    analysis in your May 2 report, did you have any

4    personal involvement with any analyses performed

09:48:26 5    after the eight companies were selected?

6        A.    The eight companies, you may have it

7    backwards or I may be misinterpreting you.    I

8    apologize if I am.    The eight companies were

9    selected after the analyses were done.    After the

09:48:45 10   analyses of each company was done, after the

11   analysis for each company was done, the companies

12   were selected.

13            So when they were selected, all that

14   remained was to take existing analysis and conform

09:49:04 15   it to a presentation.

16       Q.    Did you have any involvement with

17   respect to that?

18       A.    Yes.

19       Q.    What was the nature of your

09:49:21 20   involvement?

21       A.    One item which we created late in the

22   program, as a check to all of our other work, was

23   to add a gross margin analysis to the overall

24   analysis.

09:49:59 25       Q.    Why did you do so?

1                    *J. Fensterstock*

2    M&A transactions list, once you identify the

3    industry and SIC codes that you are looking for,

4    and the time frame, it is a computer run out of

09:56:23  5    databases, with standard information that is

6    provided out of the those databases for -- that is

7    used in investment banking circles and valuation

8    circles, and therefore it is really a reporting of

9    data and much less -- it is really reporting of

09:56:52 10    data, requires less thorough analysis than the

11    discounted cash flow analysis or the comparable

12    company analysis.

13         Q.    Did you have any role in the

14    comparable transaction analysis?

09:57:08 15         A.    Only to review it, and to make sure

16    that the universe that was being focused on,

17    relative to the Inacom service business, was the

18    universe that I would have focused on.

19         Q.    Did you make any changes to that

09:57:23 20    universe, through your review?

21         A.    Did not have to.

22         Q.    Who was primarily responsible for the

23    comparable transaction analysis?

24         A.    The Duff & Phelps side of the

09:57:35 25    equation.

1                    **J. Fensterstock**

2          Q.       Was Mr. Whalen ultimately responsible

3    at Duff & Phelps for that analysis?

4          A.       Yes.

09:57:42  5          Q.       Do you intend, at trial, to offer

6    opinions with respect to all of the analyses in

7    the May 2 report?

8          A.       I suspect so, that's conjecture, since

9    I suspect you are going to capitulate before

09:58:16  10   trial.

11          Q.       Let me ask it a different way then,

12   and I always appreciate humor, believe me.

13          A.       Forgive me for that indulgence.

14          Q.       No forgiveness required.  Assuming

09:58:34  15   this matter proceeds to trial, do you expect to

16   offer opinions with respect to all of these

17   analyses in the May 2nd report?

18          A.       Yes.

19          Q.       To your knowledge, does Mr. Whalen

09:58:52  20   hold any opinions with respect to the May 2

21   report?

22          A.       Yes.

23          Q.       Does he hold any opinions different

24   than yours?

09:58:59  25          A.       Not to my knowledge.

## C E R T I F I C A T E

STATE OF NEW YORK      )
                            : ss.
COUNTY OF NEW YORK     )

          I, JOHN IANNO, JR., a Shorthand Reporter and a Notary Public within and for the State of New York, do hereby certify that the foregoing deposition of JASON FENSTERSTOCK was taken before me on the 28th day of July, 2005;

          That the said witness was duly sworn before the commencement of his testimony; that the said testimony was taken stenographically by me and then transcribed.

          I further certify that I am not related by blood or marriage to any of the parties to this action or interested directly or indirectly in the matter in controversy; nor am I in the employ of any of the counsel in this action.

          IN WITNESS WHEREOF, I have hereunto set my hand this 11th day of August, 2005.

                                        _____
                                   JOHN IANNO, JR.

July 28, 2005

<u>I N D E X</u>

| <u>WITNESS</u> | <u>EXAMINATION BY</u> | <u>PAGE</u> |
|---|---|---|
| JASON FENSTERSTOCK | MR. CAINE | 6 |
| | MR. FORTE | 201 |

---------- INFORMATION REQUESTS ----------

DIRECTIONS (DI):      None

INSERT:               None

RULINGS (RL):         None

REQUESTS (RQ):        None

CERTIFIED (CE):       None

MOTIONS (MO):         None


E X H I B I T S

| Plaintiff's Exhibits | For ID |
|---|---|
| 1 through 8, expert reports and related documents | 6 |
| 9, copy of Murray Devine report | 205 |

17:16:19

*COMPUTER REPORTING INC.*
*(212) 986-1344*