# EXHIBIT B – PART 1

1

```
 1              UNITED STATES DISTRICT COURT
                  DISTRICT OF DELAWARE
 2                                              COPY
    ------------------------------
 3  In re:                        ) Chapter 11
                                  )
 4  INACOM CORP., et al.,         ) Case No. 00-2426 (PJW)
                                  )
 5        Debtors.                ) Jointly Administered
                                  )
 6  ------------------------------)
                                  )
 7  INACOM CORP.,                 )
                                  ) Civil Action No.
 8  On behalf of all affiliated   )    04-582 (GMS)
    Debtors,                      )
 9          Plaintiffs,           )
                                  )
10      V.                        ) Adv. Pro. No.
                                  )    02-03499 (PJW)
11  DELL COMPUTER CORPORATION,    )
    Et al.,                       )
12          Defendants.           )
    ------------------------------)
13


14  ************************************************


15              ORAL DEPOSITION OF

16             STEPHEN H. THOMAS

17               JULY 13, 2005

18  ************************************************

19

20      ORAL DEPOSITION of STEPHEN H. THOMAS, produced as a
    witness at the instance of the Plaintiffs, and duly
21  sworn, was taken in the above-styled and numbered cause
    on the 13th day of July, 2005, from 9:33 a.m. to 4:29
22  p.m., before David Bateman, RPR, CSR in and for the
    State of Texas, reported by machine shorthand, at the
23  offices of Hughes & Luce, LLP, 111 Congress Avenue,
    Suite 900, Austin, Texas 78701, pursuant to the Federal
24  Rules of Civil Procedure and the provisions stated on
    the record or attached hereto.

25
```

DISK
ENCLOSED

1                          A P P E A R A N C E S

2

3        FOR THE PLAINTIFFS:

4            MR. EARL M. FORTE
             Blank Rome, LLP
5            One Logan Square
             18th & Cherry Streets
6            Philadelphia, Pennsylvania 19103-6998
             (215) 569-5618

7

8        FOR THE DEFENDANT DELL COMPUTER CORPORATION:

9

             MS. SABRINA STREUSAND
10           Hughes & Luce, LLP
             111 Congress Avenue, Suite 900
11           Austin, Texas 78701
             (512) 482-6842

12

13

         ALSO PRESENT:

14

             MR. MICHAEL L. NEWSOM (Via Telephone)
15                Bridge Associates, LLC

16

17

18

19

20

21

22

23

24

25

INDEX

|  |  | PAGE |
|---|---|---|
| Appearances | .................................... | 2 |
| **STEPHEN H. THOMAS** |  |  |
| Examination by Mr. Forte | ................. | 4 |
| Changes and Signature | ......................... | 251 |
| Reporter's Certificate | ....................... | 253 |

EXHIBITS

| NO. DESCRIPTION |  | PAGE MARKED |
|---|---|---|
| 1 | .......................................... | 44 |
| 05-30-02 Thomas Engagement Letter |  |  |
| 2 | .......................................... | 86 |
| Thomas Expert Report Binder |  |  |
| 3 | .......................................... | 227 |
| 05-26-05 Newsom Rebuttal Report |  |  |

STEPHEN H. THOMAS,

2  having been first duly sworn, testified as follows:

3                         EXAMINATION

4  BY MR. FORTE:

5      Q     Mr. Thomas, could you please state your full

6  name and home address for the record.

7      A     Stephen Harrison Thomas, 3325 Regent Drive,

8  Dallas, Texas 75229.

9      Q     Okay.  Do you intend to reside there for the

10 indefinite future, sir?

11     A     Yes.

12     Q     I assume you've given a deposition before.

13     A     Correct.

14     Q     All right.  So you're familiar with the ground

15 rules?

16     A     Yes.

17     Q     Well, let me just go through a few.  As you

18 know, there's a court reporter to your left taking down

19 everything that's said.  Please speak audibly and

20 clearly.

21           And I'll promise to try not to interrupt

22 you and hopefully you can do the same.  If your counsel

23 objects, please stop and let her complete her objection

24 so the court reporter can get everything down because

25 he can't get down two people speaking at once.

1              Do you understand that, sir?

2      A    Yes.

3      Q    All right.  Is there any reason that you're

4  aware of why you cannot proceed with your deposition

5  today?

6      A    No.

7      Q    You're represented today by Sabrina Streusand?

8      A    Correct.

9      Q    Of Hughes & Luce?

10     A    Yes.

11     Q    And Hughes & Luce is preference counsel to

12 Dell in this case; is that correct?

13     A    Correct.

14          MS. STREUSAND:  Mr. Forte, just to

15 clarify that, we have retained Mr. Thomas as an expert

16 witness.

17          MR. FORTE:  I understand.

18          MS. STREUSAND:  Okay.

19     Q    (BY MR. FORTE) What's your current business

20 address, sir?

21     A    400 North St. Paul, Suite 600, Dallas, Texas

22 75201.

23     Q    Is that your only business address?

24     A    Yes.

25     Q    Do you intend to keep your business address

1    there for the indefinite future?

2        A    Yes.

3        Q    Now starting with your undergraduate

4    education, could you review your educational background

5    for me, please.

6        A    I have a bachelor of business administration

7    degree with a specialization in accounting from

8    Southern Methodist University in Dallas, Texas.    I

9    obtained that degree in 1974.    I have no other degrees.

10        Q    Okay.    You said you majored in accounting?

11        A    I have emphasis in accounting.    At that time,

12    SMU didn't have majors technically, although I had 36

13    hours of accounting, nine of business law and nine of

14    finance.    I would easily be an accounting major in a

15    school that had majors.

16        Q    All right.    So your undergraduate degree is in

17    business with an emphasis in accounting, correct?

18        A    Yes.

19        Q    All right.    Was that a full-time, four-year

20    undergraduate program?

21        A    Yes.

22        Q    Now you said you have no other degrees; is

23    that right?

24        A    Yes.

25        Q    Do you have any other form of non-degreed

1  education?

2      A    As an -- as a CPA, I'm required to take at

3  least 40 hours of continuing professional education

4  each year.  And I've maintained my CPA certificate

5  since obtaining it in 1979.

