# EXHIBIT B – PART 2

1  revisions to it, that would be the -- the first one

2  would be a draft one.  And if you make revisions, that

3  would be the second draft.

4  　　　　　If you finalize it, it becomes a final

5  product.  I don't consider fixing a typographical error

6  a revision, as I am using it to define a draft.  I

7  could not tell you that this was perfectly typed with

8  no typographical errors the first time.

9  　　Q    Well, what about substantive improvement or

10  changes?

11  　　A    Absolutely none.

12  　　Q    So you got it exactly right the first time you

13  tried to prepare this report?

14  　　A    Yes.

15  　　Q    Mr. Thomas, how many times have you testified,

16  either in a deposition or at trial?

17  　　A    I believe there's 14 listed in the last four

18  years in my curriculum vitae.  Prior to that, I've

19  testified several times, although I don't recall how

20  many.  So it might be fair to say 20, 20-plus.

21  　　Q    Now when you say testified, you mean

22  depositions and trial?

23  　　A    Yes.

24  　　Q    Okay.  How many times have you testified in a

25  deposition prior to today?

1    A    I don't recall specifically.  I would say 15

2  times plus or minus.  Typically, whenever I testify at

3  trial, I've also been deposed prior.

4    Q    All right.  To clarify, approximately 15 times

5  you have given depositions?

6    A    That would be a fair approximation.

7    Q    Approximately how many times have you

8  testified at trial?

9    A    Eight or 10.

10    Q    And in each one of those cases in which you

11  testified at trial, you also gave a deposition; is that

12  right?

13    A    Usually.  I could not say that each and every

14  time there was a deposition.

15    Q    Is your opinion letter of April 28th, 2005

16  stored on Lain Faulkner's computer system?

17    A    The unsigned version should be stored as a

18  Word document.  I don't know whether or not a PDF

19  version that would include my signature is stored on

20  the system or not.

21    Q    Okay.  So an unsigned version of your April

22  28th, 2005 opinion letter in this case is stored on

23  Lain Faulkner's computer system as a Word document?

24    A    It should be.

25    Q    Do you have any reason to question why it

1              MS. STREUSAND:  Objection to the form of

2    the question.  He doesn't actually get to make a legal

3    conclusion.

4         A    I have not been asked to do any work on

5    solvency.  For the purposes of my report, I was

6    directed to assume that.

7                   MR. FORTE:  I understand.

8         A    So I have no opinion on the solvency or

9    insolvency of InaCom.

10        Q    (BY MR. FORTE) Okay.  But with the exception

11   of the insolvency report -- excuse me -- the insolvency

12   issue, you were told to assume that all the payments

13   made to Dell during the 90-day preference period in

14   this case were preferential transfers?

15        A    That have the elements of a preference, not

16   whether or not they could also be offset by an

17   affirmative defense.

18        Q    Okay.  But setting aside defenses.

19        A    Okay.

20        Q    That the plaintiff can prove the elements of a

21   preference?

22        A    I was told to assume that and I did.

23        Q    Now in your April 28th letter, it states:  I

24   would note that for most of the past 30 years I have

25   been engaged in the practice of public accountancy.

1                What do you mean by the term public

2   accountancy?

3        A    Not working in the private sector but instead

4   working as an accountant for various clients.  That

5   would include my time at Arthur Andersen, my time with

6   John H. Litzler & Associates, my time with Lain

7   Faulkner & Associates.

8                It would exclude my time at Energy

9   Sources, Inc. when I was controller and manager of

10  public -- manager of partnership accounting there.

11       Q    All right.  So you do not mean by public

12  accountancy necessarily the auditing of public

13  companies.

14       A    That is correct.  Public accountancy is one of

15  the defined terms in our industry.  And you can

16  certainly be in public accountancy and subject to all

17  the rules governing public accountancy without being an

18  auditor.

19       Q    So I assume, when you say you've been doing

20  that for most of the past 30 years, you're excluding

21  your time at -- I'm already forgetting the name.

22       A    Energy Sources, Inc.?

23       Q    Yes.

24       A    That is correct.

25       Q    All right.  So that was approximately eight

1  years of the 30.  Is that how you get to the 22 you

2  refer to here?

3              I'm sorry.  I can ask the question in a

4  different way.  Why don't -- why don't I just read what

5  it says?

6      A    Okay.

7      Q    Quote, while I will not repeat all of the

8  facts stated herein, I would note that for most of the

9  past 30 years I have been engaged in the practice of

10 public accountancy.

11             And for the past 22 years, my practice

12 has been centered around providing professional

13 accounting and consulting services in bankruptcies and

14 other financially-troubled company situations, end

15 quote.

16             So my question is:  The eight years --

17 excuse me.  The 22 years refers to all the work you've

18 done since the time you were at Arthur Andersen with

19 the exception of Energy Resources?

20     A    May I correct my prior answer?

21     Q    Yes, absolutely.

22     A    Having done the math, I can clarify this.

23     Q    Sure.  Please do.

24     A    Okay.  The 22 years are continuous.  That

25 would be -- that would exclude my time at Arthur

1 Andersen, which was in public accountancy.

2    Q    Okay.

3    A    But then I went to Energy Sources, which was

4 in private.  So the 22 years would be the 30 years less

5 four at Arthur Andersen less four at Energy Sources,

6 roughly.  So it was continuous since I started public

7 accountancy this round.

8              MR. FORTE:  All right.

9              THE WITNESS:  I apologize for the

10 confusion.

11              MR. FORTE:  No, I apologize for the

12 confusing questions.  Thank you for the clarification.

13    Q    (BY MR. FORTE) Now you go on to mention

14 here -- and we talked about this a little bit earlier

15 today.  And I don't want to go over it again

16 completely.

17              But you state here my practice has been

18 centered around providing professional accounting

19 consulting services in bankruptcies and other

20 financially-troubled company situations, end quote.

21              Approximately how many bankruptcy cases

22 have you been involved with?

23    A    Involved with meaning billing any amount of

24 time?

25    Q    Significantly, something that you would

1    consider significant work.

