# EXHIBIT B – PART 3

1        A    Yes.

2        Q    Now let's look at the Frequency Analysis at

3   tab six of your report.  What's the purpose of this

4   chart?

5        A    This chart is one of many tools I use in

6   trying to analyze the ordinary course of business

7   defense.  One of the primary uses of this report is

8   determine what may or may not be what I'm going to call

9   an ordinary course range, which in case law is often

10  referred to as a baseline of dealings.

11            I look at this report in conjunction with

12  the payments schedules in conjunction with the XY

13  graph.  And altogether, I try to formulate what might

14  be an ordinary course range based on what happened in

15  the historical period.

16            That's what I'm -- that's what I use this

17  for.  This is one tool.  Based on then what I see in

18  the historical period, I try to extend that range into

19  the preference period and see if any of the payments

20  fall within it or outside of it.

21            So the historical period guides or leads

22  and the preference period, the chips fall as they may.

23       Q    Now just for the record, I want to ask you

24  what each of the three columns of data show in tab six.

25  Days to Payment, I assume, is the same as on Exhibits 5

1  and 6; is that correct?

2      A    That is correct.

3      Q    Excuse me.  4 and 5.

4      A    Yes.

5      Q    Excuse me.  4 and 5.

6      A    I made the mistake, too.  Yes.

7      Q    And the Number of Invoices are the number of

8  invoices paid.  What does this show?

9      A    The number of occurrences.  As example,

10 looking at the first one, 129 days negative, that is

11 the benchmark, how many times if you flipped this whole

12 500-something page report would you find an invoice

13 that was 129 days negative, it would happen once.

14          And the amount of that invoice would be

15 1,415 dollars.

16     Q    All right.

17     A    So the Number of Invoices is the number of

18 occurrences, each invoice counting as one.  The dollars

19 is the total of all those invoices.

20     Q    So, for example, down the page of tab six

21 where you have number of invoices, 178, do you see

22 that?

23     A    Excuse me.  What was the number you said?

24     Q    178.

25     A    Oh, the number -- thank you.  I see that now.

1    Q    Correct.  And the days to pay was 27.  There

2    were 178 invoices that were paid within 27 days.  And

3    the total of those 27 -- excuse me -- of those 178

4    invoices was $1,175,416.06; is that correct?

5    A    Correct.

6    Q    Now what does the black line across the page

7    represent over the 27, 178 and a million point 175?

8    A    In looking at this schedule, I try to

9    determine what was their baseline of dealings.  And I,

10   again, use the term ordinary course range.  Usually,

11   there is a concentration.  There's a range where the

12   number of transactions are concentrated.

13           And in a large business relationship like

14   this where there was 20 thousand invoices paid

15   totalling over 178 million dollars during this

16   historical period, there's going to be aberrations.

17   There's going to be fliers.  There's going to be

18   something that gets recorded as a negative 129 days.

19           There's going to be some old invoice that

20   fell through the cracks that didn't get paid until 385

21   days after the invoice.  So I believe that you can't

22   take everything that's ever happened and say that

23   anything between the quickest and the oldest is

24   ordinary.

25           Instead you look to where there is a

1  baseline of dealings, a concentration of where most of

2  the transactions occur, the clump as some attorney

3  friends refer to it.  This is a little bit like a Bell

4  Curve analysis, in that in a fairly normal data set,

5  the bulk of the transactions sort of falls somewhere in

6  the middle.

7           And if you scan down this report, you can

8  sort of see that, both in the number of invoices and

9  invoice dollars.  They generally track each other

10  fairly closely.  This line indicates where I, in my

11  judgment, based on the data and my experience, said

12  that the ordinary course range in the historical period

13  started.

14           And if you'll look further down the

15  schedule, the grouping symbols or bat wings, as they're

16  called, end at 71 days.  I wish I would have drawn a

17  line there to be consistent.  But somehow that didn't

18  happen or it didn't print.

19           But under the 71-day benchmark on page

20  two, imagine a line there.  And I'm saying that between

21  those two lines representing 27 days to payment and 71

22  days to payment is where I see the clump, what I think

23  I could suggest to the Court might be a reasonable

24  baseline of dealings or ordinary course range.

25           I then quantify, just -- it's just simple

1  mathematics.  I add up how many invoices were in there

2  and how many dollars and compare that to the total of

3  the historical period to come up with these

4  percentages.

5              For example, the number of invoices,

6  there's 18,284 invoices out of 19,567 invoices.  That

7  computes to 93.4 percent of the invoices.  I do the

8  same calculation for the dollars.  And it happens to

9  come up to 95.1 percent of the dollars.

10             I look at this in conjunction with the XY

11 graph and the other data to try to formulate what I

12 would refer to as the ordinary course range.

13             Thank you for allowing me to ramble on

14 and try to answer.

15     Q    That's all right.  Did your calculation of the

16 ordinary course range, which I understand for purposes

17 of your report is 27 to 71 days, change over time?

18     A    No.

19     Q    You from the beginning always believed it was

20 27 to 71 days?

21             MS. STREUSAND:  Misstates his testimony,

22 argumentative and --

23     Q    (BY MR. FORTE) Do you understand the question?

24     A    Yes.  I would like to clarify my answer in

25 saying that, based on the Dell data versus the InaCom

1  data, working off the Dell data, that's my opinion.

2      Q    27 to 71?

3      A    Yep.

4      Q    So my question is:  Based on the Dell data,

5  did you ever believe or did you ever consider that the

6  payment range would be different than 27 to 71 days?

7      A    I considered it could be different.  I looked

8  at this report and tried to figure out what I felt

9  comfortable testifying to, since I do defense work and

10 plaintiff work.  And I looked at this and sort of

11 scratched my head.

12          And the bottom line, 27, was really a

13 pretty easy one.  So I marked that first.  Then I began

14 to work -- where would I put the top line?  And I sort

15 of looked at it and thought about it.  And I may have

16 thought to myself, "Well, if I put it here, why am I

17 doing that or if I put it there," trying to come up

18 with what I really thought was the best, most

19 reasonable answer that I could support and testify to,

20 whether I'm for the plaintiff or the defense.

