**IN THE UNITED STATE DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 11 |
| INACOM CORP., et al., | ) | |
| | ) | Case No. 00-2426 (PJW) |
| Debtors. | ) | |
| | ) | |
| | ) | |
| INACOM CORP., on behalf of affiliated | ) | |
| Debtors, | ) | Civil Action no. 04-582-GMS |
| | ) | Adv. No. 02-3499 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| DELL COMPUTER CORPORATION, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**REPLY OF PLAINTIFF IN SUPPORT OF ITS MOTION IN LIMINE TO**
**EXCLUDE EXPERT TESTIMONY OF STEPHEN H. THOMAS**

Plaintiff, Debtors, InaCom Corporation on behalf of affiliated Debtors, through Executive

Sounding Board Associates, Inc., Plan Administrator ("Plaintiff"), replies to the opposition filed

to its Motion In Limine to exclude testimony by Stephen H. Thomas of Lain Faulkner & Co.,

P.C. ("Thomas"), designated by Defendants Dell Computer Corporation, Dell Receivables, L.P.

and Dell Marketing, L.P. (collectively, "Dell") as an expert witness under Federal Rule of

Evidence ("F.R.E.") 702. The testimony offered by Thomas must be excluded because it

instructs the trier of fact on what legal conclusion to reach, it does not address an ultimate factual

issue under F.R.E. 704 and it does not offer expertise helpful to the trier.

Thomas' qualifications are not at issue, because his purported qualifications, notably in

"public accountancy", were not used.[1]  Thomas relied solely on routine invoice and payment

---

[1] Thomas testified that there was no reason for him to apply general accepted accounting principles, generally
accepted auditing standards or Financial Accounting Standard Board rules. (Thomas Dep. Tr. 111:7-111:23).
Deposition transcript excerpts from Thomas' deposition are attached as Exhibit A.

119096.01600/40156328v.2

information provided to him entirely by employees of Dell and other information provided to
him by Dell's legal counsel.[2] Thomas then used "simple math" and rendered a legal opinion that
the payments to Dell during the preference period were made in the ordinary course of business.
(Thomas Dep. Tr. 237:14-237:15).

### 1.     "Simple Math" does not Require Specialized Knowledge

Without any factual or legal support, Dell insists that Thomas's testimony will assist the
trier.  In In re Shalom Hospitality Inc., 293 B.R. 211, 214 (Bankr. N.D. Iowa 2003), a case cited
but misapplied by Dell, the Court stated that "[t]he test for determining the appropriateness of
expert testimony is the common sense inquiry whether the untrained layman would be qualified
to determine intelligently and to the best possible degree the particular issue without
enlightenment from those having a specialized understanding of the subject involved in the
dispute." (citation omitted).  Nothing Thomas did in his report requires such "enlightenment".

Dell erroneously states that "Thomas analyzed 19,567 invoices during the pre-preference
period and additional 611 invoices for the preference period." (Dell Motion, p. 3).  This is
wrong.  Thomas admitted that he did not compile any of the data used in his report, nor did he
independently verified any of the invoices – even those which on their face are non-sensical
(e.g., invoices purportedly issued 129 days after payment). (Thomas Dep. Tr. 166:9-167:20).
Instead, Thomas relied entirely on Dell for the compilation and accuracy of the data and
performed nothing more than simple counting to calculate the number of days between the date
on Dell's invoices and the date payment was received from Inacom at Dell's lockboxes to render
his opinion.[3]

---

[2] Thomas testified that the data for his report came from an electronic database prepared by Dell and that he did
nothing to verify its accuracy. (Thomas Dep. Tr. 166:9-167:20).
[3] This "simple math" was actually done automatically by Thomas' modified Excel spread sheet software. (Thomas
Dep. Tr. at 165:20-165:22; 37:22-38:22).

2.    Opinion on the Ordinary Course of Business is a Legal Conclusion not an
       Ultimate Issue

F.R.E. 704 precludes opinion testimony that embodies a legal conclusion, specifically,

one that "inadequately explores legal criteria." (See Off. Comment F.R.E. 704). That is

precisely what Thomas does in opining on the ordinary course of business under §547(c)(2)(B). [4]

Dell relies on In re Kevco, Inc., 2005 Bankr. LEXIS 1249 (Bankr. N.D. Texas June 30,

2005) for the proposition that Thomas has previously testified on the § 547(c)(2)(B) element.

However, much in Kevco contradicts Thomas' opinion in this case. In Kevco the court stated

that "reliance on average payment time, as is often the case with statistics, does not portray the

complete picture of [the debtor's] payment history". Kevco at *45. The ordinary course of

business analysis must also take into account any credit holds, shipment holds, manner of

payment (overnight vs first class), number of invoices covered by a single check and numerous

other particularities that mark the preference period. Kevco, pp. 52-56.[5] Thomas' report

considers none of these factors. Rather, Thomas uses "simple math" to perform

subtraction and relies entirely on employees at Dell and the advice of Dell's legal counsel in

rendering his opinion, which amounts to nothing more than an instruction to the Court on how to

rule on Dell's § 547(c)(2)(B) defense. This is not expert testimony and it should be excluded.[6]

---

[4] Contrary to Dell's reliance on In re Brothers Gourmet Coffees, Inc., 271 B.R. 456 (Bankr. D. Del. 2002), the
creditor's expert in that case did not testify on what the "ordinary course of business" was. Rather, he opined on the
standard term in the green coffee industry. In re Brothers, at 461.
[5] The Kevco decision contains no discussion of Thomas' qualifications, nor does it set forth the contents of his
report. Indeed, it is not possible to tell from reading Kevco precisely what opinion Thomas offered, if any.
[6] Thomas testified that while he became aware of unusual collection activities by Dell well after he wrote his report,
and just a day before his deposition, Dell's counsel advised him that these facts were not relevant to the preference
period and he, therefore, did not consider them in his opinion. (Thomas Dep. Tr. 150:25-152:5.)

