IN THE UNITED STATE DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 11 |
| INACOM CORP., et al., | ) | |
| | ) | Case No. 00-2426 (PJW) |
| Debtors. | ) | |
| | ) | |
| | ) | |
| INACOM CORP., on behalf of affiliated | ) | |
| Debtors, | ) | Civil Action no. 04-582-GMS |
| | ) | Adv. No. 02-3499 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| DELL COMPUTER CORPORATION, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**REPLY OF PLAINTIFF IN SUPPORT OF ITS MOTION IN LIMINE TO
EXCLUDE EXPERT TESTIMONY OF STEPHEN H. THOMAS**

Plaintiff, Debtors, InaCom Corporation on behalf of affiliated Debtors, through Executive

Sounding Board Associates, Inc., Plan Administrator ("Plaintiff"), replies to the opposition filed

to its Motion In Limine to exclude testimony by Stephen H. Thomas of Lain Faulkner & Co.,

P.C. ("Thomas"), designated by Defendants Dell Computer Corporation, Dell Receivables, L.P.

and Dell Marketing, L.P. (collectively, "Dell") as an expert witness under Federal Rule of

Evidence ("F.R.E.") 702.  The testimony offered by Thomas must be excluded because it

instructs the trier of fact on what legal conclusion to reach, it does not address an ultimate factual

issue under F.R.E. 704 and it does not offer expertise helpful to the trier.

Thomas' qualifications are not at issue, because his purported qualifications, notably in

"public accountancy", were not used.[1]  Thomas relied solely on routine invoice and payment

---

[1] Thomas testified that there was no reason for him to apply general accepted accounting principles, generally accepted auditing standards or Financial Accounting Standard Board rules. (Thomas Dep. Tr. 111:7-111:23). Deposition transcript excerpts from Thomas' deposition are attached as Exhibit A.

information provided to him entirely by employees of Dell and other information provided to
him by Dell's legal counsel.[2] Thomas then used "simple math" and rendered a legal opinion that
the payments to Dell during the preference period were made in the ordinary course of business.
(Thomas Dep. Tr. 237:14-237:15).

### 1.    "Simple Math" does not Require Specialized Knowledge

Without any factual or legal support, Dell insists that Thomas's testimony will assist the
trier.  In In re Shalom Hospitality Inc., 293 B.R. 211, 214 (Bankr. N.D. Iowa 2003), a case cited
but misapplied by Dell, the Court stated that "[t]he test for determining the appropriateness of
expert testimony is the common sense inquiry whether the untrained layman would be qualified
to determine intelligently and to the best possible degree the particular issue without
enlightenment from those having a specialized understanding of the subject involved in the
dispute." (citation omitted).  Nothing Thomas did in his report requires such "enlightenment".

Dell erroneously states that "Thomas analyzed 19,567 invoices during the pre-preference
period and additional 611 invoices for the preference period." (Dell Motion, p. 3).  This is
wrong.  Thomas admitted that he did not compile any of the data used in his report, nor did he
independently verified any of the invoices – even those which on their face are non-sensical
(e.g., invoices purportedly issued 129 days after payment). (Thomas Dep. Tr. 166:9-167:20).
Instead, Thomas relied entirely on Dell for the compilation and accuracy of the data and
performed nothing more than simple counting to calculate the number of days between the date
on Dell's invoices and the date payment was received from Inacom at Dell's lockboxes to render
his opinion.[3]

---

[2] Thomas testified that the data for his report came from an electronic database prepared by Dell and that he did
nothing to verify its accuracy. (Thomas Dep. Tr. 166:9-167:20).
[3] This "simple math" was actually done automatically by Thomas' modified Excel spread sheet software. (Thomas
Dep. Tr. at 165:20-165:22; 37:22-38:22).

