# EXHIBIT A

BRIDGE ASSOCIATES LLC

747 Third Avenue
Suite 32A
New York, NY 10017
800-838-6966
877-711-6966 fax

www.bridgellc.com

April 19, 2005



BRIDGE ASSOCIATES LLC
New York, Cleveland, Naples, Houston

## InaCom Corp. and Affiliated Entities
## Insolvency/Valuation Analysis As of March 25, 2000

1. <u>VALUATION OVERVIEW</u>

    a.  As of March 25, 2000, InaCom's ("the Company") primary business was to provide computer services; thus, its tangible assets were not significant.  The make-up of the Company's fixed assets was primarily software, office equipment, leasehold improvements (associated with over 100 leased offices), and furniture.  (InaCom sold its product distribution business in February, 2000.)

    b.  The appropriate measure of the value of InaCom's assets as of March 25, 2000 is "fair value", which assumes conversion of the assets to cash during a reasonable period of time, usually the value that the debtor can obtain to promptly effect payment of its debts. (*See, In re Trans World Airlines, Inc.*, 134 F.3d 188, 194-195 (3rd Cir. 1998).

1

c.  This valuation approach was particularly appropriate because the income approach was neither effective nor feasible; InaCom used a significant amount of cash. InaCom used $19 million of cash in the period between March 25 and the Petition Date (June 16, 2000). The cash use would have been much greater had the Company not used $90 million of cash deposited in the Company's bank accounts, and which belonged to Compaq. Discovery of this event in April 2000 ultimately led to a default under the terms of InaCom's credit agreement. Also, the company experienced large operating losses totaling $466 million in 1999 and $35 million for the thirteen weeks ended March 25, 2000. These events among others led to failed attempts to sell substantially all operating assets as a going concern.

d.  As of March 25, 2000, Generally Accepted Accounting Principles ("GAAP") would have required that InaCom write down its long-term assets to liquidation value because the assets were not generating positive cash flow.[1]

e.  On March 25, 2000, InaCom's liabilities, including over $50 million of unrecorded liabilities, amounted to $960.2 million, or well above the fair value of its assets. (It is worth noting

---

[1] See, FAS 144, para. 7, Accounting for the Impairment of Disposal of Long Lived Assets, provides that: "An impairment loss shall be recognized only if the carrying amount of a long-lived asset is not recoverable and exceeds its fair value. The carrying amount of a

that this assessment is in line with current estimates of

distribution to creditors of InaCom's bankruptcy estate).

2. <u>MARCH 25,2000 "FAIR VALUE" OF ASSETS AS COMPARED TO BOOK VALUE</u>:

| Asset | Book Value (millions) | Recovery (% of Book) | Fair Value (millions) |
|-------|----------------------:|:--------------------:|----------------------:|
| Cash | $51 | 100% | $51 |
| Accounts Receivable | 378 | 65% | 245.7 |
| Vendor AR | 40 | 0% | 0 |
| Inventory | 77 | 75% | 57.8 |
| Other Current Assets | 7 | 10% | .7 |
| FF&E, Net | 79 | 5% | 4.0 |
| Goodwill | 257 | 8% | 20.6 |
| Deferred tax | 188 | 0% | 0 |
| Other assets | 41 | 50% | 20.5 |
| *Total Assets* | *$1,118* | *36%* | *$400.2* |

3. <u>Accounts receivable</u> -$378 million book value with an overall 65% recovery.   Receivables remaining from InaCom's product distribution business totaled approximately $180 million (retained after the sale of the distribution business to Compaq in February 2000), and the majority of the remaining balance was associated with InaCom's service business; InaCom faced several problems in connection with collection of its receivables.

   As of March 25, 2000, InaCom's primary business was to provide computer repair and maintenance services to Fortune 1000 manufacturing and service companies for their entire domestic operations. In addition, InaCom provided turn-key upgrade services whereby organizations such as Sun Trust would replace and upgrade

---

long-lived asset is not recoverable if it exceeds the sum of the undiscounted cash flows

IT infrastructure. These projects were long term in nature, and generally provided for milestone billing. The factors associated with the 35% discount, in line with the ultimate recovery value of the accounts receivable balance, from book value include the following:

a. <u>Customer offset claims</u>.

    i. The service contracts generally contained liquidated damage clauses for failure to provide appropriate service. The vast majority of InaCom's customers asserted these damages including General Electric, Alcoa, Blue Cross of Michigan, Blue Cross of MA, and Bridgestone/Firestone. The discounts could run up to 80% of the face value of the receivable depending on the circumstances.

b. <u>Poor documentation of services provided</u>.

Documentation for services provided by InaCom was evidenced by work orders signed, in general, by customers. These documents were maintained on a decentralized basis in over 100 field office locations. The work order information was not recorded in a centralized computer database or other program that would allow for the access to and reconciliation of the information. If a customer questioned the validity of an invoice, InaCom

---

expected to result from the use and eventual disposition of the asset."

would often be unable to produce the underlying work order or other supporting documentation.

c.  Valuation of lease AR.

The Company's largest leases were with Lockheed Martin. The recorded book value of the leases was $24 million, but they were sold in 2001 and 2002 after a complex negotiation and closing process for only approximately $13 million. A number of issues resulted in the variance between the book value and market value of the leases, including:

1. The leases should have been recorded at the net present value of the future lease stream. The discount based on the term of the leases (generally five years) would have required a substantial discount from the face amount. InaCom did not note specific reserves for these items.

2. Payments made by the lessee were not recorded against the face amount of the receivable.

3. The leases provided for the bundling of hardware and services; when InaCom was unable to provide service to the equipment, damages associated with the service arose.

5

4. The cash stream from the leases was assigned by InaCom to a third party prior to March 25, 2000, as part of an amendment to a service agreement. As a result, InaCom was not, in March, 2000, realizing any cash for the services that it provided under the leases, or otherwise realizing any value from these receivables.

d. General age of the Service AR.

i. As of the Petition Date, 38% of the service AR was over 60 days old. In March, 2000, the AR aging was likely to have been worse given the liquidity issues that InaCom faced in the 90 days prior to bankruptcy.

e. Vendor/Product Accounts Receivable - $40 million book value with 0% recovery. Collection of these receivables for product distributed by InaCom prior to the sale of its distribution business in February, 2000, faced unique challenges. The vendors making up this balance questioned the validity of InaCom's receivable claims as evidenced by the Company's decision to take substantial charge/write down of at least $100 million of vendor AR because of its inability to prove and recover the amounts recognized; the total amount was never resolved and remained as an issue in the anticipated

6

restatement of previously issued financial statements that never occurred.

4. Inventory - $77 million book value with 75% recovery. The inventory consisted solely of computer related components and systems primarily remained on hand following the mid-February, 2000 sale of InaCom's distribution business to Compaq. The general age of the inventory made much of this equipment obsolete, and required a substantial discount from cost. Since InaCom thereafter operated primarily as a service business, it did not purchase any additional inventory other than spare parts.

5. Furniture, Fixtures & Equipment - $79 million net book value with a recovery value of 5%. This asset category was composed of the following:

   a. Computer software: $17.5 million net book value – this relates to the capitalized cost associated with the implementation of an Oracle system for financial accounting, a PeopleSoft system for Human Resources, and a custom built service management system (NOVA). The value of these systems was unique to InaCom; the systems were custom configured to the operations of InaCom's business, and customized to the manner in which InaCom ran its business processes. An attempt was made to market the Nova systems, but the Company was unable to locate any interested party.

    b.  <u>Leasehold improvements</u>: $5 million net book value – all but approximately five of the more than 100 office leases were at or below market. This indicates the underlying improvement value was not able to be recovered for significant value.

6.  <u>Other Current Assets</u> - $7 million net book value – this category is comprised of office furniture and fixtures. Given the large number of leased locations, the majority of this equipment was ultimately disposed of through abandonment or transfer to the lessors.

    a.  <u>Computer equipment</u>: $22 million book value – this equipment was used to operate the business, and included servers, laptops, desktops and printers. Used computer equipment in general based on the speed of obsolescence does not realize significant value.

    b.  <u>Other equipment</u>: $5 million book value – this equipment consisted of various telephone and office equipment, which given the nature and age of the equipment, had minimal recovery value.

7.  <u>Goodwill</u> -- $257 million net book value, which arose from various acquisitions made by InaCom over the previous ten years, with a recovery of $20.6 million.

    a.  The only operation that made money in 2000 was InaCom Communications, which was disposed of for $20.6 million in excess of net book value. This sale amount accounts for the

8

$20.6 goodwill valuation. Due to the significant operating losses and cash use, InaCom would have been required to write-down goodwill significantly per the terms of Financial Accounting Standard 142.

b. According to Financial Accounting Standard 142 (FAS 142) Accounting for Goodwill and Other Intangible Assets (¶ 15), Recognition and Impairment of Loss, "an impairment loss shall be recognized if the carrying amount of an intangible asset is not recoverable and its carrying amount exceeds its fair value."

c. Continuing to paragraph 17, "the impairment test shall consist of a comparison of the fair value of an intangible asset with its carrying amount. If the carrying amount of an intangible asset exceeds its fair value, an impairment loss shall be recognized in an amount equal to that excess." In paragraph 19, the impairment test is further defined as the "fair value of a reporting unit with its carrying amount including goodwill."

d. Any market measure values of InaCom on March 25, 2000 were vastly overstated, as they did not contemplate the following:

　　i. $40 million of unrecorded liabilities associated with the Compaq transactions, of which the Company was unaware in March 2000.

    ii.  Substantial financial restatements had not been

        finalized.

    iii.  In March 2000, the Company's operational cash

        requirements were masked by the significant amount of

        cash received by InaCom, but intended for and

        belonging to Compaq. From February, 2000 through

        mid April, 2000, InaCom received approximately $90

        million in funds from Compaq Computer. This

        occurred after the sale of the distribution business to

        Compaq because Compaq account debtors were not

        instructed to change direct payments to Compaq bank

        accounts. As a result, these account debtors continued

        to remit payments to InaCom bank accounts.

    iv.  Issues associated with the marketability of the

        Company, including the fact that Compaq did not buy

        the service business, and that InaCom was unable to

        find a buyer for the service business in the spring of

        2000.

