**IN THE UNITED STATE DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 11 |
| INACOM CORP., et al., | ) | |
| | ) | Case No. 00-2426 (PJW) |
| Debtors. | ) | |
| ———————————————— | ) | |
| | ) | |
| INACOM CORP., on behalf of affiliated | ) | |
| Debtors, | ) | Civil Action no. 04-582-GMS |
| | ) | Adv. No. 02-3499 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| DELL COMPUTER CORPORATION, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| ———————————————— | ) | |

**REPLY OF PLAINTIFF IN SUPPORT OF ITS MOTION IN LIMINE TO**
**EXCLUDE EXPERT TESTIMONY OF JOHN LAROCCA**

Plaintiff, Debtors, InaCom Corporation and affiliates, through Executive Sounding Board

Associates, Inc., Plan Administrator ("Plaintiff") replies to Dell's opposition to its Motion *In*

*Limine* to exclude testimony by John LaRocca of Quote to Cash Solutions ("LaRocca"),

designated by Defendants Dell Computer Corporation, Dell Receivables, L.P. and Dell

Marketing, L.P. (collectively, "Dell") as an expert witness under Federal Rule of Evidence

("F.R.E.") 702.

<u>LaRocca's Experience In Credit Ended In 1997</u>

Dell exaggerates LaRocca's expertise in the credit area. In 1997, LaRocca left the credit

area at HP and moved "into [] sales and marketing". LaRocca admits this was a career change.

After leaving sales at HP in March 1998, LaRocca worked for Allied Signal as a consultant to

"facilitate review of their overlapping business activities between Allied Signal and Honeywell

and help them come to the best decisions possible to efficiently merge those two organizations".

LaRocca then consulted with Gateway Computers on its business plan to acquire LeasingX and was then hired by LeasingX to work on developing "a commercial auction platform for computer equipment leases." Thus, after switching positions at HP in 1997, LaRocca was no longer involved in the reseller credit market. (LaRocca Dep. Tr. 33:9-33:13, 80:20-80:25, 81:15-81:25, 82:16-83:17)[1].

<u>LaRocca's Opinion is Unreliable</u>

LaRocca's report also has numerous deficiencies which undermine its reliability. LaRocca admitted that he made no effort to conduct a market survey of the relevant industry. Nor did he personally select any of the companies to review that are referenced in the data submitted with his report. Rather, the companies were chosen for him by Dell and Lain Faulkner & Co., Inc. without any input by him. And, while there is data attached to LaRocca's report, he admits that he did not reply on any of that data to reach his conclusions. LaRocca stated that his opinion was based solely on his experience in credit at HP, not on any of the data attached to his report. LaRocca also adopted Thomas' ordinary course of business opinion wholesale, with no independent research, inquiry or certification. (LaRocca Dep. Tr. 126:9-129:11, 176:17-176:25, 177:23-178:11, 196:12-196:25).

Dell does not dispute that reliability requires an expert opinion "to be tied to the facts of a particular case." <u>Kumho Tire v. Carmichael</u>, 526 U.S. 137, 150 (1999). LaRocca's opinion is not tied to the facts of this case. Instead, it is, by LaRocca's own admission, based solely on his dated experience in credit at HP, experience which he supports with no data, only hearsay information from old meetings and former colleagues. It is improper for Dell to designate

---

[1] Deposition transcript excerpts from LaRocca's deposition are attached as Exhibit A.

LaRocca as an expert so he can rely on stale, anecdotal evidence that would be inadmissible hearsay if offered through a fact witness.

LaRocca's Testimony on Alleged "Held Checks" is Irrelevant.

Dell contends that LaRocca's hearsay testimony on Inacom's alleged check holding in 1997 to freeze funds temporarily in order to comply with lending covenants with IBM Credit Corp., is comparable to InaCom's holding of checks in 2000 due to severe cash flow problems; the latter resulting in Inacom's Treasurer, Richard Oshlo actually locking the checks in his office and only releasing them when funds were available. This comparison by Dell is absurd. The two situations are not only years apart, but had completely different factual predicates. LaRocca testified that the IBM situation was not due to cash flow problems, but to IBM's tough credit policies. LaRocca's testimony on this point is not only irrelevant, but inadmissible hearsay because it is based on his knowledge as a fact witness, not as an expert. (LaRocca Dep. Tr. 161:10-162:7, 162:18-162:24, 199:4-10, 201:16-24; Oshlo Dep. Tr. 217:9-217:12[2]).