6              Also as a certified fraud examiner, I

7  have to have either 10 or 20 hours a year in

8  fraud-related topics.  The two can be concurrent, and I

9  usually do training that satisfies both needs.

10             So I usually get around 40 hours a year

11 of continuing professional education.

12     Q    And you've been doing that since 1979?

13     A    Yes.

14     Q    And how did you get your certified public

15 accountancy license?

16     A    It's in Texas and I got it the standard way.

17 I took the test, paid the money and got the -- I think

18 at that time two years of experience under the

19 supervision of other licensed CPAs.

20     Q    And what kind of experience was that?

21     A    I was an auditor for the accounting firm of

22 Arthur Andersen & Company in Dallas, Texas.

23     Q    That was the auditing of public companies?

24     A    Some were public.  Some were private.

25     Q    Did you ever certify a publicly-filed

1   financial statement?

2        A    No.  I was not a partner at Arthur Andersen.

3   Thus I did not sign any audit opinions.

4        Q    And I assume that the two years you worked for

5   Arthur Andersen was before you were a CPA.

6        A    That's correct.  I worked for Arthur Andersen

7   more than two years.  But it was a required two-year

8   minimum in order to obtain your certificate.

9        Q    And how long did you work for Arthur Andersen,

10  sir?

11       A    Approximately four years.

12       Q    In what time period?

13       A    '74 to '78.

14       Q    And again, that was before you were a CPA?

15       A    Correct.

16       Q    Did you ever work for Arthur Andersen after

17  you became a CPA?

18       A    Yes.

19       Q    And when was that?

20       A    I became a CPA in early 1979 and I didn't

21  leave Arthur Andersen until mid-1979.  So there was a

22  short period of time I was a CPA working for Arthur

23  Andersen.

24       Q    Could you describe what kind of work you did

25  during that short period in 1979?

1      A      The same kind of work as before, I was an

2   auditor.

3      Q      And that was a mixture of public and private

4   companies?

5      A      Correct.

6      Q      And I assume the reason you didn't certify any

7   financial statements for a public company during the

8   time you were at Arthur Andersen because it was company

9   policy to have that done by partners; is that correct?

10     A      The partners only signed the opinions.

11     Q      And you were just an employee?

12     A      Correct.

13     Q      All right.  What occasioned your departure

14   from Arthur Andersen in mid-1979?

15     A      I was an oil and gas auditor primarily.  This

16   was during the oil and gas boom.  So I left for more

17   money, less hours, bigger staff, better title.  It's a

18   natural transition from public accounting.

19     Q      Okay.  So during the time you were at Arthur

20   Andersen, most of your auditing work was for oil and

21   gas clients?

22     A      Correct.

23     Q      Could you describe several examples of the

24   types of clients you audited for me, please?

25     A      Yes.

1    Q    Could you do that?

2    A    Yes.

3    Q    Please do.

4    A    Okay.  Primarily, they were public fund

5  companies.  They were oil and gas.  Let me back up.

6              On-shore oil and gas exploration,

7  domestic generally, often they did public drilling

8  funds where they would form limited partnerships and

9  sell limited partnership units to investors.  Those

10  were most of my clients.

11    Q    Okay.  So domestic exploration and production?

12    A    Yes.

13    Q    And limited partnership type structures?

14    A    Yes.

15    Q    All right.  And by whom were you employed

16  after you left Arthur Andersen -- excuse me -- in

17  mid-1979?

18    A    Energy Sources, Inc.

19    Q    What kind of a company was that?

20    A    The same kind.  They did public drilling

21  funds, although we did have some offshore concessions,

22  which was one differentiation.  However, my primary

23  focus was on the domestic on-shore oil and gas

24  production limited partnerships.

25    Q    So Energy Sources, Inc. was a limited

1    partnership?

2        A    No.  Energy Sources, Inc. was a corporation.

3    They would serve as the general partner in each of the

4    limited partnerships they formed and sold and did

5    partnership units in.

6        Q    Approximately how many limited partnerships

7    did Energy Sources, Inc. act as the general partner of?

8        A    This is rough, but I would say 20 to 25.

9        Q    Was that investment in domestic oil fields?

10       A    Yes, or undeveloped leases we hoped to make

11   into an oil field.

12       Q    Did you succeed?

13       A    Occasionally.

14       Q    How long was Energy Sources, Inc. and the

15   limited partnerships it was the GP of operate?

16       A    Could you --

17       Q    How long did -- that was a bad question.

18       A    I'm sorry.

19       Q    I'll re-ask the question.  How long did Energy

20   Sources, Inc. operate?

21       A    I don't know when they were founded or when

22   they started since I came on board in 1979 and they

23   were preexisting.

24       Q    Does it still exist today?

25       A    No.

1      Q    Did it go bankrupt?

2      A    Yes.

3      Q    What was your position at Energy Sources,

4 Inc.?

5      A    My initial position was manager of partnership

6 accounting.  I was then promoted to controller.

7      Q    And what were your duties as manager of

8 partnership accounting?

9      A    I basically oversaw and managed the accounting

10 for all the limited partnerships.

11      Q    Did that involve the calculation of tax

12 deductions for limited partner investors?

13      A    No.

14      Q    Did you render any kind of tax opinions with

15 respect to your work at Energy Sources, Inc.?

16      A    No.

17      Q    Did the company go bankrupt while you were

18 employed there?

19      A    Yes.

20      Q    Were you an owner of Energy Sources, Inc.?

21      A    I had stock options, which were eventually

22 worthless.

23      Q    Was Energy Sources, Inc. put through a

24 bankruptcy proceeding?

25      A    Yes.

1    Q    What federal district?

2    A    The Northern District of Texas, Dallas

3 Division.

4    Q    When was that?

5    A    I think in 1982.

6    Q    Do you recall whether it was a Chapter 11 or a

7 Chapter 7?

8    A    It started off as 11 and went to 7.

9    Q    As they often do.  Did you give any testimony

10 during the bankruptcy proceeding?

11    A    No.

12    Q    Were you sued in connection with that

13 bankruptcy?