2        A    Lots, 50, a hundred.

3        Q    And you gave me a general description earlier

4    today of your work in the bankruptcy area.  Is there

5    anything else that you can add to that that would give

6    me a --

7                MS. STREUSAND:  Objection to the form of

8    the question.

9        Q    (BY MR. FORTE) That would give me a better

10   description of what you were doing in the bankruptcy

11   field the last 22 years?

12       A    No.

13               THE WITNESS:  I'm sorry.

14               MS. STREUSAND:  Objection to the form of

15   the question.

16       A    Now my answer is no.

17       Q    (BY MR. FORTE) Now you say here that you also

18   worked for other financially-troubled companies.  What

19   do you mean by that?  What kind of work would you do?

20       A    Companies that might be contemplating going

21   into bankruptcy but didn't or I work for them and then

22   they go into bankruptcy.  And any work I would do might

23   be then for the debtor-in-possession, trustees.

24               Sometimes it's companies that just need

25   some analytical help, operational reviews.

1  than it would have in a Chapter 7 case in this InaCom

2  matter?

3      A    I was told to assume that.

4      Q    Now you say you're -- you've worked as an

5  examiner.  What matter was that?

6              You're referring to your CV?

7      A    Correct.  Mickey Luu Van, Tho, Inc. and Thang

8  Loi, Inc., debtors.  They were Chinese restaurants.

9      Q    What was the nature of your work in that

10  matter?

11      A    I investigated certain allegations of

12  misconduct, inappropriated or misappropriated funds,

13  and made report -- and made a report to the Court.

14      Q    What was the conclusion of your report?

15      A    That it appeared that, rather than a huge

16  change in the profitability of these restaurants before

17  bankruptcy and after bankruptcy when -- I forget if it

18  was debtor-in-possession or trustee.

19              Rather than there being a huge change in

20  the profitability, what really changed was their

21  accuracy in reporting payroll taxes, that after

22  bankruptcy they reported a lot more, the inference

23  being that they didn't report some prior.  But I was

24  not asked to investigate that any further.

25      Q    Did you give testimony in that case?

1    A    Yes.

2    Q    And I assume at hearings.

3    A    It was a hearing where I presented my

4 findings.

5    Q    Okay.

6    A    It's listed in my curriculum vitae.

7    Q    By the way, when I asked you earlier if you

8 testified in depositions or at trials, did you include

9 evidentiary hearings in your answer?

10    A    Anytime I'm sworn is what I included.

11    Q    Anytime you're sworn in a courtroom means

12 trial?

13    A    No.  I'm sworn here today.  I would include

14 today as giving testimony.

15    Q    I'm sorry.  I wasn't clear.  When I asked you

16 earlier today how many times you had given testimony in

17 deposition and how many times you had given testimony

18 in a trial, I think you said you testified at trial

19 eight to 10 times; is that right?

20    A    Yes.

21    Q    All right.  In that answer, did you include

22 evidentiary hearings that were not technically trials?

23 That was -- that's my question.

24    A    I'm not sure if I understand the technical

25 difference between a trial and evidentiary hearing.

1    But what I meant when I answered you was in a courtroom

2    under oath.

3        Q    Fine.  That's -- I just wanted to clarify the

4    point.

5        A    Okay.

6        Q    When you say you acted as a receiver in state

7    court, could you tell me what that matter was about?

8        A    It was a furniture and home accessory showroom

9    in the Market Center in Dallas.  I was appointed as a

10   receiver to oversee the shutdown, liquidation and

11   move-out of the facility.

12       Q    Is that listed in your CV, that matter?

13       A    It's listed in the verbiage where I refer to

14   the fact that I served as a receiver.  It's not listed

15   as prior testimony or publications because it didn't

16   require my testimony and I didn't publish anything.

17       Q    Thank you.  Now you say that you're the head

18   of the firm's avoidance practice area.  You've talked a

19   little bit about that.  How many people work in Lain

20   Faulkner's avoidance action area?

21       A    Currently, there are three staff accountants

22   that report primarily to me to do avoidance action

23   work.  We draw in other staff accountants and other

24   members of our firm as needed.

25       Q    Who are the three people?

1    A    That primarily report to me.  Again, we bring

2   in other people as needed, clerical support.

3    Q    Well, other than yourself, Mr. Cass and

4   Ms. Rush, did -- were any other accountants or

5   professionals assigned to work on the InaCom matter?

6    A    Not in any substantive manner.  There may have

7   been other accountants that billed minor amount of

8   hours in this file because it was appropriate to do so

9   at the time.

10    Q    Do yourself, Mr. Cass and Ms. Rush work

11   full-time in the avoidance area?

12    A    It is the primary area that we have worked in,

13   in the last three to four years.  It is not full-time

14   because all of us help out on other non-avoidance

15   action projects as needed.

16    Q    What other types of non-avoidance action work

17   do you do?

18    A    Fraud investigations, cash tracing.  I'm one

19   of the two fraud examiners in our firm, so I often get

20   a lot of the cash tracing, fraud work investigative

21   kind of things.

22    Q    And I assume there was no fraud or cash

23   tracing investigation involved in the InaCom matter.

24    A    No.

25    Q    Now you state here that over the past 10 years

1  you have supervised the accounting analysis of

2  approximately three thousand preference files.  What do

3  you mean by a preference file?

4      A    As an example, we have a debtor, what we're

5  employed to do the preference review either for the

6  debtor-in-possession, the Chapter 11 or 7 trustee or

7  sometimes a postconfirmation trust where the preference

8  actions have been transferred as an asset.

9      Q    Uh-huh.

10     A    Within that debtor, there -- they may have

11 been paid a hundred vendors payments during the

12 preference period large enough that it would warrant us

13 to review those.  So in that example, I would say

14 that's a hundred preference files.

15     Q    All right.  Do you mean by a file one

16 preference claim, meaning one lawsuit for recovery of

17 preferences?

18     A    There's not always lawsuits, but one demand or

19 lawsuits to recover preferences.  There may be several

20 payments to a vendor.  But generally, it's one vendor,

21 one cause of action or potential cause of action, one

22 analysis, one negotiation to recover what's going to be

23 recovered or withdraw the demand in a lawsuit.