21          And I put it there.  Did I initially just

22 look at this and go, oh, 27 to 71 just like that,

23 probably not.  I probably had to think about and -- and

24 reflect on where the uppermost limit might be, because

25 it's not a bright line.  It's not purely a statistical

1  calculation.  It's a judgmental factor.

2      Q    Well, did you ever consider the payment

3  range -- well, back up.  Scratch that.

4              Did you ever consider doing an analysis

5  assuming that the ordinary course payment range was

6  between 27 and 50 days?

7      A    Did I ever consider it?

8      Q    Yes.

9      A    I consider doing it at any range that I looked

10 at this and thought it would be appropriate.  I did not

11 calculate one at 27 to 50.

12     Q    Did you calculate it at any other range than

13 27 to 71?

14     A    When you say calculate it, help me.  What do

15 you -- what are you thinking I would have done?

16     Q    Well, you told me you thought about it and you

17 made a judgment --

18     A    Uh-huh.

19     Q    -- and you came to the range of 27 to 71.

20     A    Uh-huh.

21     Q    During the course of thinking about it and

22 making the judgment, did you consider making the

23 payment range different than 27 to 71?

24              MS. STREUSAND:  I think he's already

25 answered that question.

1    A    Yes, I considered different payment ranges.

2    Q    (BY MR. FORTE) Okay.  What --

3    A    I probably didn't consider much different on

4 the bottom because, to me, that's fairly clear cut.  I

5 probably wouldn't move that around much.

6    Q    Well, what other payment ranges did you

7 consider?

8    A    Well, I would have considered moving the top

9 line, the top line where -- envisioning there's a line

10 at 71.  Should I have moved it down a little bit?

11 Should I have moved it up to include some of the later

12 clumps?

13         At 77 days, there's 115 invoices for 1.2

14 million.  I probably thought if I should extend the

15 range up to there or not, but I didn't do that.  And I

16 didn't run calculations of then what the answers would

17 be thereafter.

18    Q    Do you have any prior versions of tab six?

19    A    No.

20    Q    So you only did one version of this?

21    A    Yes.

22    Q    There were no drafts or other scenarios run?

23    A    Correct.

24    Q    I assume this document is still on your

25 computer.

1    A    This is --

2    Q    Tab six.

3    A    -- a database query, as I've tried to explain.

4  And it's not like a Word document where we save it.  We

5  could recreate this by punching in the same stuff.

6    Q    So it's not --

7    A    It may -- it may be saved as a PDF file

8  because I e-mailed it to -- matter of fact, I'm sure it

9  is saved somewhere as a PDF file so we could e-mail it.

10    Q    Now let's look at your percentage

11  calculations, the 93.4 percent.  Are you saying there

12  that, in order for the number of invoices to be

13  ordinary, they have to occur 93.4 percent of the time?

14    A    No.

15    Q    Okay.  What are you saying by the 93.4

16  percent?  How does that apply to your decision of

17  ordinariness?

18    A    Okay.  That's a fair question.  I'll attempt

19  to answer it.  It's not a very simple answer.

20            I look at a number of factors, the XY

21  graph, the payment history and the frequency analyses

22  to try to eyeball where is this clump, where is this

23  baseline of dealings.

24            And once I establish that, based on my

25  judgment, my experience, my training and understanding

1  of the law and my review of the data, after that, I

2  calculate and just see where it falls out.

3          I have looked at instances to where what

4  I think the baseline of dealings or the ordinary course

5  range is and it has percentages different than that.

6  This is just an after-the-fact calculation to highlight

7  the fact that, in this range, which is only 45 days

8  wide, there is a significant coverage of both the

9  number of invoices and the total dollar amount of the

10  invoices.

11          There is nothing magical or guiding about

12  95 or 93 percent.

13      Q    Now on the last page of tab six, we have again

14  the mean, maximum, minimum, median and standard

15  deviation figures.  They appear to correspond to what

16  you had at the end of tab four, if I'm not mistaken.

17  Is that right?

18      A    That's correct.

19      Q    And that's because they're based on the same

20  data?

21      A    Yes.  They're also shown on the XY graphs

22  under tab eight.

23      Q    Now please turn to tab seven.  What is the

24  purpose of this chart?

25      A    This chart is constructed the same as tab six

1  except that it contains the data during the preference

2  period.  The function here is to determine the amount

3  of invoices that would lie outside of any defined

4  ordinary course range.

5              I indicate that by adding -- and let me

6  correct.  There is a difference on this chart, in that

7  I have added the far right-hand column indicating

8  unordinary invoices.  If you will look, any invoices

9  that are -- have a less days to payment than 27 or

10  greater than 71 are extended into this right-hand

11  column and then totaled at the bottom.

12              So the short answer is, is this lets you

13  quantify the invoices that lie outside of my defined

14  ordinary course range.

15     Q    And in doing your frequency analysis in

16  Exhibit 6 and 7, did you take into account anything

17  other than the days to payment range in reaching the

18  calculations?

19              MS. STREUSAND:  Object to the form of the

20  question.

21     Q    (BY MR. FORTE) Do you understand?

22     A    Yes.  I'm trying to formulate --

23     Q    Okay.  I want to make --

24     A    -- a concise --

25     Q    -- sure you understood.

1    A    -- answer to you.

2    Q    Take your time.

3    A    Yes, I considered other things.

4    Q    What did you consider?

5    A    I considered whether or not there was a

6    discernible change in the payment pattern.  And if

7    there had have been, it would have affected what I

8    thought may have been ordinary payments or not.

9              In this case, there wasn't any.  So it

10    didn't change.  But I did consider other factors, which

11    I thought was your question.

12    Q    What were the other factors you considered?

13    A    Whether or not there was a change in payment

14    pattern -- I considered all of the factors that we

15    discussed in detail at the start of my deposition.

16    Q    Did you consider whether, at the time any of

17    the preference period payments were made, that Dell had

18    InaCom on credit hold?

19    A    No.

20    Q    Did you consider the effect of the Compaq sale

21    on the parties' course of dealing following that

22    transaction?

23    A    At the time of my --

24              MS. STREUSAND:  Object to the form of the

25    question.  I think you need to give some time periods.

1  report.  That was given to me as an assumption to use.

2      Q    Well, do you assume that's because Dell has

3  taken the position legally that that is not an ordinary

4  course payment?

5      A    I don't know why exactly Sabrina told me to

6  assume that.  I don't think it's an unreasonable

7  assumption.