3

Respectfully submitted,

**BLANK ROME LLP**

Dated: September 6, 2005

Bonnie Glantz Fatell, Esquire (DE No. 3809)
Elio Battista, Jr. (DE No. 3814)
Alisa E. Moen, Esquire (DE No. 4088)
Chase Manhattan Centre
1201 Market Street, Suite 800
Wilmington, DE 19801
Tel:    (302) 425-6400
Fax:    (302) 425-6464

- and -

Earl M. Forte, Esquire
Regina Stango Kelbon, Esquire
One Logan Square
Philadelphia, PA 19103
Tel:    (215) 569-5500
Fax:    (215) 569-5555

Attorneys for Plaintiff Executive Sounding Board
Associates, Inc., as Plan Administrator for Debtors

4

# EXHIBIT A

```
 1            UNITED STATES DISTRICT COURT
                  DISTRICT OF DELAWARE
 2
   -------------------------------
 3 In re:                      ) Chapter 11
                               )
 4 INACOM CORP., et al.,       ) Case No. 00-2426 (PJW)
                               )
 5        Debtors.             ) Jointly Administered
                               )
 6 -----------------------------)
                               )
 7 INACOM CORP.,               )
                               ) Civil Action No.
 8 On behalf of all affiliated )    04-582 (GMS)
   Debtors,                    )
 9        Plaintiffs,          )
                               )
10    V.                       ) Adv. Pro. No.
                               )    02-03499 (PJW)
11 DELL COMPUTER CORPORATION,  )
   Et al.,                     )
12        Defendants.          )
   -----------------------------)
13

14 ***********************************************

15              ORAL DEPOSITION OF

16              STEPHEN H. THOMAS

17                JULY 13, 2005

18 ***********************************************

19

20    ORAL DEPOSITION of STEPHEN H. THOMAS, produced as a
   witness at the instance of the Plaintiffs, and duly
21 sworn, was taken in the above-styled and numbered cause
   on the 13th day of July, 2005, from 9:33 a.m. to 4:29
22 p.m., before David Bateman, RPR, CSR in and for the
   State of Texas, reported by machine shorthand, at the
23 offices of Hughes & Luce, LLP, 111 Congress Avenue,
   Suite 900, Austin, Texas 78701, pursuant to the Federal
24 Rules of Civil Procedure and the provisions stated on
   the record or attached hereto.
25
```

```
1                    A P P E A R A N C E S

2

3        FOR THE PLAINTIFFS:

4             MR. EARL M. FORTE
              Blank Rome, LLP
5             One Logan Square
              18th & Cherry Streets
6             Philadelphia, Pennsylvania 19103-6998
              (215) 569-5618
7

8

        FOR THE DEFENDANT DELL COMPUTER CORPORATION:
9
              MS. SABRINA STREUSAND
10            Hughes & Luce, LLP
              111 Congress Avenue, Suite 900
11            Austin, Texas 78701
              (512) 482-6842
12

13

        ALSO PRESENT:
14
              MR. MICHAEL L. NEWSOM (Via Telephone)
15               Bridge Associates, LLC

16

17

18

19

20

21

22

23

24

25
```

1    A    Some of the materials previously existed, such
2 as an example XY chart and how to read it.  Others were
3 created right before the seminar.

4            MS. STREUSAND:  You prepare like the rest
5 of us.

6    Q    (BY MR. FORTE) How long have you been using an
7 XY graph in your analysis of preferences?

8    A    I believe my very first XY graph used in a
9 preference analysis may have been nine or 10 years ago.

10    Q    What software is used for that?

11    A    At that time, it was an Excel spreadsheet.

12    Q    Is it still an Excel spreadsheet?

13    A    No.

14    Q    What is it now?

15    A    Our software system is a Sequel server
16 database back-end with an Access front end or user
17 interface grafted together.

18            Additionally, there's some custom
19 programming, one of which is taking what started out
20 life as an Excel XY graph, tweaking it to fit into that
21 system.  Thus it generated the charts you see.

22    Q    Well, I'm not sure I understood all that.  But
23 you -- you took the Excel XY graph and modified it?

24    A    Uh-huh.

25    Q    You have to say "yes" or "no" so he can get it

1  down.

2       A    I'm sorry.  Yes.

3       Q    Thank you.  And how precisely did you modify

4  the Excel spreadsheet?

5       A    I didn't do the modification, so I wouldn't be

6  able to tell you.  We hired a programmer to do that.

7       Q    Well, did you give instructions to the

8  programmer as to what you wanted?

9       A    Yes.

10      Q    What instructions were those?

11      A    Make it look like the graph in my expert

12  report as opposed to the graph that comes out of the

13  stock Excel schedule.

14      Q    How does it differ?

15      A    The Excel -- other than the basic concept of

16  the two axes and plotting data points, the Excel

17  schedule doesn't have any of the titles and it doesn't

18  look like that.  So we made it look the way we wanted.

19           We chose to put certain report

20  restrictions and certain statistical data up there and

21  the titles so that it would be a little more

22  user-friendly and easier to read, we hoped more useful.

23      Q    Can -- can you give me a precise example of

24  what was added to the Excel form?

25      A    Other than saying everything on that tab,

1     A    I can't quote it.  It's the AICPA Code of

2   Professional Conduct.

3     Q    Did you conduct your report and opinion in

4   this case in accordance with the AICPA Code of

5   Professional Conduct?

6     A    Yes.

7     Q    In this matter, were there any reason for you

8   to apply general accepted accounting principles?

9     A    No.

10    Q    How about general accepted accounting

11  standards?

12    A    Generally accepted accounting standards?

13    Q    Excuse me.  Generally accepted auditing

14  standards.

15    A    No.

16    Q    How about any of the rules or guidelines set

17  forth by the Fair Accounting Standards Board?

18         MS. STREUSAND:  Objection to the form of

19  the question.

20    Q    (BY MR. FORTE) Maybe I'm using the wrong

21  title.  FASB, F-A-S-B, doesn't that stand for Fair

22  Accounting Standards Board?

23    A    I don't think so.

24    Q    What -- what does it stand for?

25    A    I don't know, but it's not fair.  Well, that's

 1  affect on the preferential payments?

 2     A    I base that on the timing of the e-mails, the

 3  content of the e-mails and the timing of the preference

 4  payments.

 5     Q    What do you mean by that?

 6     A    Okay.  If I -- if I may just generally

 7  explain, my one-time-through reading of the e-mails led

 8  me to believe that, generally, the topic of those

 9  e-mails was the creditworthiness of InaCom and the

10  ability of Dell to collect monies owed to it by InaCom

11  and the timing of those payments.

12              And I think at a -- a noteworthy factor

13  in those e-mails was what was categorized as a soft

14  credit hold on a few of the InaCom customer accounts.

15  I understand that the soft credit hold was lifted and

16  was not in effect during the preference period and that

17  the reason I say this doesn't affect the preference

18  period is that it's my understanding, based on my

19  understanding of case law, is that credit holds might

20  be construed in some cases as unusual collection

21  efforts.

22              And that impacts a preference payment if

23  a preference payment is made in response to unusual

24  collection efforts.

25     Q    Based on Mr. Horton's e-mails, do you remember

1  the date on which the credit hold imposed by Dell was

2  resolved?