2.    Opinion on the Ordinary Course of Business is a Legal Conclusion not an
       Ultimate Issue _____

F.R.E. 704 precludes opinion testimony that embodies a legal conclusion, specifically,

one that "inadequately explores legal criteria." (See Off. Comment F.R.E. 704). That is

precisely what Thomas does in opining on the ordinary course of business under §547(c)(2)(B).[4]

Dell relies on In re Kevco, Inc., 2005 Bankr. LEXIS 1249 (Bankr. N.D. Texas June 30,

2005) for the proposition that Thomas has previously testified on the § 547(c)(2)(B) element.

However, much in Kevco contradicts Thomas' opinion in this case.  In Kevco the court stated

that "reliance on average payment time, as is often the case with statistics, does not portray the

complete picture of [the debtor's] payment history".  Kevco at *45.  The ordinary course of

business analysis must also take into account any credit holds, shipment holds, manner of

payment (overnight vs first class), number of invoices covered by a single check and numerous

other particularities that mark the preference period.  Kevco, pp. 52-56.[5]  Thomas' report

considers none of these factors.  Rather, Thomas uses "simple math" to perform

subtraction and relies entirely on employees at Dell and the advice of Dell's legal counsel in

rendering his opinion, which amounts to nothing more than an instruction to the Court on how to

rule on Dell's § 547(c)(2)(B) defense.  This is not expert testimony and it should be excluded.[6]

---

[4]  Contrary to Dell's reliance on In re Brothers Gourmet Coffees, Inc., 271 B.R. 456 (Bankr. D. Del. 2002), the
creditor's expert in that case did not testify on what the "ordinary course of business" was.  Rather, he opined on the
standard term in the green coffee industry. In re Brothers, at 461.
[5]  The Kevco decision contains no discussion of Thomas' qualifications, nor does it set forth the contents of his
report.  Indeed, it is not possible to tell from reading Kevco precisely what opinion Thomas offered, if any.
[6]  Thomas testified that while he became aware of unusual collection activities by Dell well after he wrote his report,
and just a day before his deposition, Dell's counsel advised him that these facts were not relevant to the preference
period and he, therefore, did not consider them in his opinion. (Thomas Dep. Tr. 150:25-152:5.)

3

Respectfully submitted,

**BLANK ROME LLP**

Dated: September 6, 2005

Bonnie Glantz Fatell, Esquire (DE No. 3809)
Elio Battista, Jr. (DE No. 3814)
Alisa E. Moen, Esquire (DE No. 4088)
Chase Manhattan Centre
1201 Market Street, Suite 800
Wilmington, DE 19801
Tel:    (302) 425-6400
Fax:    (302) 425-6464

- and -

Earl M. Forte, Esquire
Regina Stango Kelbon, Esquire
One Logan Square
Philadelphia, PA 19103
Tel:    (215) 569-5500
Fax:    (215) 569-5555

Attorneys for Plaintiff Executive Sounding Board
Associates, Inc., as Plan Administrator for Debtors

4

**EXHIBIT A**

1              UNITED STATES DISTRICT COURT
                  DISTRICT OF DELAWARE
2
   -----------------------------
3  In re:                        ) Chapter 11
                                 )
4  INACOM CORP., et al.,         ) Case No. 00-2426 (PJW)
                                 )
5          Debtors.              ) Jointly Administered
                                 )
6  -----------------------------)
                                 )
7  INACOM CORP.,                 )
                                 ) Civil Action No.
8  On behalf of all affiliated   )   04-582 (GMS)
   Debtors,                      )
9          Plaintiffs,           )
                                 )
10     V.                        ) Adv. Pro. No.
                                 )   02-03499 (PJW)
11 DELL COMPUTER CORPORATION,    )
   Et al.,                       )
12         Defendants.           )
   -----------------------------)
13

14 ************************************************************

15               ORAL DEPOSITION OF

16              STEPHEN H. THOMAS

17                JULY 13, 2005

18 ************************************************************

19

20     ORAL DEPOSITION of STEPHEN H. THOMAS, produced as a
   witness at the instance of the Plaintiffs, and duly
21 sworn, was taken in the above-styled and numbered cause
   on the 13th day of July, 2005, from 9:33 a.m. to 4:29
22 p.m., before David Bateman, RPR, CSR in and for the
   State of Texas, reported by machine shorthand, at the
23 offices of Hughes & Luce, LLP, 111 Congress Avenue,
   Suite 900, Austin, Texas 78701, pursuant to the Federal
24 Rules of Civil Procedure and the provisions stated on
   the record or attached hereto.
25