8.  <u>Deferred Taxes</u> - $188 million book value with 0% recovery.

    a.  This represents an asset that InaCom could theoretically offset

       against future taxable income. Based on InaCom's historical

       financial performance and expected financial performance, it

would have been unable to realize these benefits.  This is based on the following:

    i.  InaCom received $43 million in tax refunds in the six months prior to the bankruptcy.  FAS 109, Accounting for Income Taxes in paragraph 8, states "the measurement of deferred tax assets is reduced, if necessary by the amount of any tax benefits that, based on available evidence, are not expected to be realized." Paragraph 20 states that "all available evidence both positive and negative should be considered to determine whether based on the weight of that evidence, a valuation allowance is needed.  Information about an enterprise's current financial position and its results of operations for the current and preceding years ordinarily is readily available. That historical information is supplemented by all currently available information about future years."

   ii.  As of March 25, 2000, the following facts, among others, support such a "valuation allowance" for InaCom:

        1.  The IRS filed a claim of $17 million, disputing a portion of the refunds received by InaCom in 2000.

2. InaCom had an operating loss of $466 million in 1999 and $34 million for the thirteen weeks ended March 25, 2000.

3. During fiscal 2000, the cash balance decreased by $40 million even after use of approximately $90 million of Compaq accounts receivable cash.

4. The Company was unable to sell its service business. In fact, Compaq decided, after due diligence, not to purchase the service business.

5. The Computer Service industry was trending strongly towards OE manufacturers (IBM, HP and Compaq) providing turn-key services including, the hardware, installation, maintenance, management and financing. InaCom was unable to provide hardware, IT management and financing at cost competitive position.

iii. In the over two years since its liquidation, InaCom has unsuccessfully attempted to market the NOLs to a potential third party.

9. <u>Other assets</u> - $41 million book value with a 50% recovery.

a. These are comprised generally of investments in outside entities including illiquid debt and equity instruments in certain franchises and investments in various publicly traded companies.

b. The bulk of the recovery relates to 125,000 shares of common stock in TMP Worldwide and an 8% investment in Computerland Poland, a Company traded on the Warsaw stock exchange. The remainder of the recovery primarily relates to investments in franchises ultimately yielding between 0%-30% of book value.

10. <u>LIABILITIES</u> - The following represents a list of the categories of InaCom's liabilities as of March 25, 2000, along with the applicable face value of the obligations:

| Description | Face Value (millions) |
|---|---|
| Trade Accounts Payable | $362 |
| Other Current Liabilities | $188 |
| Long Term Liabilities | $165 |
| MIPS | $195 |
| *Sub Total* | *$910* |
| <u>Unrecorded Liabilities:</u> | |
| Due to Compaq | $40 |
| Real property lease obligations | $10.2 |
| *Total Liabilities* | *$960.2* |

13

11. Trade Accounts Payable and Other Current Liabilities – These

primarily consist of:

    a. Trade debt associated with the distribution business – InaCom

       largely retained responsibility for its trade debt in the Compaq

       sale transaction.

    b. Lease and operating expense payable.

    c. Employee wages and benefits payable.

    d. Sales tax payable.

12. Long Term Liabilities – In April 1999, InaCom entered into a $450

million revolving credit and amortizing term loan facility with a group

of lenders led by Deutsche Bank AG, as agent (the "Prepetition Credit

Facility"). In addition, InaCom had obligations under a floor planning

facility for IBM product purchases with IBM Credit Corporation, and

certain of InaCom's bank accounts were directly controlled by Pooled

Accounts Receivable Capital Corporation pursuant to certain

"lockbox" and blocked account agreements. InaCom used the cash

proceeds of the Compaq Sale to reduce the Prepetition Credit Facility

to a $225 million revolving credit facility, and to satisfy and retire

various other then-outstanding secured credit facilities as conditions to

the Compaq Sale. Following the Compaq Sale, InaCom's primary

source of liquidity was provided through the Prepetition Credit

Facility.

14

13. <u>MIPS</u> – These are subordinated debentures for which InaCom assumed responsibility as a result of its merger with Vanstar in February, 1999. Vanstar purchased the debentures in 1996, in the original face amount of $207.5 million, to bear interest at 6/75% per annum, with the principal due and payable in 2016. The principal and interest is subordinated and junior in right of payment to the prior payment in full or all existing and future senior indebtedness, and Vanstar had the right to defer interest payments on the debentures at any time for up to twenty months.

14. <u>Unrecorded Liabilities</u>:

    a. <u>Due to Compaq</u> – This consists primarily of cash received by InaCom in "trust" for Compaq following the sale of InaCom's distribution business to Compaq. After the close of the sale in mid-February, 2000, Compaq did not quickly change the "remit to" address for payments for shipments to its customers (all former InaCom customers). As such, between February 2000 and April 2000, InaCom received approximately $90 million in payment for goods shipped by Compaq. The $40 million liability noted represents the portion received prior to March 2000, in addition to closing adjustments that adversely affected the purchase price of the transaction with Compaq.

    b. <u>InaCom had over 100 leases for real property</u>. The obligation from April 1, 2000 through March 31, 2001 was approximately

$10.2 million. The total obligation for these leases to InaCom was much greater if the obligation was calculated to term.

   c.  <u>Additional Liabilities Not Noted</u> – The Liabilities chart does not include contingent liabilities that were later asserted by various parties.

14.   <u>SUMMARY</u> – As indicated above, the "fair value" of InaCom's assets amounts to approximately 36% of the book value of InaCom's assets, and is approximately 41.6% measured against InaCom's liabilities.

Regards,

Dean Vomero
Managing Director
Bridge Associates LLC

16

## DEAN VOMERO
**Managing Director**

Dean Vomero is a Managing Director of Bridge, LLC, joining the firm in 2000. Mr. Vomero has approximately 15 years of strategic, financial and operational restructuring experience. His Bridge engagements include:

- Co-headed the Bridge Accelerated Strategic Assessment Team, which prepared a business plan feasibility report for UAL Corporation (United Airlines) and its labor leadership.
- Interim CFO and COO for a consumer food company while in that role oversaw a 100% increase in sales from $30 million to $60 million over a nine month period.
- Headed the Bridge Financial Restructuring Team for Hamon Corporation, a $300 million construction firm serving the power generation industry.
- Chief Financial Officer and member of the Board of Directors of Epic Resorts, LLC, a timeshare resort development and management company which prior to bankruptcy had six resorts and over 400 employees.
- Headed the Bridge Wind Down Team for InaCom Corporation., a $5.9 billion (pre-petition) reseller of computer services and hardware. He also provided an expert financial report associated with various causes of actions.
- Provided Bankruptcy Advisory Services to various Creditors' Committees, including Level Propane Inc., James River Coal Company and C2 Media in Chapter 11 proceedings. He has advised these committees in various business and restructuring matters and prepared, presented and defended expert financial reports in connection with various litigation matters in these cases.
- Provided due diligence reports for various private equity funds. These reports focused on the strategy, projections, business process and performance measures of the target Companies.

Prior to joining Bridge, Mr. Vomero served as Vice President of Strategy and Development for a $60 million Tier 1 metal fabrication and stamping concern serving the automotive, truck and bus markets. As part of the Company's turnaround team, he assisted the primary equity sponsor in stabilizing operations and selling all operating assets.

As Principal Consultant for the Financial and Operational Improvement Group of Pricewaterhouse-Coopers, LLP. Mr. Vomero worked on major cost reduction, productivity improvement and merger integration projects, primarily for Fortune 500 companies.

Mr. Vomero was a Manager in Ernst & Young's Performance Improvement Group. In that role, he managed a variety of revenue enhancement, cost reduction and merger integration projects for primarily Fortune 500 companies.

Mr. Vomero also managed the implementation of a large ERP system for an international telecom engineering and manufacturing concern

Mr. Vomero is a member of the Advisory Board for the Mid-Atlantic Region of the American Bankruptcy Institute. He holds a Bachelors of Science in Business Administration from John Carroll University in Cleveland, Ohio and is a Certified Public Accountant.

# EXHIBIT B

UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE

In re:                                    )        Chapter 11
                                          )
                                          )        Bankruptcy Case No. 00-2426 (PJW)
INACOM CORP., et al.,                     )
          Debtors                         )
                                          )
                                          )
INACOM CORP., et al.,                     )
                                          )
          Plaintiffs,                     )
     v                                    )        Civil Action No. 04-CV-582 (GMS)
                                          )
DELL COMPUTER CORP.,                      )
                                          )
          Defendants.                     )
                                          )

ORAL DEPOSITION OF

**DEAN VOMERO**

July 27, 2005



**FREDERICKS-CARROLL REPORTING & LITIGATION SERVICES, INC.**

| 7719 Wood Hollow Drive ❖ Suite 156 ❖ Austin, Texas 78731 | ❖ | (800) 234-3376 | ❖ | (512)477-9911 | ❖ | (512) 345-1417 | Fax |
| 9 Greenway Plaza ❖ Suite 3112 ❖ Houston, TX 77046 | ❖ | (800) 234-3376 | ❖ | (713) 572-8897 | ❖ | (512) 345-1417 | Fax |
| 909 N.E. Loop 410 ❖ Suite 810 ❖ San Antonio, TX 78209 | ❖ | (800) 767-9161 | ❖ | (210) 222-9161 | ❖ | (210) 225-1476 | Fax |

1                    UNITED STATES DISTRICT COURT
                          DISTRICT OF DELAWARE
2

3      ------------------------------ )
       In re: INACOM CORP., et al. )  Chapter 11
4              Debtors              )  Bankruptcy Case No.
       ------------------------------ )  00-2426 (PJW)
5                                   )
       INACOM CORP., et al.         )
6              Plaintiffs           )
           v.                       )  Civil Action No.
7                                   )  04-CV-148 (GMS)
       TECH DATA CORPORATION        )
8              Defendant            )
       ------------------------------ )
9                                   )
       INACOM CORP., et al.         )
10             Plaintiffs           )
           v.                       )  Civil Action No.
11                                  )  04-CV-580 (GMS)
       INGRAM MICRO INC.            )
12             Defendant            )
       ------------------------------ )
13                                  )
       INACOM CORP., et al.         )
14             Plaintiffs           )
           v.                       )  Civil Action No.
15                                  )  04-CV-582 (GMS)
       DELL COMPUTER CORP.          )
16             Defendant            )
       ------------------------------ )
17                                  )
       INACOM CORP., et al.         )
18             Plaintiffs           )
           v.                       )  Civil Action No.
19                                  )  04-CV-583 (GMS)
       LEXMARK INTERNATIONAL, INC. )
20             Defendant            )
       ------------------------------ )
21                                  )
       INACOM CORP., et al.         )
22             Plaintiffs           )
           v.                       )  Civil Action No.
23                                  )  04-CV-584 (GMS)
       RESILIEN, INC.               )
24             Defendant            )
       ------------------------------ )
25

```
1   _____
                                     )
2   INACOM CORP., et al.             )
              Plaintiff              )
3       v.                           ) Civil Action No.
                                     ) 04-CV-593 (GMS)
4   INGRAM ENTERTAINMENT INC.        )
              Defendant              )
5   _____)
```