For the foregoing reasons, and those stated in Plaintiff's motion, LaRocca's testimony regarding "ordinary business terms" should be excluded.

Respectfully submitted,

**BLANK ROME LLP**

Dated: September 6, 2005

Bonnie Glantz Fatell, Esquire (DE No. 3809)
Elio Battista, Jr., Esquire (DE No. 3814)
Alisa E. Moen, Esquire (DE No. 4088)
Chase Manhattan Centre
1201 Market Street, Suite 800
Wilmington, DE 19801
Tel:     (302) 425-6400

---

[2] Deposition transcript excerpts from Oshlo's deposition are attached as Exhibit B.

Fax:    (302) 425-6464

- and -

Earl M. Forte, Esquire
Regina Stango Kelbon, Esquire
One Logan Square
Philadelphia, PA 19103
Tel:    (215) 569-5500
Fax:    (215) 569-5555

Attorneys for Plaintiff Executive Sounding Board
Associates, Inc., as Plan Administrator for Debtors

119096.01600/40156358v.1

**EXHIBIT A**

```
 1              UNITED STATES DISTRICT COURT
                  DISTRICT OF DELAWARE
 2
      ------------------------------
 3    In re:                        ) Chapter 11
                                    )
 4    INACOM CORP., et al.,         ) Case No. 00-2426 (PJW)
                                    )
 5          Debtors.               ) Jointly Administered
                                    )
 6    ------------------------------)
                                    )
 7    INACOM CORP.,                 )
                                    ) Civil Action No.
 8    On behalf of all affiliated   )    04-582 (GMS)
      Debtors,                      )
 9          Plaintiffs,             )
                                    )
10       V.                         ) Adv. Pro. No.
                                    )    02-03499 (PJW)
11    DELL COMPUTER CORPORATION,    )
      Et al.,                       )
12          Defendants.            )
      ------------------------------)
13

14    ********************************************************

15                   ORAL DEPOSITION OF

16                    JOHN LaROCCA

17                    JULY 14, 2005

18    ********************************************************

19

20       ORAL DEPOSITION of JOHN LaROCCA, produced as a
      witness at the instance of the Plaintiffs, and duly
21    sworn, was taken in the above-styled and numbered cause
      on the 14th day of July, 2005, from 9:35 a.m. to 5:09
22    p.m., before David Bateman, RPR, CSR in and for the
      State of Texas, reported by machine shorthand, at the
23    offices of Hughes & Luce, LLP, 111 Congress Avenue,
      Suite 900, Austin, Texas 78701, pursuant to the Federal
24    Rules of Civil Procedure and the provisions stated on
      the record or attached hereto.
25
```

DISK
ENCLOSED

1                A P P E A R A N C E S

2

3    FOR THE PLAINTIFFS:

4         MR. EARL M. FORTE
          Blank Rome, LLP
5         One Logan Square
          18th & Cherry Streets
6         Philadelphia, Pennsylvania 19103-6998
          (215) 569-5618

7

8

9    FOR THE DEFENDANT DELL COMPUTER CORPORATION:

10        MS. SABRINA STREUSAND
          Hughes & Luce, LLP
11        111 Congress Avenue, Suite 900
          Austin, Texas 78701
          (512) 482-6842

12

13

14   ALSO PRESENT:

15        MR. STUART GOLLIN (Via Telephone)
             Weiser, LLP

16

17

18

19

20

21

22

23

24

25

1   calendar year?

2       A     Yes.   That was -- that program lasted less

3   than one month in duration.

4       Q     Now you also did some training in team

5   development with Bentonville Associates.

6       A     That's correct.

7       Q     What was that?

8       A     Bentonville Associates is on the location of

9   the Wal-Mart Company.   In 1997, I switched career

10  positions in HP and moved from credit back into a sales

11  and marketing responsibility for the global

12  responsibility for the Pinacor account for

13  Hewlett-Packard.

14              Bentonville Associates facilitated

15  training on how to manage global accounts, building

16  effective relationships at executive levels.  And that

17  was an on-site program in Fayetteville, Arkansas.   It

18  was one week in duration.

19      Q     And what year was that?  You said '97?

20      A     19 -- that was 1997.

21      Q     All right.  Have you described to me all of

22  your formal training as a professional aside from job

23  experience?

24      A     At Hewlett-Packard, in order to maintain

25  yourself from a current standpoint in business

1  you've just described, did you begin working again?