14    A    Me personally?

15    Q    Yes.

16    A    No.

17    Q    Was there a lawsuit against the directors and

18 officers of Energy Sources, Inc.?

19    A    I don't recall.

20    Q    Were there any investigations by the Internal

21 Revenue Service?

22    A    I don't recall.  I don't think so.

23    Q    You don't happen to recall the case number for

24 the bankruptcy of Energy Sources, Inc.?

25    A    No, sir.  I apologize for that outburst.  I --

Case 1:04-cv-00582-GMS    Document 74-11    Filed 08/29/2005    Page 15 of 50

1  my memory's not nearly that good.

2      Q   No, I -- I understand.  But sometimes people

3  live things and they remember surprising details and

4  can't remember what they had for breakfast the same

5  day.  It's just the way it is.  So I had to ask you.

6      A   I'm sorry.  No, I -- I do not recall the case

7  number.

8      Q   All right.  And that proceeding was filed in

9  1982 you said; is that correct?

10      A   That's to the best of my recollection.  I

11  could be off a year either way.

12      Q   Do you remember how long it was pending?

13      A   No.

14      Q   Do you recall who the judge was?

15      A   No.

16      Q   When did you leave the employment of Energy

17  Sources, Inc.?

18      A   Possibly late '83, early '84.  I don't recall

19  with much specificity.

20      Q   So you remained an employee of Energy Sources,

21  Inc. after its bankruptcy filing?

22      A   For around a year, possibly a little more.

23      Q   What was your -- what were your job duties

24  during that year?

25      A   Well, they continually increased as the staff

1  shrank until I was one of the final handful of people

2  there and finally, obviously in a Chapter 7, everyone

3  goes away.

4      Q    What were you doing?  Why were you still

5  there?

6      A    Accounting -- accounting and various

7  administrative functions.

8      Q    Like what?

9      A    Gathering various information for the

10 attorneys, helping figure out how to shut down offices,

11 basically trying to close down the business.

12     Q    Do you recall if -- well, let me back up a

13 minute.  Were you an officer of Energy Sources, Inc.?

14     A    No.

15     Q    Just an employee?

16     A    Yes.

17     Q    All right.  Do you recall whether the Internal

18 Revenue Service or other taxing authorities sought to

19 recover from you personally unpaid trust fund taxes or

20 things of that nature?

21     A    They didn't try to recover anything from me

22 personally.

23     Q    And that's the Internal Revenue Service or the

24 local taxing authorities in the state of Texas?

25     A    Correct.

1     Q     Were you involved in preference litigation --

2     A     No, I didn't --

3     Q     -- at Energy Sources, Inc.?

4     A     I'm sorry.

5     Q     That's okay.  Go ahead.

6     A     Not at Energy Sources, Inc.

7     Q     Did you assist the lawyers during the

8  bankruptcy filing with litigation matters?

9              MS. STREUSAND:  In Energy Sources, Inc.?

10  Is that your question?

11              MR. FORTE:  Yes.

12     A     I may have, in that I often gathered data or

13  information that they wanted.  But at that time, I

14  didn't know if that was because of the planned

15  preparation, other bankruptcy requirements or

16  litigation.

17              So I couldn't specifically say that it

18  was for litigation.  I just helped the attorneys

19  gathering information that they asked for.

20     Q     (BY MR. FORTE) Do you recall whether there was

21  any recovery for the limited partner investors in

22  Energy -- in the Energy Sources, Inc. bankruptcy

23  proceeding?

24     A     No.

25     Q     You just don't recall or there wasn't any?

Case 1:04-cv-00582-GMS    Document 74-11    Filed 08/29/2005    Page 18 of 50

1    A    I left before the bankruptcies were finalized,

2 so I don't know.

3    Q    All right.  When you left Energy Sources, Inc.

4 in late '83 and early '84, what was your next place of

5 employment?

6    A    For the next several months, I worked as an

7 independent contractor because it was audit and tax

8 time.  And as an accountant, I was able to find hourly

9 employment in that manner.

10    Q    All right.  So what kind of hourly employment?

11    A    I assisted various companies prepare audit and

12 tax work papers.

13    Q    What kind of companies?

14    A    Generally, oil and gas companies since that

15 was my area of expertise.  There may have been other

16 companies.  I don't recall.

17    Q    Did you work as an employee or independent

18 contractor at that time?

19    A    As an independent contractor.

20    Q    Now prior to the time you left Energy Sources,

21 Inc. and began this auditing and tax work as you've

22 described, did you have prior experience in the audit

23 and tax area?

24    A    None in tax.  My work at Arthur Andersen, as

25 I've explained, was as an auditor.  So I did have

1  experience there.

2      Q    I just want to clarify.  So beginning in

3  approximately late '83 or early '84, you left Energy

4  Sources, Inc. and acted as an independent contractor

5  for certain oil and gas concerns doing audit and tax

6  work.  Is that a fair summary?

7      A    Preparing audit and tax work papers to be used

8  by others in the audit or tax return.  I was helping

9  just prepare the data.

10     Q    All right.

11     A    I did not do any tax returns.  I didn't do any

12 actual audit opinions.  I was just doing the ground

13 work, the preparatory work.

14     Q    And how long did you do this independent

15 contracting work?

16     A    Six months to a year.

17     Q    So approximately until early 1985; is that

18 fair?

19     A    Yes.

20     Q    All right.  Did you eventually find full-time

21 employment after that period?

22              MS. STREUSAND:  Object to the form of the

23 question.

24     A    Eventually I did.

25     Q    (BY MR. FORTE) And what did you find?

19

1    A    After being an independent contractor as I've

2 explained, my next work was still as an independent

3 contractor.  However, it was no longer performing the

4 same function.

5         An associate of mine at Arthur Andersen &

6 Company had also left Arthur Andersen & Company.  And

7 he began to work for a trustee in bankruptcy.  He

8 needed assistance at -- on one of his jobs.

9         And he called me up and asked if I would

10 help him on an hourly basis as I continued to seek

11 full-time, permanent employment, which I was still

12 trying to do at that time.