24     Q    All right.  So the InaCom case constitutes one

25 preference file?

1    A    Yes.

2    Q    All right.  Now you aggregate the payments for

3 those files as over 300 million dollars.  How do you

4 get to that number?

5    A    We track all of our preference work in a

6 historical database so we know how to manage our

7 business and how to somewhat predict things and just to

8 see how we're doing.

9              And so for each debtor case -- and by

10 that I mean debtor, trustee postconfirmation -- we keep

11 track of how many files did we review, what were the

12 gross payments during the preference period, what did

13 we recover, what did it cost so that we have some kind

14 of basis to judge our performance and to talk to people

15 about what possibly could they expect if we did work

16 for them.

17              And so we have in our records who we did

18 work for.  And this is a rounded approximation of the

19 payments that were made during the preference period.

20    Q    Now it states here further down on the first

21 page of your April 28th opinion, quote, I am familiar

22 with the customs, practices and standards of care that

23 are expected to be used by parties in determining

24 whether or not such claims have merit and warrant

25 prosecution.

1          What customs, practices and standards of

2    care do you mean?

3          MS. STREUSAND:  Object to the form of the

4    question as vague.

5    A     Generally, everything that goes on when you

6    start a preference analysis through the negotiation and

7    settlement of all the -- either demands or lawsuits, it

8    would include the accounting analysis and my support

9    and observations of the legal process.

10   Q     (BY MR. FORTE) What do you mean by the term

11   standards of care?

12   A     An example would be that, before we would

13   demand or sue somebody, I should go verify that, in

14   fact, the checks that were cut actually cleared the

15   bank.

16   Q     Okay.

17   A     That doesn't always happen.  I've actually

18   seen people that didn't do that.

19   Q     Other than that, what other standards of care?

20   A     I believe that a preference should be

21   thoroughly researched before demand or lawsuit is made.

22   That's why I call it standard of care.

23   Q     All right.  Well, you don't mean a legal

24   standard of care, do you?

25   A     I am testifying as an accountant here.  So I

1  was talking about the standards of care that would

2  pertain to me as an accounting expert having --

3       Q     Go ahead.

4       A     In our profession, there's all kinds of rules

5  and regulations.  And to be a consulting expert, I need

6  to have performed sufficient work to have a basis for

7  my opinion, those kind of things.

8                There's just various rules that are

9  actually very general.  But basically, it says have

10 something to base your opinion on, do your homework,

11 think before you speak.

12      Q     Well, the standards of care that you refer to

13 in your opinion and that I assume you apply here, are

14 they obtained from any accounting organization like

15 FASB?

16      A     Some are.  Some are general.  It's just me

17 speaking in layman's terms.  But there is a code of

18 professional conduct.  There are -- and I don't refer

19 to them so -- too often because they're fairly general

20 and we always meet them.

21               But I -- one of them is to have

22 sufficient evidentiary matter to support your opinion.

23      Q     Okay.  Can you cite me to the code of

24 professional conduct or other source that you're

25 referring to in your last answer?

1     A     I can't quote it.  It's the AICPA Code of

2  Professional Conduct.

3     Q     Did you conduct your report and opinion in

4  this case in accordance with the AICPA Code of

5  Professional Conduct?

6     A     Yes.

7     Q     In this matter, were there any reason for you

8  to apply general accepted accounting principles?

9     A     No.

10     Q     How about general accepted accounting

11  standards?

12     A     Generally accepted accounting standards?

13     Q     Excuse me.  Generally accepted auditing

14  standards.

15     A     No.

16     Q     How about any of the rules or guidelines set

17  forth by the Fair Accounting Standards Board?

18              MS. STREUSAND:  Objection to the form of

19  the question.

20     Q     (BY MR. FORTE) Maybe I'm using the wrong

21  title.  FASB, F-A-S-B, doesn't that stand for Fair

22  Accounting Standards Board?

23     A     I don't think so.

24     Q     What -- what does it stand for?

25     A     I don't know, but it's not fair.  Well, that's

1          MR. FORTE:  He already said he did.

2          THE WITNESS:  I --

3          MS. STREUSAND:  But let's make sure it's

4  clear because it doesn't sound like that he did.

5          THE WITNESS:  Yes.  As I testified, I did

6  review the e-mails.

7     Q     (BY MR. FORTE) And when did counsel tell you

8  about the, quote, Compaq transaction?

9     A     At or about the same time that she gave me the

10 e-mails and asked me to review them.

11    Q     Within the last few days?

12    A     As I explained, it was yesterday.

13    Q     All right.  Now the two-year pre-preference

14 period data that's attached to tab four to your report,

15 where did you obtain that?

16    A     I obtained it from Dell in an electronic

17 transfer.

18    Q     Who at Dell gave it to you?

19    A     Michael Keller.

20    Q     When did you first receive it?

21    A     Mid to late 2004.

22    Q     Prior to that time, had Mr. Keller or anyone

23 else at Dell provided you with payment history data?

24    A     No.  We had worked prior to that time off of

25 payment history data provided by InaCom.

1      Q      Where did you obtain the InaCom payment

2  history data?

3      A      From Ms. Streusand.

4      Q      Do you know where she got it?

5      A      I assume from you or InaCom.

6      Q      Why did you get the two-year payment history

7  from Mr. Keller in addition to what you had from

8  Ms. Streusand?  What led you to do that?

9      A      Why did I --

10     Q      Right.

11     A      I don't understand the question.

12     Q      In other words, you had -- okay.  Let me go

13 back.

14             You said you were -- you obtained some

15 payment history data from Ms. Streusand that you assume

16 came from me or from InaCom, correct?

17     A      Yeah.  I'll call that -- let's call that the

18 InaCom data --

19     Q      Correct.

20     A      -- so we can communicate.

21     Q      All right, the InaCom data.

22     A      Okay.

23     Q      Why did you find it necessary to contact Mr.

24 Keller and get the two-year payment history from Dell

25 after you already had the InaCom data?