8      Q    All right.  Well, do you intend to express an

9  opinion about that wire transfer at trial?

10     A    I am -- I intend not to try to defend it with

11 the ordinary course of business defense.

12     Q    All right.

13     A    To the extent any of the new value, back under

14 one of these tabs, might come after that, then it might

15 be defended to that extent but not ordinary course.

16     Q    Now you said earlier today, when we were

17 talking about something else, that you know of only one

18 wire transfer between InaCom and Dell; is that correct?

19     A    Yes.

20     Q    Is the $806,000 transfer the one wire transfer

21 you referred to?

22     A    Yes.

23     Q    Let's take a look at tab eight of your report.

24 Now Mr. Thomas, you've talked about these several times

25 today.  I wanted to focus in on them a little bit more.

1    Tab eight consists of two what I will call

2    scattergrams.  Is that a fair word to use for them?

3        A    That's a --

4                MS. STREUSAND:  I think that's XY chart.

5        A    I use XY chart.

6                MR. FORTE:  Okay.

7        A    Many judges -- at least one judge calls it a

8    splattergram.  So if you want to call it a scattergram,

9    I'm fine with that.

10               MR. FORTE:  I'll stick with XY chart.

11   That will make the record clearer.

12       Q    (BY MR. FORTE) Well, tell me what each axis

13   shows on this XY chart, the first one.

14       A    The vertical axis on the left-hand side is

15   days to payment.  That is the same days to payment as

16   we defined earlier being the difference between the

17   payment date and the invoice date.

18       Q    Yes.

19       A    The horizontal axis along the bottom is the

20   timing of the payment.  If the payment date was on

21   March 1st, 1998, it would be way over on the left.  If

22   it was later, it would be further to the right.

23               The start of the preference period is

24   indicated with a scored line with a text box saying

25   start of preference period.  And the bankruptcy date is

1    somewhere just to the right of where the diamonds stop.

2        Q    Now what does each diamond represent?

3        A    Each diamond represents one or more invoices

4    being paid.  I say one or more only because it is

5    possible that, for a single payment, it might pay two

6    invoices both having the same invoice date.

7                So you could think of it as having two

8    diamonds stamped right on top of each other and, thus,

9    you wouldn't be able to see it on the chart.  The

10   higher up on the chart the diamond is, the older the

11   invoice is when it was paid.

12       Q    Well, does the diamond represent a payment or

13   an invoice?

14       A    It's an invoice being paid.  If I may explain

15   just a bit further, if a check was written on March

16   1st, 1998 and it paid several invoices having different

17   invoice dates, you would see a string, a vertical

18   column of these diamonds.  And they would be centered

19   over March 1st, 1998.

20                If it was March 1st, 1999, it would be

21   way off to the right, vertical string.

22       Q    So each diamond could represent one invoice or

23   any number of invoices or one check or any number of

24   checks.

25       A    It would only be any number of checks if there

1  was more than one check having the same payment date.

2  If on day one there were three checks issued and

3  received that date, there would be a column of invoices

4  that would be paid by any of those three checks.

5      Q    And if the underlying invoices paid by those

6  three separate checks had the same date, there would be

7  one diamond that you could see for all, correct?

8      A    Yes.  If you --

9      Q    Because they'd be on top of each other, right?

10     A    Yes.  If you had -- to make an extreme

11 example, if you had a hundred checks issued or received

12 on the same date and they all paid one invoice but all

13 those invoices happened to be the same date, you'd see

14 one diamond.

15          That's why this is just one of many tools

16 you use in conjunction with each other to determine

17 what may or may not be an ordinary course range.

18     Q    Okay.  Let's take an example.  If you go

19 across the top horizontal line, the edge of the chart,

20 if you will, at 200 and you go to the dot that appears

21 to be over 10/1/98, do you see that?

22     A    Yes, I do.

23     Q    I'll circle the one I'm talking about.  Do you

24 see?

25     A    I do.  Thank you.

1    Q    Okay.  Now that diamond then could represent

2  one payment by check on one invoice, one payment by

3  check on a number of invoices or a number of payments

4  for a number of invoices.  Correct?

5    A    Assuming that all the invoices had the same

6  date and all the checks had the same pay date, yes.

7    Q    All right.  Now on the first page of tab

8  eight, the first XY chart, there appears to be a gray

9  bar going horizontally across the bottom part of the

10  chart.  What does that represent?

11    A    That denotes what I have determined to be the

12  ordinary course range, payments made between 27 and 71

13  days after invoice.

14    Q    Okay.  So the top of the bar would be 71 days

15  and the bottom would be 27?

16    A    Yes.  The lines are a visual reference.

17    Q    And the box in the lower left seems to be an

18  incorporation of your 93.4 percent and 95.1 percent

19  figures that were in the prior chart we looked at.  Is

20  that correct?

21    A    Yes.

22    Q    Now the days to payment box on the upper right

23  before and during, where you have the mean, max,

24  minimum, median and standard deviation, do you see

25  that?

1       A    Yes.

2       Q    Are those figures the same as for the pre- and

3  preference period analysis we looked at, at tabs four

4  and five?

5       A    Everywhere I presented them, they should be

6  the same.

7       Q    All right.  Now there's a box in the upper

8  right called Report Restrictions.  And it states

9  minimum days zero, maximum days 200.  Why does that

10 differ from what was on charts four and five?

11      A    The charts under tabs four and five don't have

12 a minimum days or maximum days restriction at all.

13 They contain the entire database.  The reason that the

14 minimum and maximum days are contained on this page is

15 to show less of the data.

16           If you show all of the data, which is the

17 second page of this tab, you notice that the days to

18 payment axis goes from negative 200 to positive 800.

19 That's what was required to show all of the data.  By

20 doing that, you --

21      Q    I see.  Thank you.

22      A    You squish down the data to where it's really

23 pretty compact where most of the transactions are,

24 making it not as useful to the Court.  You can't see as

25 much detail.

1          So what I've tried to do on the first

2    page of tab eight is to pick a range to show the meat

3    of what's going on, to get rid of the high fliers and

4    low fliers so that we show the remaining data in more

5    detail, larger.