3      A    Not based on the e-mails.

4      Q    Based on something else?

5      A    Yes.

6      Q    Based on what?

7      A    It was represented to me by counsel that, at

8  some point in time after those e-mails but before the

9  start of preference period, a financial transaction

10 involving Compaq -- and I really don't know what that

11 was -- occurred, which made funds available to catch

12 everything up.

13           Thus it was no longer an issue by the

14 time the preference period started.

15     Q    Okay.  So it was based on something that

16 occurred after the period of the e-mails but before the

17 preference period.  Is that what you said?

18           MS. STREUSAND:  Objection to the form.

19 That mischaracterizes his testimony.

20     A    The e-mails talk about certain issues and

21 factors.  And the last e-mail was somewhere in early or

22 mid-February.  I don't recall the date.  I was told by

23 Ms. Streusand that in mid-February this transaction

24 occurred, which allowed InaCom to clear up any of these

25 issues that might be leading to these soft credit

```
 1   holds.
 2                 Thus it was no longer an issue or factor
 3   at the start of the preference period.  And
 4   accordingly, none of the preference payments could have
 5   been made in response to that soft credit hold.
 6        Q    (BY MR. FORTE) What was the transaction that
 7   you were informed about?
 8        A    The Compaq transaction.
 9        Q    Do you know what that was?
10        A    No.
11        Q    Other than calling it the Compaq transaction,
12   do you know anything about it?
13        A    Apparently, it generated some kind of funds to
14   be available to InaCom.
15        Q    Have you seen any documents showing how funds
16   from the Compaq transaction were disbursed?
17        A    No.
18        Q    So you're basing this solely on what counsel
19   told you?
20        A    Yes.
21        Q    Did you make an attempt to verify what counsel
22   told you?
23        A    No.
24                 MS. STREUSAND:  For clarification
25   purposes, did you also review the e-mails?
```

1  Vendor correctly, tell me if I'm wrong.  That just

2  simply shows that, between February 1st, 1998 and March

3  17th, 2000, Dell sold $183,822,705.41 of computer

4  equipment to InaCom; is that correct?

5      A    That's the total of their invoices.

6      Q    Right.  And the total paid?

7      A    Correct.

8      Q    All right.  Now Days to Payment to the right,

9  there is a number of items listed there:  Mean, max,

10  min, median, standard deviation.

11            Could you explain for me first what the

12  mean is, 44.16?

13      A    A layman would call that the average.  I think

14  mean and average are synonymous.

15      Q    What is it the mean of?

16      A    The days to payment.

17      Q    It's the average number of days between the

18  invoice date and the payment date?

19      A    Correct.

20      Q    And I assume that was just calculated

21  automatically by your computer.

22      A    Yes.

23      Q    So you're comfortable that it's accurate?

24      A    Absolutely.

25      Q    And what does max, M-A-X, mean?

1    A    Maximum, the largest.

2    Q    The largest days to pay?

3    A    Yes, days to payment.

4    Q    Okay.  So that -- in other words, the invoice

5    that was the oldest during this two-year period?

6    A    It is the greatest number of days between the

7    payment date and the invoice date, not necessarily the

8    oldest invoice.

9    Q    Okay.  I understand, 385 days.  And minimum,

10   minus 129, what does that mean?

11   A    That's the shortest, smallest number of days

12   to payment between the -- it's the shortest or minimum

13   number of days to payment during the historical period.

14   Q    Why is it a negative number?

15   A    According to the data we had to work with, a

16   payment was made before an invoice date.

17   Q    By 129 days?

18   A    Yes.

19   Q    How were you able to discern that the payment

20   was for an invoice if it had not been identified yet?

21   A    That's the way it came to me in the electronic

22   payment database.

23   Q    So in other words, InaCom would make a payment

24   to Dell and Dell would issue an invoice for that

25   payment 129 days after receiving payment?

1    A    That's what the electronic database says.

2    Q    Did you do anything to verify if that's

3  accurate?

4    A    No.   That happened once for 14 hundred dollars

5  and change.

6    Q    Only one time?

7    A    Once.

8    Q    Did anyone at Dell or elsewhere explain to you

9  how that happened?

10    A    No.

11    Q    Well, what's the minimum if you exclude the

12  negative 129?   Do you know?

13    A    I can tell you by looking at my reports.

14    Q    Please do.

15    A    Then the minimum is 110.

16    Q    And that's not a negative number?

17    A    It's a negative number.

18    Q    So that's another situation where payment was

19  made 110 days before an invoice was issued?

20    A    According to the electronic database.

21    Q    Excluding all negative numbers, all negative,

22  quote, minimums based on your chart, do you know what

23  the shortest days to pay was?

24    A    Yes.

25    Q    What?

1    somehow one of the numbers happened to come out to 95

2    percent, which almost by definition is two standard

3    deviations.  So I'm just quoting what he said in his

4    deposition.

5        Q    All right.  Well, let's go on to paragraph

6    four of the Newsom rebuttal report.  With regard to Mr.

7    Thomas's report, there is no basis in statistics for

8    him to conclude that the ordinary course range

9    reflected in this data is from 27 to 71 days.

10            Do you agree with that statement?

11       A    If I understand what basis and statistics

12   mean, if you mean adding, subtract, divide and multiply

13   calculating number of days between dates, then I

14   disagree because I do base my opinion on that simple

15   and not deep math.

16            If by statistics you mean standard

17   deviation, I agree.

18       Q    Mr. Thomas states that this ordinary course

19   bracket included 95 percent of the dollars paid which,

20   according to his calculations, is just one standard

21   deviation.  Do you agree with that?

22       A    I vehemently disagree.  I have no idea how he

23   came up with that.

24       Q    Well, how do you disagree with it?

25       A    Show me in my report where my calculations of

## CERTIFICATE OF SERVICE

I, Alisa E. Moen, hereby certify that on this 6th day of September 2005 I caused a copy of

the **Reply of Plaintiff in Support Of Its Motion In Limine To Exclude Expert Testimony Of**

**Stephen H. Thomas** to be served upon the following counsel in the manner indicated:

### VIA US MAIL AND FACSIMILE

Sabrina L. Streusand, Esquire
G. James Landon, Esquire
Hughes & Luce, L.L.C.
111 Congress Avenue, Suite 900
Austin, TX 78701

### VIA HAND DELIVERY

Patricia P. McGonigle, Esquire
Seitz, Van Ogtrop & Green, P.A.
222 Delaware Avenue, Suite 1520
P.O. Box 68
Wilmington, DE 19899

Laura Davis Jones, Esquire
Pachulski Stang Ziehl Young Jones & Weintraub, P.C.
919 North Market Street
Suite 1600
Wilmington, DE 19899

Alisa E. Moen (DE ID No. 4088)