2

```
 1                    A P P E A R A N C E S

 2

 3      FOR THE PLAINTIFFS:

 4           MR. EARL M. FORTE
             Blank Rome, LLP
 5           One Logan Square
             18th & Cherry Streets
 6           Philadelphia, Pennsylvania 19103-6998
             (215) 569-5618
 7

 8
        FOR THE DEFENDANT DELL COMPUTER CORPORATION:
 9
             MS. SABRINA STREUSAND
10           Hughes & Luce, LLP
             111 Congress Avenue, Suite 900
11           Austin, Texas 78701
             (512) 482-6842
12

13
        ALSO PRESENT:
14
             MR. MICHAEL L. NEWSOM (Via Telephone)
15                Bridge Associates, LLC

16

17

18

19

20

21

22

23

24

25
```

1    A    Some of the materials previously existed, such

2    as an example XY chart and how to read it.  Others were

3    created right before the seminar.

4              MS. STREUSAND:  You prepare like the rest

5    of us.

6    Q    (BY MR. FORTE) How long have you been using an

7    XY graph in your analysis of preferences?

8    A    I believe my very first XY graph used in a

9    preference analysis may have been nine or 10 years ago.

10   Q    What software is used for that?

11   A    At that time, it was an Excel spreadsheet.

12   Q    Is it still an Excel spreadsheet?

13   A    No.

14   Q    What is it now?

15   A    Our software system is a Sequel server

16   database back-end with an Access front end or user

17   interface grafted together.

18              Additionally, there's some custom

19   programming, one of which is taking what started out

20   life as an Excel XY graph, tweaking it to fit into that

21   system.  Thus it generated the charts you see.

22   Q    Well, I'm not sure I understood all that.  But

23   you -- you took the Excel XY graph and modified it?

24   A    Uh-huh.

25   Q    You have to say "yes" or "no" so he can get it

1  down.

2      A      I'm sorry.  Yes.

3      Q      Thank you.  And how precisely did you modify

4  the Excel spreadsheet?

5      A      I didn't do the modification, so I wouldn't be

6  able to tell you.  We hired a programmer to do that.

7      Q      Well, did you give instructions to the

8  programmer as to what you wanted?

9      A      Yes.

10     Q      What instructions were those?

11     A      Make it look like the graph in my expert

12  report as opposed to the graph that comes out of the

13  stock Excel schedule.

14     Q      How does it differ?

15     A      The Excel -- other than the basic concept of

16  the two axes and plotting data points, the Excel

17  schedule doesn't have any of the titles and it doesn't

18  look like that.  So we made it look the way we wanted.

19             We chose to put certain report

20  restrictions and certain statistical data up there and

21  the titles so that it would be a little more

22  user-friendly and easier to read, we hoped more useful.

23     Q      Can -- can you give me a precise example of

24  what was added to the Excel form?

25     A      Other than saying everything on that tab,

1    A    I can't quote it.  It's the AICPA Code of

2  Professional Conduct.

3    Q    Did you conduct your report and opinion in

4  this case in accordance with the AICPA Code of

5  Professional Conduct?

6    A    Yes.

7    Q    In this matter, were there any reason for you

8  to apply general accepted accounting principles?

9    A    No.

10    Q    How about general accepted accounting

11  standards?

12    A    Generally accepted accounting standards?

13    Q    Excuse me.  Generally accepted auditing

14  standards.

15    A    No.

16    Q    How about any of the rules or guidelines set

17  forth by the Fair Accounting Standards Board?

18        MS. STREUSAND:  Objection to the form of

19  the question.

20    Q    (BY MR. FORTE) Maybe I'm using the wrong

21  title.  FASB, F-A-S-B, doesn't that stand for Fair

22  Accounting Standards Board?

23    A    I don't think so.

24    Q    What -- what does it stand for?

25    A    I don't know, but it's not fair.  Well, that's

 1  affect on the preferential payments?