6

7                          *-*-*-*-*-*

8

9              **ORAL DEPOSITION OF DEAN VOMERO**

10

11          On the 27th day of July, 2005, between the

12   hours of 9:04 a.m. and 5:18 p.m., in the offices of

13   Pachulski, Stang, Ziehl, Young, Jones & Weintraub,

14   P.C., 780 Third Avenue, Suite 3600, New York,

15   New York, before me, WILLIAM M. FREDERICKS, a

16   Certified Shorthand Reporter for the State of Texas,

17   appeared **DEAN VOMERO**, who, being by me first duly

18   sworn, gave an oral deposition at the instance of

19   Dell, Inc., in said cause, pursuant to the Federal

20   Rules of Civil Procedure.

21

22

23

24

25

A P P E A R A N C E S

FOR THE PLAINTIFF INACOM CORP.:

       **MR. ANDREW W. CAINE**
       Pachulski, Stang, Ziehl, Young,
       Jones & Weintraub
       10100 Santa Monica Boulevard
       11th Floor
       Los Angeles, California  90067-4100

FOR THE EXECUTIVE SOUNDING BOARD ASSOCIATION, INC. AS
PLAN ADMINISTRATOR:

       **MR. EARL M. FORTE**
       Blank Rome LLP
       One Logan Square
       18th & Cherry Streets
       Philadelphia, Pennsylvania 19103-6998

FOR THE DEFENDANT TECH DATA CORPORATION:

       **MR. STEPHEN C. HUNT**
       Adorno & Yoss LLP
       350 East Las Olas Boulevard
       17th Floor
       Fort Lauderdale, Florida  33301

FOR THE DEFENDANT DELL COMPUTER CORPORATION:

       **MR. H. ROBERT POWELL** and
       **MS. SABRINA L. STREUSAND**
       Hughes & Luce LLP
       111 Congress Avenue
       Suite 900
       Austin, Texas  78701

FOR THE DEFENDANT LEXMARK INTERNATIONAL, INC.:

       **MR. CULVER V. HALLIDAY**
       Stoll, Keenon & Park, LLP
       2650 AEGON Center
       400 West Market Street
       Louisville, Kentucky 40202-3377

4

1           A P P E A R A N C E S  (Continued)

2

FOR THE DEFENDANT INGRAM ENTERTAINMENT INC.:

3

4           **MR. JONATHAN P. HERSEY**
           Sheppard Mullin Richter & Hampton LLP
           650 Town Center Drive
5           4th Floor
           Costa Mesa, California  92626-1993

6

7  ALSO PRESENT:

8           Mr. Jason F. Fensterstock.

9

10                    *-*-*-*-*

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                                I N D E X

2      Appearances....................................... 3, 4

3      **DEAN VOMERO**
            Examination by Mr. Powell.................... 7
4           Examination by Mr. Hunt..................... 251

5      Signature and Changes............................. 265
       Reporter's Certificate............................ 267
6