2      A    I was recruited by Allied Signal.  I think the

3  words of their treasurer were "you're too young to be

4  retired."  I wasn't retired.  I needed a job.

5           Allied Signal was merging with Honeywell

6  and they had overlapping treasury operations, credit

7  and collections operations.  I was recruited with one

8  other person, another consultant, to help them

9  efficientize their treasury services and credit

10  collections on a global basis.

11      Q    How long were you paid by De Lage Landen after

12  you left?

13      A    Well, I was paid immediately at my choice for

14  the next three years.

15      Q    So until about 2002?

16      A    Yes.

17      Q    Were you hired as an employee of Allied

18  Signal?

19      A    No, consultant.

20      Q    Consultant?  And what was the purpose of your

21  consulting?

22      A    It was to facilitate review of their

23  overlapping business activities between Allied Signal

24  and Honeywell and help them come to the best decisions

25  possible to efficiently merge those two organizations.

1          The objective was to save 10 million

2    dollars over a 24-month period.  I was only engaged for

3    90 to 120 days.  They exceeded that 10 million dollars

4    anticipated savings.

5        Q    Okay.  So you were in that consulting position

6    with Allied Signal for 90 to 120 days?

7        A    Yes, sir.

8        Q    That was in?

9        A    October through January -- October of '99

10   through January -- no, excuse me.  I said '99.  Yeah.

11   Just getting my dates right.

12            MS. STREUSAND:  I think you can

13   approximate.

14       A    Yeah.  October '99 through January 2000.

15       Q    (BY MR. FORTE) And what did you do after you

16   finished the consulting work with Allied Signal and

17   Honeywell?

18       A    As I was wrapping that up, I received a call

19   from Gateway Computers.  And they had been a company

20   that sold specifically to consumers and now were

21   getting into the commercial reseller channel

22   distribution business and didn't know how to do it.

23            Instead of extending two and $10,000

24   credit facilities, they were now being asked to extend

25   five million and $10 million credit facilities.  And

1    there was disconnects between their selling

2    organization and their credit organization had no

3    experience.

4            I was contracted to go do an on-site

5    review of their -- at their headquarters in South

6    Dakota of their current business practices and make

7    recommendations and which resulted in creating a

8    commercial credit policy for Gateway Computers.

9            And that was done from December of '99, I

10   was engaged, until it was completed at the end of March

11   of 2000.

12       Q    All right.  Did you go from the Gateway

13   consulting job to LeasingX?

14       A    I did.

15       Q    What did you do at LeasingX?

16       A    I was again consulted in April of 2000 by

17   Gateway Computer.  They were involved in evaluating a

18   start-up company by the name of LeasingX and looking to

19   put a financial investment in LeasingX.

20           LeasingX was purported -- it was started

21   in fall of 1990 -- fall of 1999.  And their ambition

22   was to create a commercial auction platform for

23   computer equipment leases.

24           Before Gateway would invest in it, they

25   asked me to go to New York and evaluate the business

1    plan of the principals and talk to the principals and

2    give them my opinion.   I did that and I met with them

3    in April.

4              In fact, I met with them at 30th Street

5    Station, Philadelphia in my initial meeting.   And

6    through April and early May, I gave Gateway a written

7    report on my opinion.

8              At the end of May, Gateway came back,

9    along with the people at LeasingX, and said, "We'd like

10   to offer you the position of vice-president of

11   operations for LeasingX," which I accepted.

12             And on or about the 1st of July, they

13   offered me the president position for LeasingX, which I

14   accepted.   And I stayed in that capacity through

15   January 1st of 2001.

16        Q    Why did you leave LeasingX?

17        A    They ran out of money.   They ran out of it

18   before I left, but the impact of the devastation that

19   took place on 9/11 stopped -- as I talked to a VP of

20   sales for Hewlett-Packard in November, he said, "John,

21   if we didn't have orders to replenish data centers that

22   were destroyed in New York City, we would have

23   absolutely no orders for computer systems as I'm

24   talking to you today.   Nobody's buying anything."

25             And the order flow went away.   And it was

1  in the way that it tells you the number of invoices

2  that were paid and the days to payment column proceeds

3  it to the left.

4      Q    And how does --

5      A    The total invoices relates to the number of --

6  the total dollar value of those number of invoices

7  consistent with those number of payments, the days to

8  payment.

9      Q    All right.  Now near the bottom of the page on

10 tab six, there are some black lines.  Do you see them?

11     A    I do.

12     Q    Heavy black lines, do you know what those

13 represent?