13         And so as I continued to look for a real

14 permanent job, I switched gears a little bit and began

15 to work for a bankruptcy trustee on an hourly basis.

16 And I did that for several years as I continued to look

17 for a real permanent, part-time -- a real permanent,

18 full-time job.

19    Q    All right.  So you -- you continued doing

20 independent contracting work for bankruptcy trustees;

21 is that correct?  I'm just trying --

22    A    Primarily one bankruptcy trustee.

23    Q    Okay.  Who was that?

24    A    Walter Kellogg.

25    Q    K-E-L-L-O-G-G?

1      A      Yes.

2      Q      Did he work primarily in the Northern District

3  of Texas?

4      A      I don't know.

5      Q      Now your former friend from Arthur Andersen,

6  did he put you and Mr. Kellogg together?  Is that a

7  fair characterization?

8      A      I worked with and through him.  He was the

9  lead accountant and I worked with him.  Together, we

10  worked for Mr. Kellogg.

11      Q      All right.  So your former friend from Arthur

12  Andersen -- what was his name, by the way?

13      A      John Litzler, L-I-T-Z-L-E-R.

14      Q      So Mr. Litzler worked for Mr. Kellogg; is that

15  correct?

16      A      Indirectly.  Often we would be hired by either

17  the debtors or the state, as you know how bankruptcy

18  works.  But essentially we were working under the

19  direction and for the benefit of Mr. Kellogg.

20            MS. STREUSAND:  On behalf of the state.

21            THE WITNESS:  Yes, or the secured

22  creditor, whoever we might be working for.

23      Q      (BY MR. FORTE) What kind of work would you do

24  for Mr. Kellogg or the other types of clients that you

25  worked for during this period?

1    A    Accounting work.

2    Q    And what was the accounting work used for?

3    A    Various bankruptcy purposes.

4    Q    Can you give me some examples?

5    A    Often there would be questions posed in the

6  bankruptcy proceedings or decisions to be made, should

7  we go down this avenue or that avenue.  The people that

8  made the decisions would need information.

9              I was a functionary trying to gather

10  information and possibly package it for presentation to

11  higher-ups for whatever use they might be working on.

12    Q    During that time, did you do any preference

13  analysis?

14    A    No.

15    Q    How long did you perform this work with Mr.

16  Litzler and Mr. Kellogg and the various other types of

17  clients you've just described?

18    A    Several years.

19    Q    Okay.  Well, I think we came up to

20  approximately early 1985 when you began this phase; is

21  that correct?

22    A    Yes.

23    Q    And you say "several years."  Does that mean

24  three?

25    A    At least.

1              MS. STREUSAND:  Answer only if you know.

2   Don't speculate.

3      A    At least.

4      Q    (BY MR. FORTE) At least three?  Okay.  Was it

5   five?

6      A    I don't know.

7      Q    Well, if it was at least three, it's more than

8   three.  Correct?

9      A    Without being evasive, if I could just

10  explain.  We went from being independent hourly

11  contractors.  We actually then formed a firm.  And when

12  that happened and how that transitioned, I don't recall

13  when.

14              But I then worked with Litzler &

15  Associates for many years.  Exactly when that

16  transpired, I don't recall.  It was a slow, almost

17  evolutionary process.

18     Q    All right.  Well, was it -- is it safe to say,

19  based on your recollection, that it was sometime

20  between 1985 and 1990?

21     A    Yeah.

22     Q    All right.  What form of entity was Litzler &

23  Associates?

24     A    I don't know.

25     Q    Were you an owner in Litzler & Associates?

1       A       No.

2       Q       Who owned it?

3       A       I think John Litzler.

4       Q       He was the one hundred percent owner?

5       A       I don't know.  I think so.

6       Q       Is there any reason why you would doubt that

7  Mr. Litzler was the one hundred percent owner?

8       A       No.

9               MS. STREUSAND:  Objection to the form of

10 the question.

11      A       No.

12      Q       (BY MR. FORTE) All right.  How long were you

13 employed by Litzler & Associates?

14      A       Again, there was -- if I can try to be clear

15 to your answer, there was then a phase where I began to

16 phase out of Litzler Associates and began to work as an

17 hourly contractor for Lain Faulkner & Company, my

18 current employer.

19              So there was a transition period of

20 possibly a year, as I was wrapping up duties with

21 Litzler & Associates, while doing hourly work as an

22 employee for Lain Faulkner & Company.

23              And again, there's not a clean break

24 there.  But I think my official employment date at Lain

25 Faulkner & Company may have been in 1989.

1   Q    All right.  I want to make sure I understand

2 what you just described.  Sometime around approximately

3 1985 you began working for Litzler & Associates.

4   A    Uh-huh.

5   Q    And in approximately 1989 you began phasing

6 over to work for Lain Faulkner as an hourly worker; is

7 that correct?

8   A    I -- the phase-in may have started prior to

9 '89.  But I think sometime in '89 is the official

10 employment date where I became a full-time employee at

11 Lain Faulkner.

12   Q    A W-2 employee --

13   A    Yes.

14   Q    -- is my question.

15   A    Yes.

16   Q    All right.  Could you describe the work -- the

17 line of business that Lain Faulkner was in, in 1989,

18 when you started working there.

19   A    Yes.  They were forensic bankruptcy

20 accountants doing much the same kind of work as I did

21 with Litzler & Associates.

22   Q    What do you mean by the word forensic?

23   A    To me as I understand it, forensic means

24 applying the discipline of blank, in this case

25 accounting, to matters of public discourse and law.

1      Q     Public discourse and law, what do you mean by

2  that phrase?

3      A     As an example, you hear of Quincy, forensic

4  pathologist.  He was doing pathology as it related to a

5  criminal investigation or a lawsuit.  So he was

6  doing --

7      Q     You mean the television character?

8      A     Yes, I do.

9      Q     Okay.  Someone who actually didn't exist?

10     A     Correct.

11            MR. FORTE:  All right.  Go ahead.

12  Proceed.

13            MS. STREUSAND:  You asked him the

14  question, Mr. Forte.