1       A    The InaCom data appeared to be messy,

2  incomplete, and only had the check generation date and

3  some clear dates but not all.  It was a little bit of a

4  mixture.  It was inconsistent in that regard.

5           Thus when negotiations to settle this

6  failed, counsel and Dell decided we should back up,

7  start over and get Dell's data, which would have the

8  cash receipt or application date which would be

9  consistent and be a valid benchmark to determine days

10 to payment and thus, in part, support an ordinary

11 course of business defense.

12      Q    Do you know who at Dell created the two-year

13 payment data?

14      A    No.

15      Q    What did you do to verify the accuracy of the

16 two-year payment data?

17      A    We requested from Mike Keller sample invoices

18 so that we could compare the copies of the invoices to

19 what was in the data for the preference period.  And

20 whenever we had check copies available to us from

21 InaCom, we compared it to the check amounts.

22           We also performed certain analytical

23 functions.  A little is just common-sense testing.  We

24 would look at a -- say a check number, check paid

25 several invoices, thus it's recorded in the database

1  several times and we'd see whether or not, for a

2  certain check number if it had one and only one pay

3  date, which you would expect if the pay date is to

4  represent the date they received the check.

5         On the occasions where there was more

6  than one pay date, we would pose these questions to

7  Mike Keller for his research and resolution.

8    Q    All right.  Are you comfortable, as you sit

9  here today, that the two-year payment history is

10  accurate?

11   A    I say it is materially accurate.  As I pointed

12  out in my footnote one, there were certain

13  reconciliation and clean-up procedures performed by

14  Dell for 1999 and the period of 2000 prior to the

15  preference period.

16         They did not perform those procedures for

17  1998.  So to that extent, 1998 might be slightly less

18  accurate than the later data.  However, Dell

19  represented to me and, in my limited ability to test

20  it, I did test it.  And I believe that there's no

21  material differences.

22         I believe that the data we have is

23  sufficient to analyze the historical period.

24   Q    Could you please turn to tab four of your

25  report, sir.  Now the data in tab four is the so-called

1  two-year pre-preference period data we've been

2  discussing today; is that right?

3      A    Correct.

4      Q    And this is the information you got from Mr.

5  Keller, correct?

6      A    Yes.

7      Q    Starting in the left-hand column, Payment

8  Date, tell me what that represents.

9      A    That represents the date that Dell recorded

10 receipt of the payment, basically the day they got the

11 payment.

12     Q    At their lock box?

13     A    Wherever they would receive payments.  I

14 understand that most payments were received at a lock

15 box.

16     Q    Okay.  But the payment date is not the date

17 that the check cleared InaCom's bank, correct?

18     A    That is correct.

19     Q    Now there's a column that says Delivery Date,

20 but there's no information underneath it.  Do you know

21 why that is?

22     A    Yes.

23     Q    Why is that?

24     A    This is a standard format that we use for our

25 preference analysis.  And there are occasions where we

1  would have a payment date and we would record the check

2  date there.

3         But if the check wasn't released or

4  delivered until later, we would record a delivery date.

5  There's several different ways you could know that.

6     Q    Uh-huh.

7     A    There might be a sticky note in the voucher

8  check.  There might be testimony.  Sometimes there's a

9  stamp on the voucher check when they truly release it,

10 various ways.

11        If that data is available, we would

12 insert it there.  And the delivery date, I understand,

13 is the appropriate date for measuring days to payment

14 based on case law.

15        So if that was available and it was

16 different than the check date, it would be delivery

17 date versus the invoice date used to calculate the days

18 to payment.  In this case, we didn't use the delivery

19 date column.

20    Q    Now Exhibit 4, I'll call it for ease, to your

21 report, you said it was a standard form that was used.

22 Is there a software program you used to print this

23 document?

24    A    Yes.

25    Q    What is it?

1    A    It's our proprietary software system that I've

2  explained previously.  In general, it's a Sequel server

3  database with an Access front end grafted onto it and

4  certain Excel graphics functions then added in.

5    Q    When you say proprietary, what do you mean by

6  that?

7    A    We own the code that controls how these are

8  joined and the little extra peripherals that we have

9  designed and put in place.

10    Q    All right.  Is there any kind of a patent or

11  trademark protection on it?

12    A    No.

13    Q    Now the third column from the left, Payment

14  Number, what does that show?

15    A    Typically, that is the check number.  If it's

16  a wire transfer, sometimes wire transfers don't have a

17  number.  And so we'd assign a number.

18    Q    Okay.  So the payment number LFC-299, for

19  example on the first line, is the number of the check

20  that paid the invoices to the right?

21    A    In --

22    Q    Is that correct?

23    A    No.

24    Q    All right.

25    A    May I explain?

1     Q    Sure.  Please do.

2     A    Okay.  Usually if we -- if we have the check

3  number, we'll just put the check number.  So if you

4  flip way back, you'll see a number that doesn't have

5  LFC in front of it.

6              However, if we do not have a check number

7  for that payment, we assign one so that we have a

8  reference number.

9     Q    All right.

10    A    And if it's one that we have assigned, we

11 denote that by putting LFC, standing for Lain Faulkner

12 Company.

13    Q    Okay.  And obviously, the amount of the

14 payment is the amount of the check received from

15 InaCom?

16    A    That's the actual cash payment amount.

17    Q    These payments were all by check, correct,

18 except for a few wires?  Am I right about that?

19    A    I know of only one wire.

20    Q    Okay.  The one in the -- in the preference

21 period?

22    A    Correct.

23    Q    And what does the -- why is the Clear Date

24 column blank?