6          So we determined to not show anything

7    that goes below the zero line, because there wasn't

8    very many of them, and to not show anything that goes

9    above the 200 line.  Now we quantify what dots are not

10   shown on this graph in the text box, which is in the

11   upper, left-hand corner.

12        Q    In order to make this graph, etcetera,

13   correct?

14        A    Yes.  Mainly, it's a way to blow it up so that

15   it's big enough to use effectively.

16        Q    Okay.  And the line marked start of preference

17   period, I assume, corresponds to March 17th, 2000; is

18   that correct?

19        A    Yes.

20        Q    Now if you look at the bar area, shaded bar

21   area showing the 27 to 71 days, if you go over to

22   February 1st, 2000, there's a gap there where there are

23   no payments.

24          Do you see that?  It appears to be

25   approximately a month.

1      A      I see the gap.

2      Q      Do you know why that's there?

3      A      There were no payments during that period.

4      Q      Do you know why?

5      A      No.

6      Q      And now the second part of tab eight, which is

7  entitled Ordinary Course Preference Analysis, your XYZ

8  chart, this appeared to me to be a more compressed

9  version of the first page.  Is that fair?

10     A      It's an XY chart, no Z.  But yes, it's

11 actually --

12     Q      Without the Z, excuse me.

13     A      It contains all the data.  And in order to get

14 it all on the same size page, it does need to be

15 compressed.

16     Q      Does -- if you do not take into account the

17 data that was excluded from the first page, do these

18 two charts that make up tab eight have the same number

19 of diamonds on them?

20     A      They come from exactly the same data set.  I

21 just cut off what prints.

22     Q      All right.

23     A      If you will -- to help you out, look at the

24 days to payment on both charts in the text -- in the

25 box days to payment up here.

1    Q    Yeah.

2    A    They're the same.  They couldn't be the same

3  if there was actually things out of the calculation.

4  It's purely a printing function to display visually the

5  data.

6    Q    The second XY chart, what we'll call the

7  compressed version, does each diamond in that chart

8  represent the same thing as each diamond in the first

9  chart?

10    A    These charts are identical other than we cut

11  off the top and bottom for display purposes and I

12  didn't add all the text boxes.

13    Q    But in the course of compressing the data for

14  the second chart, will you naturally get more

15  overlapping diamonds?

16    A    I don't understand.

17    Q    Well, in other words, if you compress the

18  number of days to pay so that there's not as much space

19  or spread between each day, you increase the likelihood

20  that a diamond is going to be on top of or overlapping

21  with another diamond.  Correct?

22    A    Yes.

23    Q    All right.  So given that, it's at least

24  possible that in the second XY chart there are fewer

25  diamonds because there is more overlap.

1    A    There's the same theoretical diamonds.

2    Q    Correct, but you can't see them.

3    A    But our eyes, given the human frailties and

4 shortcomings, you probably can't see the

5 differentiation because they begin to overlap.  That's

6 the inverse of the reason that I exclude and try to

7 blow it up so you can see the differences on the first

8 page.

9    Q    Now explain to me how you look at the two XY

10 charts that make up tab eight and reach any conclusions

11 about the ordinary course range.

12            Let's assume, for the -- for the sake of

13 the question, that your bar has not been inserted yet.

14 I assume that the 21 to -- the 71/27 day bar is the

15 result of your analysis, correct?

16            MS. STREUSAND:  Object to the form of the

17 question.

18    Q    (BY MR. FORTE) I'm sorry.  Inartfully, I

19 assume that, when you look at Exhibit 8, the first

20 page, you look at it and you make some kind of a

21 judgment about what you think the ordinary course range

22 is.  Is that fair to say?

23    A    Yes.

24    Q    All right.  And then you -- when you decide

25 what you believe the range to be, you have -- you

1  inserted the gray bar, which showed the 27-to-71 day

2  range.  Correct?

3      A    That is after I determined what I believe the

4  ordinary course range to be, yes.

5      Q    Correct.  All right.  Now what I'd like you to

6  do is imagine that the ordinary course range gray bar

7  is not present.

8      A    Okay.

9      Q    And you're looking at this and you're trying

10 to decide what is the ordinary course range.  I want

11 you to tell me how you go about doing that by looking

12 at this chart.

13     A    I don't look solely at this chart when I do

14 it.  Thus I can't.

15     Q    All right.

16     A    What I do do is, I take frequency analysis

17 during the historical period.

18     Q    Uh-huh.

19     A    And I take the XY chart and look at those in

20 conjunction.  If this was a data set that there wasn't

21 nearly as many invoices -- and often I do work where

22 there's maybe only a handful of checks in the

23 historical period and a handful of invoices.

24          So it's not so thick with dots, often

25 visually it's very easy to see that all the payments

1   were in this narrow range and then a preference payment

2   may have been way out of range.

3            When you have this large of a data set,

4   it becomes less likely that you can do it just looking

5   at the XY graph.  And you have to depend more and more

6   on the frequency analysis during the historical page --

7   historical period, excuse me.

8            In this case, given the number of data

9   points, I worked primarily off of the -- the frequency

10  analysis.  I looked at the XY chart and I saw, yeah,

11  there's -- there's a period of -- pattern of payments.

12  You can see where there's lots of diamonds and it's

13  sort of dark with activity.

14           And if you go into the preference period,

15  sort of visually extending that, there's some diamonds

16  there and there's some diamonds that aren't.  I then

17  went to the frequency analysis, selected the ranges

18  I've tried to explain to you.

19      Q    Uh-huh.

20      A    That drives other calculations, such as the

21  dollar amount of invoices that are outside the range.

22  One of the last things we do is actually put the bar

23  here on this XY graph --

24      Q    Well, I assumed that.

25      A    -- and add these text boxes.  It's to be able

1  to explain my position.

2      Q    All right.  Well, I think in your report you

3  refer to this as a visual depiction of the ordinary

4  course between InaCom and Dell.

5                How can you -- how can you instruct me or

6  the Court to look at this XY chart and use it in trying

7  to figure out what the ordinary course range is absent

8  the gray bar?  Can you give me an example?

9      A    Sure.

10     Q    By pointing to this, could you do that,

11 please.

12     A    I think it's intuitively obvious to many

13 people, when you look at these charts, where most of

14 the transactions occurred in the historical period.

15 And you can sort of eyeball off to the right and see if

16 any of the preference payments are within that range.