119096.01600/40156328v.2

**IN THE UNITED STATE DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: ) | |
| ) | Chapter 11 |
| INACOM CORP., et al., ) | |
| ) | Case No. 00-2426 (PJW) |
| Debtors. ) | |
| _____ ) | |
| ) | |
| INACOM CORP., on behalf of affiliated ) | |
| Debtors, ) | Civil Action no. 04-582-GMS |
| ) | Adv. No. 02-3499 |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| DELL COMPUTER CORPORATION, et al., ) | |
| ) | |
| Defendants. ) | |
| _____ ) | |

**REPLY OF PLAINTIFF IN SUPPORT OF ITS MOTION IN LIMINE TO
EXCLUDE EXPERT TESTIMONY OF JOHN LAROCCA**

Plaintiff, Debtors, InaCom Corporation and affiliates, through Executive Sounding Board

Associates, Inc., Plan Administrator ("Plaintiff") replies to Dell's opposition to its Motion *In*

*Limine* to exclude testimony by John LaRocca of Quote to Cash Solutions ("LaRocca"),

designated by Defendants Dell Computer Corporation, Dell Receivables, L.P. and Dell

Marketing, L.P. (collectively, "Dell") as an expert witness under Federal Rule of Evidence

("F.R.E.") 702.

LaRocca's Experience In Credit Ended In 1997

Dell exaggerates LaRocca's expertise in the credit area. In 1997, LaRocca left the credit

area at HP and moved "into [] sales and marketing". LaRocca admits this was a career change.

After leaving sales at HP in March 1998, LaRocca worked for Allied Signal as a consultant to

"facilitate review of their overlapping business activities between Allied Signal and Honeywell

and help them come to the best decisions possible to efficiently merge those two organizations".

LaRocca then consulted with Gateway Computers on its business plan to acquire LeasingX and was then hired by LeasingX to work on developing "a commercial auction platform for computer equipment leases." Thus, after switching positions at HP in 1997, LaRocca was no longer involved in the reseller credit market. (LaRocca Dep. Tr. 33:9-33:13, 80:20-80:25, 81:15-81:25, 82:16-83:17)[1].

LaRocca's Opinion is Unreliable

LaRocca's report also has numerous deficiencies which undermine its reliability. LaRocca admitted that he made no effort to conduct a market survey of the relevant industry. Nor did he personally select any of the companies to review that are referenced in the data submitted with his report. Rather, the companies were chosen for him by Dell and Lain Faulkner & Co., Inc. without any input by him. And, while there is data attached to LaRocca's report, he admits that he did not reply on any of that data to reach his conclusions. LaRocca stated that his opinion was based solely on his experience in credit at HP, not on any of the data attached to his report. LaRocca also adopted Thomas' ordinary course of business opinion wholesale, with no independent research, inquiry or certification. (LaRocca Dep. Tr. 126:9-129:11, 176:17-176:25, 177:23-178:11, 196:12-196:25).

Dell does not dispute that reliability requires an expert opinion "to be tied to the facts of a particular case." Kumho Tire v. Carmichael, 526 U.S. 137, 150 (1999). LaRocca's opinion is not tied to the facts of this case. Instead, it is, by LaRocca's own admission, based solely on his dated experience in credit at HP, experience which he supports with no data, only hearsay information from old meetings and former colleagues. It is improper for Dell to designate

---

[1] Deposition transcript excerpts from LaRocca's deposition are attached as Exhibit A.

2

LaRocca as an expert so he can rely on stale, anecdotal evidence that would be inadmissible hearsay if offered through a fact witness.

      <u>LaRocca's Testimony on Alleged "Held Checks" is Irrelevant.</u>

      Dell contends that LaRocca's hearsay testimony on Inacom's alleged check holding in 1997 to freeze funds temporarily in order to comply with lending covenants with IBM Credit Corp., is comparable to InaCom's holding of checks in 2000 due to severe cash flow problems; the latter resulting in Inacom's Treasurer, Richard Oshlo actually locking the checks in his office and only releasing them when funds were available. This comparison by Dell is absurd. The two situations are not only years apart, but had completely different factual predicates. LaRocca testified that the IBM situation was not due to cash flow problems, but to IBM's tough credit policies. LaRocca's testimony on this point is not only irrelevant, but inadmissible hearsay because it is based on his knowledge as a fact witness, not as an expert. (LaRocca Dep. Tr. 161:10-162:7, 162:18-162:24, 199:4-10, 201:16-24; Oshlo Dep. Tr. 217:9-217:12[2]).

      For the foregoing reasons, and those stated in Plaintiff's motion, LaRocca's testimony regarding "ordinary business terms" should be excluded.

                      Respectfully submitted,

                      **BLANK ROME LLP**

Dated: September 6, 2005

                      Bonnie Glantz Fatell, Esquire (DE No. 3809)
                      Elio Battista, Jr., Esquire (DE No. 3814)
                      Alisa E. Moen, Esquire (DE No. 4088)
                      Chase Manhattan Centre
                      1201 Market Street, Suite 800
                      Wilmington, DE 19801
                      Tel:   (302) 425-6400

---

[2] Deposition transcript excerpts from Oshlo's deposition are attached as Exhibit B.

3

Fax:    (302) 425-6464

- and -

Earl M. Forte, Esquire
Regina Stango Kelbon, Esquire
One Logan Square
Philadelphia, PA 19103
Tel:    (215) 569-5500
Fax:    (215) 569-5555

Attorneys for Plaintiff Executive Sounding Board
Associates, Inc., as Plan Administrator for Debtors

4

# EXHIBIT A

1       UNITED STATES DISTRICT COURT
             DISTRICT OF DELAWARE
2
     -----------------------------
3    In re:                        ) Chapter 11
                                   )
4    INACOM CORP., et al.,         ) Case No. 00-2426 (PJW)
                                   )
5           Debtors.               ) Jointly Administered
                                   )
6    -----------------------------)
                                   )
7    INACOM CORP.,                 )
                                   ) Civil Action No.
8    On behalf of all affiliated   )    04-582 (GMS)
     Debtors,                      )
9           Plaintiffs,            )
                                   )
10      V.                         ) Adv. Pro. No.
                                   )    02-03499 (PJW)
11   DELL COMPUTER CORPORATION,    )
     Et al.,                       )
12          Defendants.            )
     -----------------------------)
13

14   ********************************************************

15              ORAL DEPOSITION OF

16               JOHN LaROCCA

17               JULY 14, 2005

18   ********************************************************

19

20      ORAL DEPOSITION of JOHN LaROCCA, produced as a
     witness at the instance of the Plaintiffs, and duly
21   sworn, was taken in the above-styled and numbered cause
     on the 14th day of July, 2005, from 9:35 a.m. to 5:09
22   p.m., before David Bateman, RPR, CSR in and for the
     State of Texas, reported by machine shorthand, at the
23   offices of Hughes & Luce, LLP, 111 Congress Avenue,
     Suite 900, Austin, Texas 78701, pursuant to the Federal
24   Rules of Civil Procedure and the provisions stated on
     the record or attached hereto.
25

2

A P P E A R A N C E S

FOR THE PLAINTIFFS:

      MR. EARL M. FORTE
      Blank Rome, LLP
      One Logan Square
      18th & Cherry Streets
      Philadelphia, Pennsylvania 19103-6998
      (215) 569-5618


FOR THE DEFENDANT DELL COMPUTER CORPORATION:

      MS. SABRINA STREUSAND
      Hughes & Luce, LLP
      111 Congress Avenue, Suite 900
      Austin, Texas 78701
      (512) 482-6842


ALSO PRESENT:

      MR. STUART GOLLIN (Via Telephone)
         Weiser, LLP

1  calendar year?