 2      A    I base that on the timing of the e-mails, the

 3  content of the e-mails and the timing of the preference

 4  payments.

 5      Q    What do you mean by that?

 6      A    Okay.  If I -- if I may just generally

 7  explain, my one-time-through reading of the e-mails led

 8  me to believe that, generally, the topic of those

 9  e-mails was the creditworthiness of InaCom and the

10  ability of Dell to collect monies owed to it by InaCom

11  and the timing of those payments.

12              And I think at a -- a noteworthy factor

13  in those e-mails was what was categorized as a soft

14  credit hold on a few of the InaCom customer accounts.

15  I understand that the soft credit hold was lifted and

16  was not in effect during the preference period and that

17  the reason I say this doesn't affect the preference

18  period is that it's my understanding, based on my

19  understanding of case law, is that credit holds might

20  be construed in some cases as unusual collection

21  efforts.

22              And that impacts a preference payment if

23  a preference payment is made in response to unusual

24  collection efforts.

25      Q    Based on Mr. Horton's e-mails, do you remember

1  the date on which the credit hold imposed by Dell was

2  resolved?

3      A    Not based on the e-mails.

4      Q    Based on something else?

5      A    Yes.

6      Q    Based on what?

7      A    It was represented to me by counsel that, at

8  some point in time after those e-mails but before the

9  start of preference period, a financial transaction

10 involving Compaq -- and I really don't know what that

11 was -- occurred, which made funds available to catch

12 everything up.

13          Thus it was no longer an issue by the

14 time the preference period started.

15     Q    Okay.  So it was based on something that

16 occurred after the period of the e-mails but before the

17 preference period.  Is that what you said?

18          MS. STREUSAND:  Objection to the form.

19 That mischaracterizes his testimony.

20     A    The e-mails talk about certain issues and

21 factors.  And the last e-mail was somewhere in early or

22 mid-February.  I don't recall the date.  I was told by

23 Ms. Streusand that in mid-February this transaction

24 occurred, which allowed InaCom to clear up any of these

25 issues that might be leading to these soft credit

1  holds.

2              Thus it was no longer an issue or factor

3  at the start of the preference period.  And

4  accordingly, none of the preference payments could have

5  been made in response to that soft credit hold.

6      Q    (BY MR. FORTE) What was the transaction that

7  you were informed about?

8      A    The Compaq transaction.

9      Q    Do you know what that was?

10     A    No.

11     Q    Other than calling it the Compaq transaction,

12 do you know anything about it?

13     A    Apparently, it generated some kind of funds to

14 be available to InaCom.

15     Q    Have you seen any documents showing how funds

16 from the Compaq transaction were disbursed?

17     A    No.

18     Q    So you're basing this solely on what counsel

19 told you?

20     A    Yes.

21     Q    Did you make an attempt to verify what counsel

22 told you?

23     A    No.

24              MS. STREUSAND:  For clarification

25 purposes, did you also review the e-mails?

1  Vendor correctly, tell me if I'm wrong.  That just

2  simply shows that, between February 1st, 1998 and March

3  17th, 2000, Dell sold $183,822,705.41 of computer

4  equipment to InaCom; is that correct?

5      A    That's the total of their invoices.

6      Q    Right.  And the total paid?

7      A    Correct.

8      Q    All right.  Now Days to Payment to the right,

9  there is a number of items listed there:  Mean, max,

10  min, median, standard deviation.

11           Could you explain for me first what the

12  mean is, 44.16?

13      A    A layman would call that the average.  I think

14  mean and average are synonymous.

15      Q    What is it the mean of?

16      A    The days to payment.

17      Q    It's the average number of days between the

18  invoice date and the payment date?

19      A    Correct.

20      Q    And I assume that was just calculated

21  automatically by your computer.