7

8                           E X H I B I T S

9      NUMBER                                            PAGE

10          1................................................ 26
            2................................................ 47
11          3................................................ 47
            4................................................ 51
12          5................................................ 62
            6................................................ 64
13          7................................................ 68
            8................................................ 69
14          9................................................ 69
            10............................................... 69
15          11............................................... 70
            12............................................... 70
16          13............................................... 71
            14............................................... 71
17          15............................................... 71
            16............................................... 72
18          17............................................... 72
            18............................................... 74
19          19............................................... 74
            20............................................... 94
20          21............................................... 96
            22............................................... 103
21          23............................................... 104
            24............................................... 130
22          25............................................... 133
            26............................................... 133
23          27............................................... 133
            28............................................... 141
24          29............................................... 144
            30............................................... 147
25          31............................................... 179
            32............................................... 181

```
1                    E X H I B I T S (Continued)

2    NUMBER                                              PAGE

3        33..................................................  196
         34..................................................  203
4        35..................................................  203
         36..................................................  212
5        37..................................................  214
         38..................................................  215
6        39..................................................  216
         40..................................................  239
7        41..................................................  241
         42..................................................  241
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**DEAN VOMERO,**

having been first duly sworn, testified as follows:

EXAMINATION

BY MR. POWELL:

    Q.   Would you tell us your name, please, sir.

    A.   Dean Vomero.

    Q.   Mr. Vomero, my name is Bob Powell and I represent Dell, Inc., in this case, and in the next few hours I'm going to ask you some questions about the opinions that you've formed in this case, and I want to ask you that if at any time during this deposition you don't understand a question that I might ask that you stop me right then and ask me to explain or clarify the question.

          Will you do that for me?

    A.   Certainly.

    Q.   And can I assume that if you don't ask me to explain or clarify the question that you do understand the question?

    A.   Yes.

    Q.   Okay. And you understand your testimony today is under oath and it has the same force, significance and effect as if you were testifying in a courtroom before a judge and a jury?

    A.   Yes.

09:04
09:04
09:04
09:04
09:04

128

1  Objection, no foundation.

2      A.    In our view, because of the inability of the

3  entity to generate cash, whether it was -- we didn't

4  look at it from either perspective.  It was not in our

5  view relevant.                                              01:15

6      Q.    (BY MR. POWELL)  Did you use a liquidation

7  value in your assessment of any of the assets in the

8  April 19th report?

9            MR. CAINE:  Objection to form.

10     A.    Again, the standard is converting the asset      01:15

11 to cash, and I believe in the report at times we have

12 interchanged that standard or defined it as

13 liquidation value; but, again, not -- whether it was a

14 going concern or not wasn't relevant to us.

15     Q.    (BY MR. POWELL)  Well, are you saying            01:15

16 basically you decided the value according to a

17 liquidation value?

18            MR. CAINE:  Objection to form.

19     A.    If you're defining liquidation value as

20 converting the assets to cash in a reasonable period      01:16

21 of time, that was, again, our standard.

22            (Discussion off the record.)

23     Q.    (BY MR. POWELL)  As of February the 16th,

24 Inacom was essentially a new business.  Would you

25 agree with that?                                           01:16

230

1   your valuation.  So which was it?

2              MR. CAINE:  Objection to form.

3      A.    We considered it, but it wasn't a material

4   portion of our -- it wasn't material to us reaching

5   any of our conclusions.                                    04:00

6      Q.    (BY MR. POWELL)  So according to your

7   methodology, it's okay to use 20-20 hindsight in

8   reaching a valuation as of a particular date?

9              MR. CAINE:  Objection to form.

10  Objection, no foundation.                                  04:01

11             MR. FORTE:  Objection, argumentative.

12     A.    No, we used all available facts that we had.

13     Q.    (BY MR. POWELL)  Including facts occurring

14  after the event of valuation?

15             MR. CAINE:  Objection, no foundation.           04:01

16     A.    Correct.  And...

17             THE WITNESS:  Could we take a short

18  break?

19             MR. POWELL:  Sure.  Absolutely.

20             (Recess.)                                       04:20

21     Q.    (BY MR. POWELL)  Mr. Vomero, let's look at

22  Exhibit No. 3, your report dated May the 27th, 2005,

23  please, and let's look at Page 6.

24             By the way, how much were you all paid

25  for your two reports?                                      04:21

EXHIBIT C

## Exhibit C

### Examples of Vomero's Use of Post-factum Events To Show Insolvency

Vomero's references in the Bridge Associates Valuation Analysis dated May 27, 2005, to Blackstone Group Projections – a consulting group retained by Inacom in May 2000 who rendered a report in May 2000 based on then existing events:

> p. 13:     "Bridge prepared a projection for the period April 23, 2000 through the end of fiscal 2001 ...These results were compared to the Debtor's projection in May 2000 for reasonableness. ... Based on this, Bridge's extrapolated projections are clearly reasonable."

> p. 16:     "The forecasts prepared by the Debtor with the assistance of The Blackstone Group in May 2000 for the period April –December 2000 are listed below. The cumulative projected EBITDA loss during this time period was $60 million radically different than the $8 million EBITDA projected by Duff.  The difference is $52 million or 650%. (Exhibit 8 below)."

> p. 17, Exhibit 7: "Cumulative Loss Per Blackstone Forecast May 2000 (millions) per BSG 0054"

> p. 6, Exhibit 1, and  p. 19, Exhibit 9, at note **:     "...consistent with Blackstone projections."

> p. 37:     "These forecasts include a forecast prepared in ... May by the Blackstone Group (BG0054)."

> p. 38, Exhibit 20:     (pictorially presenting the May forecast by Blackstone Group).

> p. 38:     "The change between the forecast presented in January to the projection prepared in May represents a downward revision to EBITDA of $109 million."

> p. 40:     "The extrapolated projection was compared to a number of Debtor's projections completed in May and June of 2000 with the assistance of the Blackstone Group."

> p. 42,     "It is important to note that although two very comparable transactions have been identified, the service business assets of the Debtor were actively marketed as a going concern by ...The Blackstone Group ...During this marketing process, the Debtor was unsuccessful in finding a willing buyer for the remaining service assets even after The Blackstone Group contacted 16 potential strategic and financial buyers."

> Similar references were made in the April 19, 2005, Bridge Associates Valuation Analysis, at page 2 in paragraph c, "...failed attempts to sell substantially all

operating assets as a going concerns" and page 10 in paragraph iv. "InaCom was unable to find a buyer for the service business in the spring of 2000."

References in the April 19, 2005, Bridge Associates Valuation Analysis (Exhibit A), to events occurring during bankruptcy proceedings after June 16, 2000:

pp. 2-3, paragraph e:    "(It is worth noting that this assessment is in line with current estimates of distribution to creditors of Inacom's bankruptcy estate)."

p. 4:                    "The factors associated with the 35% discount, in line with the ultimate recovery value of the accounts receivable balance,…"

p. 5, paragraph c:    "The recorded book value of the leases was $24 million, but they were sold in 2001 and 2002 after a complex negotiation and closing process for only approximately $13 million."

p. 6, paragraph d:    "As of the Petition Date, 38% of the service AR was over 60 days old.

p. 8, paragraph 6:    "… the majority of this equipment [office furniture and fixtures] was ultimately disposed of through abandonment or transfer to the lessors."

p. 11, paragraph ii (1.): "The IRS filed a claim of $17 million, disputing a portion of the refunds received by InaCom in 2000."

p. 12, paragraph iii:    "In the over two years since its liquidation, Inacom has unsuccessfully attempted to market the NOLs to a potential third party."



**BRIDGE ASSOCIATES LLC**

# Response to Duff & Phelps, LLC/Sasco Hill Advisors, Inc. InaCom Corp, Valuation Analysis

## May 27, 2005



the Valuation Date. These liabilities should have been deducted from non-operating assets in the determination of the value estimate. When the $67.9 million non-operating liabilities are properly subtracted from the non-operating receivables of $63.2 million, the result is a deficit of $5 million. When compared to the surplus of $120 million used by Duff in determining the value estimate, the value impact is a reduction in value of $125 million.

**Additional AR Reserve - $25.9 million**
The Debtor's ineligible service receivables totaled $41 million as determined in an asset valuation report by FTI around the Valuation Date. The Duff Report contains a deduction of only $15.3 million; the difference of $25.9 million represents a further deduction required to decrease the level of expected cash receipts from service receivables. This is warranted as these receivables were not expected to convert to cash. This is further supported by the general age of the service receivables, which contained $50 million of amounts over 60 days past due, representing 34% of the total balance[8].

## *Forecasting and Multiple Issues*

**DCF Column - $184 million**
As noted above and further discussed in this report, Bridge does not believe the DCF valuation method was practical based on Duff's reliance on overly aggressive projections that were not properly tested to ensure reasonableness based on the business and financial facts surrounding the Debtor's operations. Also, the actual 2000 financial performance of the service business and corresponding corporate overhead with certain other adjustments should have been used as the basis for determining the projection used in the DCF and comparable company valuation estimates.

Bridge prepared a projection for the period April 23, 2000 through the end of fiscal 2001 extrapolating the actual financial performance of the service business for the four months ending April 22, 2000 as the basis, with certain other adjustments. These results were compared to the Debtor's projection in May 2000[9] for reasonableness. Material seasonality issues did not exist based on a review quarterly revenue patterns for the service business over a two year period. Based on this, Bridge's extrapolated projections are clearly reasonable.

The resulting downward adjustment in value of $184 million[10] over the 20 month period is listed in Exhibit 3's DCF column. This projection was not extrapolated over the 10 year period used in determining the Valuation Estimate because the resulting negative enterprise continues to grow rendering the DCF valuation method inappropriate[11].



In the first few months during 2000 alone, the normalized cash use <u>was $167 million</u>[17] even after the Company was forced to sell substantially all of its products distribution assets, representing approximately 85% or $5 billion of 1999 revenue, to pay down debt.  After this sale, the Debtor's primary operation was installing and servicing computer hardware.  <u>The cumulative service business loss in 2000, excluding corporate overhead, with approximately a third of the fiscal year complete, totaled $29 million</u>[18].

*EXHIBIT 6*



As the chart above shows, the loss was consistent throughout 2000 on a monthly basis.  The average EBITDA loss per reporting month was over $7 million.  Again this loss excludes the costs and expenses of various corporate and administrative functions which, after the sale of the distribution business, were approximately $3.8 million per month[19].

This difficult situation was noted by the Company's Chief Financial Officer, Tom Fitzpatrick, during the May 15, 2000 Board meeting:

> <u>"Mr. Fitzpatrick noted that the $20 million cash "burn rate" was causing serious concern for the banks and also pointed out that the Company had already made severe cost cuts."</u>

No end in site.  The forecasts prepared by the Debtor with the assistance of The Blackstone Group in May 2000 for the period April – December 2000 are listed below.  The cumulative projected EBITDA loss during this time period was $60 million


BRIDGE ASSOCIATES LLC

radically different than the $8 million EBITDA projected by Duff.  This difference is $52 million or 650%. (Exhibit 8 below)

*EXHIBIT 7*



In summary, we believe the substantial cash use and the actual and projected EBITDA losses rendered the DCF method and use of EBITDA multiples in the comparable company analysis impractical.  The unreasonableness of the projections and impact on value are discussed in the following sections of this document.



EXHIBIT 1[1]

| | EBITDA Projected Degree of Improvement | | | |
| | Jan - Apr Actual | May - Dec Duff Projection | Dollar Improvement | Percent Improvement |
|---|---|---|---|---|
| 2000 Actual | $ (30.0) | $ 8.0 | $ 38.0 | 475% |
| 2000 Actual w/out gain on sale* | $ (107.0) | $ 8.0 | $ 115.0 | 1438% |
| 2000 Actual Service Business | $ (29.1) | $ 8.0 | $ 37.1 | 464% |
| 2000 Actual Service Business w/CO** | $ (44.3) | $ 8.0 | $ 52.3 | 654% |

*Excludes effect of $77M gain on sale of distribution business recorded 3/31/00 per DE004407
**Includes estimate of coporate overhead of $3.8M/month based on April results - consistent with Blackstone projections

The overly aggressive EBITDA projections are used in the enterprise value estimates for both the DCF analysis and the comparable company analysis. The 2000 actual service business EBITDA, including estimated corporate overhead costs and expenses (primarily excluding one time items and costs and expenses associated with the distribution business) between January 2000 (or date beginning the fiscal year 2000) through April 22, 2000, was a loss of $44.3 million. The projection used by Duff assumes EBITDA for the remainder of 2000 (May - December 2000) of $8 million. This represents a 654% improvement over an eight month period.

In order to assess the reasonableness of the projections, Duff:

- Compared, certain financial measures, most importantly EBITDA from the projections to the actual financial performance of incomparable public companies. The comparable company EBITDA percentages used were not comparable based on a similarity/dissimilarity analysis discussed further in this report. Bridge identified two more relevant comparable public companies, Entex Information Systems ("Entex") and DecisionOne Corporation ("DecisionOne"), which were deemed comparable based on a similarity/dissimilarity analysis primarily based on service offerings and capabilities. Significant differences exist between the projections, the Debtor's actual 2000 performance, and the more comparable companies, per Exhibit 1-1.



*EXHIBIT 19*



**2000E Forecast Revisions from March 1999 to December 1999**

*Source: Goldman Sachs – 016366*

The reforecast downward trend continued into 2000. We are aware of three apparent significant forecasts where the Debtor in certain cases worked in conjunction with outside professionals. These forecasts include a forecast prepared in January by Goldman Sachs (016375), February by Houlihan Lokey Howard & Zukin (HL00133) and May by The Blackstone Group (BG0054). The variation in these forecasts for EBITDA for the April – December 2000 reporting period is significant as listed below in Exhibit 20:



*EXHIBIT 20*



**The change between the forecast presented in January to the projection prepared in May represents a downward revision to EBITDA of $109 million.** As the analysis indicates, there was a clear optimistic bias in the Debtor's projections in 1999 and 2000. In addition, projections were adjusted downward frequency and materially during the same time period.



In order to determine whether extrapolating 2000 results was reasonable, the historical service revenue trend was analyzed to determine whether the service business was subject to significant quarterly deviations. The analysis calculated the percentage of service revenue per quarter to total service revenue for 1998 and 1999[34]. As the chart below indicates, the maximum variation in quarterly revenue when compared to annual revenue is 2% points between 1998 and 1999. This variation is not material.

*EXHIBIT 23*



The extrapolated projection was compared to a number of Debtor's projections completed in May and June of 2000 with the assistance of the Blackstone Group[35]. The revenue range associated with these projections between 4/23/00 and the end of fiscal 2000 was between $372 million to $392 million. In addition, the range of EBITDA was a negative 15% to 23%[36] consistent with the projections in Exhibit 22.



target company's business as it related to the Debtor as these target companies primary businesses were in either manufacturing of circuit boards, online marketing, distribution of IT hardware, and government IT contract work.[37]  Bridge concluded that only one transaction, Interactive Systems Inc.'s acquisition of CSI Computer Specialists Inc. on 5/25/00 could be considered a comparable transaction as the target provided enterprise infrastructure management and information technology outsourcing services. (See Appendix 5 for the detailed listing of all reported transactions summarized in Exhibit 25 above)  Deal economics were as follows:

### INTERACTIVE SYSTEMS INC'S ACQUISITON OF CSI COMPUTER SPECIALISTS INC ON 5/25/00[38]:

| | |
|---|---|
| -Enterprise Value: | $5.2M |
| -Enterprise Value to LTM Sales | 0.29x |
| -Enterprise Value to EBITDA: | 3.11x |

Bridge also reviewed Siemens AG's acquisition of Entex on 3/13/00.  This transaction was of significance since Entex was viewed as a primary competitor of the Debtor and was also forced to monetize assets as the industry turned against players such as the Debtor, DecisionOne and Entex.  Deal economics were as follows:

### SIEMENS AG's ACQUISITION OF ENTEX INFORMATION SYSTEMS INC. ON 3/13/00

| | |
|---|---|
| -Enterprise Value: | $105.0M |
| -Enterprise Value to LTM 12/27/99 Sales: | 0.22x |
| -Enterprise Value to EBITDA:<br>EBITDA) | Not Meaningful *(Entex had Negative* |

The CSI Computer Specialists and Entex transactions are more appropriate comparable transactions based on the business activities of the targets when compared to Duffs' comparable transactions, several of which have been highlighted in Exhibit 24 above where public information was readily available.

It is important to note that although two very comparable transactions have been identified, the service business assets of the Debtor were actively marketed as a going concern by Goldman Sachs in the fourth quarter of 1999 and The Blackstone Group in the spring of 2000 just after the sale of the distribution business to Compaq Computer Corporation in February of 2000.  During this marketing process, the Debtor was unsuccessful in finding a willing buyer for the remaining service assets even after The Blackstone Group contacted 16 potential strategic and financial buyers.



EXHIBIT D

# ORIGINAL

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

In re:  INACOM CORP., et al.,
------------------------------------x
INACOM CORP., on behalf of all
affiliated Debtors,
                         Plaintiff,        Civ Act No.
              -against-                    04-148 GMS
                                           Adversary No.
TECH DATA CORP.,                           02-03496 PJW
                         Defendant.
------------------------------------x
INACOM CORP., on behalf of all
affiliated Debtors,
                         Plaintiff,        Civ Act No.
              -against-                    04-582 GMS
                                           Adversary No.
DELL COMPUTER CORPORATION,                 02-03499 PJW
                         Defendant.
------------------------------------x
INACOM CORP., on behalf of all
affiliated Debtors,
                         Plaintiff,        Civ Act No.
              -against-                    04-583 GMS
                                           Adversary No.
LEXMARK INTERNATIONAL, INC.,               02-03500 PJW
                         Defendant.
------------------------------------x
INACOM CORP., on behalf of all
affiliated Debtors,
                         Plaintiff,        Civ Act No.
              -against-                    04-593 GMS
                                           Adversary No.
INGRAM ENTERTAINMENT, INC.,                02-03960 PJW
successor in interest to
NASHVILLE COMPUTER LIQUIDATORS,
                         Defendant.
------------------------------------x

                    July 28, 2005

                    5:19 p.m.


         Deposition of RICHARD A. WHALEN


## Computer Reporting Incorporated  CRI

501 Fifth Avenue  New York, NY 10017
(212) 986-1344  Fax (212) 983-9149  www.crinyc.com

July 28, 2005

5:19 p.m.


        Deposition of RICHARD A. WHALEN, held

at the offices of Pachulski Stang Ziehl

Young Jones & Weintraub, 780 Third Avenue,

New York, New York, pursuant to Agreement,

before John Ianno, Jr., a Notary Public of

the State of New York.

3

A P P E A R A N C E S:


PACHULSKI STANG ZIEHL YOUNG

JONES & WEINTRAUB

Attorneys for Plaintiff

        10100 Santa Monica Blvd.

        Los Angeles, California 90067-4100

BY:   ANDREW W. CAINE, ESQ.,

            of Counsel



ADORNO & YOSS, LLP

Attorneys for Tech Data Corp.

        350 East Las Olas Boulevard

        Ft. Lauderdale, Florida 33301

BY:   STEPHEN HUNT, ESQ.,      (By Telephone)

            of Counsel

A P P E A R A N C E S: (Cont'd):


HUGHES LUCE LLP

Attorneys for Dell Computer Corp.

     111 Congress Avenue    Suite 900

     Austin, Texas 78701

BY:   H. ROBERT POWELL, ESQ.,

        of Counsel



STOLL KEENON & PARK LLP

Attorneys for Lexmark International

     400 West Market Street

     Louisville, Kentucky 40202-3377

BY:   CULVER V. HALLIDAY, ESQ.,

        of Counsel

A P P E A R A N C E S: (Cont'd):


SHEPPARD MULLIN RICHTER & HAMPTON LLP

Attorneys for Ingram Entertainment

      650 Town Center Drive  4th Floor

      Costa Mesa, California 92626-1993

BY:   JONATHAN P. HERSEY, ESQ.,

          of Counsel



BLANK ROME LLP

Attorneys for Executive Sounding Board

      One Logan Square

      Philadelphia, Pennsylvania 19103-6998

BY:   EARL M. FORTE, ESQ.,

          of Counsel



ALSO PRESENT:

      DEAN VOMERO

      JASON FENSTERSTOCK

6

1

2      **R I C H A R D   A.   W H A L E N,**

3              called as a witness, having been first duly

4              sworn by the Notary Public (John Ianno, Jr.),

5              was examined and testified as follows:

6      **EXAMINATION BY**

7      **MR. CAINE:**

8              Q.     Could you please state your name.

9              A.     Richard Whalen.

17:18:59  10     Q.     Have you ever had your deposition

11      taken before?

12             A.     Yes.

13             Q.     On how many occasions?

14             A.     I believe twice.

17:19:06  15     Q.     When was the last time you had your

16      deposition taken?

17             A.     Last one was November of 2004.

18             Q.     What was the subject matter of that

19      deposition?

17:19:13  20     A.     It was a -- as an expert, it was a

21      valuation case, valuation of an internet-based

22      bank.

23             Q.     Was that in the context of litigation?

24             A.     Yes.

17:19:28  25     Q.     Where was the litigation based?

1          **R. Whalen**

2     Merger Stat did not hand us Entex as a

3     possibility.

4                    Could be something else.  Could be the

17:57:16  5     fact there wasn't enough information to make the

6     database, but it did hand us a bunch of other

7     transactions that we whittled down to the 14 best,

8     and that's what depicted in our transactions.

9          Q.    The third area of the opinion that you

17:57:42  10     mention with respect to the Bridge May 27 report

11     is with respect to general valuation methodologies

12     and commonly accepted practices, and I think you

13     mentioned in that area whether you use post

14     valuation date data -- did I state that correctly?

17:58:00  15          A.    I think that's -- yes, I think that's

16     accurate.

17          Q.    What you are your opinions in this

18     area?

19          A.    It is not my opinion, but what I

17:58:11  20     have -- let me just say that popular opinion or

21     valuation theory says that when you are standing

22     there on a certain valuation date, you must use

23     information reasonably available as of that date.

24     The definition of fair market value is a willing

17:58:27  25     buyer, willing seller, reasonable knowledge and no

1                    **R. Whalen**

2    compulsion to buy or to sell.

3                    Reasonable knowledge means I could

4    have reasonably known this fact on this date.  You

17:58:39  5    can use that -- in this example, financial

6    statements at times, if you are doing a valuation

7    as of December 31st, you know the final audit

8    didn't come out until March, financials weren't

9    really assembled in that manner on December 31st,

17:58:54  10    you weren't sitting there nice and pretty.

11    However, the numbers existed, and I suppose if the

12    auditors worked hard enough, the financials could

13    have existed on that date.

14                    So I guess there are -- that's one of

17:59:07  15    the examples I can offer you, where something

16    that -- where that is stretched, I suppose, but

17    the reason I bring that up is in reading this for

18    the first time, there were a lot of things in here

19    that occurred after the valuation date, that I

17:59:25  20    didn't -- I wouldn't have checked or looked into,

21    or thought about really, would have dismissed them