14     A    I believe I do.  I believe that begins to show

15 the summary that is on page two, the summary in the

16 form of a number of invoices it represents that -- of

17 the invoices reviewed in this analysis, 93.4 percent of

18 them, or 18,284 of them, were between 27 days and 71

19 days.

20     Q    All right.  Did you assist Mr. Thomas at all

21 in reaching his 21 -- excuse me -- 27-to-71-day payment

22 range?

23     A    I did not.

24     Q    How did you use Mr. Thomas's conclusions in

25 six and seven with respect to your opinion?

1    A    I think that this is evidence of my opinion.

2    Q    All right.

3    A    It supports my opinion.

4    Q    And how does it support your opinion?

5    A    That what he's projecting is the overwhelming

6  majority, almost 19 out of every 20 transactions, and

7  more than 19 out of every 20 dollars were paid within

8  the 27 days or 71 days from the date of invoice.

9    Q    Do you know how Mr. Thomas went about

10  selecting his 27-to-71-day payment range?

11    A    No.

12    Q    Did you question him about it?

13    A    No.  It became self-apparent.  I mean, we

14  never had a discussion about it.  But it seemed like a

15  logical representation of information.

16    Q    What seemed logical?

17    A    That he projected, based on his review, that

18  19 out of 20 dollars and almost 19 out of every 20

19  transactions were paid in 27 to 71 days.

20    Q    Did you do anything to verify whether Mr.

21  Thomas's conclusion was accurate?

22    A    I perused some of the preceding information,

23  but I did not do an analytical analysis to validate

24  that because I wasn't asked to do that.

25    Q    Okay.  When you say perused, do you mean you

1  viewed?

2      A      I reviewed tab four.

3      Q      All right.

4      A      And I reviewed tab five.

5      Q      Did you read everything in tab four or did you

6  just review it?

7      A      I went through -- I went through every page of

8  tab four, but I -- I didn't do statistical composition.

9      Q      You didn't test the data?

10     A      No.

11     Q      You assumed it was accurate?

12     A      Yes.

13     Q      All right.  Please turn to tab eight in Mr.

14 Thomas's report.  Okay.  Are these the XY charts

15 referred to in paragraph six of your report?

16     A      Yes.

17     Q      All right.  And there's two of them, correct?

18     A      Yes, there are.

19     Q      Do you know the general difference between the

20 two?

21     A      I believe one is two years of historical

22 information in advance and the other is the historical

23 information from the preference period.

24     Q      Do you know what each diamond represents?  I'm

25 sorry, John.  Did you hear my question?

1    A    I did.  I'm just looking at the diamonds.

2         MS. STREUSAND:  He wants to get a better

3   look at the charts.  We're just trying to get them out

4   of the notebook so he can see them better.

5    A    It represents validation of what we just

6   looked at in the preceding tabs.  It's a pictorial

7   representation of when payments were made and, when

8   they were made, the days between the invoice date and

9   the date of payment.

10    Q    (BY MR. FORTE) Okay.  Well, can you give me a

11  specific example of how you can look at this XY chart

12  and determine the days to payment with respect to a

13  specific transfer?

14    A    I reviewed this.  I drew my conclusions from

15  the preceding documents we talked about, which were

16  21 -- 27 days to 71.

17    Q    Right.

18    A    This is a -- this is a picture of information.

19    Q    Well, do you --

20    A    This was -- go ahead.

21    Q    Go ahead.

22    A    This in itself supports the preceding reports

23  we reviewed.

24    Q    Okay.  How does it do that?

25    A    It graphically depicts data points taken from

1    the preceding reports we were looking at that show when

2    payments were made and how old they were when they were

3    made --

4        Q    Well --

5        A    -- from the date of invoice.

6        Q    When you say data point, do you mean the black

7    diamonds?

8        A    Yes.

9        Q    Okay.  So you're saying an individual black

10   diamond represents when payments were made in relation

11   to an invoice?

12       A    I anticipate that they represent elements that

13   are identical to what's on the information reports that

14   we precedently reviewed.

15       Q    Okay.  You're assuming --

16       A    I didn't validate that.

17       Q    You're assuming that?

18       A    Yes.

19       Q    All right.

20       A    It's an illustration.  Well, it's not an

21   illustration.  It's a representation.  And it -- if the

22   data points were entered correctly off of those

23   reports, then they would be reflected appropriately

24   here.