15            THE WITNESS:  I was finished.

16            MR. FORTE:  You were -- okay.  I'm sorry.

17            THE WITNESS:  That's all right.

18            MR. FORTE:  I thought I interrupted you.

19  I apologize.

20     Q     (BY MR. FORTE) Well, explain to me how you

21  would apply forensic principles to this bankruptcy

22  accounting work you were doing with Faulkner starting

23  in 1989.

24     A     As an example, they might ask which leases are

25  profitable or not.

1    Q    You mean oil and gas leases or any lease?

2    A    Any kind of lease.

3    Q    All right.

4    A    Just this is a hypothetical.

5    Q    Okay.  Understood.  Proceed.

6    A    Which are profitable, which should be assumed

7  or rejected.  And I would work up accounting data to

8  assist in that evaluation.  That evaluation would lead

9  to a legal proceeding, namely the assumption or

10 rejection of a lease.

11    Q    What would you do, typically, to value a

12 lease?

13    A    It depends on what kinds of leases.

14 Basically, you'd look at the cash flow, the obligations

15 assumed that follow along with it, whether or not it

16 made business economic sense to assume or reject it.

17    Q    Can you give me another example of how you

18 applied forensic concepts to the bankruptcy accounting

19 work you were doing at Lain Faulkner starting in 1989?

20    A    Schedules and SOFAs require a listing of

21 payments to insiders.  So we might search through the

22 records to extract that data.

23         MS. STREUSAND:  For the record, what is a

24 SOFA?

25         THE WITNESS:  I'm sorry.  Statement of

1    financial affairs, that's an acronym I mistakenly

2    assumed everyone knew.

3              MS. STREUSAND:  Thank you, Mr. Thomas.

4    Q    (BY MR. FORTE) So -- so you would help to

5    prepare statement of financial affairs and schedules

6    for debtors?

7    A    Yes.

8    Q    In 1989, how much of the work that you were

9    doing in the bankruptcy area for Lain Faulkner was

10   representing debtors or trustees and how much was

11   representing creditors?

12   A    At that time, most of our work was still for

13   Mr. Kellogg.  And Mr. Kellogg would work for both

14   debtors and usually the secured creditors.  And so in

15   my mind, I was working towards helping Mr. Kellogg.

16             And I didn't really focus nor remember

17   whether it was for secured lenders or the debtor.  It

18   was a mixture of both.

19   Q    At the time you started working for Lain

20   Faulkner in 1989, were you an owner in Lain Faulkner?

21   A    No.

22   Q    Are you currently an owner in Lain Faulkner?

23   A    I'm a shareholder.

24   Q    It's a corporation?

25   A    Correct.

1    Q    When did you first become a shareholder?

2    A    Seven or eight years ago.

3    Q    You're still employed by Lain Faulkner,

4    correct?

5    A    Yes.

6    Q    Have you been employed with Lain Faulkner

7    since 1989?

8    A    Yes.

9    Q    Have you ever left Lain Faulkner for any

10   reason and returned?

11   A    Left the employment?

12   Q    Yes, and returned.

13   A    No.  I've been employed the entire time, found

14   a home.

15   Q    That's good.  Has the work that you've done

16   for Lain Faulkner since 1989 changed since you started

17   there?

18   A    Still basically the same type work.

19   Q    Forensic bankruptcy accounting?

20   A    Primarily.

21   Q    What else do you do there?

22   A    We also do a small amount of business

23   consulting or forensic accounting outside of

24   bankruptcy, for example, just litigation support in

25   state or federal court.

1       Q       What kind of litigation support?

2       A       Generally, trying to accumulate and

3   investigate accounting issues at the direction of

4   counsel.

5       Q       Can you give me an example or two?

6       A       I was not involved in this engagement.  But as

7   an example of non-bankruptcy work, our firm worked for

8   the attorneys at Blank Rome in the TransCorp matter.

9   And they did various projects and investigated and

10  tried to answer lots of different questions posed to

11  them by their counsel.

12      Q       Who did you work with at Blank Rome?

13      A       I didn't work on that engagement.

14      Q       Okay.  I didn't know that.

15      A       I think it was -- do you have a Pittsburgh

16  office?

17      Q       No, Philadelphia --

18      A       Well, then it --

19      Q       -- is the main office.

20      A       -- was someone in your Philadelphia office.

21      Q       What year was that?  Do you remember?

22      A       It's still an ongoing case.  However, it's

23  been over the last two years.

24              MR. FORTE:  Okay.

25              MS. STREUSAND:  Speaks to your

1  qualifications.

2      Q     (BY MR. FORTE) Now you mentioned previously

3  that you're a certified public accountant in Texas; is

4  that correct?

5      A     Yes, sir.

6      Q     Is that license active?

7      A     Yes.

8      Q     Has it been active since you earned it?

9      A     Yes.

10     Q     Have you ever been disciplined by the

11  accounting authorities in Texas?

12     A     No.

13     Q     Do you have a CPA license in any other

14  jurisdiction?

15     A     No.

16     Q     Now you mentioned that you're a certified

17  fraud examiner; is that correct?

18     A     Yes.

19     Q     Who issues that certification?

20     A     The Association of Certified Fraud Examiners,

21  headquartered right here in Austin, Texas.

22     Q     That certification is not issued by a

23  governmental authority of any kind, is it?

24     A     Correct.

25     Q     For the record, it is not.  Correct?

1      A      It is not issued by a governmental authority.

2      Q      Thank you.  Have you told me all the licenses

3   that you hold?

4      A      Yes.

5      Q      Do you hold any certifications?  Well, let me

6   back up.  I would describe the certified fraud examiner

7   as a certification.  Is that fair?

8      A      Yes.

9      Q      And the CPA as a license.

10      A      That's fair.

11      Q      That's fair?  All right.  Other than that one

12   certification and that one license, do you hold any

13   other licenses or certifications?

14      A      No.

15      Q      And what do you have to do to maintain your

16   certified fraud examiner certification?

17      A      The continuing professional education

18   requirements that I've already explained.