25    A    We don't know the clear date of that payment.

```
1                    MR. FORTE:  All right.

2        A    We --

3                    MS. STREUSAND:  We would if InaCom would

4    provide it to us.

5        A    We -- we use the clear date as one of many

6    pieces of information.  Usually, you have that for the

7    payments during the preference period.  You may or may

8    not have the clear date for the payments in the

9    historical period.

10                   We attempted to get as much of that as we

11   could.  This being blank indicates to me that we could

12   not get it from InaCom.

13       Q    (BY MR. FORTE) And the Invoice Date is

14   obviously the invoice from Dell that's being paid by

15   the check?

16       A    Correct.

17       Q    And the Invoice Date is just the date off the

18   face of the printed invoice?

19       A    Yes or, in this case, these were electronic.

20   Not all of these were --

21       Q    Electronic?

22       A    -- printed out.

23       Q    All right.  And the Invoice Number is just

24   right off the face of the invoice, I assume.

25       A    Yes.
```

1      Q      And how do you calculate Days to Payment?

2      A      We compare the invoice date to the relevant

3  pay date, which could either be the payment date in

4  this case or the delivery date if, in fact, the

5  delivery date is later.

6              In this instance, it was always pay date,

7  payment date versus invoice date.

8      Q      Okay.  So in the first line here, the 45 days

9  to payment is simply the number of days between January

10 5th, 1998 and February 19th, 1998.  Correct?

11     A      Correct.

12     Q      Just math?

13     A      Yes.

14     Q      Now there's a box in the upper right corner

15 entitled Report Restrictions.  What is the significance

16 of that?

17     A      It denotes the date range this report covers.

18 March 17th, 2000 is the last day of the historical

19 period.  February 1st, 1998 is the start of the

20 historical period.

21             We could have put February 18th since the

22 first payment didn't happen until then.  But guys

23 running these reports for me just put an entire month

24 in.  It didn't really change anything.

25             If we wanted a different historical

1  period such as one year, we'd simply change the report

2  restrictions and rerun the reports.  These reports are

3  all database queries.

4      Q    Now the footnote at the bottom of the first

5  page of tab four which states Wednesday, December 24th

6  -- excuse me -- December 15th, 2004, 5:01 p.m. and 50

7  seconds, is that the date this was created or printed

8  out?

9      A    Printed.

10     Q    When was it created?

11     A    Probably minutes or hours before.  Again,

12  these are database queries.

13     Q    I understand.

14     A    You -- you give commands to the computer to

15  pull out this data and format it into this report and

16  then you can look at it on the screen.  If you then

17  want to print it, you have to hit a print function.

18              I doubt we would have created this on the

19  screen and left it up for a long period of time.

20  That's just not how we do our work.  It ties up the

21  computer for no reason.  So I assume that it was

22  queried and printed out that same day.

23     Q    Now looking at the second page of tab four, in

24  the top section above the dark line, it says subtotals

25  of invoices paid.

1          Is that just the sum of all the invoices

2  paid by the check listed on the first page?

3      A    Yes.

4      Q    The amounts correspond, so that would seem to

5  be logical.

6      A    Yes.

7      Q    Now there's a line, Difference - Invoices and

8  Check Amount.  What does that represent?

9      A    In this case, there is none.  But often in the

10 real world, someone may pay 10 invoices that, say,

11 equal 10 thousand dollars but they have 400 dollars

12 worth of credits and other accounting adjustments that

13 they can use to apply to those invoices.

14          So the actual check they write to pay the

15 10 thousand dollars worth of invoices may be 9,500

16 dollars.  This just compares the sum of the invoices to

17 the actual payment amount and tells the difference so

18 you know whether or not there was any difference at all

19 and, if there was, what was the amount.

20          Generally, those amounts are relatively

21 small and have to do with credits available.

22      Q    Could you please turn to page 548 of tab four?

23 I think it's the last page.

24      A    I'm there.

25      Q    All right.  Now if I read Grand Total for

1    Vendor correctly, tell me if I'm wrong.  That just

2    simply shows that, between February 1st, 1998 and March

3    17th, 2000, Dell sold $183,822,705.41 of computer

4    equipment to InaCom; is that correct?

5        A    That's the total of their invoices.

6        Q    Right.  And the total paid?

7        A    Correct.

8        Q    All right.  Now Days to Payment to the right,

9    there is a number of items listed there:  Mean, max,

10   min, median, standard deviation.

11              Could you explain for me first what the

12   mean is, 44.16?

13       A    A layman would call that the average.  I think

14   mean and average are synonymous.

15       Q    What is it the mean of?

16       A    The days to payment.

17       Q    It's the average number of days between the

18   invoice date and the payment date?

19       A    Correct.

20       Q    And I assume that was just calculated

21   automatically by your computer.

22       A    Yes.

23       Q    So you're comfortable that it's accurate?

24       A    Absolutely.

25       Q    And what does max, M-A-X, mean?

1    A    Maximum, the largest.

2    Q    The largest days to pay?

3    A    Yes, days to payment.

4    Q    Okay.  So that -- in other words, the invoice

5  that was the oldest during this two-year period?

6    A    It is the greatest number of days between the

7  payment date and the invoice date, not necessarily the

8  oldest invoice.

9    Q    Okay.  I understand, 385 days.  And minimum,

10  minus 129, what does that mean?

11    A    That's the shortest, smallest number of days

12  to payment between the -- it's the shortest or minimum

13  number of days to payment during the historical period.

14    Q    Why is it a negative number?

15    A    According to the data we had to work with, a

16  payment was made before an invoice date.

17    Q    By 129 days?

18    A    Yes.

19    Q    How were you able to discern that the payment

20  was for an invoice if it had not been identified yet?

21    A    That's the way it came to me in the electronic

22  payment database.

23    Q    So in other words, InaCom would make a payment

24  to Dell and Dell would issue an invoice for that

25  payment 129 days after receiving payment?

1    A    That's what the electronic database says.

2    Q    Did you do anything to verify if that's

3 accurate?

4    A    No.   That happened once for 14 hundred dollars

5 and change.

6    Q    Only one time?

7    A    Once.

8    Q    Did anyone at Dell or elsewhere explain to you

9 how that happened?

10    A    No.

11    Q    Well, what's the minimum if you exclude the

12 negative 129?  Do you know?

13    A    I can tell you by looking at my reports.

14    Q    Please do.

15    A    Then the minimum is 110.

16    Q    And that's not a negative number?

17    A    It's a negative number.

18    Q    So that's another situation where payment was

19 made 110 days before an invoice was issued?