17     Q    So it's --

18     A    Now there's not a -- there's not a bright

19 line.  The judge wouldn't look at this without my bar

20 and visually see the lines that I have at 27 and 71.

21 They've got to have the frequency analysis in order to

22 pick that, also.

23     Q    So you're saying then that reviewing the XY

24 chart, obviously before you put the lateness range

25 numbers in of the group which represent -- which are

1    represented by the gray bar, that review of this is

2    essentially visually intuitive?

3                 MS. STREUSAND:  Object to the form of the

4    question.

5         A    I believe it's visually intuitive.

6         Q    (BY MR. FORTE) In selecting the left-hand

7    axis, the vertical axis on the first page of Exhibit 8,

8    why did you choose a spread of 20 days between the

9    numbers?

10        A    That's what's assigned by the software system.

11   I didn't say use a 20-day range.  It picks what would

12   fit on the page.  So that's a machine decision.

13        Q    And on the second page of tab eight, the XY

14   chart has more data and it's compressed.  Why did you

15   choose a 100-day spread between the days to payment?

16        A    The same reason.  The machine chose it, not

17   me.

18        Q    Now the first page of tab eight, the XY chart

19   with the gray bar across it, indicates at the bottom

20   that it was printed out or created April 19th of this

21   year; is that correct?

22        A    April 19th, 2005.

23        Q    Okay.  Was that the day it was printed out or

24   the day it was created?

25        A    I think that's the same.

1     Q    All right.

2     A    It's definitely when it was printed.  The same

3    answer I gave earlier, we could do the query.  And if

4    we left it up on the screen for days and days, it could

5    be created earlier and printed later.

6              But realistically, that's not what we do.

7    We bring it up.  It's on the screen.  We print it.

8     Q    Okay.  The second page of the tab eight, the

9    compressed XY chart, indicates it was created December

10   21st of '04.  Do you see that?

11    A    Yes.

12    Q    Do you know why there's such a big gap in

13   dates, approximately four months?

14    A    That we didn't need to rerun the full -- the

15   full compressed version, whereas the earlier version we

16   needed to run after I had selected this ordinary course

17   range so that we could get the bar and such on it.

18    Q    All right.  So when did you select the

19   ordinary course range?  Was it sometime near April

20   19th?

21    A    Probably fairly close to when I generated my

22   report.

23    Q    Well, based on the date on this XY chart, it

24   was at least April 19th, correct?

25    A    Yes.

1    Q    Because it's indicated there with a -- with a

2    gray bar, right?

3    A    Yes.

4    Q    Why is there no gray bar showing the

5    27-to-71-day payment range on the second XY chart that

6    makes up tab eight?

7    A    It would be too small to be meaningful.  The

8    reason that I included this at all is to be sure to

9    include all the data points so we couldn't be accused

10   of hiding any data points.

11   Q    Please turn to tab nine of your report, sir.

12   A    I'm there.

13   Q    Could you identify tab nine, please?

14   A    Yes.  It is a schedule that shows all of the

15   unordinary invoices paid during the preference period

16   via check.  It excludes any invoices that were paid

17   between 27 and 71 days because I've determined that

18   range to be ordinary.

19              It also excludes any payments made by the

20   wire transfer, based on assumption given to me by

21   counsel.

22   Q    So you're saying here that $99,300.45 of the

23   payments received by Dell from InaCom during the

24   preference period are not protected by the ordinary

25   course of business defense?

1    A    No.

2    Q    What are you saying?

3    A    I'm saying that the invoices paid, that the

4  invoices totaled 99,300.  To help you out and

5  understand, if you will look at tab seven, look at the

6  second page.

7              You see the same $99,345.  So this is a

8  total of invoices.  Due to credits and other accounting

9  adjustments, the actual cash payment on those invoices

10  was slightly less.  So you asked about payments.  These

11  are actually invoices.

12    Q    And then you take that information in tab 10

13  and you make a calculation of the non-ordinary payments

14  of $82,476.81; is that correct?

15    A    Yes.

16    Q    Okay.  And that $82,000 figure, are you saying

17  that is not protected by the ordinary course defense?

18    A    Yes, unless the judge chooses to expand the

19  range that I have calculated.

20    Q    In determining -- well, let me ask this

21  question.  On tab -- tab 10, please, could you explain

22  how you calculated the $82,000 figure?

23    A    Yes.  Each check has a discrete amount.

24  That's the actual amount that was really paid by the

25  check.  Each check was applied to several -- usually

1   several invoices.

2              Occasionally, the total of those invoices

3   was greater than the amount of the check because of

4   accounting adjustments, credit memos applied, such as

5   that.  A check might have some ordinary and some

6   unordinary invoices in it, some that were paid within

7   the ordinary course range, some that were paid outside

8   the ordinary course range.

9              These invoices were not paid in full in

10  total by cash because of these accounting adjustments

11  and credit memos.  So what I have done is I have taken

12  the difference between the total of the invoices and

13  the actual cash payment and determined what that

14  difference is and then spread it, prorated it dollar

15  for dollar amongst all of the invoices.

16             Some of those invoices might be

17  unordinary and some might be ordinary.  That's what

18  this calculation does.

19       Q    Is it your view that the ordinary course of

20  business defense analysis applies to transfers or

21  payments or to invoices?

22       A    Invoices.

23       Q    What do you base that on?

24       A    Case law.

25       Q    Well, isn't the goal to determine whether the

1  transfers were ordinary?

2     A    Yes.

3     Q    Okay.  Can you -- in light of that, could you

4  explain your prior answer?

5     A    Yes.

6     Q    Please do.

7     A    The transfer is the payment of an invoice.

8  One check under case law could be several transfers.

9  The case law is clear on that.

10    Q    So one check payment can be several transfers?

11    A    If it pays several invoices.  You break up

12 your analysis invoice by invoice.

13    Q    What case law do you base that on?

14    A    I don't -- it's such a basic premise that I

15 don't quote it very often.  So I don't have it on the

16 top of my head, but I certainly have it in my files

17 because there have been one or two occasions that we

18 have to prove up such basic concepts.

19    Q    Now your last tab, 11, "Paid" New Value, how

20 did you calculate the $69,814.17 figure?