2     A    Yes.  That was -- that program lasted less

3  than one month in duration.

4     Q    Now you also did some training in team

5  development with Bentonville Associates.

6     A    That's correct.

7     Q    What was that?

8     A    Bentonville Associates is on the location of

9  the Wal-Mart Company.  In 1997, I switched career

10 positions in HP and moved from credit back into a sales

11 and marketing responsibility for the global

12 responsibility for the Pinacor account for

13 Hewlett-Packard.

14            Bentonville Associates facilitated

15 training on how to manage global accounts, building

16 effective relationships at executive levels.  And that

17 was an on-site program in Fayetteville, Arkansas.  It

18 was one week in duration.

19    Q    And what year was that?  You said '97?

20    A    19 -- that was 1997.

21    Q    All right.  Have you described to me all of

22 your formal training as a professional aside from job

23 experience?

24    A    At Hewlett-Packard, in order to maintain

25 yourself from a current standpoint in business

1  you've just described, did you begin working again?

2      A    I was recruited by Allied Signal.  I think the

3  words of their treasurer were "you're too young to be

4  retired."  I wasn't retired.  I needed a job.

5          Allied Signal was merging with Honeywell

6  and they had overlapping treasury operations, credit

7  and collections operations.  I was recruited with one

8  other person, another consultant, to help them

9  efficientize their treasury services and credit

10 collections on a global basis.

11     Q    How long were you paid by De Lage Landen after

12 you left?

13     A    Well, I was paid immediately at my choice for

14 the next three years.

15     Q    So until about 2002?

16     A    Yes.

17     Q    Were you hired as an employee of Allied

18 Signal?

19     A    No, consultant.

20     Q    Consultant?  And what was the purpose of your

21 consulting?

22     A    It was to facilitate review of their

23 overlapping business activities between Allied Signal

24 and Honeywell and help them come to the best decisions

25 possible to efficiently merge those two organizations.

1           The objective was to save 10 million

2    dollars over a 24-month period.  I was only engaged for

3    90 to 120 days.  They exceeded that 10 million dollars

4    anticipated savings.

5        Q    Okay.  So you were in that consulting position

6    with Allied Signal for 90 to 120 days?

7        A    Yes, sir.

8        Q    That was in?

9        A    October through January -- October of '99

10   through January -- no, excuse me.  I said '99.  Yeah.

11   Just getting my dates right.

12           MS. STREUSAND:  I think you can

13   approximate.

14       A    Yeah.  October '99 through January 2000.

15       Q    (BY MR. FORTE) And what did you do after you

16   finished the consulting work with Allied Signal and

17   Honeywell?

18       A    As I was wrapping that up, I received a call

19   from Gateway Computers.  And they had been a company

20   that sold specifically to consumers and now were

21   getting into the commercial reseller channel

22   distribution business and didn't know how to do it.

23           Instead of extending two and $10,000

24   credit facilities, they were now being asked to extend

25   five million and $10 million credit facilities.  And

1    there was disconnects between their selling

2    organization and their credit organization had no

3    experience.

4              I was contracted to go do an on-site

5    review of their -- at their headquarters in South

6    Dakota of their current business practices and make

7    recommendations and which resulted in creating a

8    commercial credit policy for Gateway Computers.

9              And that was done from December of '99, I

10   was engaged, until it was completed at the end of March

11   of 2000.

12   Q    All right.  Did you go from the Gateway

13   consulting job to LeasingX?

14   A    I did.

15   Q    What did you do at LeasingX?

16   A    I was again consulted in April of 2000 by

17   Gateway Computer.  They were involved in evaluating a

18   start-up company by the name of LeasingX and looking to

19   put a financial investment in LeasingX.

20              LeasingX was purported -- it was started

21   in fall of 1990 -- fall of 1999.  And their ambition

22   was to create a commercial auction platform for

23   computer equipment leases.

24              Before Gateway would invest in it, they

25   asked me to go to New York and evaluate the business

1  plan of the principals and talk to the principals and
2  give them my opinion.  I did that and I met with them
3  in April.

4          In fact, I met with them at 30th Street
5  Station, Philadelphia in my initial meeting.  And
6  through April and early May, I gave Gateway a written
7  report on my opinion.

8          At the end of May, Gateway came back,
9  along with the people at LeasingX, and said, "We'd like
10 to offer you the position of vice-president of
11 operations for LeasingX," which I accepted.

12         And on or about the 1st of July, they
13 offered me the president position for LeasingX, which I
14 accepted.  And I stayed in that capacity through
15 January 1st of 2001.

16     Q    Why did you leave LeasingX?

17     A    They ran out of money.  They ran out of it
18 before I left, but the impact of the devastation that
19 took place on 9/11 stopped -- as I talked to a VP of
20 sales for Hewlett-Packard in November, he said, "John,
21 if we didn't have orders to replenish data centers that
22 were destroyed in New York City, we would have
23 absolutely no orders for computer systems as I'm
24 talking to you today.  Nobody's buying anything."