22      A    Yes.

23      Q    So you're comfortable that it's accurate?

24      A    Absolutely.

25      Q    And what does max, M-A-X, mean?

1       A     Maximum, the largest.

2       Q     The largest days to pay?

3       A     Yes, days to payment.

4       Q     Okay.  So that -- in other words, the invoice

5  that was the oldest during this two-year period?

6       A     It is the greatest number of days between the

7  payment date and the invoice date, not necessarily the

8  oldest invoice.

9       Q     Okay.  I understand, 385 days.  And minimum,

10 minus 129, what does that mean?

11      A     That's the shortest, smallest number of days

12 to payment between the -- it's the shortest or minimum

13 number of days to payment during the historical period.

14      Q     Why is it a negative number?

15      A     According to the data we had to work with, a

16 payment was made before an invoice date.

17      Q     By 129 days?

18      A     Yes.

19      Q     How were you able to discern that the payment

20 was for an invoice if it had not been identified yet?

21      A     That's the way it came to me in the electronic

22 payment database.

23      Q     So in other words, InaCom would make a payment

24 to Dell and Dell would issue an invoice for that

25 payment 129 days after receiving payment?

1    A    That's what the electronic database says.

2    Q    Did you do anything to verify if that's

3  accurate?

4    A    No.  That happened once for 14 hundred dollars

5  and change.

6    Q    Only one time?

7    A    Once.

8    Q    Did anyone at Dell or elsewhere explain to you

9  how that happened?

10    A    No.

11    Q    Well, what's the minimum if you exclude the

12  negative 129?  Do you know?

13    A    I can tell you by looking at my reports.

14    Q    Please do.

15    A    Then the minimum is 110.

16    Q    And that's not a negative number?

17    A    It's a negative number.

18    Q    So that's another situation where payment was

19  made 110 days before an invoice was issued?

20    A    According to the electronic database.

21    Q    Excluding all negative numbers, all negative,

22  quote, minimums based on your chart, do you know what

23  the shortest days to pay was?

24    A    Yes.

25    Q    What?

1    somehow one of the numbers happened to come out to 95

2    percent, which almost by definition is two standard

3    deviations.  So I'm just quoting what he said in his

4    deposition.

5        Q    All right.  Well, let's go on to paragraph

6    four of the Newsom rebuttal report.  With regard to Mr.

7    Thomas's report, there is no basis in statistics for

8    him to conclude that the ordinary course range

9    reflected in this data is from 27 to 71 days.

10             Do you agree with that statement?

11       A    If I understand what basis and statistics

12   mean, if you mean adding, subtract, divide and multiply

13   calculating number of days between dates, then I

14   disagree because I do base my opinion on that simple

15   and not deep math.

16             If by statistics you mean standard

17   deviation, I agree.

18       Q    Mr. Thomas states that this ordinary course

19   bracket included 95 percent of the dollars paid which,

20   according to his calculations, is just one standard

21   deviation.  Do you agree with that?

22       A    I vehemently disagree.  I have no idea how he

23   came up with that.

24       Q    Well, how do you disagree with it?

25       A    Show me in my report where my calculations of

## CERTIFICATE OF SERVICE

I, Alisa E. Moen, hereby certify that on this 6th day of September 2005 I caused a copy of

the **Reply of Plaintiff in Support Of Its Motion In Limine To Exclude Expert Testimony Of**

**Stephen H. Thomas** to be served upon the following counsel in the manner indicated:

### VIA US MAIL AND FACSIMILE

Sabrina L. Streusand, Esquire
G. James Landon, Esquire
Hughes & Luce, L.L.C.
111 Congress Avenue, Suite 900
Austin, TX 78701

### VIA HAND DELIVERY

Patricia P. McGonigle, Esquire
Seitz, Van Ogtrop & Green, P.A.
222 Delaware Avenue, Suite 1520
P.O. Box 68
Wilmington, DE 19899

Laura Davis Jones, Esquire
Pachulski Stang Ziehl Young Jones & Weintraub, P.C.
919 North Market Street
Suite 1600
Wilmington, DE 19899


_____
Alisa E. Moen (DE ID No. 4088)

119096.01600/40156328v.2