22    because they aren't -- against the rules to

23    include them.

24                    Q.    Is whether something reasonably could

17:59:46  25    have been known on or before the valuation date a

36

1                           *R. Whalen*

2      matter of judgment?

3           A.    The answer with many, many things, I

4      suppose -- well, financial statements and some of

17:59:59  5      these things are quite quantitative, if a

6      financial event occurs, or I can give you example

7      of other kinds of events that effect the

8      marketplace.

9                 Price of soybeans for Cargill, that

18:00:13 10      comes out on March 13, the price of their division

11      is different on March 11 versus March 15, because

12      that price changed.  Could they have reasonably

13      known that was going to occur on March 11?  If

14      they did, then they should have take that into

18:00:29 15      account, and if they knew the report was going to

16      come out from the government with a different

17      price -- trying to think of an example for you.

18           Q.    Let me ask the question in this way:

19      Is it the province of the person performing the

18:00:46 20      valuation to exercise their judgment as to whether

21      to consider certain information because it may or

22      may not have been reasonably foreseeable or could

23      have been known prior to the valuation day?

24           A.    Like many other things, I suppose

18:01:07 25      sometimes it can fall into the judgment of the

37

**R. Whalen**

2    appraiser, but some things are very, very

3    clear-cut.

4         Q.    If you are valuing a company at a date

18:01:17  5    in the past, and much like the information that

6    might be contained in a financial statement as of

7    a certain date, that's prepared sometime

8    thereafter, is it inappropriate to use information

9    reported after the valuation date, regarding facts

18:01:39 10    that occurred before the valuation date?

11         A.    You have to decide whether or not

12    those facts were known.  Reasonable knowledge,

13    that's part of the definition of the fair market

14    value, reasonable knowledge.  That means a

18:01:53 15    reasonable investor, willing buyer in this case,

16    would the willing buyer have known this.

17              If a corporate insider has knowledge

18    in their head three days before a corporate event,

19    and doesn't tell anybody, you can't use that

18:02:06 20    information, even if two weeks later they say I

21    was really thinking that at that barbecue on

22    Sunday, should have told somebody.

23              You can't use that data.

24         Q.    A willing buyer is going to want as

18:02:21 25    complete information as possible?

1                          **R. Whalen**

2          A.     Of course.

3          Q.     And depending upon the nature of the

4   asset, likely to do extensive due diligence?

18:02:30  5          A.     As best they can, yes.

6          Q.     Let me give you an example in this

7   case.  The Blackstone Group did projections in May

8   of 2000.  Have you seen those?

9          A.     I don't think so.

18:02:48 10          Q.     Just assume the following:  They did

11  projections for Inacom Service Systems in May of

12  2000 that included data, actual data prior to

13  April 22.  Is that --

14          A.     Historical data.

18:03:07 15          Q.     Yes, is that something that should be

16  considered for a valuation done as of April 22nd?

17          A.     You mean should another -- Blackstone

18  should have considered that data?

19          Q.     Sorry, I didn't ask the question

18:03:22 20  clearly enough.

21          A.     You are saying --

22          Q.     A Blackstone report that includes

23  projections for Inacom based on historical data

24  for the time period prior to April 22nd, should

18:03:36 25  that be used by someone trying to value Inacom as

39

**R. Whalen**

1

2       of April 22nd?

3              A.     No, and I'll tell you why.

4       Blackstone's opinion and their thinking and all of

18:03:48  5   the judgment that went into it, you just told me

6       occurred in May of 2000.

7              Q.     Yes.

8              A.     The mosaic of facts that they used to

9       do whatever it was they did, and I apologize if I

18:04:02  10  should recall what they did, or if I have seen it,

11      I don't think I reviewed it in this process, that

12      the mosaic of opinions that they would have put

13      out there, or thinking that they would have used

14      to perform whatever tasks they performed, was

18:04:18  15  based on facts in evidence in May, not April 17 or

16      April 22nd.

17             Q.     In an order to prepare their

18      projection, if the only data they used was data

19      that was available as of April 22nd, would you

18:04:43  20  still have the same opinion?

21             A.     Yes, because they are doing their work

22      in May.  What you are saying is -- they started

23      and stopped their work on a day in May and didn't

24      think about anything --

18:04:59  25            Q.     No -- I understand your answer, let me

*COMPUTER REPORTING INC.*
*(212) 986-1344*

40

1          **R. Whalen**

2     ask a different way, or a different question.

3     Should the analyst trying to value Inacom as of

4     April 22 use the historical data contained in a

18:05:14  5     Blackstone report done in May, if it is historical

6     data for prior to April 22?

7          A.    The analyst should use every piece of

8     data they can get their hands on.  When you say

9     use, that means consider.

18:05:28 10          Q.    Yes.

11          A.    Try and acquire and think about, if

12     they think that some of the data is tainted by

13     post valuation data, they might consider it and

14     throw it out.

18:05:43 15          Q.    So the analyst should look at

16     available information, even if it came out after

17     the valuation date --

18          A.    What I'm assuming --

19          Q.    Let me finish the question.  If it

18:06:00 20     includes information that reasonably could have

21     been known prior to the valuation date?

22          A.    Let me qualify what I just said.  You

23     wouldn't consider something that came out in May,

24     that's after the valuation date.  I thought what

18:06:11 25     you were describing is something that came out in

**R. Whalen**

2    May and used some data that was around in March,

3    that you knew about, you could have gotten from

4    some other source.

18:06:23    5            It was sitting there, and you found

6    it, so whether the data found its way into your

7    hand, because you did due diligence and you found

8    this data in March, or some other report that was

9    done later on pointed you towards it, I'm not sure

18:06:39  10    that matters to me, because they are pointing at

11    data that was around in March.

12            Q.    The Inacom April 22, 2000 balance

13    sheet was something that you used in preparing

14    your report; correct?

18:06:54  15            A.    Right, yes.

16            Q.    Was that prepared after April 22nd?

17            A.    I believe so.

18            Q.    Do you know when it was prepared?

19            A.    I don't know, I don't recall.

18:07:08  20            Q.    It was prepared sometime after April

21    22?

22            A.    I think so, yes.

23            Q.    It is okay to use that why?

24            A.    Because the data was there on April

18:07:18  25    22nd, and I do know that we did not have many,

42

**R. Whalen**

many choices.  There was what, a March 25 balance

sheet and an April 22 balance sheet, and we were

trying to get a value as of April 17, so we chose

18:07:32  the 22nd because it was closer.

Q.    I'm not quibbling with your choice of

which balance sheet to use.

A.    There is a difference, though, between

a valuation firm coming in, in May, and giving an

18:07:46  opinion on financials, and a balance sheet data

sitting on a piece of paper.  Balance sheets are

not supposed to be opinions of this and that, in

fact they are not even opinions sometimes of the

fair value of things, because there is historical

18:08:01  cost reporting for assets, and it is an opinion of

what the cash is in the checking account and all

that.  I suppose that's an opinion, but it is

backed up by fact.

Q.    Let's assume for the moment that the

18:08:16  Inacom April 22 balance sheet was completed the

same day as Blackstone's report came out, sometime

in May.

A.    Okay.

Q.    The data that was used to prepare the

18:08:27  April 22 balance sheet was also used in the

43

1                              **R. Whalen**

2      Blackstone report.  Would it be appropriate to

3      consider the information in the Blackstone report?

4              A.      You don't need it, you already have

18:08:42  5    it.  You mean that particular balance sheet and

6      those balances, current assets, $10, fixed assets,

7      $12.

8              Q.      There may be additional data

9      underlying the balance sheet that's contained in

18:08:53 10    the Blackstone report that you don't see in the

11     balance?

12             A.      I suppose if it is factual data that

13     was around on the valuation date, then I'm

14     thinking no matter where it comes from, you should

18:09:06 15    consider it.  There is a difference between

16     creating a report with all the judgment that goes

17     into it, and the thinking cap on in May of 2000,

18     which is different than perhaps a thinking cap in

19     April, or March, or February.  The difference

18:09:26 20    between assertions made in a report and financial

21     statement data on a page.  Maybe that's where we

22     are diverging here.

23             Q.      We are not, I'm just trying to

24     understand your opinion.

18:09:42 25            A.      I think in general wherever you can

44

**R. Whalen**

get information that was reasonable knowledge by a
willing buyer as of the valuation date, and you
should endeavor to get as much information as they
18:09:53  can, but things that are put out there, published,
become public or become available after the
valuation date, you can't use, you can't consider
them, unless you pick a new valuation date.

Q.    Let's say hypothetically you have a
18:10:25  valuation date of June 30?

A.    Okay.

Q.    And the most recent projection you
have in order to perform your analysis, have been
completed on January 1st, and those projections
18:10:40  relied on actual data prior to January 1st?

A.    And the thinking on January 1st.

Q.    Right.

**MR. POWELL:**  Which January 1st?

**MR. CAINE:**  Of the same year.

18:10:52  **THE WITNESS:**  Before.

Q.    You would use those January 1st
projections in preparing your valuation as of June
30?

A.    Yes, or what I would try and do is
18:11:03  update those projections, make sure they are

45

**R. Whalen**

2   either still valid, trying to get the interim

3   financial statements from January to June,

4   internal whatever they had, to try and say this

18:11:16   5   was your opinion in January, I need your opinion

6   on June 30, what did you learn during those six

7   months, what happened to the business during those

8   six months, and would your opinion of these

9   projections which will go out a few years into the

18:11:28  10   future, has it changed.

11       Q.    Let's assume the next set of

12   projections that come from the company are put out

13   on July 1st, the date after your valuation date,

14   projecting for the same time period that's got

18:11:44  15   maybe another six months out, and relying on

16   actual data between January 1 and June 30, you

17   wouldn't use those?

18       A.    Can't, it is not allowed.  Now,

19   remember what I said though, what I said was I'm

18:11:59  20   going to try and get -- figure out what everyone

21   was thinking on June 30, update the January

22   projections.  So I would imagine if I did a good

23   job updating the January projections to June, I

24   would have been thinking most of the things they

18:12:14  25   were thinking -- see what your example, and let's

46

R. **Whalen**

2  say it was only a one day period, but it was

3  September 10 and September 11 of the year 2001 and

4  it is only two days apart, and on September 10 I'm

18:12:29  5  using some projections from six months ago, trying

6  to update them to 9/10, and there is a certain

7  picture of the world, and that's the picture I

8  have to use.  It is a very different picture of

9  the world two days later, but I can't use it, it

18:12:45 10  is not allowed.

11      Q.    Under no circumstances is it allowed?

12      A.    Not allowed.

13      Q.    Even if you had no good data between

14  January 1 and June 30, with which to try and

18:13:10 15  update your projections?

16      A.    I would probably say can I pick July

17  2nd as my valuation date, because my analysis

18  would be a lot better, and if the purposes of the

19  deal allowed you to do that, you'd pick July 2nd

18:13:23 20  and then everybody is happy.

21          **MR. CAINE:**  Give me a minute.

22          (Discussion off the record.)

23          (Recess taken.)

24          **MR. CAINE:**  We are done, I have

18:18:20 25      nothing further.

47

                              *R. Whalen*

**EXAMINATION BY**

**MR. POWELL:**

      Q.    Mr. Whalen, I just have a couple of

18:20:09  questions for clarification, just so we make sure

that we have gotten your position correctly on the

record.

      Do you agree with the Bridge report

that the companies used in the Duff & Phelps/Sasco

18:20:28  Hill Advisors Inacom Corp. valuation analysis,

Exhibit 1, are not comparable to Inacom?