25            If there was some typographical data

```
 1      A     Accounts payable would process the invoice for

 2   payment.  The controllership would issue the -- issue

 3   the payment.  And I don't know if it needed multiple

 4   signatures depending on the size.

 5              But when they were being held, it was

 6   represented by Leon to Lorn that he never held them,

 7   they were always held in the treasurer's office.  And

 8   upon confrontation, that was always found they -- that

 9   that's where they were being held.

10      Q     Now when you say "confrontation," what do you

11   mean?

12      A     Well, when -- when Lorn Morris would call Leon

13   and say where's my payment, he said John -- Lorn, I cut

14   the payment.  If it's -- if you don't have it, it's

15   because it's being held at the treasurer's level.

16              Lorn would contact the treasurer.  The

17   treasurer would validate -- he never said I -- I sent

18   it.  He'd just -- when he hadn't, he'd say I have it

19   and I can't release it yet or I don't want to release

20   it yet.

21      Q     Okay.  So these -- these contacts you

22   described between HP and --

23      A     InaCom.

24      Q     -- InaCom regarding this holding of checks by

25   Gary Goldberg were principally between Lorn Morris and
```

1   InaCom?

2       A     Yes.  And then he would escalate it to me.

3   When Gary Goldberg would say, "Lorn, I can't mail the

4   check," then Lorn would come to me.  And I would call

5   Dave Guenthner or we arranged to meet more frequently

6   that year than otherwise planned.

7                   Normally, in inclement weather in the

8   winter, he would come to Cupertino.  And in the milder

9   weather, I would go to Omaha.

10      Q     Would the checks usually be released when you

11  asked for them to be released?

12      A     Yes.  Sometimes that was not the case, but

13  usually it was.  They had reasons why they couldn't

14  release them.

15      Q     Well, I was going to get to that.  It states

16  in your report Dave Guenthner would always explain

17  these checks had been held as they, InaCom, were up

18  against their lending covenants of their IBM Credit

19  Corp. line of credit, unquote.

20                  Was that the reason you were told that

21  checks were being held by Gary Goldberg?

22      A     Consistently and always, that was the reason.

23      Q     Were you ever told that checks were being held

24  by Gary Goldberg because InaCom was having cash flow or

25  liquidity problems?

1    A    No.  And I would have known that because of my

2    review of their financial statements, their cash flow

3    statements.  And when we would have these situations,

4    we would then ask them to submit weekly, for a period

5    of time until the behavior went away, cash flow sources

6    and uses, how much income is coming in and how do you

7    deploy it, who are you paying.

8              And they would always comply.

9    Q    Now you state here, quote, from my experience,

10   InaCom was not the only distribution customer that

11   would at times cut checks but then hold them for a

12   period of time before releasing them, unquote.

13             Can you give me some examples?

14   A    Merisel in Los Angeles; Comp USA in Texas;

15   Intelligent Electronics in Chantilly, Virginia and

16   Exton, Pennsylvania; CoMark in Chicago; Ingram on less

17   occasions, but occasionally, Ingram Micro.

18   Q    Uh-huh.

19   A    Tech Data in St. Petersburg.  It was not an

20   uncommon behavior.  And -- and usually the reason had

21   more to do with meeting lending covenants of their

22   lender, who was usually the IBM Credit Corporation.

23   They were the most aggressive lender in those years to

24   this channel.

25   Q    What do you mean by that?

1    Q    Jacom, J-A-C-O-M, LASON, L-A-S-O-N and that's

2  all, correct?

3    A    Yes.

4    Q    Okay.  Now could you turn to the first page of

5  the Jacom data in the back of your report?  It says

6  unpaid invoices as of filing date at the top.

7    A    I have it.

8    Q    What does this information show?

9    A    Invoices due to Dell from Jacom at the date of

10  the filing for reorganization that were unpaid, I

11  anticipate.  I didn't go back and prove this.  I'm just

12  reading what you're reading.

13    Q    Okay.  Now the data on this document doesn't

14  give you any indication of what ordinary business terms

15  were, does it?

16    A    No.

17    Q    All right.  And it doesn't give you any

18  indication of what ordinary course payments were, does

19  it?  It's just a list of invoices, dates and amount.

20  Correct?

21    A    Yeah.  It's -- it's data.  It's not

22  information.

23    Q    Okay.  So you wouldn't have been able to use

24  this to reach your conclusion?

25    A    I didn't.

1    Q    Okay.  Well, why is it in here?

2    A    Because it was supplied to me and that's the

3    only reason it's in there.