19      Q      Right.  Anything else?

20      A      And pay your money each year.  Now I also

21   assume that if I were to ever get into any kind of

22   trouble or commit misdeeds, that they could kick you

23   out.  But that's never been a concern of mine.

24   Basically, I do my CPE and pay my money.

25      Q      And I assume you have no formal legal

1  education.

2      A    Formal legal, no, sir.

3      Q    All right.  You've never practiced law or held

4  a law license, correct?

5      A    Correct.

6      Q    Have you ever held a teaching position?

7            MS. STREUSAND:  Teach.

8      Q    (BY MR. FORTE) Teaching.

9      A    I teach in training meetings, at seminars, but

10 I don't have a teaching license to be employed as a

11 teacher.  I've certainly taught people things.

12     Q    These training seminars are -- who sponsors

13 those?

14     A    Lain Faulkner is a provider of accredited CPE

15 in Texas.  I have given CPE courses where not only Lain

16 Faulkner people attend, but also outside CPAs and

17 attorneys.

18           For example, last week in Dallas I gave a

19 speech, along with an attorney -- it was a co-speech --

20 on defending preferences at the Dallas chapter of the

21 -- excuse me -- the bankruptcy section of the Dallas

22 Bar Association.

23           CPAs that attended that were able to get

24 CPE credit.  So in that regard, I might have taught.

25     Q    Did you create any materials for your

1  defending preferences presentation in Dallas?

2      A    Yes.

3      Q    Were they published in any kind of form, in a

4  booklet or pamphlet or anything of that nature?

5      A    Trying to understand published.  They have

6  not --

7      Q    Well, I'm sorry.

8              MS. STREUSAND:  It's a just a handout,

9  correct?

10             THE WITNESS:  Yeah.

11     A    I -- I made copies of them and gave it out.

12             MR. FORTE:  Right.  I -- I didn't mean to

13  use the word in a legal sense that --

14             THE WITNESS:  Okay.

15             MR. FORTE:  -- something's published and

16  circulated by a publisher.

17             THE WITNESS:  No.

18     Q    (BY MR. FORTE) Okay.  You created materials

19  that were gathered and put in some sort of a collected

20  form and distributed to people who participated in the

21  seminar?

22     A    That is correct.

23     Q    All right.  Did those materials reflect

24  your -- back up.

25             Did anything in those materials reflect

1   or relate to the opinion you're giving in this case?

2     A    No.

3     Q    Did you use any of the principles in those

4   materials in rendering your opinion in this case?

5            MS. STREUSAND:  Objection to the form of

6   the question.

7     A    I used some of the same tools.  One of the --

8   part of the handout was our XY graph, which is part of

9   my expert report in this case.

10     Q    (BY MR. FORTE) What do you mean by an XY

11  graph?

12     A    It's --

13           MR. FORTE:  Well, I -- I want him to

14  describe it to me from his memory.

15     A    Okay.  An XY graph is a common term for a

16  presentation of data.  There are two axes.  The

17  horizontal axis is time.  The vertical axis in my graph

18  is the days to payment, defined as the difference

19  between the date of an invoice and the date it was

20  paid.

21           The payment of an invoice is represented

22  by a diamond.  Thus it gives a visual representation of

23  the payment history over some period of time.  It's one

24  of many tools we use in preference analysis.  And it

25  was included in my handout as one of many tools.

1     Q    (BY MR. FORTE) What other tools are described

2 in that handout?

3     A    Statistics, a statistical summary.

4     Q    What do you mean by a statistical summary?

5     A    That's the name of a chart that is one of the

6 schedules that come out of our computer system.  The

7 most common and most well-understood statistic is the

8 days to payment.

9          It calculates the average days to

10 payment, the median days to payment, the minimum and

11 maximum days to payment and the standard deviation, as

12 is laid out in this box on my XY chart under tab eight.

13    Q    Okay.  And you're referring to tab eight

14 meaning Exhibit 8 to your expert report in the case?

15    A    That is correct.

16    Q    What some people refer to as scattergrams?

17    A    Some people might.

18    Q    All right.  The statistical summary you just

19 described, did you use one of those in the report in

20 this case?

21    A    No.

22    Q    Why not?

23    A    I didn't need it to make my point or support

24 my opinion.

25    Q    Well, what was it about the statistical

1  summary that you didn't need?

2      A    The statistical summary performs those

3  calculations I just described for a number of data

4  points:  days to payment, dollar amount of payment,

5  days between payment, number of invoices per payment,

6  and the invoice size.

7              Most of those, other than -- well, none

8  of those, other than days to payment, I felt that I

9  needed to support my opinion.  Thus I didn't include it

10  in my report.

11              MR. FORTE:  I'd like to get a copy of the

12  materials that Mr. Thomas used at his Dallas seminar.

13              MS. STREUSAND:  We'll take it under

14  advisement and get back to you on that.

15      Q    (BY MR. FORTE) Do you have materials with

16  respect to defending preference actions that you

17  regularly use in teaching classes or giving

18  presentations or seminars?

19      A    No.

20      Q    Well, when did you create the materials that

21  you used at the Dallas seminar you recently described?

22      A    I pulled together that handout a day or two

23  before.

24      Q    Did you use a prior graph of similar materials

25  to build that?

1    A    Some of the materials previously existed, such

2  as an example XY chart and how to read it.  Others were

3  created right before the seminar.

4            MS. STREUSAND:  You prepare like the rest

5  of us.

6    Q    (BY MR. FORTE) How long have you been using an

7  XY graph in your analysis of preferences?

8    A    I believe my very first XY graph used in a

9  preference analysis may have been nine or 10 years ago.

10   Q    What software is used for that?

11   A    At that time, it was an Excel spreadsheet.

12   Q    Is it still an Excel spreadsheet?

13   A    No.

14   Q    What is it now?

15   A    Our software system is a Sequel server

16  database back-end with an Access front end or user

17  interface grafted together.

18            Additionally, there's some custom

19  programming, one of which is taking what started out

20  life as an Excel XY graph, tweaking it to fit into that

21  system.  Thus it generated the charts you see.

22   Q    Well, I'm not sure I understood all that.  But

23  you -- you took the Excel XY graph and modified it?