20    A    According to the electronic database.

21    Q    Excluding all negative numbers, all negative,

22 quote, minimums based on your chart, do you know what

23 the shortest days to pay was?

24    A    Yes.

25    Q    What?

1    A    Zero.

2    Q    And that would be a situation where an invoice

3 was issued the same day a payment was received?

4    A    Correct.

5    Q    Other than negative numbers and zero, what was

6 the shortest days to pay?

7    A    One.

8    Q    What page are you looking at, sir?

9    A    I'm looking at page one of six under tab six.

10    Q    And in the left column of tab six under days

11 to pay, the negative numbers are the ones in

12 parentheticals; is that correct?

13    A    Yes.

14    Q    Did you run an analysis of the data without

15 the negative or zero dates?

16    A    No.

17    Q    Did you ever see the backup data for the

18 negative or zero dates?

19    A    No.

20    Q    Do you know whether the invoices for the

21 negative or zero dates are reflected in the computer

22 records of invoices that you reviewed in this case?

23    A    I don't know if they are in the CDs of the

24 invoices transmitted to me because there were many

25 invoices in there.  I chose a sample to test the data.

1  It was not one of these because if I would have seen

2  one of those invoices, I would have corrected this.

3      Q    What would you have corrected?

4      A    I would have corrected the invoice date.  I'm

5  assuming that that is an error that might be causing

6  this problem, although I do not know that for a fact.

7  And these could be accurate.

8      Q    Well, as far as you know, did InaCom ever

9  pre-pay Dell?

10     A    I do not know.

11     Q    As far as you know, did InaCom ever make COD

12 payments to Dell?

13     A    I do not know.

14         MR. FORTE:  For the record, meaning cash

15 on delivery.

16     Q    (BY MR. FORTE) Let's go back to page 548 of

17 tab four again.  And there's a number to the right of

18 the word median, which is 39.0.  What does that show?

19     A    In layman's terms, that's the midpoint.  I

20 best explain it to people, if you have a set of data

21 and you throw out the highest and the lowest, then you

22 throw out the next highest and next lowest and do that

23 and keep doing it, sort of like picking roses out of

24 the -- rose petals off a rose, you come to the

25 midpoint.

```
 1              If you end up coming to two midpoints,

 2    only two data sets left, it's actually the halfway

 3    point between them.

 4        Q    Okay.  So what does the median of 39 represent

 5    here?

 6        A    It is the median of the days to payment in

 7    this data set during the historical period.

 8        Q    And the last line, S-T-D-D-E-V colon, 19.93, I

 9    assume that stands for standard deviation, 19.93.

10        A    Correct.

11        Q    All right.  What does that show?

12        A    Mathematicians would cringe at my definition.

13    But as I explain it, standard deviation is to measure

14    how dispersed or splattered out a data set is.

15        Q    Well, what does the 19.93 mean?

16        A    It means that that's the standard deviation of

17    this data set.  It's a measure of how disperse -- how

18    varied the days to payment are during this period.

19        Q    Well, what does the 19.93 tell me about your

20    ordinary course analysis, if anything?

21        A    Not much.

22        Q    Well, does it tell me something?

23        A    Not in this case.

24        Q    Well, what did you intend to do by having it

25    in there?
```

1    A    That is part of our standard format that we

2 use.  I didn't change our computer coding to omit it in

3 this case.  It is a fact.  It is a factor that gets

4 looked at along with many, many other factors.  I

5 didn't omit it.

6    Q    Well, do you believe you should have omitted

7 it?

8    A    No.

9    Q    Well, you say it's a factor.  How is it a

10 factor?  How does it influence your decision?

11    A    Okay.  If I may try to just in general

12 explain, you can have two very, very different data

13 sets.  And those two very, very different data sets

14 could have very, very similar mean and medians.

15           You could have, for a hypothetical, a

16 data set that during the historical period that

17 regularly paid at a hundred days, every payment,

18 thousands of them.  The mean and median on that data

19 set would be a hundred.

20           During the preference period, you could

21 have a very widely dispersed data set ranging from

22 negative 200 to plus 400 that the mean and median still

23 calculate to be a hundred.

24           In that case, looking only at mean and

25 median could be misleading.  However, the standard

1  deviation of those two data sets would be very

2  different.  I included standard deviation in our

3  standard reports because very occasionally, not very

4  often, someone would bring that up.

5          So it was pretty easy to have the

6  computer to calculate it and have it there.  It's just

7  a fact.

8    Q    Did the standard deviation of 19.93 have any

9  influence on your opinion in this case with respect to

10  the pre-preference period analysis?

11    A    No.

12    Q    Why not?

13          MS. STREUSAND:  Asked and answered.

14          MR. FORTE:  I didn't understand his

15  answer.

16    Q    (BY MR. FORTE) Why didn't it have any bearing?

17    A    Why didn't it have any bearing?  It's an issue

18  that I -- it's a factor.  It's a fact I looked at.  It

19  didn't change my opinion.

20    Q    Why did it not change your opinion?

21    A    Because I -- I knew of no reason to change my

22  opinion because of it.

23    Q    Well, if the result of the standard deviation

24  in Exhibit 4 had been different, okay, would it have

25  changed your opinion?

1      A      Probably not.  I hardly ever use standard

2  deviation for anything in these reports.

3      Q      Well, do you use it at all?

4              MS. STREUSAND:  Counsel, he's just

5  answered the question before with --

6              MR. FORTE:  Well, he said he --

7              MS. STREUSAND:  -- an example.

8              MR. FORTE:  He says he hardly uses it.

9      A      I do use it at all, as in the example I just

10  gave you about the two data sets with the same mean and

11  median but that were, in fact, very different.  So you

12  could then point to the standard deviation which would,

13  in fact, be very different.

14      Q      (BY MR. FORTE) Well, in looking at the mean

15  and median calculations, on the face of the numbers how

16  would you tell that they were different enough so you

17  would then have to look to the standard deviation?