21    A    It was a multistep process.  Any invoice that

22 was dated -- and I have been told that the invoice date

23 and the delivery date are the same.  So any goods or

24 services that were delivered after the earliest

25 preference payment could possibly be used as new value.

1          However, there are certain restrictions

2 on paid new value.  Some of it has to do what circuit

3 you're in.  Others are common across all the circuits.

4 And what's common across all the circuits is, is that

5 you can't double-dip by claiming an invoice as new

6 value and then claim that the invoice that paid the --

7 payment that paid it is ordinary and, thus, not

8 avoidable.

9          I looked at the data and simply listed

10 invoices that came after preference payments that would

11 be available as new value assuming, for some reason,

12 those payments that paid them were deemed to be

13 unordinary.

14          Now it's my judgment that all these

15 payments are ordinary because they weren't by the wire

16 transfer and they fall within my ordinary course range.

17          However, if the judge chooses to see

18 differently, then we wanted to point out the fact that,

19 if the judge chose a range that excluded any of these

20 invoices, then these invoices would be available as --

21 what I will coin a phrase -- paid new value.

22     Q    The invoices that make up this

23 69-thousand-and-change new value, do you know whether

24 those were paid before the date of InaCom's bankruptcy

25 filing?

1    A    They were all paid --

2    Q    They were all paid?

3    A    -- before the date.

4    Q    Do you know whether the law requires that, to

5    use something as new value, it must remain unpaid as of

6    the petition date?

7    A    Yes.

8    Q    Okay.  So if, in fact, that's the law that

9    applies and these were paid, then under that rule this

10    would not be available for new value.  Correct?

11            MS. STREUSAND:  Counsel, I need to

12    collect -- correct the record.  You asked him if he

13    knew.

14            THE WITNESS:  And I said yes.

15            MS. STREUSAND:  He answered the question

16    yes, but he didn't answer that question.  So it's a

17    compound question.  We need to clarify the record.

18            THE WITNESS:  I answered that I knew the

19    answer.  I didn't tell you what the answer was.

20    Q    (BY MR. FORTE) Okay.  Well, what's the answer?

21    A    It depends.  It depends on which circuit

22    you're in and which case law and, apparently, which

23    judge you're in front of.  Generally, the Third Circuit

24    is in one of the circuits that does not allow paid new

25    value.

1 the statistical factors presented just below the

2 invoice aging table."

3            And those would be the figures in the

4 mean, max, minimum, median, standard deviation list at

5 the end of tab five and tab four.

6      A    I -- I would agree with his statement if, when

7 he says value, he's talking about the usefulness.  Now

8 if he means value as the absolute number or the -- you

9 know, value in the math term meaning a data point or a

10 number, then I disagree because all of those are

11 absolutely one hundred percent accurate and supported

12 by the data.

13     Q    Well, have you tested the calculation of

14 standard deviation in tab four and five of your report

15 to determine whether Mr. Newsom is right or wrong?

16     A    I tested the software extensively and we used

17 outside people to test the software extensively before

18 we put this software into use.  And I have not tested

19 it since, since it always seems to work.

20     Q    Well, I thought you said earlier today that

21 the standard deviation had no bearing or almost no

22 bearing on your opinion in the case.  Correct?

23     A    That is what I said.

24     Q    All right.  Then if it bore no relationship to

25 your opinion, why would you have tested it?

1   that he somehow inferred that.  And again, I'm not

2   clear on his message.  But I do not agree with that

3   statement.

4        Q    Well, you listened in on his deposition,

5   correct?

6        A    Yes.

7        Q    Have you read the transcript?

8        A    No.

9        Q    Is there any other reason why you disagree

10  with that statement?

11       A    No.

12       Q    All right.  Do you have formal education in

13  statistics?

14       A    I probably had -- I did have some statistics

15  in college.  I would hardly call that a formal

16  education in statistics.

17       Q    Well, you took college courses on statistics.

18  Is that what you're saying?

19       A    Statistics was part of some of the courses I

20  took.

21       Q    Do you use statistical analyses in your

22  professional life?

23       A    To the extent you see it in this report,

24  that's generally the extent of how I use it.  Some

25  people would call that just math, adding, subtracting,

1  divide and multiply.

2      Q    All right.  Well, let's continue.  In a normal

3  distribution, a range of two standard deviations about

4  the mean includes approximately 95 percent of the

5  population.  Do you agree with that?

6      A    Yes.

7      Q    You do?

8      A    Yeah.  We've gone to the same textbooks or

9  Internet sites.  That's a truism.

10     Q    Therefore, Mr. Thomas is overstating the

11 breadth of any ordinary course bracket relative to the

12 actual standard deviation.  Do you agree with that

13 statement?

14     A    I'm not sure I understand it, but I certainly

15 don't agree with it.

16     Q    Why not?

17     A    Because I don't understand it.  I haven't

18 overstated anything.  I haven't compared anything to

19 one standard deviation.  So I'm not sure where he's

20 coming from, other than a misinference.

21     Q    Well, what inference are you referring to?

22     A    During his deposition when questioned about

23 this, he said that he inferred that I used standard

24 deviation in my calculation of ordinary course range.

25              And I'm guessing that happened because

1  questions until the time of trial.

2                (Deposition concluded at 4:29 p.m.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                       CHANGES AND SIGNATURE

2    PAGE   LINE        CHANGE                    REASON

3    _____

4    _____

5    _____

6    _____

7    _____

8    _____

9    _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   _____

18   _____

19   _____

20   _____

21   _____

22   _____

23   _____

24        I, STEPHEN H. THOMAS, have read the foregoing

25   deposition and hereby affix my signature that same is

1  true and correct, except as noted above.

2

3  _____

4                    STEPHEN H. THOMAS

5

6

7  THE STATE OF _____  )

8  COUNTY OF      _____  )

9

10       Before me, _____, on this day

11  personally appeared STEPHEN H. THOMAS, known to me (or

12  proved to me under oath or through _____ ) to

13  be the person whose name is subscribed to the foregoing

14  instrument and acknowledged to me that they executed

15  the same for the purposes and consideration therein

16  expressed.

17

18       Given under my hand and seal of office this

19  _____ day of _____, _____.