25         And the order flow went away.  And it was

 1  in the way that it tells you the number of invoices
 2  that were paid and the days to payment column proceeds
 3  it to the left.
 4      Q    And how does --
 5      A    The total invoices relates to the number of --
 6  the total dollar value of those number of invoices
 7  consistent with those number of payments, the days to
 8  payment.
 9      Q    All right.  Now near the bottom of the page on
10  tab six, there are some black lines.  Do you see them?
11      A    I do.
12      Q    Heavy black lines, do you know what those
13  represent?
14      A    I believe I do.  I believe that begins to show
15  the summary that is on page two, the summary in the
16  form of a number of invoices it represents that -- of
17  the invoices reviewed in this analysis, 93.4 percent of
18  them, or 18,284 of them, were between 27 days and 71
19  days.
20      Q    All right.  Did you assist Mr. Thomas at all
21  in reaching his 21 -- excuse me -- 27-to-71-day payment
22  range?
23      A    I did not.
24      Q    How did you use Mr. Thomas's conclusions in
25  six and seven with respect to your opinion?

```
 1    A    I think that this is evidence of my opinion.
 2    Q    All right.
 3    A    It supports my opinion.
 4    Q    And how does it support your opinion?
 5    A    That what he's projecting is the overwhelming
 6  majority, almost 19 out of every 20 transactions, and
 7  more than 19 out of every 20 dollars were paid within
 8  the 27 days or 71 days from the date of invoice.
 9    Q    Do you know how Mr. Thomas went about
10  selecting his 27-to-71-day payment range?
11    A    No.
12    Q    Did you question him about it?
13    A    No.  It became self-apparent.  I mean, we
14  never had a discussion about it.  But it seemed like a
15  logical representation of information.
16    Q    What seemed logical?
17    A    That he projected, based on his review, that
18  19 out of 20 dollars and almost 19 out of every 20
19  transactions were paid in 27 to 71 days.
20    Q    Did you do anything to verify whether Mr.
21  Thomas's conclusion was accurate?
22    A    I perused some of the preceding information,
23  but I did not do an analytical analysis to validate
24  that because I wasn't asked to do that.
25    Q    Okay.  When you say perused, do you mean you
```

1    viewed?

2        A    I reviewed tab four.

3        Q    All right.

4        A    And I reviewed tab five.

5        Q    Did you read everything in tab four or did you

6    just review it?

7        A    I went through -- I went through every page of

8    tab four, but I -- I didn't do statistical composition.

9        Q    You didn't test the data?

10       A    No.

11       Q    You assumed it was accurate?

12       A    Yes.

13       Q    All right.  Please turn to tab eight in Mr.

14   Thomas's report.  Okay.  Are these the XY charts

15   referred to in paragraph six of your report?

16       A    Yes.

17       Q    All right.  And there's two of them, correct?

18       A    Yes, there are.

19       Q    Do you know the general difference between the

20   two?

21       A    I believe one is two years of historical

22   information in advance and the other is the historical

23   information from the preference period.

24       Q    Do you know what each diamond represents?  I'm

25   sorry, John.  Did you hear my question?

```
 1     A    I did.  I'm just looking at the diamonds.
 2               MS. STREUSAND:  He wants to get a better
 3    look at the charts.  We're just trying to get them out
 4    of the notebook so he can see them better.
 5     A    It represents validation of what we just
 6    looked at in the preceding tabs.  It's a pictorial
 7    representation of when payments were made and, when
 8    they were made, the days between the invoice date and
 9    the date of payment.
10     Q    (BY MR. FORTE) Okay.  Well, can you give me a
11    specific example of how you can look at this XY chart
12    and determine the days to payment with respect to a
13    specific transfer?
14     A    I reviewed this.  I drew my conclusions from
15    the preceding documents we talked about, which were
16    21 -- 27 days to 71.
17     Q    Right.
18     A    This is a -- this is a picture of information.
19     Q    Well, do you --
20     A    This was -- go ahead.
21     Q    Go ahead.
22     A    This in itself supports the preceding reports
23    we reviewed.
24     Q    Okay.  How does it do that?
25     A    It graphically depicts data points taken from
```

1    the preceding reports we were looking at that show when

2    payments were made and how old they were when they were

3    made --

4         Q     Well --

5         A     -- from the date of invoice.

6         Q     When you say data point, do you mean the black

7    diamonds?

8         A     Yes.

9         Q     Okay.  So you're saying an individual black

10   diamond represents when payments were made in relation

11   to an invoice?

12        A     I anticipate that they represent elements that

13   are identical to what's on the information reports that

14   we precedently reviewed.

15        Q     Okay.  You're assuming --

16        A     I didn't validate that.

17        Q     You're assuming that?

18        A     Yes.

19        Q     All right.

20        A     It's an illustration.  Well, it's not an

21   illustration.  It's a representation.  And it -- if the

22   data points were entered correctly off of those

23   reports, then they would be reflected appropriately

24   here.

25               If there was some typographical data

1    A    Accounts payable would process the invoice for

2  payment.  The controllership would issue the -- issue

3  the payment.  And I don't know if it needed multiple

4  signatures depending on the size.

5          But when they were being held, it was

6  represented by Leon to Lorn that he never held them,

7  they were always held in the treasurer's office.  And

8  upon confrontation, that was always found they -- that

9  that's where they were being held.

10   Q    Now when you say "confrontation," what do you

11 mean?

12   A    Well, when -- when Lorn Morris would call Leon

13 and say where's my payment, he said John -- Lorn, I cut

14 the payment.  If it's -- if you don't have it, it's

15 because it's being held at the treasurer's level.

16          Lorn would contact the treasurer.  The

17 treasurer would validate -- he never said I -- I sent

18 it.  He'd just -- when he hadn't, he'd say I have it

19 and I can't release it yet or I don't want to release

20 it yet.

21   Q    Okay.  So these -- these contacts you

22 described between HP and --

23   A    InaCom.

24   Q    -- InaCom regarding this holding of checks by

25 Gary Goldberg were principally between Lorn Morris and

1  InaCom?

2    A    Yes.  And then he would escalate it to me.

3  When Gary Goldberg would say, "Lorn, I can't mail the

4  check," then Lorn would come to me.  And I would call

5  Dave Guenthner or we arranged to meet more frequently

6  that year than otherwise planned.

7              Normally, in inclement weather in the

8  winter, he would come to Cupertino.  And in the milder

9  weather, I would go to Omaha.

10   Q    Would the checks usually be released when you

11  asked for them to be released?

12   A    Yes.  Sometimes that was not the case, but

13  usually it was.  They had reasons why they couldn't

14  release them.

15   Q    Well, I was going to get to that.  It states

16  in your report Dave Guenthner would always explain

17  these checks had been held as they, InaCom, were up

18  against their lending covenants of their IBM Credit

19  Corp. line of credit, unquote.

20              Was that the reason you were told that

21  checks were being held by Gary Goldberg?

22   A    Consistently and always, that was the reason.

23   Q    Were you ever told that checks were being held

24  by Gary Goldberg because InaCom was having cash flow or

25  liquidity problems?

 1      A      No.  And I would have known that because of my
 2   review of their financial statements, their cash flow
 3   statements.  And when we would have these situations,
 4   we would then ask them to submit weekly, for a period
 5   of time until the behavior went away, cash flow sources
 6   and uses, how much income is coming in and how do you
 7   deploy it, who are you paying.