      A.    Absolutely not, I don't agree with the

Bridge report saying they are not comparable.

      Q.    Are you confident of your conclusion

18:20:49  that the companies set forth in your report, which

is Exhibit 1, are indeed comparable to Inacom for

the purposes for which you used them?

      A.    Yes, they are.

      Q.    I heard a question and answer that I'm

18:21:05  also wanting to clarify.  The question was

something like -- your answer was something to the

effect that it was not your opinion that the use

of post valuation data was permissible, and I

wanted to clarify, are you saying that in your

18:21:28  opinion, it is permissible to use post valuation

48

1                    *R. Whalen*

2      data, or it is inappropriate to use post valuation

3      date data?

4           A.    It is inappropriate to use post

18:21:42  5      valuation date data.  I may have been unclear

6      because I didn't want it to sound like that was

7      just my opinion, I think that's valuation rules.

8           **MR. POWELL:**  We reserve further

9           questions.

18:21:55  10  **FURTHER EXAMINATION**

11  **BY MR. CAINE:**

12           Q.    The valuation rules to which you

13      refer, where are they from?

14           A.    They are in most textbooks, Shannon

18:22:17  15      Pratt, third edition, if one does a Google search,

16      they can find it in many different places.

17      Shannon Pratt has a book called Valuing a

18      Business, it is one of the things you give the new

19      hires and say here, read this, kind of a

18:22:40  20      dictionary of business valuation, and there is a

21      section in there which stresses the importance of

22      using valuation data right at the valuation date.

23           I'm not sure which edition of Pratt

24      says don't go past your -- you know, it is one

18:22:58  25      thing to say don't use valuation data far afield

49

1                          ***R. Whalen***

2    from your date, it is another thing to say you are

3    not allowed to use anything after the valuation

4    date; but there are many valuation texts.

18:23:52  5          **MR. CAINE:**  Read back the last answer.

6              (Record read.)

7          Q.    Are you saying at times it is

8    permissible to use data not far afield from the

9    valuation indicate?

18:23:59  10             (Continued on next page.)

11                          oOo

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              *R. Whalen*

2          A.    No, I'm saying there are two different

3    assertions in the valuation text, the more general

4    assertion is stick to your date, use data right

18:24:08  5    around your date, the more specific one and

6    valuation rule we have been talking about is you

7    can look at history, but you have to use all

8    reasonable knowledge as of the valuation date.

9          **MR. CAINE:**  Okay.  I have nothing

18:24:23 10    further.

11          **MR. POWELL:**  We reserve further

12    questions.

13          (Time Noted:  6:24 p.m.)

14

15          _____

16          RICHARD A. WHALEN

17

18  Subscribed and sworn to before me

19  this _____day of _____, 2005.

20

21  _____          _____

22  (Notary Public)          My Commission Expires:

23

24

25

EXHIBIT E

# ORIGINAL

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

In re:  INACOM CORP., et al.,
------------------------------------x
INACOM CORP., on behalf of all
affiliated Debtors,                      Civ Act No.
                    Plaintiff,           04-148 GMS
          -against-                      Adversary No.
TECH DATA CORP.,                         02-03496 PJW
                    Defendant.
------------------------------------x
INACOM CORP., on behalf of all
affiliated Debtors,                      Civ Act No.
                    Plaintiff,           04-582 GMS
          -against-                      Adversary No.
DELL COMPUTER CORPORATION,               02-03499 PJW
                    Defendant.
------------------------------------x
INACOM CORP., on behalf of all
affiliated Debtors,                      Civ Act No.
                    Plaintiff,           04-583 GMS
          -against-                      Adversary No.
LEXMARK INTERNATIONAL, INC.,             02-03500 PJW
                    Defendant.
------------------------------------x
INACOM CORP., on behalf of all
affiliated Debtors,                      Civ Act No.
                    Plaintiff,           04-593 GMS
          -against-                      Adversary No.
INGRAM ENTERTAINMENT, INC.,              02-03960 PJW
successor in interest to
NASHVILLE COMPUTER LIQUIDATORS,
                    Defendant.
------------------------------------x


                    July 28, 2005

                    9:11 a.m.



        Deposition of JASON FENSTERSTOCK


**Computer Reporting Incorporated** 

501 Fifth Avenue  New York, NY 10017
(212) 986-1344  Fax (212) 983-9149  www.crinyc.com

July 28, 2005

9:11 a.m.


Deposition of JASON FENSTERSTOCK, held at the offices of Pachulski Stang Ziehl Young Jones & Weintraub, 780 Third Avenue, New York, New York, pursuant to Agreement, before John Ianno, Jr., a Notary Public of the State of New York.

A P P E A R A N C E S:


PACHULSKI STANG ZIEHL YOUNG

JONES & WEINTRAUB

Attorneys for Plaintiff

      10100 Santa Monica Blvd.

      Los Angeles, California 90067-4100

BY:   ANDREW W. CAINE, ESQ.,

         of Counsel


ADORNO & YOSS, LLP

Attorneys for Tech Data Corp.

      350 East Las Olas Boulevard

      Ft. Lauderdale, Florida 33301

BY:   STEPHEN HUNT, ESQ.,    (By Telephone)

         of Counsel

A P P E A R A N C E S: (Cont'd):

HUGHES LUCE LLP

Attorneys for Dell Computer Corp.

 111 Congress Avenue   Suite 900

 Austin, Texas 78701

BY: H. ROBERT POWELL, ESQ.,

 SABRINA L. STRUESAND, ESQ.,

  of Counsel

STOLL KEENON & PARK LLP

Attorneys for Lexmark International

 400 West Market Street

 Louisvile, Kentucky 40202-3377

BY: CULVER V. HALLIDAY, ESQ.,

  of Counsel

A P P E A R A N C E S: (Cont'd):


SHEPPARD MULLIN RICHTER & HAMPTON LLP

Attorneys for Ingram Entertainment

     650 Town Center Drive  4th Floor

     Costa Mesa, California 92626-1993

BY:   JONATHAN P. HERSEY, ESQ.,

         of Counsel


BLANK ROME LLP

Attorneys for Executive Sounding Board

     One Logan Square

     Philadelphia, Pennsylvania 19103-6998

BY:   EARL M. FORTE, ESQ.,

         of Counsel


ALSO PRESENT:

     DEAN VOMERO

     RICHARD A. WHALEN

1

2    **J A S O N    F E N S T E R S T O C K,**

3    called as a witness, having been first duly

4    sworn by the Notary Public (John Ianno, Jr.),

5    was examined and testified as follows:

6    **(Plaintiff's Exhibits 1 through 8,**

7    expert reports and related documents, marked

8    for identification, as of this date.)

9    **EXAMINATION BY**

09:11:30  10    **MR. CAINE:**

11        Q.    Good morning.  Could you please state

12    your name for the record.

13        A.    Jason Forbes Fensterstock.

14        Q.    Could you spell your name for the

09:11:44  15    record.

16        A.    J A S O N, F O R B E S, F E N S T E R

17    S T O C K.

18        Q.    Are you currently employed?

19        A.    Yes.

09:11:54  20    Q.    By whom, or what entity?

21        A.    Alix Partners.

22        Q.    What is your current business address,

23    please?

24        A.    9 West 57th Street, New York, New

09:12:07  25    York.

35

*J. Fensterstock*

1

2          See that?

3      A.    Yes.

4      Q.    What circumstances were you referring

10:07:42  5   to?

6      A.    All of the company circumstances, as

7   of April 17.

8      Q.    Why was April 17 chosen?

9      A.    That was the date that counsel asked

10:07:58  10  us to make our assessment as of.

11     Q.    Why was not April 22nd chosen?

12     A.    I believe April 17 was the date after

13  which all of the clients that have retained us, by

14  that date all of the payments that are subject to

10:08:33  15  attack in this action had been received, and there

16  was no need to go beyond that date.

17     Q.    In the course of preparing your

18  report, did you use any information of which

19  Inacom became aware after April 17th?

10:09:01  20     A.    Could you just please repeat that

21  question.

22     Q.    Sure.  In the course of preparing your

23  report, Exhibit 1, did you use any information of

24  which Inacom became aware after April 17th?

10:09:29  25     A.    In the course -- no.

36

*J. Fensterstock*

1

2          Q.      So if something happened on April 18th

3     and Inacom became aware of, you didn't use it in

4     your report?

10:09:44  5          A.      Except as set forth in this paragraph,

6     we used the income statements and balance sheet as

7     of the end of the April fiscal month for Inacom,

8     and if there were liabilities that were not on

9     that April 22nd balance sheet, but because of

10:10:40  10   information that became available to the company

11    between the 17th and the 22nd, we wanted to adjust

12    the liabilities to include those, so that the

13    liabilities would not be understated.

14          Q.      So do I understand you to say that any

10:11:15  15   liabilities that may have been discovered between

16    April 17 and April 22nd were included in your

17    report?

18          A.      Yes.

19          Q.      Was there any other information of

10:11:35  20   which the company may have become aware after

21    April 17th, that you included in your report?

22          A.      No, other than that which was

23    reasonably foreseeable on April 17th.  If it was

24    not reasonably foreseeable at April 17th it would

10:12:06  25   not be included in our report.

*COMPUTER REPORTING INC.*
*(212) 986-1344*

37

*J. Fensterstock*

1

2      Q.    As you sit here today, can you

3  identify any developments that were reasonably

4  foreseeable at April 17th that you included or

10:12:16  5  incorporated into your analysis?

6      A.    Only those related to the balance

7  sheet adjustment to liabilities, that we

8  previously discussed.

9      Q.    What were those balance sheet

10:12:31 10  adjustments to liabilities?  I don't mean the

11  numbers, I mean what were the liabilities related

12  to?

13      A.    We reviewed the convertible debt

14  associated with the missed preferred stock of

10:13:04 15  Vanstar.  We reviewed the -- something called

16  misdirected payments.  We reviewed something known

17  as the overpayment made by Compac in connection

18  with its purchase of the distribution and

19  configuration business from Inacom in February of

10:13:25 20  2000.  I believe that encompasses all, if --

21  substantially all, if not all, of what I was

22  referring to.

23      Q.    In the course of preparing your

24  report, or thereafter, did you become aware of any

10:13:55 25  information not known or reasonably foreseeable to

### J. Fensterstock

1

2    Inacom at April 17, that would have implication

3    for its financial condition as of April 22nd?

4        A.    No.

10:14:14 5        Q.    Had you become aware of any such

6    event, or information, would it have been

7    appropriate to include it in your analysis?

8        A.    Would you kindly repeat the question.

9        Q.    Sure.   Read it back.

10:15:38 10        (Record read.)

11        A.    If I understand the question

12    correctly, any information which was not known or

13    reasonably foreseeable as of April 17th, that

14    became available after April 17th, would not be

10:15:58 15    included in our analysis as of April 17th.   If it

16    was not known or reasonably foreseeable as of

17    April 17th.   I hope that is responsive.

18        Q.    I understand that that is the manner

19    in which you prepared this report.   My question

10:16:19 20    is:   If you became aware, during the course of

21    preparing this report, of information that had

22    material implication for Inacom's financial

23    condition as of April 22nd, even though that

24    information wasn't known or reasonably foreseeable

10:16:39 25    as of April 17th, would it have been appropriate

39

**J. Fensterstock**

2    for you to incorporate into your analysis?

3         A.    I don't believe so.

4         Q.    Why not?

10:16:48    5         A.    Because we were asked to value Inacom

6    at a certain -- at a given date, and in any

7    valuation process, there is a time frame beyond

8    which no more data is available.  There is a

9    curtain that's drawn, you can't see beyond that

10:17:26    10   curtain, it becomes guesses.  So you don't go

11   beyond that curtain in your analysis.

12             I think someone asked a question about

13   valuation of airplanes.  I think that's a good

14   analogy.  If you are going to value a 747 on June

10:17:59    15   30th of 2001, and the valuation is being asked

16   for, relative to June 30th, and your work is to be

17   done as of June 30th, only based upon information

18   that was known at June 30th, or could have been

19   known at June 30th, one would not forecast,

10:18:32    20   project, guess, that on September 11th of 2001,

21   some crazies were going to crash into the World

22   Trade Center and do other terrible damage.  So one

23   would value those, that 747, without giving effect

24   to what occurred on September 11th.

10:19:01    25        Q.    Have you finished your answer?

*J. Fensterstock*

A.    Yes.

Q.    Is there any particular place in Exhibit 1, your May 2 report, to which you can point, that shows the analysis that went into that conclusion?

A.    Which conclusion?

Q.    That Inacom was able to pay its debts as it became due on April 22, 2000, without having to restructure its debt or sell any of its assets outside the ordinary course of business.

A.    That was a background conclusion we did not provide the bases for in this report.