4    Q    Okay.  Now following this, I have a letter

5    from Rick Cass at Lain Faulkner to you enclosing

6    some -- I think three CDs, it states.

7    A    Uh-huh.

8    Q    What was in those three CDs?

9    A    That was the MicroAge/Pinacor invoices and

10   payment information.  I think that's tab number four,

11   if I'm not mistaken, from Exhibit 2.

12   Q    Mr. Thomas's report?

13   A    Yes.

14   Q    Okay.  I believe it's tabs four and five,

15   which would be the --

16   A    You're right.  It is four and five.

17   Q    Okay.  So those two things, the

18   MicroAge/Pinacor data --

19   A    Uh-huh.

20   Q    -- and the information that's in tab four and

21   five of Mr. Thomas's report related to InaCom?

22   A    Uh-huh.

23   Q    Could you turn to the next page.  I have a

24   document, LASON versus Dell unpaid invoices as of

25   filing date.  Again, this doesn't give any indication

1  of ordinary business terms or ordinary course of

2  business, does it?

3      A    No.

4      Q    It's just a list of invoice numbers, dates and

5  amounts?

6      A    It is.

7      Q    And you wouldn't have used this in your

8  opinion?

9      A    I perused this, as I perused the preceding

10  document.  But my opinion is highly based on my

11  experience, not on this document.

12      Q    All right.  Now the next page of data states

13  Jacom Computer Services, Inc. versus Dell invoice paid

14  analysis.

15          Could you explain to me what this

16  document is?

17      A    It shows the one-year period prior to the

18  preference period in that bankruptcy.  It shows the

19  preference period in that bankruptcy.

20          It shows the historical number of

21  invoices in each of the aging buckets, what percentage

22  of the total invoices they represent, what the

23  corresponding total of invoice dollars by aging bucket

24  that are represented, and what the total number of

25  invoice dollars, as a percentage of the whole, each

1           THE WITNESS:  -- pit stop?

2           MR. FORTE:  Please.  Absolutely.

3           (Recess from 3:03 p.m. to 3:24 p.m.)

4       Q    (BY MR. FORTE) Now other than InaCom, Mr.

5    LaRocca, you reviewed data with respect to Dell's

6    payment histories with MicroAge, Jacom, LASON.  And I

7    think that's it, correct?

8       A    Yes.

9       Q    All right.  Did you make any effort to review

10   data with respect to additional companies?

11      A    No.

12      Q    Okay.  Did you make any effort to conduct a

13   market survey?

14      A    No.

15      Q    All right.

16      A    Notwithstanding my phone calls to the two

17   people we discussed previously.

18      Q    Understood.  Why did you select MicroAge,

19   Jacom, and LASON?

20      A    I didn't.

21      Q    They were just given to you?

22      A    Yes.

23      Q    Okay.  Did you ask for more examples?

24      A    No.

25      Q    All right.

1  experience with InaCom.  When that evidenced by my

2  report, that's when it was suggested that I could also

3  be a fact witness.  It was bad marketing on my part.

4      Q    Well, could you look at paragraph six and

5  seven of your report, please?

6      A    Sure.

7      Q    Is any of the information in paragraph six

8  based on your knowledge as a fact witness as opposed to

9  an expert?

10      A    Yes.

11      Q    Okay.  What would that be?

12      A    The reports by Mr. Thomas -- not the report,

13  the information, the data that he provided that

14  demonstrated the 95 percent plus or minus invoices and

15  dollars paid in the 27-to-71-day window after the date

16  of invoice.

17      Q    That's information you know as a fact witness?

18      A    I do -- I do -- I -- I know information as a

19  fact witness.  And then I took that information in

20  processing it and said this supports what I know the

21  industry to be.

22      Q    Okay.  So --

23      A    I -- I would have an opinion independent of

24  any of this as a fact witness.  But this -- that --

25  that specific information, I think, is valuable

1  dealings with them when you used to work with them

2  would be --

3      A    And ongoing.

4      Q    And ongoing would be based as -- on your

5  knowledge as a fact witness; is that right?

6              MS. STREUSAND:  I object to the form of

7  the question.

8      A    I think my conversations with both of those

9  gentlemen is supportive of my expert report.