24   A    Uh-huh.

25   Q    You have to say "yes" or "no" so he can get it

1  down.

2      A    I'm sorry.  Yes.

3      Q    Thank you.  And how precisely did you modify

4  the Excel spreadsheet?

5      A    I didn't do the modification, so I wouldn't be

6  able to tell you.  We hired a programmer to do that.

7      Q    Well, did you give instructions to the

8  programmer as to what you wanted?

9      A    Yes.

10     Q    What instructions were those?

11     A    Make it look like the graph in my expert

12 report as opposed to the graph that comes out of the

13 stock Excel schedule.

14     Q    How does it differ?

15     A    The Excel -- other than the basic concept of

16 the two axes and plotting data points, the Excel

17 schedule doesn't have any of the titles and it doesn't

18 look like that.  So we made it look the way we wanted.

19          We chose to put certain report

20 restrictions and certain statistical data up there and

21 the titles so that it would be a little more

22 user-friendly and easier to read, we hoped more useful.

23     Q    Can -- can you give me a precise example of

24 what was added to the Excel form?

25     A    Other than saying everything on that tab,

1    because I don't think anything on that tab is what

2    comes out of a stock Excel XY graph, although I will

3    admit it's been years since I've looked at a stock

4    Excel tab.  But it's pretty barren.

5                MS. STREUSAND:  So years?  How many years

6    ago was it, for the record, Mr. Thomas?

7                THE WITNESS:  Since I last looked at a --

8    just a stock Excel XY graph, oh, at least four, five,

9    six.

10   Q    (BY MR. FORTE) All right.  Now you're looking

11   at the document that's marked as tab eight to your

12   expert report; is that correct?

13   A    Yes, sir.

14   Q    Okay.  And that's two pages of these charts

15   you've described, correct?

16   A    Yes.

17   Q    Well, let's look at the first page, which says

18   Ordinary Course Preference Analysis 2 Year Historical

19   Period 45-Day Ordinary Course Range.

20                Now can you point to items on that page

21   that you believe were added by your modification to the

22   XY graph Excel format?

23   A    Yes.

24   Q    Okay.  Tell me.

25   A    The only things that weren't added from a

1  stock Excel graph would be whatever description would

2  come out on the X and Y axis.  That's all that comes

3  out on a stock Excel graph.

4          So everything else was added by us.  The

5  report restrictions box in the upper right-hand corner

6  was added.  The days to payment statistical summary was

7  added.

8          All of the description in the left-hand,

9  upper corner, InaCom ordinary preference analysis

10  two-year historical, 45-day ordinary course range, all

11  of those descriptive phrases were added.  The text

12  boxes were added.

13      Q    The text box at the bottom left, was that

14  added?

15      A    Yes, sir.

16      Q    All right.

17      A    Also the text box in the upper left.

18      Q    Now you said you hired a programmer to

19  actually make these modifications to the Excel format?

20      A    Yes.

21      Q    All right.  That wasn't you, correct?

22      A    Yes.

23      Q    We'll be looking at your report later today.

24  Have you written any articles or published any

25  writings?

1      A      Again, what do you mean by the word published?

2      Q      Well, that's why I said have you written any

3  articles or published any writings because I understand

4  sometimes articles can be written and distributed

5  without officially being published.

6      A      Okay.

7      Q      So I'm trying to find out if you've written

8  anything and, if you have, has anything been published.

9  So anything written, published or not, or anything

10  written and published?

11      A      I have written things like I wrote the cover

12  sheet on the handout that I gave at the Dallas Bar

13  meeting.  In my mind, none of that's been published.

14              In my Rule 26 disclosure, I answer the

15  question regarding prior publications as none.

16      Q      Well, I assume that you have no prior

17  publications.

18      A      That is correct.  That's why I offer --

19  answered it as none.

20      Q      All right.  Do you have any examples of

21  writings that you've created that perhaps weren't

22  published but were otherwise distributed to people for

23  various reasons, such as the seminar you described

24  earlier today?

25      A      Yes.

42

1    Q    All right. Do you keep them in a place where

2   they can be recovered?

3    A    I've kept some of them, others not.

4    Q    Do any of them address preferences?

5    A    Yes.

6         MR. FORTE:  I'd like to get copies of

7   those, please, the ones that address preferences.

8         MS. STREUSAND:  We'll take it under

9   advisement and get back to you.

10   Q    (BY MR. FORTE) Now in the course of your

11  professional work, do you have occasion, Mr. Thomas, to

12  read publications relevant to your professional work?

13   A    Yes.

14   Q    Are there any publications that you read or

15  review on a regular basis?

16   A    Yes.

17   Q    Which ones are those?

18   A    I subscribe to a bankruptcy law update service

19  that comes over the Internet.  I don't recall the name.

20  My partners and I are members in many different

21  professional associations such as the American

22  Bankruptcy Institute, CIRA.

23        All of these organizations regularly

24  publish updates or papers and we circulate them amongst

25  the professionals in our office.  We subscribe to the

1    Bankruptcy Litigation Support, I think's the name of

2    it.  All of the -- there's a lot of these materials

3    that flow across my desk and I review them.

4        Q    Well, could you name three that you review

5    regularly that you look to as authoritative sources?

6        A    Three I review regularly are the American

7    Bankruptcy Institute -- I don't know what they call it.

8    It's the monthly report.

9        Q    What else?

10       A    Bankruptcydata.com sends out a bankruptcy

11   newsletter.  And then we pay to subscribe to -- and I

12   don't recall -- it's the bankruptcy litigation report

13   or something, reports on bankruptcy case law and

14   current developments.  And I regularly review that.

15       Q    When you review bankruptcy materials,

16   particularly those relating to current case law, is

17   there any particular area of bankruptcy law that you

18   focus on?

19       A    Yes.

20       Q    What's that?

21       A    Avoidance actions and claims.  I pass the

22   claims information on to my partner in charge of our

23   claims department and I use the avoidance action --

24       Q    What do --

25       A    -- information.

1      Q      -- you mean by avoidance actions?

2      A      Primarily avoidance actions under the

3  Bankruptcy Code, Sections 547, 548 and 549.

4      Q      So that would be preferences, fraudulent

5  transfers and postpetition transfers?