18      A      I don't understand the question.  I would use

19  standard deviation when -- as one of many tools to

20  point out when mean and medians between two different

21  data sets appeared to be the same and then -- thus

22  someone would try to make the argument that, thus,

23  these data sets are identical, logically leading to an

24  ordinary course defense when, in fact, they were very

25  different, as in the example I gave you.

1          And the standard deviation would be some

2    numbers that would bear that out.  Another way to bear

3    that same example out, you'd be able to look at our XY

4    chart.  You'd be able to see the differences.

5        Q    So you're saying here that the standard

6    deviation is having no effect at all on your opinion?

7        A    Yes.

8        Q    Okay.  If the standard deviation number was

9    something other than 19.93, would it have had an effect

10    on your opinion?

11        A    Not it alone, no.

12        Q    Well, can you give me an example using a

13    number of what standard deviation calculation would

14    have an impact on your opinion?

15        A    I just have.  If -- if I was looking at the

16    ordinary course of business defense, as far as the

17    debtor/creditor relationship, not industry standards,

18    not whether or not it was incurred in the ordinary

19    course, but whether or not it -- in the historical

20    period, in the baseline of dealings established then,

21    was similar enough in the preference period so that

22    those preference periods would be -- preference

23    payments would be protected by the ordinary course

24    defense and someone said, oh, the averages are the same

25    and the medians are the same, thus they're ordinary, I

1  would look at -- first, I'd probably look at the XY

2  graph, which would tell it a lot easier and a lot more

3  simply to understand.

4              But if, in fact, the mean and median were

5  the same and yet the data sets were very different, the

6  standard deviation would be very different.  And that

7  would be one of many tools or factors that I could use

8  to make a point.

9      Q    Well, if the standard deviation was very

10 different, as you say, what point would that make about

11 the mean and median calculations --

12             MS. STREUSAND:  Asked and answered.

13     Q    (BY MR. FORTE) -- in your example?

14             MS. STREUSAND:  Asked and answered, I

15 think, for the fourth time.

16             MR. FORTE:  No, he hasn't -- I -- I still

17 don't understand how he uses standard deviation.

18             MS. STREUSAND:  I think he's explained it

19 at least four times.

20     Q    (BY MR. FORTE) Mr. Thomas, you seem to be

21 saying to me that whether or not you look to or use the

22 standard deviation is in some way a function of the

23 mean and median calculations.  Is that correct?

24     A    They are all interrelated.

25     Q    Okay.  Tell me how they're interrelated.

1       A       I'll try again.  I'm not a mathematician.  In

2  this instance, standard deviation played no important

3  role in my opinion at all.  To come up with a

4  hypothetical where I would perhaps use it, I would give

5  you the example where someone is saying that the

6  historical period has this data set and the preference

7  period data set is so similar as to everything to be

8  ordinary because they have the same mean and median.

9               And yet, if I looked at the data and the

10  historical period was very, very tight, every invoice

11  was paid at exactly a hundred days, and during the

12  preference period the payments varied a lot so they

13  were all spread out, they just happened to have the

14  same mean and median, I most effectively and easiest

15  would look at our XY graph, which would show that very

16  dramatically.

17               But some people want numbers and

18  statistics.  So we have built standard deviation into

19  our system because, once you pay to have it programmed,

20  it's basically free.  It spits out.  It is a fact that

21  may or may not be useful but sometimes could be used to

22  bolster an observation or a judgment or an opinion.

23               In my hypothetical case, my opinion would

24  be that the preference payments aren't sufficiently

25  like historical payments to all be covered, even though

1  the mean and median is the same.

2            I would depend most heavily on the XY

3  graph, but the standard deviation is a number that

4  would help bear that out.  I don't use standard

5  deviation in a vacuum.  I don't take the standard

6  deviation and add it or subtract it from the mean or

7  median to come up with any kind of range.

8            Preference analysis is a peculiarly

9  factual analysis.  We gather as much data and

10  statistics and information as we can to try to look at

11  it to determine if what happened in the historical

12  period -- we try to determine what is the same between

13  the two and what's different between the two.

14            I could also -- we thought about adding

15  the mode because we did a preference case and somebody

16  came up with well, the mode is such and such.  Well,

17  that would be real easy to add.  We'd have that fact.

18  I'd probably never defend -- depend just solely on the

19  mode which, by the way, is I think the data point that

20  happens most frequent.

21      Q    Are you finished?

22      A    Yes, I am.  Thank you for allowing me to try

23  to explain.

24            MS. STREUSAND:  I think he asked you for

25  your explanation.

1      Q    (BY MR. FORTE) Now you've testified a little

2  bit earlier today, Mr. Thomas, about footnote one in

3  your April 28th opinion.  And I have some questions for

4  you about that.

5            Now you -- I'm going to summarize.  So if

6  I get it wrong, just tell me.  You say here in footnote

7  one that invoices recorded when cash is received equal

8  to the invoice amount.  So if there's a partial payment

9  received or an incomplete payment received, that the

10 system at Dell doesn't show it as being paid until the

11 balance comes in or until some kind of a credit is

12 done, for example, for a tax charge or something of

13 that nature.

14            Is a correct?

15     A    That was a good summary.

16     Q    Or a sales tax problem might be another issue;

17 is that correct?

18     A    Yes.

19     Q    Okay.

20     A    That's the example I used in my footnote.

21     Q    Right.  Now how do you understand Dell to have

22 gone back into the two-year pre-preference period

23 analysis and corrected those issues?

24            MS. STREUSAND:  Objection to the form of

25 the question.  I think it misstates the prior

1   testimony.

2       Q    (BY MR. FORTE) Well, it says in your footnote

3   that people at Dell went back and accounted for those

4   kinds of problems; is that correct?

5       A    Yes.

6       Q    All right.  What exactly did they do?

7       A    I don't know exactly what they did other than

8   to dig back into the various information that's

9   available to them.  And I don't know whether they had

10  to look at hard copy documents or electronically.

11           But apparently it was very tedious and

12  time-consuming.  And they went back and corrected what

13  I summarized in my footnote.

14      Q    Okay.  Did you speak to the people who

15  actually performed this work?