20

21

22

23                    _____

24                    NOTARY PUBLIC IN AND FOR

25                    THE STATE OF _____

```
 1                  UNITED STATES DISTRICT COURT
                        DISTRICT OF DELAWARE
 2
    ------------------------------
 3  In re:                        )  Chapter 11
                                  )
 4  INACOM CORP., et al.,         )  Case No. 00-2426 (PJW)
                                  )
 5          Debtors.              )  Jointly Administered
                                  )
 6  -----------------------------)
                                  )
 7  INACOM CORP.,                 )
                                  )  Civil Action No.
 8  On behalf of all affiliated   )     04-582 (GMS)
    Debtors,                      )
 9          Plaintiffs,           )
                                  )
10      V.                        )  Adv. Pro. No.
                                  )     02-03499 (PJW)
11  DELL COMPUTER CORPORATION,    )
    Et al.,                       )
12          Defendants.           )
    -----------------------------)
13

14

15             REPORTER'S CERTIFICATE OF FILING

16                   ORAL DEPOSITION OF

17                   STEPHEN H. THOMAS

18                  TAKEN JULY 13, 2005

19

20

21          I, DAVID BATEMAN, Certified Shorthand Reporter

22  for the State of Texas, hereby certify to the

23  following:

24          That the witness, STEPHEN H. THOMAS, was duly

25  sworn by the officer and that the transcript of the
```

1  oral deposition is a true record of the testimony given

2  by the witness;

3          That the deposition transcript was submitted

4  on _____, 2005 to Ms. Sabrina Streusand, attorney

5  for Defendant Dell Computer Corporation, for

6  examination, signature and return to

7  _____ by _____, 2005;

8          That $_____ is the deposition officer's

9  charges to Plaintiff, Executive Sounding Board

10 Associates, Inc. on behalf of Debtors, for preparing

11 the original deposition transcript and any copies of

12 the exhibits;

13         That pursuant to information given to the

14 deposition officer at the time said testimony was

15 taken, the following includes counsel for all parties

16 of record:

17     FOR THE PLAINTIFFS:

18         MR. EARL M. FORTE
           Blank Rome, LLP
19         One Logan Square
           18th & Cherry Streets
20         Philadelphia, Pennsylvania 19103-6998
           (215) 569-5618
21

22     FOR THE DEFENDANT DELL COMPUTER CORPORATION:

23         MS. SABRINA STREUSAND
           Hughes & Luce, LLP
24         111 Congress Avenue, Suite 900
           Austin, Texas 78701
25         (512) 482-6842

1    I further certify that I am neither counsel

2  for, related to, nor employed by any of the parties or

3  attorneys in the action in which this proceeding was

4  taken, and further that I am not financially or

5  otherwise interested in the outcome of the action.

6    Certified to by me this 19th day of July,

7  2005.

8

9

10

11

12

13  _____

14  David Bateman, RPR, Texas CSR #7578
    Expiration Date:  12/31/05
15  FREDERICKS-CARROLL REPORTING
    Firm Registration No. 82
16  7719 Wood Hollow Drive, Suite 156
    Austin, Texas 78731
17  (512) 477-9911

18

19

20

21

22

23

24

25

1    Q    Correct.  And none of those bear on the InaCom

2 matter, correct?

3    A    I did not have to use any of those in doing my

4 expert report.

5              MR. FORTE:  All right.

6              THE WITNESS:  Financial Accounting

7 Standards Board.  Excuse me.

8              MR. FORTE:  That's right.  Thank you.

9    Q    (BY MR. FORTE) What customs did you apply in

10 creating your report in this case?

11    A    This entire phrase is layman's terms to try to

12 explain the process.  That includes customs, practices,

13 standards of care both in the official promulgated

14 accounting rules and regulations, also as a layman

15 would use them, just using standards of care, being

16 careful.

17              Customs would mean what I usually see as

18 being done.

19    Q    Which is what?  What do you usually see being

20 done?

21    A    In my case, it would be doing a thorough

22 analysis before you present something, doing your

23 homework.

24    Q    So you're saying you -- you applied that to

25 your ordinary course analysis in this case?

1    A    Yes.

2    Q    Okay.  What was the thorough analysis that you

3  did?

4    A    It's what's laid out in my report.

5    Q    The report and the exhibits?

6    A    Correct.  I -- I consider -- when I say "my

7  report," I mean to be inclusive of the exhibits.

8              MR. FORTE:  All right.

9              MS. STREUSAND:  And just for the record,

10  that's one through 11?

11             THE WITNESS:  Yes.

12    Q    (BY MR. FORTE) Well, in this case, you were

13  not asked to determine whether the claims being

14  asserted by the plaintiff warrant prosecution, were

15  you?

16    A    No.

17    Q    No?  Now you state I have also learned how

18  these customs, practices and standards of care are or

19  should be applied in real-life situations, end quote.

20             What do you mean by real-life situations?

21    A    Not hypothetical examples.

22    Q    So basically any engagement you have?

23    A    Any engagement I have I would consider a

24  real-life situation.

25    Q    Well, can you give me an example of a

1  hypothetical where these customs, practices and

2  standards of care would apply?

3      A    As I'm teaching someone in one of my classes

4  or just trying to explain something unofficially to the

5  side to help develop staff, I might use hypothetical

6  examples.

7      Q    Now you state in your report on page two that

8  you reviewed certain documents listed at tab two.  And

9  tab two states you reviewed the complaint, invoices,

10  electronic payment history, bank statements and

11  canceled checks.

12          Are those all the documents you reviewed

13  in this case?

14      A    Yes.

15      Q    When did you first see the complaint?

16      A    I don't recall.

17      Q    Well, would it have been near the time you

18  began your engagement of May of 2002?

19      A    Yes.

20      Q    Now when you say invoices, what invoices do

21  you mean?

22      A    Invoices from Dell to InaCom.

23      Q    For what?

24      A    For the goods and services provided by Dell to

25  InaCom.

1    Q    What services did Dell provide InaCom?

2    A    I don't know.

3    Q    Could you give a general description?

4    A    I -- I use the term "goods and services" to

5    mean whatever they're allowed to bill for.

6    Q    All right.  What kind of goods did Dell

7    provide to InaCom?

8    A    Computer --

9    Q    Now you're -- you're looking at the invoices.

10   Do you remember outside of looking at the invoices

11   right now?