 8                   And they would always comply.

 9      Q      Now you state here, quote, from my experience,
10   InaCom was not the only distribution customer that
11   would at times cut checks but then hold them for a
12   period of time before releasing them, unquote.

13                   Can you give me some examples?

14      A      Merisel in Los Angeles; Comp USA in Texas;
15   Intelligent Electronics in Chantilly, Virginia and
16   Exton, Pennsylvania; CoMark in Chicago; Ingram on less
17   occasions, but occasionally, Ingram Micro.

18      Q      Uh-huh.

19      A      Tech Data in St. Petersburg.  It was not an
20   uncommon behavior.  And -- and usually the reason had
21   more to do with meeting lending covenants of their
22   lender, who was usually the IBM Credit Corporation.
23   They were the most aggressive lender in those years to
24   this channel.

25      Q      What do you mean by that?

1    Q    Jacom, J-A-C-O-M, LASON, L-A-S-O-N and that's

2  all, correct?

3    A    Yes.

4    Q    Okay.  Now could you turn to the first page of

5  the Jacom data in the back of your report?  It says

6  unpaid invoices as of filing date at the top.

7    A    I have it.

8    Q    What does this information show?

9    A    Invoices due to Dell from Jacom at the date of

10  the filing for reorganization that were unpaid, I

11  anticipate.  I didn't go back and prove this.  I'm just

12  reading what you're reading.

13    Q    Okay.  Now the data on this document doesn't

14  give you any indication of what ordinary business terms

15  were, does it?

16    A    No.

17    Q    All right.  And it doesn't give you any

18  indication of what ordinary course payments were, does

19  it?  It's just a list of invoices, dates and amount.

20  Correct?

21    A    Yeah.  It's -- it's data.  It's not

22  information.

23    Q    Okay.  So you wouldn't have been able to use

24  this to reach your conclusion?

25    A    I didn't.

1    Q    Okay.  Well, why is it in here?

2    A    Because it was supplied to me and that's the

3  only reason it's in there.

4    Q    Okay.  Now following this, I have a letter

5  from Rick Cass at Lain Faulkner to you enclosing

6  some -- I think three CDs, it states.

7    A    Uh-huh.

8    Q    What was in those three CDs?

9    A    That was the MicroAge/Pinacor invoices and

10  payment information.  I think that's tab number four,

11  if I'm not mistaken, from Exhibit 2.

12    Q    Mr. Thomas's report?

13    A    Yes.

14    Q    Okay.  I believe it's tabs four and five,

15  which would be the --

16    A    You're right.  It is four and five.

17    Q    Okay.  So those two things, the

18  MicroAge/Pinacor data --

19    A    Uh-huh.

20    Q    -- and the information that's in tab four and

21  five of Mr. Thomas's report related to InaCom?

22    A    Uh-huh.

23    Q    Could you turn to the next page.  I have a

24  document, LASON versus Dell unpaid invoices as of

25  filing date.  Again, this doesn't give any indication

1  of ordinary business terms or ordinary course of

2  business, does it?

3       A    No.

4       Q    It's just a list of invoice numbers, dates and

5  amounts?

6       A    It is.

7       Q    And you wouldn't have used this in your

8  opinion?

9       A    I perused this, as I perused the preceding

10 document.  But my opinion is highly based on my

11 experience, not on this document.

12      Q    All right.  Now the next page of data states

13 Jacom Computer Services, Inc. versus Dell invoice paid

14 analysis.

15           Could you explain to me what this

16 document is?

17      A    It shows the one-year period prior to the

18 preference period in that bankruptcy.  It shows the

19 preference period in that bankruptcy.

20           It shows the historical number of

21 invoices in each of the aging buckets, what percentage

22 of the total invoices they represent, what the

23 corresponding total of invoice dollars by aging bucket

24 that are represented, and what the total number of

25 invoice dollars, as a percentage of the whole, each

```
 1                    THE WITNESS:  -- pit stop?
 2                    MR. FORTE:  Please.  Absolutely.
 3                    (Recess from 3:03 p.m. to 3:24 p.m.)
 4      Q    (BY MR. FORTE) Now other than InaCom, Mr.
 5   LaRocca, you reviewed data with respect to Dell's
 6   payment histories with MicroAge, Jacom, LASON.  And I
 7   think that's it, correct?
 8      A    Yes.
 9      Q    All right.  Did you make any effort to review
10   data with respect to additional companies?
11      A    No.
12      Q    Okay.  Did you make any effort to conduct a
13   market survey?
14      A    No.
15      Q    All right.
16      A    Notwithstanding my phone calls to the two
17   people we discussed previously.
18      Q    Understood.  Why did you select MicroAge,
19   Jacom, and LASON?
20      A    I didn't.
21      Q    They were just given to you?
22      A    Yes.
23      Q    Okay.  Did you ask for more examples?
24      A    No.
25      Q    All right.
```

1    experience with InaCom.  When that evidenced by my

2    report, that's when it was suggested that I could also

3    be a fact witness.  It was bad marketing on my part.

4        Q    Well, could you look at paragraph six and

5    seven of your report, please?

6        A    Sure.

7        Q    Is any of the information in paragraph six

8    based on your knowledge as a fact witness as opposed to

9    an expert?

10       A    Yes.

11       Q    Okay.  What would that be?

12       A    The reports by Mr. Thomas -- not the report,

13   the information, the data that he provided that

14   demonstrated the 95 percent plus or minus invoices and

15   dollars paid in the 27-to-71-day window after the date

16   of invoice.

17       Q    That's information you know as a fact witness?

18       A    I do -- I do -- I -- I know information as a

19   fact witness.  And then I took that information in

20   processing it and said this supports what I know the

21   industry to be.