Q.    What sorts of information did you use to come to that background conclusion?

A.    All of the discovery documents that I reviewed, which included thousands of pages, among other items that I would highlight, which is a very short portion of the total list, would include the income statements for the four weeks ending April 22nd, which had the company at a $63 million revenue run rate for four weeks, which implies a $820 million annual revenue run rate, with historical gross margins between 30 and 40 percent, with projected gross margins of 34 to 35

52

1          *J. Fensterstock*

2    percent, which gross margins had plenty of

3    historical bases for in the calendars years '96,

4    '7, '8, '9, all of which data had been reviewed

10:52:32  5    for over a year and a half by Goldman Sachs, a

6    world class investment banking firm, Houlahan

7    Lokey, in its solvency opinion, Compac, in its

8    determination that it was entering into a $55

9    million subordinated loan agreement, a three year,

10:52:46  10   $420 million services and supply agreement, which

11   was expected to produce 10 percent EBITDA margins

12   on that 420 million, a distribution agreement

13   which was 3 and a half percent sales, and a

14   cooperation agreement which -- between Compac and

10:53:06  15   Inacom, which provided for a transition of -- a

16   transition period to work together, all of which

17   intended long-term -- and excluding -- including

18   the third and fourth bank amendments, pursuant to

19   which Deutsche Bank was the agent bank, various

10:53:32  20   borrowing base certificates, which showed

21   availability, and the list is very lengthy, but

22   that's a small portion of it.

23          Q.    Can you recall any other documents?

24          A.    I think those are the highlighted

10:53:50  25   ones.  I could go on and on and on, but I think

1                    *J. Fensterstock*

2      those are the ones that would be primary in my

3      thinking, but all of the others are included in my

4      thinking because I personally viewed all of those

10:54:02  5      documents.

6            Q.    Can you recall any others?

7            A.    Not at this time.

8            Q.    Can you identify for me, again, the

9      April, 2000 document that you referred to in that

10:54:21  10     last answer?

11           A.    There was an income statement for the

12     four week period ending April 22nd, which

13     provided -- there were several forms of that same

14     income statement in the documents.

10:54:36  15           There was $63 million of revenue for

16     the four weeks ending April 22nd.  If I'm not --

17     if my memory is correct, the gross margin at that

18     time for that four week period was 28 percent or

19     so, and this was in a time frame in which almost

10:54:55  20     all, in fact every one of the participants that I

21     had mentioned, including Houlahan, Goldman,

22     Greenhill, Deutsche Bank, Compac, and all the

23     syndicate banks, in the agent facility, had

24     understood that the March, April, May time frame

10:55:17  25     for Inacom would be suboptimal, and that after

54

*J. Fensterstock*

1

2          that period both revenues and margins would

3          improve as the company was able to further

4          downsize its operating costs, and the cash savings

10:55:33 5   and resultant increase in EBITDA would kick in

6          subsequently.

7               Q.    Do you know if the April income

8          statement, to which you just referred,

9          incorporated any misdirected payment?

10:56:05 10      A.    Misdirected payments would not be

11         included in an income statement item, they would

12         be balance sheet items.

13               Perhaps it would enter into some

14         interest adjustment on the income statement, but

10:56:21 15  that would be the -- and that interest adjustment

16         would clearly not factor into either gross margin

17         or EBITDA document calculations, since interest is

18         an item below those calculations on an income

19         statement.

10:56:39 20      Q.    There was no balance sheet connected

21         to the document to which you have been referring,

22         the April income statement?

23               A.    There was a consolidated balance sheet

24         as of April 22nd.

10:56:52 25      Q.    Did that balance sheet include --

55

### J. Fensterstock

2        A.      That I saw.

3        Q.      Did that balance sheet include any

4    misdirected payments?

10:57:00 5        A.      We believe that it did.

6        Q.      Did it include any liability for the

7    $42 million overpayment by Compac?

8        A.      May I take a moment to refresh my

9    recollection?

10:57:31 10       Q.      Sure.

11       A.      We believe it did.

12       Q.      You don't have the document in front

13    of you today to check?

14       A.      Correct, I don't have the document in

10:59:06 15    front of me to check.

16       Q.      Still on page 16, if you could look at

17    the last bullet point.  I'd like you to hold that

18    page and at the same time turn to page 46 of your

19    report.  I direct your attention to the line item

10:59:47 20    that says intangible assets and deferred income

21    tax.  See that?

22       A.      Yes.

23       Q.      On page 16 you indicate that you

24    attribute no value to the company's significant

11:00:05 25    tax attributes; correct?

61

*J. Fensterstock*

1

2      **MR. POWELL:**  How does he do that?

3      Q.   Tell me what they were.  What

4  documents did you use?

11:11:06  5      A.   Among others, I refer you to pages 50

6  and -- among others I refer you to page 50 of our

7  report.

8      Q.   Did you use all of the documents

9  referenced on page 50 in coming to your review of

11:11:45 10  the company's historical performance and revenue

11  projections for 2000 through 2002?

12      A.   Those on page 50 that were pertinent

13  to that, we used.

14      Q.   Did you use documents from the

11:12:05 15  Blackstone Group referenced in the top right-hand

16  corner of page 50?

17      A.   No.

18      Q.   In any part of your analysis contained

19  in any of your reports, did you use projections

11:12:53 20  prepared by the Blackstone Group?

21      A.   No.

22      Q.   Why not?

23      A.   I referred back to our earlier

24  questions and answers concerning what data was

11:13:10 25  used in connection with our analysis as of the

62

**J. Fensterstock**

2    valuation date, and Blackstone Group data was not,

3    to my best knowledge, contemplated, or in

4    existence, until sometime after the valuation

11:13:36  5    date.

6         Q.    Do you recall when those Blackstone

7    projections were performed?

8         A.    To my best recollection, sometime in

9    May.

11:13:50 10         Q.    Do you recall for what time period the

11    projections applied?

12         A.    Which projections?

13         Q.    The Blackstone projections.

14         A.    Not offhand at this time.

11:14:02 15         Q.    Did it overlap any of the time periods

16    for which you were considering projections, that

17    is, 2000 through 2003?

18         A.    I don't recall.

19         Q.    In the course of reviewing the

11:14:36 20    company's historical performance, did you use any

21    actual performance data for the year 2000?

22         A.    Could you please repeat the question.

23         Q.    Sure.  The first bullet point, you

24    indicate you conducted a ten year DCF analysis

11:14:59 25    based on the company's historical performance, and

*J. Fensterstock*

2    revenue projections for 2000 through 2002;

3    correct?

4         A.    Yes.

11:15:07  5         Q.    Did you review the company's actual

6    performance for any of the time periods during the

7    year 2000?

8         A.    Yes.

9         Q.    What time period?

11:15:20  10         A.    The whole time period of 2000, prior

11   to our valuation date.

12         Q.    Did you use that actual data, for

13   January 1 through April 22, 2000, in preparing

14   your discounted cash flow analysis?

11:15:50  15         A.    Did we use the actual data?

16         Q.    Yes.

17         A.    In preparing our discounted cash flow

18   analysis?

19         Q.    Yes.

11:17:01  20         A.    In part, yes.

21         Q.    How can I tell that from your report?

22         A.    If you go to Exhibit B, and

23   specifically if you go to B-3, that is where you

24   will find the historical -- the only -- that is

11:17:32  25   where you will find, when you say use, there are

64

1          *J. Fensterstock*

2    two different ways to use data, among others.  One

3    is to incorporate specific numbers into an Excel

4    spreadsheet, and the other one is to observe the

11:17:49  5    data and have it factor into judgments made with

6    respect to analyses.

7            In Exhibit B you will see some of the

8    specific numbers we used in our Excel

9    spreadsheets, what you cannot see is how the data

11:18:07 10   we observed for calendar 2000 leading up to April

11   22, factored into our judgments concerning our DCF

12   analysis.

13      Q.    Let's talk about each of the ways in

14   which you can use data.  Are the actual

11:18:26 15   performance numbers for Inacom, for the service

16   business from January 1, through April 22, 2000,

17   in your data?

18      A.    Balance sheet numbers, as of April

19   22nd, are in our Excel spreadsheets that were used

11:18:53 20   in the discounted cash flow analysis.

21      Q.    What about revenue?

22      A.    Revenue leading up to the date April

23   22nd, was reviewed by all of us, but is not set

24   forth for the stub period, because of two factors.

11:19:26 25   One factor is that the DCF analysis is for the

*COMPUTER REPORTING INC.*
*(212) 986-1344*

**J. Fensterstock**

2    future cash flows.  You are discounting back

3    future cash flows.  You look at historical income

4    statement and balance sheets to put the future

11:19:47  5    into some type of a context.

6              In the context of this analysis, much

7    of the financial data that we had for the period

8    January 1 through April 22nd of 2000, included pre

9    and post sale to Compac, data, did not include the

11:20:24  10    expense reduction program that was thought through

11    and contemplated by Inacom.  Did not include, for

12    example, the large services and supply arrangement

13    between Compac and Inacom for $420 million of

14    revenues, with $85 million obligated in calendar

11:20:52  15    2000 and 125 in 2001, and 145 in 2002, with the

16    associated 10 percent EBITDA margins that were

17    expected as presented to the board by Goldman

18    Sachs in January of 2000, and so we had some

19    degree of difficulty basing the future on -- let's

11:21:22  20    just say 60 days from February 15th to April 22nd,

21    where the data was not parsed out adequately.

22              So although we reviewed it, our

23    footnotes would have been extensive if we had just

24    copied that data and put it into historical

11:21:42  25    context in Exhibit B, and we simply did not do

66

1                  *J. Fensterstock*

2       that, but we went through all of the exercise that

3       I have been trying to summarize for you.

4            Q.    Did you, in that same exercise, use

11:22:15  5       historical performance data for prior years?

6            A.    Yes, for the service business.

7            Q.    Correct.  Do I understand you

8       correctly you did use service business performance

9       data from prior years as a source for looking

11:22:41  10      forward, but you did not use the January 21, to

11      April 22, 2000 service data as a source for

12      looking forward?

13           A.    We did not have -- the answer to that

14      is yes, because we had four -- among others, four

11:23:02  15      pieces of paper produced in the discovery, which

16      were for calendar years and quarters in those

17      calendars years in '99, '98, '97, and '96, which

18      gave us 16 quarterly data points on the revenues

19      and gross margins associated with the historical

11:23:26  20      service business.  When it came to January through

21      February 15th, and February 15th through April

22      22nd, we did not have a clear picture of the gross

23      margin for the service business loan except, to my

24      best recollection, as we saw the first full month

11:24:05  25      that was broken out, March may have been as well,

87

**J. Fensterstock**

1

2    but the first full month that we focused on, with

3    great weight, not because of anything other than

4    we thought it was the business data point, and the

11:24:21  5    last good data points was the four weeks ending

6    April 22nd, which was Inacom, and clearly Inacom,

7    post the sale of the distribution business, and

8    even reflected a 28 percent gross margin and a

9    $820 million annual revenue run rate without the

11:24:47  10   benefit of any noticeable portion, or any portion

11   of the $85 million of revenue that was to come to

12   Inacom from Compac, pursuant to the

13   distribution -- sales and service agreement that

14   also had an expected 10 percent EBITDA margin

11:25:08  15   attached to it, as set forth in the January

16   Goldman board presentation.

17        Q.    Okay, back to page 21.  In the second

18   bullet point -- why don't I give you a moment to

19   read that to yourself.  Have you had a chance to

11:26:30  20   do so?

21        A.    Yes.

22        Q.    In the second sentence you say, "as a

23   result, Inacom's financial statements do not

24   provide a clear basis for projecting long-term

11:26:38  25   EBITDA margins for its service business."