10             MR. FORTE:  I understand.

11     A    And I think that it also supports my knowledge

12  base that I've developed over a period of time as a

13  fact witness because my familiarity with Compaq from

14  years ago, in part, is due to my relationship with Dave

15  Kaminski.

16     Q    (BY MR. FORTE) Well, in paragraph seven, which

17  is the longest paragraph in your report, you talk a lot

18  about your meetings with David Guenthner and others at

19  InaCom.  And we went over that today.

20             You talked about Gary Goldberg and the

21  check holding issue, the IBM situation.  That's factual

22  information that you gathered at the time you worked

23  for Hewlett-Packard, correct?

24     A    Yes.

25     Q    All right.  And is it fair to say that the

**EXHIBIT B**

1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE


In re
INACOM CORP., et al.      Bankruptcy Case No. 00-2426 PJW

---

| | |
|---|---|
| INACOM CORP., on behalf of all affiliated Debtors, | : |
| | : Civil Action No. 04-148 GMS |
| | : (Original filed in this Action) |
| Plaintiff, | : Adversary Case No. 02-03496 PJW |
| v. | : |
| | : |
| TECH DATA CORP., | : |
| | : |
| Defendant. | : |

COPY

---

| | |
|---|---|
| INACOM CORP., on behalf of all affiliated Debtors, | : |
| | : |
| Plaintiff, | : Civil Action No. 04-582 GMS |
| | : |
| v. | : Adversary Case No. 02-03499 PJW |
| | : |
| DELL COMPUTER CORPORATION, | : |
| | : |
| Defendant. | : |

---

| | |
|---|---|
| INACOM CORP., on behalf of all affiliated Debtors, | : |
| | : |
| Plaintiff, | : Civil Action No. 04-583 GMS |
| | : |
| v. | : Adversary Case No. 02-03500 PJW |
| | : |
| LEXMARK INTERNATIONAL, INC., | : |
| | : |
| Defendant. | : |

---

DEPOSITION OF RICHARD CHARLES OSHLO, JR.,
March 20, 2005


KATHRYN POWERS- CERTIFIED SHORTHAND REPORTER

2

```
                              :
INACOM CORP., on behalf of    :
all affiliated Debtors,       :
                              :
              Plaintiff,      :  Civil Action No. 04-584 GMS
                              :
         v.                   :  Adversary Case No. 02-03501 PJW
                              :
RESILIEN, INC., et al.,       :
                              :
              Defendant.      :
_____:
                              :
INACOM CORP., on behalf of    :
all affiliated Debtors,       :
                              :
              Plaintiff,      :  Civil Action No. 04-593-GMS
                              :
         v.                   :  Adversary Case No. 02-03960 PJW
                              :
INGRAM ENTERTAINMENT, INC.,   :
Successor in interest to      :
NASHVILLE COMPUTER            :
LIQUIDATORS,                  :
                              :
              Defendant.      :
_____:
                              :
INACOM CORP., on behalf of    :
all affiliated Debtors,       :
                              :  Civil Action No. 04-601 GMS
                              :
              Plaintiff,      :  Adversary Case No. 02-04441 PJW
                              :
         v.                   :
                              :
SIGMA DATA, INC,              :
                              :
              Defendant.      :
_____:
```

## DEPOSITION OF RICHARD CHARLES OSHLO, JR.,

taken by the Defendants before Kathryn Powers, Certified
Shorthand Reporter of the State of Iowa, at the Renaissance
Savery Hotel, Room 210, Des Moines, Iowa, commencing at
9:45 a.m., Sunday, March 20, 2005.

```
 1   APPEARANCES:

 2   For InaCom Corp.:            JEFFREY P. NOLAN, ESQ.
                                  Pachulski, Stang, Ziehl,
 3                                 Young, Jones & Weintraub, P.C.
                                  10100 Santa Monica Blvd.
 4                                Eleventh Floor
                                  Los Angeles, California 90067-4100
 5
     For Executive Sounding       EARL M. FORTE, ESQ.
 6   Board Associates, Inc.,      Blank & Rome, LLP
     Liquidating Agent of         One Logan Square
 7   InaCom Corp.:                18th and Cherry Streets
                                  Philadelphia, Pennsylvania 19103-6998
 8
     For Defendant Dell:          SABRINA L. STREUSAND, ESQ.
 9                                G. JAMES LANDON, ESQ.
                                  Hughes & Luce, LLP
10                                111 Congress Avenue, Suite 900
                                  Austin, Texas  78701
11
     For Defendant Tech          STEPHEN C. HUNT, ESQ.
12   Data:                        Adorno & Yoss
     (by telephone)               350 East Las Olas Blvd.
13                                Seventh Floor
                                  Fort Lauderdale, Florida  23301
14
     For Defendant Lexmark:       CULVER V. HALLIDAY, ESQ.
15                                Stoll, Keenon & Park, LLP
                                  2650 Aegon Center
16                                400 West Market St.
                                  Louisville, Kentucky 40202-3377
17
     For Defendant Ingram:        JONATHAN P. HERSEY, ESQ.
18   (by telephone)               Bingham McCutchen, LLP
                                  600 Anton Road, 18th Floor
19                                Costa Mesa, California  92626

20   For Third-Party              GAIL S. GREENWOOD, ESQ.
     Defendant Hewlett            Friedman, Dumas & Springwater, LLP
21   Packard, Successor in        One Maritime Plaza
     Interest to Compaq           Suite 2475
22   Computer:                    San Francisco, California  94111

23

     Also Present:               Jason Fensterstock
24   (by telephone)               Duff & Phelps

25
```