6      A      Yes.

7             THE WITNESS:  May I refill my water while

8  you're --

9             MR. FORTE:  Absolutely.  I meant to say

10  if you need a break for any reason, Mr. Thomas, just

11  say so.

12             MS. STREUSAND:  And actually, give me a

13  minute and I'll be --

14             MR. FORTE:  You need a break?

15             MS. STREUSAND:  Yeah.  I need a break.

16             (Recess from 10:26 a.m. to 10:32 a.m.)

17             MR. FORTE:  I would like to mark as

18  Thomas 1 the Lain Faulkner engagement letter of May

19  30th, 2002 with Hughes & Luce.

20             I want to apologize I don't have more

21  than one extra copy of it.  I discovered last night in

22  my hotel I didn't bring enough of them but we have one

23  you can look...

24             (Exhibit No. 1 marked)

25      Q      (BY MR. FORTE) Mr. Thomas, I've handed you

1    engage our firm in that capacity, a decision will be

2    made in light of the nature of the information

3    previously disclosed to us, end quote.

4                Can you help me to understand what you

5    meant by that sentence?

6        A    That if you wish to engage us as a testifying

7    expert, you know that anything we've done is

8    discoverable.

9        Q    Now going down to the next paragraph, you

10   state:  In general terms, we will assist you by

11   performing forensic accounting research.

12               Can you explain to me how the forensic

13   principles you've talked about earlier today were

14   actually applied in this preference analysis?

15       A    Yes.

16       Q    Please do.

17       A    The way we applied forensic accounting is we

18   took the data.  We performed various analyses.  We

19   looked at the data and we tried to then use what we saw

20   and did to apply towards a preference defense.

21       Q    And is the data set forth in tab four to your

22   report, the two-year payment history?

23               MR. FORTE:  I'm sorry.  I haven't marked

24   it yet.

25               MS. STREUSAND:  Let me hand the witness

1    the documents so he can refer to them.

2                    MR. FORTE:   Thank you.

3       A    Tab four is the history of payments made prior

4    to the preference period.  And it covers the range

5    February 1, 1998 through March 17th, 2000.

6       Q    (BY MR. FORTE) Okay.  Well, with respect to

7    the pre-preference period, is that the data that you

8    referred to in answer to your last question?

9       A    Yes.

10      Q    All right.  Now the fourth paragraph of Thomas

11   1, it refers to all work papers or other documents used

12   by us during the course of this engagement will be

13   maintained in segregated files, end quote.

14                   What documents were maintained by you and

15   where were they segregated physically?

16      A    In files, various kinds of files depending on

17   what the actual tangible object was.

18      Q    All right.

19      A    In file cabinets near my office.

20      Q    Now you just indicated, by pointing to your

21   left, towards documents on the side board of the

22   conference room that counsel produced earlier today.

23   Are those the files that are referred to in the letter?

24      A    Yes.

25      Q    Okay.  Those are all your work papers?

Case 1:04-cv-00582-GMS    Document 74-11    Filed 08/29/2005    Page 48 of 50

1    A    Yes.

2    Q    Could you give me a general description of

3  what they are.

4    A    They are source business documents such as

5  invoices, bank statements, canceled checks.

6    Q    Uh-huh.

7    A    That's all the tangible documents we received.

8  We received electronically -- thus they're not in a

9  physical file but they're printed out as tab four --

10  the payment history.

11          We also received a similar electronic

12  history of the payments made during the preference

13  period, which is included under tab five of my expert

14  report.

15    Q    And the documents to your left along the side

16  board, do those contain bank statements provided to you

17  by my firm?

18    A    Yes.  May I add to my answer?

19    Q    Yes.

20    A    Additionally over on the side bar board, there

21  is one file which are calculations that we prepared at

22  the request of Sabrina which was to be furnished to

23  John LaRocca to help him prepare his expert report.

24    Q    What information did you send to Mr. LaRocca?

25    A    It's the information in that file.

1    since approximately May of 2002; is that correct?

2         A    I -- I would think that is true.

3         Q    All right.  But you can't say, as you sit here

4    today, how much more?

5         A    That is correct.

6         Q    Okay.  Even though you send all the bills out?

7         A    That is correct.

8         Q    You read all the bills before you send them

9    out, right?

10        A    Yeah.

11        Q    And you still can't say?

12        A    Still can't say.

13        Q    Will the fees that Lain Faulkner earns on this

14   matter be in any way affected by the result of this

15   litigation?

16        A    No.

17        Q    You get your hourly rates plus expenses

18   regardless of the results, win, lose or draw?

19        A    Correct.

20             MR. FORTE:  Okay.  Why don't we mark as

21   Thomas 2 your April 28th, 2005 report with the 11

22   exhibits.

23             MS. STREUSAND:  Did you bring a copy?

24             MR. FORTE:  Yeah.

25             THE WITNESS:  Is this a good place for a

1  break --

2                MS. STREUSAND:  Sure.

3                MR. FORTE:  Yeah.  Do you --

4                THE WITNESS:  -- before we get into...

5                MR. FORTE:  -- want to take a break?

6  Sure, go ahead.

7                (Exhibit No. 2 marked)

8                (Recess from 11:21 a.m. to 11:30 a.m.)

9                MR. FORTE:  Mr. Thomas, I'd like to hand

10 you a thick black binder which we will call Thomas 2.

11 And it contains transmittal letter from Ms. Streusand

12 to me dated April 29th of this year followed by a copy

13 of your report and 11 tabs of information.

14                I'll hand that to the witness.

15     Q    (BY MR. FORTE) Now Mr. Thomas, with the

16 obvious exception of the transmittal letter to me from

17 Ms. Streusand that's at the top of this document, does

18 Thomas 2 constitute your report and supporting

19 information in this case?

20                As far as I know, the copies came out

21 correct.  I haven't --

22     A    I'm taking a quick look.  And it appears to be

23 my report.

24     Q    Good.  Now let's focus first on what I'll call

25 your opinion letter, which is the top document dated