16      A    No.  I spoke to Mike Keller, who explained to

17  me what they were doing and why it took so long.

18      Q    All right.  And you assume that what Dell gave

19  you was an accurate correction?

20      A    Yes.

21      Q    Did you do any independent verification of the

22  correction that was made?

23      A    I had no data to compare or verify it to.

24      Q    So answer the --

25      A    The answer --

1    Q    -- is no?

2    A    -- is no.

3             MR. FORTE:  I'm sorry.  Did you get that

4  down?

5             THE REPORTER:  I did.

6             THE WITNESS:  That was in unison.

7    Q    (BY MR. FORTE) Now you state here that

8  these -- I'll use the term correction.  Are you

9  comfortable with that?

10    A    Yes.

11    Q    Corrections that the Dell personnel made were

12  done to the 1999 and 2000 data but not to the 1998

13  data; is that correct?

14    A    That is correct.

15    Q    Right.  And you said that, quote, to test this

16  judgment -- excuse me.  Let me back up.

17             You state here that Dell judged the

18  effect of this process did not significantly change the

19  data and accordingly elected not to spend the resources

20  to similarly correct 1998.

21             And then you state:  To test this

22  judgment, I compared the number of days between the

23  payment date and the date of the invoices paid, days to

24  payment, between 1998 and 1999/2000 to the beginning of

25  the preference period.

1          I noted for 1998 the mean and median days

2    to payment were 42 and 37, respectively.  With

3    1999/2000, they were 45 and 50, end quote.  Now --

4               MS. STREUSAND:  Counsel, you misread

5    that.

6        A    45 and 40.

7        Q    (BY MR. FORTE) Excuse me.  45 and 40, end

8    quote.  Now my question is:  How does comparing the

9    days to payment between the 1999/2000 period and the

10   1998 period verify that the people at Dell were correct

11   in going through and correcting the payment

12   applications?

13       A    It was all I could do.  And it may or may not

14   prove it up completely.  However, if there had been

15   huge differences between the uncorrected data and the

16   corrected data, I made the assumption that the

17   uncorrected data and the corrected data mean and median

18   might change dramatically.

19               It was my best attempt to do something

20   with Mr. Keller's representation to me.

21               MR. FORTE:  Counsel, may I take a short

22   break?

23               MS. STREUSAND:  Sure.

24               (Recess from 2:28 p.m. to 2:33 p.m.)

25       Q    (BY MR. FORTE) Mr. Thomas, could you please

1    turn to tab five of your report.

2        A    I'm there.

3        Q    All right.  Could you identify this, please.

4        A    This is a Payments Made During the Preference

5    Period report that I often refer to as a frequency

6    analysis.

7        Q    I'm sorry.

8        A    No, I'm --

9        Q    You're at the wrong tab.

10       A    I'm -- excuse me.

11       Q    Go back to five.

12       A    I'm sorry.  That was an error.

13       Q    That's all right.

14       A    This is -- this is Payments Made During the

15   Preference Period.  It is the database of the

16   preference payments.

17       Q    All right.  And this appears to be the same

18   kind of information as in tab four but just for the 90

19   days before the bankruptcy filing.

20       A    Correct.

21       Q    Now is there anything different about the

22   columns of information other than the numbers

23   themselves?  Do they have the same meaning as in tab

24   five?

25       A    Yes.

1      Q      Now at the end of tab five, there is a Total

2 Difference listed.  Do you see that?

3      A      Yes.

4      Q      285 thousand dollars and change, what does

5 that represent?

6      A      That represents the difference between the

7 total of the invoice amounts and the total of the

8 payments received.

9      Q      Does that indicate that Dell did not receive

10 285 thousand dollars for which it invoiced InaCom?

11      A      Yes.

12      Q      Do you know if Dell attempted to recover that

13 amount in the InaCom bankruptcy?

14      A      No.

15      Q      You just don't know?

16      A      That is correct.

17      Q      All right.  Do you know whether Dell filed a

18 proof of claim in the bankruptcy?

19      A      No.

20      Q      Do you know whether --

21             MS. STREUSAND:  Wait.  Wait.  Wait.  Let

22 me clarify that.  Do you mean you do not know the

23 answer to that question?

24             THE WITNESS:  I don't know if Dell filed

25 a proof of claim in the InaCom bankruptcy.

1    Q    (BY MR. FORTE) Okay.  Do you know whether any

2    obligations to Dell were listed on InaCom's schedules?

3    A    No.

4    Q    You just don't know?  I just want to clarify

5    again.

6    A    Your question was whether or not I knew.  And

7    I said no, I don't know.  But I -- I will add that to

8    my answer and we'll get through this faster.

9    Q    Good.  Now let --

10    A    Sorry.

11    Q    Good.  That's all right.  Let's -- let's take

12    a look at the mean, max, min, median and standard

13    deviation in five.

14              So the average days to pay, you're

15    saying, is 57.9 days during the preference period?

16    A    Correct.

17    Q    And the median is 54 days?

18    A    Correct.

19    Q    Now there's no negative minimums here.  Do you

20    know why?

21    A    No.

22    Q    There just weren't any in the data?

23    A    Correct.

24    Q    And the standard deviation of 47.08 is

25    significantly higher than the 19.93 from the

pre-preference period, correct?

    A    It's a little over double.

    Q    Does that have any significance with respect
to your opinion?

    A    No.

    Q    Why not?

    A    Because it's not important to me, how I'm
generating my opinion based on all the ways I've
explained in the past.

    Q    And why was the date range of March 18th, 2000
through June 15th, 2000 selected for tab five?

    A    According to the law, that's the preference
period.  So that's why I selected it.

    Q    Who prepared tab five?

    A    I or my staff under my direction and
supervision.

    Q    It wasn't prepared by Dell?

    A    Dell generated the electronic payment history
that they transmitted to us.  We put it into our
preference system and then generated this report, which
added the days to payment calculation and the
statistics in the bottom, right-hand corner of the last
page.

    Q    Okay.  Does that also apply to tab five --
excuse me -- tab four?