12              You're free to look at the invoices.  I

13   just want the record the say that.  What kind of

14   products did Dell provide InaCom?

15   A    Computer-related products.

16   Q    And the invoices, were those electronically

17   stored?

18   A    The invoices --

19              MS. STREUSAND:  Wait.  Wait.  Object to

20   the form of the question.

21   Q    (BY MR. FORTE) Fine.  Did you understand the

22   question?

23   A    Could you tell me which invoices you're

24   speaking of?

25   Q    The ones that you say on tab two that you

1    reviewed.

2              MS. STREUSAND:  I think he asked if you

3    electronically stored the invoices.

4              MR. FORTE:  No, I didn't ask that.

5              MS. STREUSAND:  Okay.  Can you --

6              MR. FORTE:  I'll start over.

7              MS. STREUSAND:  Can you re-ask the

8    question?

9         Q    (BY MR. FORTE) The invoices that you list on

10   tab two that you reviewed, were those

11   electronically-stored invoices?

12        A    Yes.

13        Q    And the electronic payment history, is that

14   tabs four and five, the pre- and postpreference period

15   payment histories you referred to earlier today?

16        A    This is a hard copy printout of that payment

17   history that was given to us electronically.

18        Q    All right.  And what bank statements and

19   canceled checks did you review?

20        A    The bank statements and canceled checks along

21   the wall to my left.

22        Q    Thank you.  Do you intend to review any other

23   documents other than what's listed on tab two of your

24   report between now and trial?

25        A    If I'm directed to do so by counsel, I will.

1   our -- our plaintiff work is over three thousand.

2       Q    So the three thousand files -- excuse me --

3   three thousand preference files referred to in your

4   April 28th opinion means three thousand plaintiffs'

5   preference files?

6       A    I didn't start off to define it that way.  But

7   the database that I went to, to pull these numbers and

8   round them down, was our plaintiff work because that's

9   where you get the big numbers.

10      Q    All right.  How -- approximately how many

11  times have you given expert opinions on the ordinary

12  course of business defense?

13      A    Eight or 10, something less than my total

14  testimony.  But most of my testimony is regarding

15  preferences.

16      Q    Of those eight or 10 ordinary course of

17  business opinions that you've given, approximately how

18  many were for plaintiffs and how many were for

19  defendants?

20      A    Most were plaintiffs.

21      Q    Do you need to refer to the list of cases

22  attached to your bio --

23      A    I'm doing that in case I can --

24      Q    -- to answer my questions?

25      A    I'm doing that so that, if I can answer more

1    Q    All right.

2    A    I did my work, gave my report.  And then the

3  case seemed to go on and I didn't really hear.

4    Q    So is it -- is it fair to say you were really

5  hired by the Court to do an analysis?

6    A    In layman's terms, yes.

7    Q    All right.

8    A    I was paid out of the estates, but the judge

9  was my boss.

10    Q    Now you mention on page two of your April 28th

11  report that you interviewed Michael Keller on the

12  telephone.  Who --

13    A    Correct.

14    Q    Correct?

15    A    Sorry.

16    Q    I'm sorry.  You did, correct?

17    A    Yes.

18    Q    Okay.  Approximately when?

19    A    Prior to issuing this report on -- I do not

20  recall.

21    Q    Well, was it closer to the engagement date of

22  May 2002 or closer to April of 2005 when you wrote your

23  report?

24    A    I'm fairly sure I talked to Mike Keller on

25  more than one occasion during this case.  I do think

1  that I talked to him about Dell's efforts to clean up

2  the database that was ultimately used to generate this

3  report so he could help me understand the procedures

4  they were employing, basically the basis of my footnote

5  number one to my report.

6     Q    Okay.

7     A    Most of that I couldn't know of my own accord

8  or looking just at the data.  I had to talk to Mike for

9  him to explain how this worked to me.

10    Q    Well, when you state in your report that you

11 interviewed telephonically Michael Keller, are you

12 referring to a specific interview or are you referring

13 to just a number of phone calls that occurred over

14 time?

15    A    The second.

16    Q    The second?  During the course of those

17 conversations, did you ask Mr. Keller specific

18 questions relevant to this engagement?

19    A    Yes.

20    Q    Did you conduct what I would call a witness

21 interview or a formal interview?

22    A    No.

23    Q    No?  Did you just ask him questions as needed?

24    A    Yes.

25    Q    All right.  Was there an occasion where you

1   took notes or made other kinds of transcriptions about

2   what Mr. Keller said?

3      A    Probably.

4          MR. FORTE:  To the extent that there's

5   notes of Mr. Thomas's conversations with Mr. Keller, we

6   would request those.

7      Q    (BY MR. FORTE) Why did you talk to Mr. Keller

8   as opposed to someone else at Dell about these issues?

9      A    Sabrina Streusand directed me to talk to Mr.

10  Keller.

11     Q    What was your understanding as to why she gave

12  you that instruction?

13     A    He would know the answer to my questions or

14  could find out the answer.

15     Q    Do you know what Mr. Keller's position --

16  excuse me.  It says here Finance Manager III.  Do you

17  know what his job function is at Dell?

18     A    I would -- yes.

19     Q    What is it?

20     A    I would describe it in layman's terms as the

21  credit manager.

22     Q    Was he the credit manager in charge of credit

23  for InaCom?

24     A    I don't know.

25     Q    Well, did he have any knowledge about InaCom?

1      A      He seemed to have knowledge of the accounting

2   records that dealt with Dell and InaCom's business.

3      Q      And was that the extent of his knowledge when

4   you spoke to him?

5      A      I don't know the full extent of his knowledge.

6   I only discussed with him what I needed to know.

7      Q      All right.  But other than what you just

8   described, did he convey any other information to you

9   about the InaCom relationship?

10      A      No, just what's in my report.

11      Q      All right.  And that's principally the data

12   that's attached?

13      A      Yeah.

14               MS. STREUSAND:  And the letter as well,

15   correct?

16               THE WITNESS:  Yeah.

17      A      The data also includes what's in my footnote

18   number one, if I can --

19               MR. FORTE:  Right.  You already --

20      A      -- clarify.

21               MR. FORTE:  No.  You've said that before.

22               THE WITNESS:  Yes.

23               MR. FORTE:  I understood that.

24               THE WITNESS:  I've said things several

25   times.