22       Q    Okay.  So --

23       A    I -- I would have an opinion independent of

24   any of this as a fact witness.  But this -- that --

25   that specific information, I think, is valuable

1  dealings with them when you used to work with them
2  would be --
3       A    And ongoing.
4       Q    And ongoing would be based as -- on your
5  knowledge as a fact witness; is that right?
6                MS. STREUSAND:  I object to the form of
7  the question.
8       A    I think my conversations with both of those
9  gentlemen is supportive of my expert report.
10               MR. FORTE:  I understand.
11      A    And I think that it also supports my knowledge
12 base that I've developed over a period of time as a
13 fact witness because my familiarity with Compaq from
14 years ago, in part, is due to my relationship with Dave
15 Kaminski.
16      Q    (BY MR. FORTE) Well, in paragraph seven, which
17 is the longest paragraph in your report, you talk a lot
18 about your meetings with David Guenthner and others at
19 InaCom.  And we went over that today.
20               You talked about Gary Goldberg and the
21 check holding issue, the IBM situation.  That's factual
22 information that you gathered at the time you worked
23 for Hewlett-Packard, correct?
24      A    Yes.
25      Q    All right.  And is it fair to say that the

**EXHIBIT B**

1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE


In re
INACOM CORP., et al.     Bankruptcy Case No. 00-2426 PJW

---

INACOM CORP., on behalf          :
of all affiliated Debtors,       : Civil Action No. 04-148 GMS
                                 : (Original filed in this Action)
            Plaintiff,           : Adversary Case No. 02-03496 PJW
     v.                          :
                                 :
  TECH DATA CORP.,               :
                                 :
            Defendant.           :

---

INACOM CORP., on behalf of       :
all affiliated Debtors,          :
                                 :
            Plaintiff,           : Civil Action No. 04-582 GMS
                                 :
     v.                          : Adversary Case No. 02-03499 PJW
                                 :
DELL COMPUTER CORPORATION,       :
                                 :
            Defendant.           :

---

INACOM CORP., on behalf of       :
all affiliated Debtors,          :
                                 :
            Plaintiff,           : Civil Action No. 04-583 GMS
                                 :
     v.                          : Adversary Case No. 02-03500 PJW
                                 :
LEXMARK INTERNATIONAL, INC.,     :
                                 :
            Defendant.           :

---

DEPOSITION OF RICHARD CHARLES OSHLO, JR.,
March 20, 2005


KATHRYN POWERS- CERTIFIED SHORTHAND REPORTER

2

| | |
|---|---|
| INACOM CORP., on behalf of all affiliated Debtors, | : |
| Plaintiff, | : Civil Action No. 04-584 GMS |
| v. | : Adversary Case No. 02-03501 PJW |
| RESILIEN, INC., et al., | : |
| Defendant. | : |

INACOM CORP., on behalf of
all affiliated Debtors,

   Plaintiff,  : Civil Action No. 04-593-GMS

   v.  : Adversary Case No. 02-03960 PJW

INGRAM ENTERTAINMENT, INC.,
Successor in interest to
NASHVILLE COMPUTER
LIQUIDATORS,

   Defendant.

INACOM CORP., on behalf of
all affiliated Debtors,  : Civil Action No. 04-601 GMS

   Plaintiff,  : Adversary Case No. 02-04441 PJW

   v.

SIGMA DATA, INC,

   Defendant.

## DEPOSITION OF RICHARD CHARLES OSHLO, JR.,

taken by the Defendants before Kathryn Powers, Certified
Shorthand Reporter of the State of Iowa, at the Renaissance
Savery Hotel, Room 210, Des Moines, Iowa, commencing at
9:45 a.m., Sunday, March 20, 2005.

```
 1    APPEARANCES:

 2    For InaCom Corp.:          JEFFREY P. NOLAN, ESQ.
                                 Pachulski, Stang, Ziehl,
 3                                Young, Jones & Weintraub, P.C.
                                 10100 Santa Monica Blvd.
 4                               Eleventh Floor
                                 Los Angeles, California 90067-4100
 5
      For Executive Sounding     EARL M. FORTE, ESQ.
 6    Board Associates, Inc.,    Blank & Rome, LLP
      Liquidating Agent of       One Logan Square
 7    InaCom Corp.:              18th and Cherry Streets
                                 Philadelphia, Pennsylvania 19103-6998
 8
      For Defendant Dell:        SABRINA L. STREUSAND, ESQ.
 9                               G. JAMES LANDON, ESQ.
                                 Hughes & Luce, LLP
10                               111 Congress Avenue, Suite 900
                                 Austin, Texas  78701
11
      For Defendant Tech        STEPHEN C. HUNT, ESQ.
12    Data:                      Adorno & Yoss
      (by telephone)             350 East Las Olas Blvd.
13                               Seventh Floor
                                 Fort Lauderdale, Florida  23301
14
      For Defendant Lexmark:     CULVER V. HALLIDAY, ESQ.
15                               Stoll, Keenon & Park, LLP
                                 2650 Aegon Center
16                               400 West Market St.
                                 Louisville, Kentucky 40202-3377
17
      For Defendant Ingram:      JONATHAN P. HERSEY, ESQ.
18    (by telephone)             Bingham McCutchen, LLP
                                 600 Anton Road, 18th Floor
19                               Costa Mesa, California  92626

20    For Third-Party            GAIL S. GREENWOOD, ESQ.
      Defendant Hewlett          Friedman, Dumas & Springwater, LLP
21    Packard, Successor in      One Maritime Plaza
      Interest to Compaq         Suite 2475
22    Computer:                  San Francisco, California  94111

23
      Also Present:              Jason Fensterstock
24    (by telephone)             Duff & Phelps

25
```

1  initial facility we had with them.  They had floor

2  planning and a bank credit document combined.

3  BY MR. NOLAN:

4      Q.   Okay.  There's a reference here, it says,

5  "Checks Held, 31,271,000.  Do you see that?

6      A.   Yes.

7      Q.   Is that your handwriting?

8      A.   No.

9      Q.   In 1999 were you ever holding $31,227,000

10 of held checks in the treasury department at

11 InaCom that were due to or payable to IBM?

12     A.   No.

13          MR. HALLIDAY:  I'm sorry, Jeff.  Your

14 question was limited to just the treasury

15 department?

16          MR. NOLAN:  Yes.

17     Q.   Did you ever become aware in 1999 that

18 the accounts payable department was holding $31

19 million in checks that were owed payable to IBM?

20     A.   Not that I recall.

21          MS. STREUSAND:  Jeff, can we take a quick

22 break?

23          MR. NOLAN:  Sure.

24          (Recess.)

25          MR. NOLAN:  Back on the record.

## CERTIFICATE OF SERVICE

I, Alisa E. Moen, hereby certify that on this 6th day of September 2005 I caused a copy of

the **Reply of Plaintiff in Support Of Its Motion In Limine To Exclude Expert Testimony Of**

**John LaRocca** to be served upon the following counsel in the manner indicated:

### VIA US MAIL AND FACSIMILE

Sabrina L. Streusand, Esquire
G. James Landon, Esquire
Hughes & Luce, L.L.C.
111 Congress Avenue, Suite 900
Austin, TX 78701

### VIA HAND DELIVERY

Patricia P. McGonigle, Esquire
Seitz, Van Ogtrop & Green, P.A.
222 Delaware Avenue, Suite 1520
P.O. Box 68
Wilmington, DE 19899

Laura Davis Jones, Esquire
Pachulski Stang Ziehl Young Jones & Weintraub, P.C.
919 North Market Street
Suite 1600
Wilmington, DE 19899

Alisa E. Moen (DE ID No. 4088)