1    initial facility we had with them.  They had floor

2    planning and a bank credit document combined.

3    BY MR. NOLAN:

4        Q.    Okay.  There's a reference here, it says,

5    "Checks Held, 31,271,000.  Do you see that?

6        A.    Yes.

7        Q.    Is that your handwriting?

8        A.    No.

9        Q.    In 1999 were you ever holding $31,227,000

10    of held checks in the treasury department at

11    InaCom that were due to or payable to IBM?

12        A.    No.

13            MR. HALLIDAY:  I'm sorry, Jeff.  Your

14    question was limited to just the treasury

15    department?

16            MR. NOLAN:  Yes.

17        Q.    Did you ever become aware in 1999 that

18    the accounts payable department was holding $31

19    million in checks that were owed payable to IBM?

20        A.    Not that I recall.

21            MS. STREUSAND:  Jeff, can we take a quick

22    break?

23            MR. NOLAN:  Sure.

24            (Recess.)

25            MR. NOLAN:  Back on the record.

## CERTIFICATE OF SERVICE

I, Alisa E. Moen, hereby certify that on this 6th day of September 2005 I caused a copy of

the **Reply of Plaintiff in Support Of Its Motion In Limine To Exclude Expert Testimony Of**

**John LaRocca** to be served upon the following counsel in the manner indicated:


**VIA US MAIL AND FACSIMILE**

Sabrina L. Streusand, Esquire
G. James Landon, Esquire
Hughes & Luce, L.L.C.
111 Congress Avenue, Suite 900
Austin, TX 78701

**VIA HAND DELIVERY**

Patricia P. McGonigle, Esquire
Seitz, Van Ogtrop & Green, P.A.
222 Delaware Avenue, Suite 1520
P.O. Box 68
Wilmington, DE 19899

Laura Davis Jones, Esquire
Pachulski Stang Ziehl Young Jones & Weintraub, P.C.
919 North Market Street
Suite 1600
Wilmington, DE 19899



Alisa E. Moen (DE ID No. 4088)

119096.01600/40156358v.1

## Briefs, Responses and Replies

1:04-cv-00582-GMS Inacom Corporation v. Dell Computer Corp., et al

### U.S. District Court

### District of Delaware

Notice of Electronic Filing

The following transaction was received from Moen, Alisa entered on 9/6/2005 at 3:28 PM EDT and filed on 9/6/2005

**Case Name:**        Inacom Corporation v. Dell Computer Corp., et al
**Case Number:**      1:04-cv-582
**Filer:**            Inacom Corporation
**Document Number:** 80

**Docket Text:**
REPLY to Response to Motion re [63] MOTION in Limine *to Exclude Expert Testimony of John Larocca* filed by Inacom Corporation. (Moen, Alisa)

The following document(s) are associated with this transaction:

**Document description:**Main Document
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1079733196 [Date=9/6/2005] [FileNumber=94650-0] [
a047d101ddd3884c82665df6d76238fb5b7e03a9c091ec30ef166af738583ed57c145e
3b512bbae7711b6e0b8093c847a8885879934949626ed5f736a10ff32e]]

**1:04-cv-582 Notice will be electronically mailed to:**

Elio Battista , Jr    battista@blankrome.com

Kevin A. Guerke    kguerke@svglaw.com,

Laura Davis Jones    ljones@pszyjw.com

Patricia Pyles McGonigle    pmcgonigle@svglaw.com,

Alisa E. Moen    moen@blankrome.com

**1:04-cv-582 Notice will be delivered by other means to:**